Anthony J. Staltari (Attorney ID No. 233022017)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel.: (415) 875-6600
anthonystaltari@quinnemanuel.com

Robert A. Zink (*pro hac vice*)
Avi Perry (*pro hac vice*)
Kurt Wolfe (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
1300 I Street, NW, Suite 900
Washington, D.C. 20005
Tel.: (202) 538-8000
robertzink@quinnemanuel.com
aviperry@quinnemanuel.com
kurtwolfe@quinnemanuel.com

Dakota Speas (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Tel.: (213) 443-3000
dakotaspeas@quinnemanuel.com

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Commodity Futures Trading Commission, | |
| *Plaintiff*, | |
| v. | Civil Action No.: 3:23-cv-11808 |
| Traders Global Group Inc., a New Jersey corporation, d/b/a "My Forex Funds"; Traders Global Group Inc., a Canadian business organization; and Murtuza Kazmi, | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SANCTIONS** |
| *Defendants*. | |

# **TABLE OF CONTENTS**

I.     PROCEDURAL HISTORY AND FACTUAL BACKGROUND ......................................... 5

   A.     The SRO .......................................................................................................... 5

   B.     The CFTC Knowingly Offered and Failed to Correct False Statements to the Court ..... 6

     1.     The Edelstein Declaration ......................................................................... 6

     2.     Additional Misstatements ......................................................................... 11

   C.     The CFTC Intentionally Sought Privileged Information from Mr. Kazmi ................... 12

II.    LEGAL STANDARDS ................................................................................................. 13

   A.     Rule 11 ........................................................................................................... 13

   B.     Rule 30 ........................................................................................................... 15

   C.     Inherent Authority ......................................................................................... 15

   D.     Rules of Professional Conduct ....................................................................... 16

III.   ARGUMENT ................................................................................................................ 18

   A.     The CFTC Violated its Duty of Candor by Knowingly Offering False Statements to the Court .......................................................................................................... 18

   B.     The CFTC Violated Rules of Professional Conduct by Seeking Privileged Information from Mr. Kazmi ............................................................................. 21

IV.    CONCLUSION ............................................................................................................. 22

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Cases</u>

*In re 38-36 Greenville Ave L.L.C.*,
  No. 16-15598 (SLM), 2020 WL 1680724 (Bankr. D.N.J. Apr. 6, 2020), *aff'd sub nom. 38-36 Greenville LLC v. Forman*, No. CV 20-3563, 2021 WL 8087151 (D.N.J. June 9, 2021), *aff'd sub nom. In re 38-36 Greenville Ave LLC*, No. 21-2164, 2022 WL 1153123 (3d Cir. Apr. 19, 2022) ............................................16

*Balthazar v. Atl. City Med. Ctr.*,
  137 F. App'x 482 (3d Cir. 2005) ............................................14

*Balthazar v. Atl. City Med. Ctr.*,
  279 F. Supp. 2d 574 (D.N.J. 2003), *aff'd*, 137 F. App'x 482 (3d Cir. 2005) ........................16

*Boulder Falcon, LLC v. Brown*,
  No. 222CV00042JNPJCB, 2023 WL 2662187 (D. Utah Mar. 28, 2023) ............................15

*In re Cendant Corp. Derivative Action Litig.*,
  96 F. Supp. 2d 403 (D.N.J. 2000) ............................................15

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991) ............................................15

*Cohen v. Kurtzman*,
  45 F. Supp. 2d 423 (D.N.J. 1999) ............................................14

*In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig.*,
  381 F. Supp. 2d 421 (E.D. Pa. 2005) ............................................15

*Ellis v. Beemiller, Inc.*,
  287 F.R.D. 326 (W.D. Pa. 2012) ............................................14

*Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc.*,
  57 F.3d 1215 (3d Cir. 1995) ............................................16

*Ford Motor Co. v. Summit Motor Prod., Inc.*,
  930 F.2d 277 (3d Cir. 1991) ............................................15

*Gaiardo v. Ethyl Corp.*,
  835 F.2d 479 (3d Cir. 1987) ............................................14

*Goodyear Tire & Rubber Co. v. Haeger*,
  581 U.S. 101 (2017) ............................................16

*Gov't Emps. Ins. Co. v. Nealey*,
    262 F. Supp. 3d 153 (E.D. Pa. 2017) ...................................................16

*Green v. Cosco Shipping Lines Co.*,
    No. CV420-091, 2021 WL 5985123 (S.D. Ga. Dec. 16, 2021)..............15

*Loatman v. Summit Bank*,
    174 F.R.D. 592 (D.N.J. 1997)...............................................................16

*Nanavanti v. Cape Reg'l Med. Ctr.*,
    No. CIV. 12-3469 RMB/KMW, 2013 WL 4787221 (D.N.J. Sept. 6, 2013) ..........................14

*Republic of Philippines v. Westinghouse Elec. Corp.*,
    43 F.3d 65 (3d Cir. 1994)......................................................................16

*SEC v. Digital Licensing Inc. dba DEBT Box*
    No. 2:23-cv-00482 (D. Utah) ...................................................1, 2, 6, 22

*Scranton Prod., Inc. v. Bobrick Washroom Equip., Inc.*,
    190 F. Supp. 3d 419 (M.D. Pa. 2016) ....................................................16

*Young v. Smith*,
    269 F. Supp. 3d 251 (M.D. Pa. 2017), *aff'd*, 905 F.3d 229 (3d Cir. 2018) ..........................14

## Rules

D.C. Rules of Prof'l Conduct R. 8.4(c) ..........................................................18

Fed. R. Civ. P. 11 .....................................................2, 4, 13, 14, 15, 20

Fed. R. Civ. P. 11(b) ..................................................................................1

Fed. R. Civ. P. 11(b)(3)...........................................................................14

Fed. R. Civ. P. 11(c) ..................................................................................3

Fed. R. Civ. P. 30 .................................................................4, 15, 21

Fed. R. Civ. P. 30(d)(2).........................................................................15

Ill. Rules of Prof'l Conduct R. 3.3 .........................................................17

N.J. Rules of Prof'l Conduct R. 3.3 ...............................................17, 20

N.J. Rules of Prof'l Conduct R. 3.3(a)(1) .............................................17

N.J. Rules of Prof'l Conduct R. 3.3(a)(4) .............................................17

N.J. Rules of Prof'l Conduct R. 3.3(a)(5) .......................................................................17

N.J. Rules of Prof'l Conduct R. 4.4 ...............................................................................17

N.J. Rules of Prof'l Conduct R. 4.4(a) ...........................................................................17

N.J. Rules of Prof'l Conduct R. 4.4(b) ...........................................................................17

## Other Authorities

Commodity Futures Trading Commission Division of Enforcement, Enforcement
  Manual (May 20, 2020) available at
  https://www.cftc.gov/sites/default/files/2021-05/EnforcementManual.pdf.............................21

D.C. Bar Ethics Opinion No. 256 (May 1995) ..............................................................18

Fed. R. Civ. P. 11 advisory committee's notes to 1993 amendment ...............................14

Model Rules of Prof'l Conduct R. 3.3 cmt. 5 (Am. Bar Ass'n 1983) ...........................17

Model Rules of Prof'l Conduct R. 4.4 cmt. 1 (Am. Bar Ass'n 1983) ...........................17

In two cases filed last summer, federal enforcement agencies abused their authority and made false statements to district judges to obtain *ex parte* restraining orders, freeze defendants' assets, and impose receiverships. The first case was a Securities and Exchange Commission ("SEC") enforcement action, *SEC v. Digital Licensing Inc. dba DEBT Box*, No. 2:23-cv-00482 (D. Utah) ("*DEBT Box*"). There, in support of its *ex parte* application for a temporary restraining order ("TRO"), the SEC claimed that the defendants were "attempting to relocate assets and investor funds overseas." Order to Show Cause, *DEBT Box* (D. Utah Nov. 30, 2023), ECF 215 at 3.[1] After granting the TRO, the court became "concerned the Commission made materially false and misleading representations that violated Rule 11(b) and undermined the integrity of the proceedings." *Id.* at 17. The court ordered the SEC to show cause why sanctions should not be imposed for the SEC's false representations:

> **The context is crucial—the representations were made by a federal agency seeking an *ex parte* TRO and while later seeking to preserve the TRO**.

> TROs are extraordinary relief, and the TRO obtained here was no exception. Among other things, it froze "all monies and assets . . . in all accounts" held by Defendants . . . . It was also the basis of the Temporary Receivership Order, which gave the Receiver "full power over all funds, assets, collateral, premises . . . choses in action, books, records, papers and other property belonging to" DEBT Box, its affiliates, and its subsidiaries. **Given the extraordinary power conferred by the TRO, the court is mindful of how it was obtained.**

*Id.* (emphasis added).

In response to the order to show cause, the SEC on its own assigned a new trial attorney to lead the litigation team, designated senior attorneys from another regional office to supervise the matter going forward, and committed to conduct mandatory agency-wide training for staff about the duty of accuracy and candor and the duty to correct any inaccuracies as soon as they come to

---

[1]   Unless otherwise indicated, this brief omits from quotations and citations all internal quotation marks, alterations, footnotes, and citations.

light. *See* SEC's Response to the Court's Nov. 30, 2023 Order to Show Cause, *DEBT Box* (D. Utah Dec. 21, 2023), ECF 233 at 1. The SEC acknowledged its shortcomings:

> The Commission must exercise its enforcement authority carefully and be vigilant in fulfilling its duty to be accurate and candid in its representations to the Court. The Commission cannot let its zeal to stop ongoing fraud interfere with its duty to be accurate and candid.
>
> The Commission and its attorneys fell short of that expectation here. Commission counsel made a representation during the July 28, 2023 hearing that, unbeknownst to him at the time, was inaccurate. Commission attorneys failed to correct that statement when they learned of the inaccuracy.

*Id.* The SEC later moved to dismiss the action without prejudice. *See* SEC's Mot. to Dismiss Action Without Prejudice and to Vacate Upcoming Hearing, *DEBT Box* (D. Utah Jan. 31, 2024), ECF 260.

The second case, of course, is this one. As the Court is aware, the Commodity Futures Trading Commission ("CFTC") knowingly made false statements to the Court in its *ex parte* submissions for a statutory restraining order ("SRO") against Traders Global Group, Inc. (a New Jersey corporation), Traders Global Group, Inc. (a Canadian corporation), and Murtuza Kazmi (collectively, "Defendants"). For months, the CFTC missed every opportunity to acknowledge or correct its misrepresentations, in violation of its duty of candor. The CFTC also lied to the Court, repeatedly, during the November 6, 2023 preliminary injunction hearing ("PI Hearing") about when it first learned there were false statements in the SRO application materials. The Court has already observed that the "CFTC's failure to disclose or to correct [its misstatements], and continued citation to the error even after realizing it was an error, is troubling at best." ECF 134 at 25. The Special Master, too, found the CFTC's conduct "troubling" and "share[d] the Court's

concern about the timeline."[2] ECF 164 at 6. But in contrast to the SEC's response in *DEBT Box*, and notwithstanding this Court's and the Special Master's condemnatory comments, the CFTC has taken only limited remedial steps.

Nor is the CFTC's misconduct limited to false statements to the Court. The CFTC also improperly sought to intrude on the attorney-client privilege between Mr. Kazmi and his counsel. During Mr. Kazmi's deposition, then-lead trial counsel for the CFTC repeatedly asserted that the CFTC wanted Mr. Kazmi to reveal the substance of privileged conversations, insisting—despite the admonishment of Defendants' counsel, and in plain violation of ethical rules—that it was appropriate for the CFTC to elicit such protected information.

Counsel for Defendants have tried to address these issues privately with the CFTC without satisfaction. Both during and immediately after Mr. Kazmi's deposition, Defendants' counsel flagged that it was improper for the CFTC to seek to invade the attorney-client privilege. The CFTC trial team maintained otherwise. On January 23, 2024, Defendants' counsel asked CFTC management for a meeting to discuss, among other issues, Defendants' concerns about the CFTC's conduct. *See* Ex. 1 at 3–4 (Jan. 23, 2024 email from A. Perry to R. Howell). The CFTC declined to engage at the time. *Id.* at 3 (Jan. 25, 2024 email from R. Howell to A. Perry). On February 15, 2024, counsel for Defendants provided the CFTC with notice and a draft of this motion, *see* Fed. R. Civ. P. 11(c), reiterating, "[i]f you intend to take appropriate corrective measures, or if you'd like to meet before we file, please let us know. If possible, we'd still like to find a path forward without the need to file a sanctions motion against the agency," *see id.* at 2–3 (Feb. 15, 2024 email from A. Perry to R. Howell). In response, the CFTC noted its "disagree[ment] with any suggestion

---

[2] At the time, the Special Master noted that Defendants had not yet invoked Rule 11 and, "[a]ccordingly, the issue of sanctions is not before the Special Master." ECF 164 at 6 n. 3. With this motion, Defendants now place the issue of sanctions before the Court.

. . . that there is evidence of bad faith or that the error in the declaration regarding certain payments . . . had a material effect on the need for a statutory restraining order," but nevertheless indicated that the CFTC "will be filing a corrected declaration with the Court" and replaced the two senior members of the trial team. *Id*. at 1 (Feb. 29, 2024 email from R. Howell to A. Perry).[3] The CFTC also agreed that the invasion of privilege during Mr. Kazmi's deposition was "objectionable and unnecessary," and committed to providing staff with "appropriate training." *Id.* at 1–2.

Recognizing that sanctions are an extraordinary remedy, they are necessary here to condemn and redress the CFTC's serious abuse of the *ex parte* process and its authority as a government enforcement agency, as well as its attendant violations of Federal Rules of Civil Procedure 11 and 30. The CFTC's paltry attempt to address its staff's misconduct at the eleventh hour is neither commensurate to the severity of its misconduct nor sufficient to remove the taint upon this litigation and Defendants' rights. By manufacturing a false justification for a total asset freeze and receivership, the CFTC caused irreparable harm to Defendants, destroying overnight a business that took years to build and leaving Mr. Kazmi's family without material support for months. The CFTC's position that its misrepresentations in seeking the SRO did not have "a material effect," *id.*, is preposterous and disregards the Court's clear expressions to the contrary, *see* Ex. 2 (Nov. 6, 2023 Hr'g Tr. at 51:11–52:12). The Court rightly pared back the asset freeze and removed the temporary receiver upon discovering that the SRO application was based on false statements, but the lasting damage to Defendants requires more. To fashion an appropriate remedy, the Court now should impose sanctions on the CFTC, up to and including dismissing this case with

---

[3] Earlier today, after receiving notice of this motion, and still without acknowledging any misconduct or prejudicial impact, the CFTC finally filed a corrected declaration. *See* ECF 171, 171-1.

prejudice. At a minimum, the Court should order an evidentiary hearing so that the CFTC's pattern

of misconduct and its effect on Defendants' rights can be fully understood and redressed.

## I.    PROCEDURAL HISTORY AND FACTUAL BACKGROUND

### A.    The SRO

On August 28, 2023, the CFTC filed a Complaint for Injunctive Relief, Civil Monetary

Penalties, and Other Equitable Relief and moved for an *ex parte* SRO freezing all of Defendants'

assets, requiring the turnover of records, and appointing a temporary receiver. ECF 7. At no time

prior to filing its complaint and *ex parte* motion for an SRO did the CFTC engage with Defendants

or seek documents or testimony from Defendants, or any employees or customers of Defendants.

On August 29, 2023, the Court granted the CFTC's *ex parte* motion. ECF 13. A purported basis

for the SRO and freeze was to preserve assets for future restitution to Defendants' customers. *Id.*

¶ 8. Yet prior to seeking the SRO, the CFTC had interviewed *no* customers or otherwise taken any

steps to confirm even a single customer's potential entitlement to restitution. *See* Ex. 2 (Nov. 6,

2023 Hr'g Tr. 36:16–37:2, 53:22–54:6). The CFTC was not even "aware of [any] pre-filing

customer complaints." *Id.* at 98:7–8.

The SRO shut down Defendants' business—My Forex Funds—globally, not just in the

United States. Defendants lost control of the company's website and bank accounts, and were

forced to let staff members go. The SRO also imposed acute financial hardship on Mr. Kazmi's

family by freezing necessary funds to pay for food, medicine, utilities, and the family home. *Id.* ¶

6; ECF 73-13 ¶ 7. To this day, Mr. Kazmi is forced to borrow from family and friends to pay for

daily living expenses and basic necessities for his family. All of this happened without prior notice to Defendants or an adversarial process to test the CFTC's claims and evidence.[4]

**B.**    **The CFTC Knowingly Offered and Failed to Correct False Statements to the Court**

1.    The Edelstein Declaration[5]

The SRO was based on a sworn declaration that the CFTC knew, at the time of submission, to be false. In support of its complaint and *ex parte* motion seeking a SRO, the CFTC relied on the declaration of CFTC Investigator Matthew S. Edelstein, which was signed under penalty of perjury on August 24, 2023 (the "Edelstein Declaration"). ECF 23, 23-44. The Edelstein Declaration formed the bedrock of the CFTC's request for *ex parte* relief. Indeed, the CFTC cited the Edelstein Declaration no fewer than *thirty times* in its moving papers and continued to rely on the declaration in subsequent pleadings. Yet despite Mr. Edelstein's representations as to the truthfulness of the evidence presented, his declaration falsely characterized the nature of certain remittances from a bank account controlled by Traders Global Group. More specifically, the Edelstein Declaration falsely stated that CAD $31,550,000 was transferred from a BMO bank account held in the name of Traders Global Group to an "unidentified Kazmi Account," intentionally creating the false impression that Mr. Kazmi had taken steps to dissipate corporate assets. ECF 23-44 ¶ 29. The judge who signed the SRO, the Honorable Robert B. Kugler, could not have known of this material misstatement at the time. Judge Kugler was misled by the CFTC.

---

[4] The *DEBT Box* court, too, recognized the real-life impact of *ex parte* restraining orders: "I'll just tell you every time I sign one of these [TRO] orders it takes my breath away. It is a profound and extraordinary invocation of the power of the federal judiciary. And it affects citizens in a direct way without notice or opportunity to be heard." July 28, 2023 Hr'g Tr. at 12:8–12, DEBT Box, No. 2:23-cv-00482 (D. Utah July 28, 2023), ECF 111.

[5] A timeline of relevant events is attached as Appendix A.

But the CFTC knew at least *seven days before* Mr. Edelstein signed his declaration and *eleven days before* the CFTC filed its *ex parte* SRO motion that the transfers were lawful tax payments to Canadian authorities. In an email dated August 17, 2023, the Ontario Securities Commission ("OSC") had notified the CFTC's lead trial counsel and Mr. Edelstein, "after months of back and forth," that "CAD 27m was paid to Canada Revenue Agency (CRA), which is our equivalent of the IRS, for corporation tax due," and "CAD 4.5m was paid to CRA for an instalment payment for the next year's taxes." *See* ECF 148-1.

In the following weeks, the CFTC continued to rely on the Edelstein Declaration. On September 20, 2023, the CFTC cited the Edelstein Declaration again in its unsuccessful motion requesting that the Court hold Defendants in contempt. ECF 48. On September 22, 2023—*more than a month after* learning that the CAD $31.55 million transfers were lawful tax payments in Canada—the CFTC relied on the Edelstein Declaration yet again in its opposition to Defendants' request to modify the *ex parte* SRO. ECF 72. On this occasion, the CFTC twice cited *the very paragraph* of the Edelstein Declaration that contained false statements regarding the CAD $31.55 million transfers. ECF 72 at 9 ("The evidence also shows substantial transfers from Traders Global's corporate accounts to Mr. Kazmi. ([Edelstein Decl.] ¶ 29.) For example, between December 2022 and April 2023, $31.55 million was transferred from one of Traders Global's corporate accounts in Canada to another account in Mr. Kazmi's name. *Id.* ¶ 29."). Relying on the false Edelstein Declaration, the CFTC urged the Court to continue to restrain all of Mr. Kazmi's personal assets. The CFTC thus not only failed to correct its prior false statement, it continued to cite it to the Court and to Defendants' detriment.

The CFTC's false statement to the Court did not come to light until Defendants raised the issue. On September 26, 2023, in their reply brief in support of their motion to modify the SRO,

Defendants explained that the CAD $31.55 million in transfers were lawful payments to Canadian tax authorities. ECF 73 at 5. Even after Defendants identified the CFTC's error, the CFTC did not timely correct the Edelstein Declaration or acknowledge the error to the Court or to Defendants. The CFTC remained silent.[6]

However, more than a month after Defendants identified the error in the Edelstein Declaration, on October 31, 2023, the CFTC filed a "corrected" declaration of CFTC Investigator Devin Malinowski to fix "a typo" and to attach an exhibit that had been inadvertently omitted.[7] ECF 112 at 1. Still, the CFTC did not correct Mr. Edelstein's materially false declaration. And the CFTC made clear that it had no intention to do so. On November 1, 2023, the CFTC informed Defendants that it "plan[s] to stand on Mr. Edelstein's declaration for the PI hearing, and will not seek to supplement it, either in writing or via testimony at the hearing." Ex. 3 (Nov. 1, 2023 email correspondence re "CFTC v. Traders Global"). In response, Defendants insisted that Mr. Edelstein be present in court for cross-examination. *Id.*

After relying on the Edelstein Declaration for months, the CFTC finally acknowledged the statements were false during the PI Hearing, but it did not disclose that the CFTC knew the statements were false *before* the Edelstein Declaration was signed under penalty of perjury and filed with the Court. During the PI Hearing, then-lead counsel for the CFTC, Ashley Burden, led Mr. Edelstein through a brief direct examination in which Mr. Edelstein testified (falsely) that he first learned of the $31.55 million error *after* the complaint and SRO application were filed:

---

[6] By contrast, when Mr. Kazmi realized, on his own, that he had inadvertently submitted an incomplete declaration to the Court, he promptly notified the CFTC the same day and filed a corrected declaration with the Court. ECF 165.

[7] The Court has noted that "[t]he record reflects that CFTC knows how to submit a corrected declaration," citing the CFTC's typographical correction of the Malinowski declaration. ECF 134 at 25 n.12.

> MR. BURDEN: Mr. Edelstein, when did you learn that these were tax payments?
>
> MR. EDELSTEIN: I believe it was in the days after filing, if not – if not the first two weeks.
>
> MR. BURDEN: How did you find, Mr. Edelstein, that these were tax payments?
>
> MR. EDELSTEIN: Through a conversation with an investigator at the Ontario Securities Commission.

Ex. 2 (Nov. 6, 2023 Hr'g Tr. 8:17–24). The $31.55 million error was the only topic of the CFTC's direct examination of Mr. Edelstein, and it seems plain that counsel and Mr. Edelstein (the two CFTC employees on the OSC's email) prepared in advance for his testimony. Still, Mr. Edelstein gave false testimony as to when the CFTC learned the actual (non-nefarious) purpose of the $31.55 million transfers, and neither Mr. Burden nor any other CFTC attorney present in court made any effort to correct Mr. Edelstein's testimony or refresh his recollection as to the actual timing.

After the direct examination of Mr. Edelstein, the Court asked Mr. Burden: "Did you inform the defense of this change prior to today's hearing?" *Id*. at 9:15–16. Mr. Burden responded: "No. Not expressly, Your Honor." *Id*. at 9:17. When the Court asked why not, Mr. Burden replied: "Counsel is aware of it. They apprised us of it in their response. After analysis, we believe that they were correct." *Id.* at 9:19–21. Obviously, this was false. There was no need for "analysis" given the OSC's clear email months earlier, which the CFTC did not disclose prior to, or during, the PI Hearing. Moreover, although Mr. Burden claimed the CFTC was "apprised" of the error in the Edelstein Declaration through Defendants' September 26, 2023 filing, *id.*, Mr. Edelstein testified during the PI Hearing that the CFTC staff was aware of the error *before* Defendants' filing. *See* Ex. 2 (Nov. 6, 2023 Hr'g Tr. 48:21–49:4).  Later during the PI Hearing, at a sidebar, the Court pressed the CFTC for additional information:

> THE COURT: I'm trying to understand the timeline of this. You learned of this discrepancy, this mistake a week or two after the filing, and you didn't inform the Court or defense counsel. They raised it in their papers? Because if that's accurate,

CFTC is going to be in a lot of trouble today. So please tell me that that's not accurate what they're implying on cross-examination.

MR. BURDEN: Your Honor, I think it is correct that we –

THE COURT: You learned of it and didn't tell the Court or defense counsel?

MR. BURDEN: Correct, Your Honor.

THE COURT: Why was that?

MR. BURDEN: Because, Your Honor, we considered that it was not material to the purpose of the declaration, and it was a small mischaracterization of this transfer that doesn't relate to trading by –

THE COURT: Here's the total in the chart, right? $32 million and change. The discrepancy is $31 and a half million. And you didn't find that material? Is that really what you're going to say? Because then you're going to say it out there and not on sidebar.

MR. BURDEN: It is, Your Honor.

THE COURT: I'll wait to hear from you later. Go back to cross-examination. You guys have a lot of explaining to do today. Get ready to do it.

*Id.* at 51:11–52:12.

After these facts came to light during the PI Hearing, by Order entered on November 14, 2023, the Court granted in part and denied in part the CFTC's motion for a preliminary injunction, ordering that the corporate Defendants' assets in the amount of $12,080,000 remain frozen, but releasing all other assets previously frozen under the SRO and discharging the temporary receiver. ECF 135. In reaching its decision, the Court recognized that, stripped of the false information about the $31.55 million in tax payments, the CFTC had provided "scant particularized evidence that supports a finding that Defendants intend to dissipate any assets." ECF 134 at 26.

And yet, despite CFTC counsel's and Mr. Edelstein's representations to the Court during the PI Hearing that the CFTC discovered the purpose of the CAD $31.55 million transfers *after* the CFTC submitted the Edelstein Declaration, the CFTC subsequently acknowledged (after Defendants pressed the point) that CFTC staff, in fact, knew the lawful purpose of the transfers

*before* it submitted the Edelstein Declaration to the Court. On December 1, 2023, weeks after the

PI Hearing and only in response to Defendants' request to apportion the temporary receiver's fees,

the CFTC revealed for the first time—in a footnote—that CFTC counsel and Mr. Edelstein knew

as early as August 17, 2023, that the CAD $31.55 million transfers were lawful tax payments. ECF

148 at 5 n.2. The CFTC attempted to brush away the significance of its misrepresentations by

calling them "inadvertent and immaterial lapses in Mr. Edelstein's recollection." *Id*.

2.   <u>Additional Misstatements</u>

While the CFTC's misrepresentations relating to the CAD $31.55 million transfers may be

the most egregious falsehood identified to date, it appears the CFTC may have made other

misstatements to the Court and Defendants. For example, the CFTC mischaracterized the scope of

Mr. Edelstein's investigation. The Edelstein Declaration stated that Mr. Edelstein interviewed

"employees" of iS Risk. ECF 23-44 ¶ 5.f. At the PI Hearing, however, Mr. Edelstein testified that

he had interviewed only a single iS Risk employee, Matthew Chichester. *See* Ex. 2 (Nov. 6, 2023

Hr'g Tr. 76:8–22). The CFTC later tried to explain away this misrepresentation by noting that Mr.

Edelstein also "spoke with an additional employee of iS Risk named Jason Meyer on a September

2022 conference call." ECF 148 at 5 n.2. To date, the CFTC has produced only an Outlook calendar

invitation as evidence that this "conference call" occurred, *see* ECF 148-2, and the CFTC recently

confirmed that "Mr. Edelstein did not take notes of this interview." Ex. 1 at 1 (Feb. 29, 2024 email

from R. Howell to A. Perry). If true, that appears to be inconsistent with the CFTC's typical

investigative practices, and Defendants remain skeptical that any "interview" of Mr. Meyer

actually occurred under any fair usage of that term. *See* ECF 148-2. As such, it continues to appear

that both Mr. Edelstein's statement in the Edelstein Declaration that he interviewed "employees"

of iS Risk and counsel's later defense of that statement were misleading, at best.

11

### C.    The CFTC Intentionally Sought Privileged Information from Mr. Kazmi

In addition to knowingly misleading the Court about Mr. Kazmi's tax payments, counsel for the CFTC openly sought to intrude on the attorney-client privilege between Mr. Kazmi and his counsel. During Mr. Kazmi's deposition on November 2, 2023, counsel for the CFTC, Mr Burden, asked a series of questions designed to elicit privileged information that even Mr. Burden's supervisors have acknowledged was "objectionable and unnecessary." Ex. 1 at 1–2 (Feb. 29, 2024 email from R. Howell to A. Perry). As the following exchange reveals, Mr. Burden was clear that his questions called for "attorney-client privileged response[s]:"

> MR. BURDEN: So Mr. Kazmi, before the entry of the SRO in this case . . . did you have any conversations with anybody about, whether customers of Traders Global or counterparties with Traders Global, on the B book?
>
> MR. PERRY: Can I just interject just to make an offer or suggestion. You know, Ashley, perhaps you could just reformulate the question as anyone who is not his attorney.
>
> MR. BURDEN: Yeah, so here's the thing, Avi, **I do want him to tell me if an attorney told him that.**
>
> MR. PERRY: Okay. Well, then we object on - - we object on privileged grounds and I think it's improper to ask that question.
>
> MR. BURDEN: It is definitely not improper to ask this question.
>
> MR. PERRY: Ashley, I think you are treading very close to an ethical issue here. If you're asking him - -
>
> (Simultaneous crosstalk.)
>
> MR. PERRY: I do. I do. And I think you're asking him improperly what he – what he may have discussed. I think –
>
> MR. BURDEN: Well, I haven't - - I'll tell you what, Avi, **I'm going to ask the question and I mean for the question to encompass privileged conversation.** If counsel would like to invoke the privilege or confer with their client –
>
> MR. PERRY: **Ashley, as a government attorney, you have a duty not to ask a – not to ask a question that you believe will elicit privileged information.**

MR. BURDEN: **That is – that is not right**, Avi. If that was your experience, then I'll let you have it. But **my own experience is that such things are entirely permissible**. So I'm going to ask the question and if you'd like to object, you should.

MR. PERRY: But before we even do that, I'm going to instruct my client that if the answer involves advice he was given or discussions that he had with an attorney representing him or his companies, he should not answer and we can take a break.

. . .

MR. PERRY: I think this line of questioning is improper and could easily be fixed by simply not treading into ground that you believe or may believe to be privileged information.

BY MR. BURDEN:

Q. Mr. Kazmi, prior to the entry of the SRO in this case, did you have any discussions with any attorneys about My Forex Funds?

A. Yes, I did.

. . .

Q. Well all right. Now, Mr. Kazmi, **I'm going to ask you a question that calls for attorney-client privileged response** and your counsel can object or you can confer or you could waive the privilege if you wish to do that as people sometimes do.

Mr. Kazmi, did you discuss My Forex Funds' counterparty status with any of these attorneys that you described?

MR. PERRY: Okay. Objection.

I'm going to instruct my client not to answer that question on the basis of privilege and I'm going to admonish counsel that I believe the questioning is improper.

MR. BURDEN: I'm afraid we'll just have to agree to disagree, Avi.

Ex. 4 (Nov. 2, 2023 Kazmi Tr. 97:24–101:23 (emphasis added)).

## II.    LEGAL STANDARDS

### A.    Rule 11

"Attorneys owe a duty of candor to the tribunal and a duty of fairness to their opposing

counsel, which must be strictly respected in order to uphold the integrity of the legal system."

*Nanavanti v. Cape Reg'l Med. Ctr.*, No. CIV. 12-3469 RMB/KMW, 2013 WL 4787221, at *7 (D.N.J. Sept. 6, 2013). Thus, Rule 11 provides that an attorney who "present[s] to the court a pleading, written motion, or other paper" is "certif[ying] that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the paper's "factual contentions have evidentiary support." Fed. R. Civ. P. 11(b)(3); *see Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 484 (3d Cir. 1987) ("The rule focuses on the act of signing the document as a certification that the signer believes in the propriety of the submission and that it has not been filed for an improper purpose."). Under Rule 11, an attorney has "an affirmative and *continuing* duty . . . to ensure that each and every paper he submit[s] to the Court contain[s] allegations that were made with reasonable belief, formed after reasonable inquiry, that they were well-grounded in fact." *Ellis v. Beemiller, Inc.*, 287 F.R.D. 326, 347 (W.D. Pa. 2012 (emphasis in original). "[A] litigant's obligations with respect to the contents of these papers are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit." Fed. R. Civ. P. 11 advisory committee's notes to 1993 amendment.

When attorneys violate their duty of candor, "there must be consequences for their misconduct." *Nanavanti*, 2013 WL 4787221, at *7. Rule 11 sanctions are warranted against an attorney that has "abused the litigation process or misused the judicial system," such as by submitting to the court filings "containing numerous misstatements and mischaracterizations," *id.*, or that "exhibit[] a deliberate indifference to obvious facts," *Young v. Smith*, 269 F. Supp. 3d 251, 333 (M.D. Pa. 2017), *aff'd*, 905 F.3d 229 (3d Cir. 2018). Moreover, "sanctions are proper when, *inter alia*, a party insist[s] upon a position after it is no longer tenable." *Balthazar v. Atl. City Med. Ctr.*, 137 F. App'x 482, 490 (3d Cir. 2005); *see Cohen v. Kurtzman*, 45 F. Supp. 2d 423, 435

(D.N.J. 1999) ("Where an abuse of litigation or misuse of the judicial system is found, Rule 11 sanctions are appropriate against the signer of the document, be it the attorney or the party.").

In determining whether an attorney's conduct violates Rule 11, courts apply "an objective standard of reasonableness under the circumstances." *In re Cendant Corp. Derivative Action Litig.*, 96 F. Supp. 2d 403, 405 (D.N.J. 2000). "Reasonableness" is "defined as an objective knowledge or belief at the time of the filing of a challenged paper that the claim was well-grounded in law and fact." *Ford Motor Co. v. Summit Motor Prod., Inc.*, 930 F.2d 277, 289 (3d Cir. 1991). Proof of subjective bad faith is not required to levy sanctions. *Cendant*, 96 F. Supp. 2d at 405.

## B.  Rule 30

Rule 30 provides for sanctions against "a person who impedes, delays, or frustrates the fair examination of the deponent." Fed. R. Civ. P. 30(d)(2). While most commonly applied to the misconduct of counsel defending a deposition, this Rule also can be invoked to sanction improper questioning by the attorney taking the deposition. *See, e.g.*, *Boulder Falcon, LLC v. Brown*, No. 222CV00042JNPJCB, 2023 WL 2662187, at *15 (D. Utah Mar. 28, 2023) ("Asserting adverse facts in a deposition question without a basis for doing so is a reason to issue a protective order and to impose sanctions."); *Green v. Cosco Shipping Lines Co.*, No. CV420-091, 2021 WL 5985123, at *5–6 (S.D. Ga. Dec. 16, 2021) (issuing protective order and imposing restrictions on counsel who "violated ethical and professional norms" when deposing witnesses).

## C.  Inherent Authority

Courts also have "inherent powers" to impose sanctions. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–45 (1991); *see In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig.*, 381 F. Supp. 2d 421, 425 (E.D. Pa. 2005) ("The inherent powers of federal courts include the well-acknowledged power to levy sanctions in response to abusive litigation practices."). Courts may exercise their inherent powers to levy sanctions where a party has "acted

in bad faith, vexatiously, wantonly, or for oppressive reasons," *Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc.*, 57 F.3d 1215, 1224 (3d Cir. 1995),[8] or to "prohibit or remedy litigation practices which constitute ethical violations," *Scranton Prod., Inc. v. Bobrick Washroom Equip., Inc.*, 190 F. Supp. 3d 419, 433 (M.D. Pa. 2016), including intrusions into attorney-client privilege, *see Loatman v. Summit Bank*, 174 F.R.D. 592, 602 (D.N.J. 1997).

A court may "fashion an appropriate sanction for conduct which abuses the judicial process," including assessment of attorney's fees, *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017), or dismissal of a lawsuit, *Gov't Emps. Ins. Co. v. Nealey*, 262 F. Supp. 3d 153, 176 (E.D. Pa. 2017). Regarding the range of permissible sanctions, the Third Circuit has explained that "a pattern of wrongdoing may require a stiffer sanction than an isolated incident; a grave wrongdoing may compel a more severe sanction than might a minor infraction; and wrongdoing that actually prejudices the wrongdoer's opponent or hinders the administration of justice may demand a stronger response." *Republic of Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 74 (3d Cir. 1994).

### D.    Rules of Professional Conduct

"Courts in the Third Circuit incorporate applicable state law on professional conduct to avoid detriment to the public's confidence in the integrity of the bar that might result from courts in the same state enforcing different ethical norms." *In re 38-36 Greenville Ave L.L.C.*, No. 16-15598 (SLM), 2020 WL 1680724, at *12 (Bankr. D.N.J. Apr. 6, 2020), *aff'd sub nom. 38-36 Greenville LLC v. Forman*, No. CV 20-3563, 2021 WL 8087151 (D.N.J. June 9, 2021), *aff'd sub nom. In re 38-36 Greenville Ave LLC*, No. 21-2164, 2022 WL 1153123 (3d Cir. Apr. 19, 2022).

---

[8] "A showing of bad faith is not required in order to sanction a party for attorney misconduct pursuant to the Court's inherent authority." *Scranton*, 190 F. Supp. 3d at, 433. A finding of bad faith is also not required for Rule 11 sanctions. *Balthazar v. Atl. City Med. Ctr.*, 279 F. Supp. 2d 574, 593 (D.N.J. 2003), *aff'd*, 137 F. App'x 482 (3d Cir. 2005).

In this matter, the CFTC's conduct implicates the New Jersey Courts' Rules of Professional Conduct governing lawyers' duty of candor toward the tribunal and communications with persons who are represented by counsel.

Rule 3.3 of the New Jersey Rules of Professional Conduct addresses an attorney's duty of candor toward the tribunal. The Rule is "premised on the lawyer's obligation as an officer of the court to prevent the trier of fact from being misled by false evidence." Model Rules of Prof'l Conduct R. 3.3 cmt. 5 (Am. Bar Ass'n 1983). To that end, Rule 3.3 prohibits a lawyer from knowingly making a false statement of material fact to the Court, from offering evidence that the lawyer knows to be false, and from failing to disclose a material fact if such omission is reasonably certain to mislead the tribunal. N.J. Rules of Prof'l Conduct R. 3.3(a)(1), (4), (5). The Rule also requires a lawyer to "take reasonable remedial measures" if the lawyer "has offered material evidence and comes to know of its falsity." N.J. Rules Prof'l Conduct R. 3.3(a)(5); *see also* Ill. Rules of Prof'l Conduct R. 3.3(a)(1) ("A lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer.").

Rule 4.4 of the New Jersey Rules of Professional Conduct protects against invasion of the attorney-client privilege, and provides that, "[i]n representing a client, a lawyer shall not . . . use methods of obtaining evidence that violate the legal rights of [a third] person," N.J. Rules of Prof'l Conduct R. 4.4(a), and the commentary to the American Bar Association Model Rule of Professional Conduct 4.4 expressly warns against "unwarranted intrusions into privileged relationships, such as the client-lawyer relationship," Model Rules of Prof'l Conduct R. 4.4 cmt. 1 (Am. Bar Ass'n 1983). New Jersey Rule 4.4 also prohibits a lawyer from knowingly viewing inadvertently produced privileged information. *See* N.J. Rules of Prof'l Conduct R. 4.4(b).

17

Obviously, the same prohibition would apply to the intentional solicitation of privileged information. Indeed, some jurisdictions have determined that a lawyer who knowingly views (much less solicits) privileged information also violates the rule of conduct governing misconduct, dishonesty, fraud, or deceit. *See* D.C. Bar Ethics Opinion No. 256 (May 1995) (citing D.C. Rules of Prof'l Conduct R. 8.4(c)).

## III.  ARGUMENT

### A.    The CFTC Violated its Duty of Candor by Knowingly Offering False Statements to the Court

The record establishes that counsel for the CFTC and Mr. Edelstein knew at the time the CFTC submitted the Edelstein Declaration to the Court that the CAD $31.55 million transfers were for lawful payments to Canadian tax authorities and *not* transfers to an "unidentified Kazmi Account." This was not a minor detail. The CFTC had "months of back and forth" with the OSC on this very issue before receiving a conclusive email from the OSC on August 17, 2023. *See* ECF 148-1. Nevertheless, the CFTC knowingly submitted false information to the Court in support of its motion for a receiver and a total asset freeze. It then continued to rely on that same false information to oppose Defendants' motion to narrow the scope of the asset freeze. Even when Defendants pointed out the error in their September 26, 2023 reply brief, *see* ECF 73 at 5–6, the CFTC *still*—inexplicably, improperly—stayed silent. That was not a good faith failure to correct an inadvertent error; it was a deliberate choice to mislead the Court and prejudice Defendants. There is no other explanation.

And after attempting to "stand on" the false declaration, *see* Ex. 3 (Nov. 1, 2023 email correspondence re "CFTC v. Traders Global"), and avoid exposing Mr. Edelstein to cross-examination, CFTC counsel led Mr. Edelstein through contrived testimony during the PI Hearing they both knew to be false. It simply is not plausible that, in preparing Mr. Edelstein for his

testimony at the PI Hearing—*on the one topic covered on direct examination*—neither CFTC counsel nor Mr. Edelstein recalled that, in fact, the two of them had received a clear, succinct email from the OSC notifying them about the true nature of the $31.55 million transfers before even filing the SRO motion. The CFTC would have the Court believe this was mere sloppiness. *See* ECF 156-1 at 4-5 ("The fact that Mr. Edelstein failed to recall receiving an email in the weeks leading up to the filing of the CFTC's case is not just plausible but true."). But it was not just Mr. Edelstein who "failed to recall" the OSC's email. It was also lead counsel for the CFTC—the same counsel who received the OSC's email "after months of back and forth" on the topic, ECF 148-1, who neglected to acknowledge the error even after Defendants clearly flagged it in their briefing, who tried unsuccessfully to avoid subjecting Mr. Edelstein to cross-examination at the PI Hearing rather than disclose his error, and who absurdly tried to portray the $31.55 million error as "not material" when pressed by the Court, Ex. 2 (Nov. 6, 2023 Hr'g Tr. 51:21–52:1).

Nor did the CFTC even take it upon themselves to correct the record *after* the hearing. Had Defendants not filed their motion seeking apportionment of the receivership costs, the CFTC never would have come clean. In fact, had Defendants not insisted that Mr. Edelstein be present for cross-examination at the PI Hearing, none of this unethical conduct would have been revealed.

Rather than square with these facts, the CFTC has sought to diminish the significance of its false statements, claiming the mischaracterization of the $31.55 million was not "materially erroneous" because "Mr. Edelstein's declaration is seventeen pages long, and accurately summarizes hundreds of pages of financial records and tens of thousands of files of trading data." ECF 148 at 4. Indeed, the CFTC continues today to dispute that the lie "had a material effect." Ex. 1 at 1 (Feb. 29, 2024 email from R. Howell to A. Perry).

This is absurd. As confirmed in the CFTC's opposition to Defendants' motion to modify the SRO, the misinformation about the $31.55 million payment was included in the Edelstein Declaration to create the false impression that Mr. Kazmi was looting corporate accounts and to justify a freeze of Mr. Kazmi's personal assets. *See* ECF 72. Mr. Edelstein also admitted during the PI Hearing that this information was included in the Edelstein Declaration, at least in part, "as evidence of potential dissipation of assets." Ex. 2 (Nov. 6, 2023 Hr'g Tr. 50:13–17). This misinformation—coupled with the baseless claim about millions of dollars flowing into Mr. Kazmi's non-existent "non-custodial" crypto wallet, *see* ECF 134 at 26 n.13—constituted the CFTC's *only* purported evidence relevant to the alleged need for a total asset freeze and the appointment of a temporary receiver, other than the vague, non-particularized assertions that Mr. Kazmi lives in Canada and has spent money on luxury items. The Court found that these barebones, conclusory assertions carry little (if any) weight. *See* ECF 134 at 26 ("The CFTC has provided scant particularized evidence that supports a finding that Defendants intend to dissipate any assets.").

By making false statements to the Court and failing to acknowledge the impact of, or take reasonable measures to correct, its false statements, the CFTC violated the duty of candor it owes the Court under both Rule 11 of the Federal Rules of Civil Procedure and Rule 3.3 of the New Jersey Rules of Professional Conduct. That the CFTC knowingly relied on misrepresentations to procure an *ex parte* order that shut down an entire business and froze all of Mr. Kazmi's personal assets makes the transgressions here especially problematic. Government enforcement agencies wield extraordinary power when they seize and freeze a defendant's property on an *ex parte* basis. Courts should be able to rely on the accuracy and completeness of an agency's submissions. Accordingly, when government attorneys abuse the *ex parte* process through the knowing

submission of false information, it is entirely appropriate to impose sanctions. As Justice Sutherland explained in an analogous context more than 85 years ago, "while [a prosecutor] may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935).

**B.    The CFTC Violated Rules of Professional Conduct by Seeking Privileged Information from Mr. Kazmi**

The CFTC's interference with Mr. Kazmi's attorney-client privilege during his deposition further confirms the agency is not adhering to the rules applicable to all litigants. Indeed, the CFTC's management acknowledged as much in its recent attempt to avoid this motion. Over the objections of defense counsel, counsel for the CFTC repeatedly and unambiguously asked Mr. Kazmi to divulge privileged information. *See* Ex. 4 (Nov. 2, 2023 Kazmi Tr. 99:4–6) ("I'm going to ask the question and I mean for the question to encompass privileged conversation."); *id.* at 101:7–9 ("I'm going to ask you a question that calls for attorney-client privileged response."). Such conduct violates Federal Rule of Civil Procedure 30 and the New Jersey Rules of Professional Conduct, is inconsistent with longstanding norms and codes of conduct for government attorneys, and may be sanctioned pursuant to the Rule 30 and the Court's inherent powers.

Further, counsel's open attempt to obtain privileged information breached the CFTC's own policies. The CFTC's Division of Enforcement instructs CFTC attorneys that they "should not ask a party to waive the attorney-client privilege or work-product protection without prior approval of the Director or the supervising Deputy." Commodity Futures Trading Commission Division of Enforcement, Enforcement Manual (May 20, 2020) at 44, available at https://www.cftc.gov/sites/default/files/2021-05/EnforcementManual.pdf. Here, it is clear that Mr. Burden did not obtain such prior approval. Thus, his knowing and deliberate attempt to solicit

privileged information—even after being admonished by Defendants' counsel repeatedly—also violates the agency's own rules.

## IV.   <u>CONCLUSION</u>

At every turn, the CFTC has taken the most aggressive possible approach in this litigation. The agency did not engage with Defendants before charging them. There was a cursory investigation that included only a single witness interview. None of Defendants' customers were interviewed pre-charge, and apparently there were not even any customer complaints. The CFTC moved *ex parte* for a restraining order, a total asset freeze over *all* of Defendants' corporate and personal assets, and a receiver on the basis of a false declaration. The CFTC then sat silently for months as Defendants tried to correct the record. The CFTC sponsored perjured testimony during the PI Hearing. And the CFTC sought to invade Mr. Kazmi's attorney-client privilege during his deposition. All so the CFTC could try to regulate simulated trading in a case where the agency's jurisdiction is questionable, at best. A case where there are *no* identified victims. A case where the CFTC's core theory of fraud does not even apply to the 92% of Defendants' customers who indisputably *knew* they were in simulated "demo" accounts. *See* ECF 134 at 27 ("It is not disputed that, of Defendants' customers, 92% never advanced out of 'demo accounts.'").

Taken as a whole, the uncontroverted evidence shows a pattern of misconduct and an abuse of Defendants' rights. The CFTC still has not acknowledged that its false statements were material or that its staff acted in bad faith, much less taken meaningful steps to redress the harm to Defendants as the SEC did in *DEBT Box*. The message to the CFTC, as the *DEBT Box* court made clear to the SEC, should be unmistakable: misrepresentations "by a federal agency seeking an *ex parte* TRO" will not be tolerated.  Order to Show Cause, *DEBT Box* (D. Utah Nov. 30, 2023), ECF 215 at 17. Sanctions are necessary here to send that message and to remedy the harm caused by

the CFTC. At a minimum, the Court should order an evidentiary hearing so that the CFTC's pattern

of misconduct and its effect on Defendants' rights can be fully understood and redressed.


Dated: New York, New York                   By */s/ Anthony J. Staltari*
       March 7, 2024                              Anthony J. Staltari (Attorney ID. No. 233022017)
                                             QUINN EMANUEL URQUHART &
                                             SULLIVAN, LLP
                                             51 Madison Avenue, 22nd Floor
                                             New York, NY 10010
                                             Tel.: (415) 875-6600
                                             anthonystaltari@quinnemanuel.com

                                             Robert A. Zink (*pro hac vice*)
                                             Avi Perry (*pro hac vice*)
                                             Kurt Wolfe (*pro hac vice*)
                                             QUINN EMANUEL URQUHART &
                                             SULLIVAN, LLP
                                             1300 I Street, NW, Suite 900
                                             Washington, D.C. 20005
                                             Tel.: (202) 538-8000
                                             robertzink@quinnemanuel.com
                                             aviperry@quinnemanuel.com
                                             kurtwolfe@quinnemanuel.com

                                             Dakota Speas (*pro hac vice*)
                                             QUINN EMANUEL URQUHART &
                                             SULLIVAN, LLP
                                             865 S. Figueroa St., 10th Floor
                                             Los Angeles, CA 90017
                                             Tel.: (213) 443-3000
                                             dakotaspeas@quinnemanuel.com

                                             *Attorneys for Defendants*

23

# Appendix A

APPENDIX A – TIMELINE

| Incident | Date | Brief Description | Reference |
|---|---|---|---|
| Email from OSC | August 17, 2023 | Ontario Securities Commission ("OSC") notified the CFTC's lead trial counsel, Ashley Burden, and the CFTC's lead investigator, Matt Edelstein, that Traders Global had made tax payments to the Canadian government in the amounts of CAD $27 million and CAD $4.5 million. | (ECF 148-1.) |
| Edelstein Declaration | August 24, 2023 | Mr. Edelstein signed a sworn declaration (the "Edelstein Declaration") that falsely stated that the same CAD $31,550,000 in tax payments had been transferred from Traders Global's corporate account to an "unidentified Kazmi Account." | (ECF 23-44 ¶ 29.) |
| Motion for Statutory Restraining Order and Preliminary Injunction | August 28, 2023 | CFTC submitted the Edelstein Declaration to the Court in support of its *ex parte* motion for a statutory restraining order and a preliminary injunction. | (ECF 7.) |
| Statutory Restraining Order Granted | August 29, 2023 | Judge Kugler grants the CFTC's *ex parte* motion for a statutory restraining order, freezing all of Defendants' personal and corporate assets. | (ECF 13.) |
| CFTC's Contempt Motion | September 20, 2023 | CFTC cited the Edelstein Declaration again in its unsuccessful motion requesting that the Court hold Defendants in contempt for allegedly violating the statutory restraining order. | (ECF No. 48). |
| CFTC's Opposition to Defendants' Motion to Modify the Statutory Restraining Order | September 22, 2023 | CFTC relied on the Edelstein Declaration yet again in its opposition to Defendants' motion to modify the *ex parte* statutory restraining order. The CFTC twice cited *the very paragraph* of the Edelstein Declaration that contained false statements regarding the CAD $31.55 million transfer to argue that Mr. Kazmi's personal assets should remain frozen. | (ECF No. 72) (ECF 72 at 9) (citing Edelstein Decl. ¶ 29.) |
| Defendants' Reply in Support of Motion to Modify the Statutory Restraining Order | September 26, 2023 | In their reply brief in support of their motion to modify the statutory restraining order, Defendants explained that the CAD $31.55 million in transfers were lawful payments to Canadian tax authorities. The CFTC failed to acknowledge the mistake or correct the record. | (ECF 73 at 5.) |
| Corrected Malinowski Declaration | October 31, 2023 | CFTC filed a "corrected" declaration of CFTC Investigator Devin Malinowski to fix "a typo" and to attach an exhibit that had been inadvertently omitted. Still, the CFTC did not correct Mr. Edelstein's declaration even after Defendants' reply | (ECF 112 at 1.) |

## APPENDIX A – TIMELINE

| Incident | Date | Brief Description | Reference |
|---|---|---|---|
| | | in support of their motion to modify the statutory restraining order. | |
| Preliminary Injunction Hearing | November 6, 2023 | CFTC finally acknowledged Mr. Edelstein's statements regarding the $31.55 million transfers were false during the Preliminary Injunction Hearing (the "PI Hearing"), but they added another misrepresentation.<br><br>During the PI Hearing, Mr. Edelstein testified (falsely) that he first learned the truth about the $31.55 million tax payment *after* the complaint and statutory restraining order motion were filed.  He lied before the Court under oath, and counsel for the CFTC knew it.<br><br>CFTC attorneys present at the hearing did not correct Mr. Edelstein.  Mr. Burden misrepresented to the Court that "after analysis" of Defendants' reply brief in support of the motion to modify the statutory restraining order, the CFTC realized these were lawful tax payments.  Counsel did not disclose to the Court that the OSC had informed Mr. Edelstein of the true nature of these payments *before* the complaint and the SRO were filed, after "months of back and forth." | (*See* ECF 130, H'rg Tr. at 8:7-20.) |
| Court Grants in Part and Denies in Part CFTC's Motion for a Preliminary Injunction | November 14, 2023 | The Court ordered that only $12,080,000 in Defendants' corporate assets remain frozen, while releasing all other assets previously frozen under the SRO, including Mr. Kazmi's personal assets, and discharging the temporary receiver.<br><br>In its opinion, the Court found that Mr. Edelstein had "mischaracterized" the $31.55 million in tax payments and called the mischaracterization "troubling, at best."  The Court further found that "[t]he CFTC has provided scant particularized evidence that supports a finding that Defendants intend to dissipate any assets" and concluded that "[w]hatever concerns the CFTC initially may have had regarding the likelihood of Defendants dissipating their assets appear to have been substantially reduced." | (ECF 134 at 25–26.)<br>(ECF 135.) |

**APPENDIX A – TIMELINE**

| Incident | Date | Brief Description | Reference |
|---|---|---|---|
| CFTC's Response to Defendants' Request to Apportion the Temporary Receiver's Fees | December 1, 2023 | In response to Defendants' request to apportion the Temporary Receiver's fees equally between Defendants and the CFTC, the CFTC revealed for the first time – in a footnote – that Mr. Burden and Mr. Edelstein knew as early as August 17, 2023, that the CAD $31.55 million transfers were lawful tax payments. The CFTC attempted to brush away the significance of its misrepresentations by claiming "inadvertent and immaterial lapses in Mr. Edelstein's recollection." | (ECF 148 at 5 n.2.) |