# Exhibit 2

```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW JERSEY

_____

COMMODITIES FUTURES TRADING          CIVIL ACTION NUMBER:
COMMISSION,
                                     3:23-cv-11808-ZNQ-TJB
    Plaintiff,
                                     PRELIMINARY INJUNCTION
    v.                               HEARING

TRADERS GLOBAL GROUP, INC.,
MURTUZA KAZMI, ANTHONY
SODONO, III,

    Defendants.
_____
         Clarkson S. Fisher Building & U.S. Courthouse
         402 East State Street
         Trenton, New Jersey  08608
         November 6, 2023
         Commencing at 11:00 a.m.

B E F O R E:              THE HONORABLE ZAHID N. QURAISHI,
                          UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

     U.S. COMMODITY FUTURES TRADING COMMISSION
     DIVISION OF ENFORCEMENT
     BY:  ASHLEY BURDEN, ESQUIRE
          KATHERINE PAULSON, ESQUIRE
     77 W. JACKSON BLVD.
     Suite 800
     Chicago, Illinois 60604
     For the Plaintiff




          Megan McKay-Soule, Official Court Reporter
              Megan_McKay-Soule@njd.uscourts.gov
                       (609) 815-2319

       Proceedings recorded by mechanical stenography;
    transcript produced by computer-aided transcription.
```

*United States District Court*
*District of New Jersey*

```
 1  A.   Yes.  There is one thing.
 2  Q.   What is that, please?
 3  A.   On the summary table below paragraph 29, there is a table
 4  with three columns:  Category, credits, debits.  And the line
 5  entry "transfer to unidentified Kazmi account" in the total
 6  amount of $31,550,000.
 7       Since filing this declaration, I have become aware that
 8  the two transactions that make up this category were, in fact,
 9  tax payments made on behalf of Mr. Kazmi.
10  Q.   Mr. Edelstein, what caused you to believe initially that
11  these were transfers to an unidentified Kazmi account?
12  A.   They -- it was two transactions, one of which was, I
13  think, about $27 million, and the other was about
14  $4 and a half million.  And just based on the size of those
15  transactions, I thought it was extremely likely they were two
16  affiliated accounts.
17  Q.   Mr. Edelstein, when did you learn that these were tax
18  payments?
19  A.   I believe it was in the days after filing, if not -- if
20  not the first two weeks.
21  Q.   How did you find, Mr. Edelstein, that these were tax
22  payments?
23  A.   Through a conversation with an investigator at the
24  Ontario Securities Commission.
25  Q.   And what did that conversation impart to you?
```

```
 1  A.   That these were, in fact, tax payments.
 2  Q.   And for whose benefit were these tax payments made?
 3  A.   Mr. Kazmi and TGG.
 4  Q.   So this change you're making to your testimony here,
 5  Mr. Edelstein, does it affect your analysis otherwise as
 6  embodied in the declaration?
 7  A.   No, I don't believe so.
 8  Q.   Mr. Edelstein, is there anything else about your
 9  declaration that you would like to correct or to supplement?
10  A.   No.
11  Q.   Is your declaration otherwise accurate?
12  A.   I believe so.
13           MR. BURDEN:  No further questions, Your Honor.
14           THE COURT:  Mr. Burden, let me just ask you a
15  question then.  Did you inform the defense of this change
16  prior to today's hearing?
17           MR. BURDEN:  No.  Not expressly, Your Honor.
18           THE COURT:  Why not?
19           MR. BURDEN:  Counsel is aware of it.  They apprised
20  us of it in their response.  After analysis, we believe that
21  they were correct.
22           THE COURT:  Okay.
23           MR. BURDEN:  And we wanted Mr. Edelstein's testimony,
24  as reflected primarily in this declaration, to be totally
25  accurate and for there not to be any changes hanging out
```

```
 1  Q.   And that software can be bought off the shelf, right?  It
 2  doesn't need to be specifically ordered in a bespoke manner,
 3  right?
 4  A.   To be honest, I'm not sure.
 5  Q.   It doesn't matter.
 6  A.   Okay.
 7  Q.   The point is MetaTrader can be modified, correct?
 8  A.   Yes.
 9  Q.   And those modifications are done by tech folks, right?
10  A.   Yes.
11  Q.   iS Risk is one of those tech folks, right?
12  A.   Yes.
13  Q.   And you talked to iS Risk in connection with this case,
14  right?
15  A.   Yes.
16  Q.   I just want to be very, very clear about one thing, and I
17  don't want to beat you up too much about this, but it's pretty
18  obvious.  Did you talk to any of the defendants in this case?
19  A.   No.
20  Q.   Did you talk to any company employees in this case?
21  A.   No.
22  Q.   So just to be clear, you didn't get the defendant's side
23  of the story for why they did what they did, right?
24  A.   Correct.
25  Q.   You didn't talk to any of their employees about why the
```

1 company did what it did, correct?
2 A.   Correct.
3 Q.   You talked to one person from -- well, how many people
4 from iS Risk did you talk to?
5 A.   Just Mr. Chichester.
6 Q.   You talked to one person from -- the company's tech
7 consultant, right?
8 A.   Correct.
9 Q.   And he actually answered the question for you about
10 delay, did he not?
11 A.   Which question specifically?
12 Q.   Why delay might be inserted and the effects of delay.  Do
13 you recall that?
14 A.   Is one of the exhibits the testimony?
15 Q.   It sure is.  But before we get there -- and I'll direct
16 your attention to the specific line -- I want to ask you, how
17 many times have you talked to Mr. Chichester?
18 A.   Prior to filing the case, we took his deposition once.
19 Q.   When was that?
20 A.   I believe it was in February of 2022.
21 Q.   February of 2022.  At that point in time he told you that
22 Traders Global --
23 A.   I'm sorry.  2023.
24 Q.   2023?
25 A.   Yeah.

| | | |
|---|---|---|
| 1 | A. | We discussed it, our team, the attorneys on the matter. |
| 2 | Q. | I'm going to push you for pronouns. Who? |
| 3 | A. | Mr. Burden, Mrs. Paulson, Mrs. Stripe. |
| 4 | Q. | Let's just ball park it. Within seven days, ten days, |
| 5 | | two weeks, any sense of it? |
| 6 | A. | I believe that the conversation with the investigator |
| 7 | | from the Ontario Securities Commission most likely took place |
| 8 | | within that first week. |
| 9 | Q. | Do you know if that mistake -- good faith mistake you |
| 10 | | made was disclosed to the defense? |
| 11 | A. | I do not know. |
| 12 | Q. | Do you know if that good faith mistake you made was |
| 13 | | disclosed to the Court? |
| 14 | A. | I don't believe it was. Well, I guess it goes -- I'm not |
| 15 | | certain of all the -- I know there was a filing by the defense |
| 16 | | that -- that drew attention to the -- to this mistake. I |
| 17 | | don't recall exactly when that date was. Perhaps you do. |
| 18 | Q. | Defense alerted the Court in its papers to the mistake, |
| 19 | | correct? |
| 20 | A. | Correct. |
| 21 | Q. | Did you learn of your mistake before or after that |
| 22 | | defense filing? |
| 23 | A. | Before. |
| 24 | Q. | Do you know -- maybe you've answered this. If you have, |
| 25 | | I can move on. |

*1*        But do you know whether you told Commission staff about
*2* your mistake before you learned the defense had raised it in
*3* their filing?
*4* A.    Yes.
*5* Q.    Do you know if the defense and the Court was informed
*6* before the defense filing?
*7* A.    I do not know.
*8* Q.    Do you know -- were you involved in any decision to
*9* disclose or not disclose that information?
*10* A.    No.
*11* Q.    Do you know -- do you have a view based on your own
*12* personal understanding of the case about who would be in a
*13* position to make that decision?
*14* A.    Mr. Burden, Ms. Paulson, and Ms. Stripe.
*15* Q.    Okay.  Let's plug along through the declaration.  So I
*16* wanted to move on, but this is my co-counsel.  I want that for
*17* the record.  Am I right -- well, let's just do it now.
*18*        Take a look at page 12 of your declaration, top of the
*19* page.  You see it there?
*20* A.    Yes.
*21* Q.    That's the 31.5 that you referenced earlier --
*22* A.    Yes.
*23* Q.    -- in direct this morning?
*24* A.    Yes.
*25* Q.    Look, if I have this wrong, tell me I have this wrong.

```
 1  But the point of your scheduling of the bank records for
 2  purposes of this declaration is to show that Mr. Kazmi was
 3  moving money, and unless stopped, could abscond and all the
 4  money would be gone, right?
 5  A.   The point of these summary tables?
 6  Q.   Yes, sir.
 7  A.   I think the point of the summary tables was to provide a
 8  depiction of the flow of the money and specifically to show
 9  that there was no significant engagement with third-party
10  liquidity providers, exchanges, margin accounts, some --
11  someplace where trading -- you know, legitimate trading could
12  take place.
13  Q.   So that's super helpful.  So I just want to be clear.
14  The purpose of the flow of money in your declaration should
15  not be meant to be read as evidence of potential dissipation
16  of assets, correct?
17  A.   I would say that that could be part of it.
18  Q.   Okay.
19  A.   But it's not the whole part.
20  Q.   Fair enough.  So it's part of it, right?  The idea is
21  restrain his money so he can't squander it or hide it, right?
22  A.   Correct.
23  Q.   You now know that 31.5 -- you know the reason for the
24  31.5, right?
25  A.   Correct.
```

```
 1  Q.   What's the reason for the 31.5?
 2  A.   Paying taxes.
 3  Q.   Do criminals pay taxes?
 4           MR. BURDEN:  Objection.
 5           THE WITNESS:  I don't know.
 6           MR. ZINK:  Withdrawn.
 7           THE COURT:  Sustained.  I want to see counsel at
 8  sidebar.
 9           MR. ZINK:  Sure.
10           (Sidebar begins at 11:54 a.m.)
11           THE COURT:  I'm trying to understand the timeline of
12  this.  You learned of this discrepancy, this mistake a week or
13  two after the filing, and you didn't inform the Court or
14  defense counsel.
15       They raised it in their papers?  Because if that's
16  accurate, CFTC is going to be in a lot of trouble today.  So
17  please tell me that that's not accurate what they're implying
18  on cross-examination.
19           MR. BURDEN:  Your Honor, I think it is correct that
20  we --
21           THE COURT:  You learned of it and didn't tell the
22  Court or defense counsel?
23           MR. BURDEN:  Correct, Your Honor.
24           THE COURT:  Why was that?
25           MR. BURDEN:  Because, Your Honor, we considered that
```

1  it was not material to the purpose of the declaration, and it
2  was a small mischaracterization of this transfer that doesn't
3  relate to trading by --
4          THE COURT: Here's the total in the chart, right?
5  $32 million and change. The discrepancy is $31 and a half
6  million. And you didn't find that material? Is that really
7  what you're going to say? Because then you're going to say it
8  out there and not on sidebar.
9          MR. BURDEN: It is, Your Honor.
10          THE COURT: I'll wait to hear from you later. Go
11  back to cross-examination. You guys have a lot of explaining
12  to do today. Get ready to do it.
13          (Sidebar was concluded at 11:55 a.m.)
14          (Open court.)
15          THE COURT: Mr. Zink, are you ready to proceed with
16  cross-examination?
17          MR. ZINK: I am, Your Honor.
18          THE COURT: All right.
19  BY MR. ZINK:
20  Q.   Mr. Edelstein, I would direct your attention to page 3 of
21  your declaration, paragraph 6. Sir, it says, "In August 2022
22  the division sent requests to all registered future Commission
23  merchants."
24          Do you see that?
25  A.   Yes.

1  Q.  "Seeking information related to any commodity futures or
2  Forex trading accounts in the name of and/or controlled by
3  Kazmi, TGG, or MFF."
4      Do you see that?
5  A.  Yes.
6  Q.  And by August of 2022, the CFTC had an open investigation
7  into Traders Global, correct?
8  A.  Correct.
9  Q.  What was the reason, in your view, information requests
10 were sent related to Traders Global?  Why?
11 A.  To determine if there were legitimate trading accounts in
12 the name of the company.
13 Q.  But there was no -- there was no whistleblower, right?
14 A.  Not to my knowledge.
15 Q.  I want you to go back to paragraph 5 of your declaration,
16 page 2.  I think you testified under oath the only person who
17 you interviewed or participated in the interview with was
18 somebody from iS Risk, right?
19 A.  I believe so, yes.
20 Q.  And that was in 2023, right?
21 A.  Correct.
22 Q.  Sir, you -- you didn't interview any of the company's
23 customers, did you?
24 A.  No.
25 Q.  You didn't interview an employee of the company, correct?

*1* A.   Correct.

*2* Q.   You didn't interview the defendant, correct?

*3* A.   Correct.

*4* Q.   You didn't interview one customer of the company,

*5* correct?

*6* A.   Correct.

*7* Q.   Why in August 2022 is the Commission sending out requests

*8* for information from Mr. Kazmi?

*9* A.   As I said, to check and see if there were any trading

*10* accounts at registered entities.

*11* Q.   Sir, I'm going to be asking the question for your

*12* personal view, based on your personal knowledge, not

*13* speculation.

*14*      Had a decision been made of the Commission based on

*15* what you saw and heard that the Forex industry needed to be

*16* disciplined?

*17* A.   I am not aware of any such decision.

*18* Q.   Were you aware of any concern at the Commission that

*19* there needed to be an enforcement action against a Forex

*20* company or individual?

*21* A.   No.

*22* Q.   So what prompted the investigation given no customer

*23* complaint, no whistleblower, no interviews in August of 2022?

*24*          MR. BURDEN:  Objection, Your Honor.  The CFTC

*25* instructs the witness not to answer on the basis of the

```
 1  oath.  Okay?
 2            THE WITNESS:  Okay.
 3            THE COURT:  Mr. Zink, what did you say, about a half
 4  hour?
 5            MR. ZINK:  Half an hour, Your Honor.
 6            THE COURT:  All right.  Let's proceed.
 7  BY MR. ZINK:
 8  Q.   Mr. Edelstein, we'll continue to work through your
 9  declaration.  I'm almost done.  Okay?
10  A.   Okay.
11  Q.   I would direct your attention to page 2 of your
12  declaration, paragraph 5 F.  Do you see that, sir?
13  A.   Yes.
14  Q.   I'll just telegraph this.  I think this is going in the
15  category -- is going to go in the category of honest mistakes,
16  but I don't mean to accuse of anything, but I do want to ask
17  you a question.
18       Interviewed employees of iS Risk Analytics, Inc., it
19  was one employee, right?
20  A.   Correct.
21  Q.   So that's wrong?
22  A.   Correct.
23  Q.   But you weren't trying to deceive anybody, right?
24  A.   No.
25  Q.   You weren't trying to mislead anybody?
```

```
 1          Given that the issue appears to be dead on the
 2   Commission's side, I think the record is what the record is.
 3          THE COURT:  All right.  Fair enough.  All right.  So
 4   then is there anything else other than you guys -- yeah, go
 5   ahead.
 6          MR. BURDEN:  Your Honor, in the nature of candor, I
 7   think Mr. Edelstein testified truthfully that we are aware of
 8   no pre-filing customer complaints or foreign TCRs.  Those are
 9   our confidential whistleblower complaints or anything like
10   that.
11       I don't believe Mr. Edelstein testified as to the
12   genesis of the investigation, and in response to that
13   question, there is an answer, and the CFTC instructed the
14   witness not to answer on the basis of the confidential
15   informant privilege.
16       I would expect that the Court might have questions
17   about this, and we are available to discuss the --
18          THE COURT:  Well, I don't know.  How relevant is it
19   for today's purposes anyway?
20          MR. ZINK:  It's not relevant.
21          THE COURT:  I don't think it moves the needle one way
22   or the another.  So unless the defense has some strong
23   position --
24          MR. ZINK:  Your Honor, I think you get our position,
25   which is there is a judgment made.  I'm not casting
```