'

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Commodity Futures Trading ) | |
| Commission, ) | Civil Action No. 1:23-cv-11808 |
| Plaintiff, ) | |
| v. ) | District Judge Edward S. Kiel |
| ) | |
| Traders Global Group, Inc., a New ) | Mag. Judge Elizabeth A. Pascal |
| Jersey corporation d/b/a "My Forex ) | |
| Funds"; Traders Group Global Inc., a ) | |
| Canadian business organization; and ) | |
| Murtuza Kazmi ) | |
| Defendants. ) | |
| ) | |

# PLAINTIFF COMMODITY FUTURES TRADING COMMISSION'S
# OPPOSITION TO DEFENDANTS'
# MOTION TO DISMISS THE COMPLAINT

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................1

II.     RELEVANT FACTUAL BACKGROUND ....................................................4

III.    ARGUMENT....................................................................................10

    A. The Court Must Evaluate the Complaint in the Light Most Favorable to the CFTC ............................................................................................10

    B. The Complaint Sufficiently Alleges That the Transactions Involved Were Leveraged Retail Forex and Commodity Transactions ................................12

        i.     The Genesis of CFTC Jurisdiction over Off-Exchange Leveraged Retail Forex and Commodity Transactions Supports the Theory of the Complaint ............................................................................12

        ii.    Customers' Transactions Were Forex and Commodity Transactions as Defined by the CEA. ..............................................................16

        iii.   Defendants' Trading Platform Did Not Function As a "Paper-Trading" Educational Tool. ..................................................................20

    C. Defendants Were The Counterparty to Their Customers' Trades................22

    D. The Complaint Plausibly Alleges the "In Connection" Element of Count I and II's Fraud Claims ......................................................................25

    E. The CFTC has Adequately Pled the Elements of its Fraud Claims .............31

        i.     The CFTC Has Adequately Pled Materiality..........................................32

        ii.    The CFTC Has Adequately Pled Scienter...............................................39

IV.     CONCLUSION.................................................................................40

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662, (2009) .................................................................10

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................11

*CFTC v. Arista LLC*, No. 12 CV 9043 PAE, 2013 WL 6978529 (S.D.N.Y. Dec. 3, 2013) ......................................................................................................................36

*CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002) ..................................................13

*CFTC v. Brockbank*, No. 2:00-cv-622 TS, 2006 WL 223835 (D. Utah. Jan. 30, 2006) ......................................................................................................................30

*CFTC v. Capitalstreet Fin., LLC*, No. 3:09-cv-387-RJC, 2012 WL 79758 (W.D.N.C. Jan. 11,2012) .......................................................................................31

*CFTC v. Choi*, No. CV 18-3991-DMG, 2019 WL 1250576 (C.D. Cal. Mar. 5, 2019) ......................................................................................................................31

*CFTC v. Clothier*, 788 F. Supp. 490 (D. Kan. 1992) ...............................................31

*CFTC v. Gorman*, No. 21 civ. 870 (VM), 2023 WL 2632111 (S.D.N.Y. Mar. 24, 2023) ..................................................................................................................... 37

*CFTC v. JBW Capital, LLC*, 812 F.3d 98 (1st Cir. 2016) ......................................30

*CFTC v. Monex Credit Co.*, 931 F.3d 966 (9th Cir. 2019) .....................................35

*CFTC v. Paragon FX Enter., LLC*, Nos. 11 Civ. 7740(FM), 11 Civ. 7741(FM), 2015 WL2250390 (S.D.N.Y. Feb. 2, 2015) .........................................................13

*CFTC v. Ramirez*, No. 4:19-cv-140, 2019 WL 4198857 (S.D. Tex. July 12, 2019) ..............................................................................................................................31

*CFTC v. Regan*, No. 11-cv-8679, 2012 WL 2308368 (N.D. Ill. May 29, 2012) ....29

*CFTC v. Rosenberg*, 85 F. Supp. 2d 424 (D.N.J. 2000). ................................. 32, 36

*CFTC v. Smith*, No. 1:10CV9, 2012 WL 1642200 (W.D. Va. Apr. 16, 2012) .......31

*CFTC v. Sw. Servs., L.L.C.*, No. 1:20-CV-1440-WCG, 2020 WL 8812868 (E.D. Wis. Dec. 17, 2020) ......................................................................38

*CFTC v. Tallinex*, No. 2:17-CV-00483-DN, 2018 WL 3350347 (D. Utah July 9, 2018) ......................................................................................................38

*CFTC v. Vartuli*, 228 F.3d 94 (2d Cir. 2000) .................................................. 28, 29

*CFTC v. Weinberg*, 287 F. Supp. 2d 1100 (C.D. Cal. 2003) ................................30

*CFTC v. WorldWideMarkets, Ltd.*, 2022 WL 3535993 (D.N.J. Aug. 18, 2022) .....35

*CFTC v. Zelener*, 373 F.3d 861(7th Cir. 2004) .......................................................14

*Chadbourne & Parke LLP v. Troice*, 571 U.S. 377 (2014) ...................................26

*Crummere v. Smith Barney*, 624 F. Supp. 751 (S.D.N.Y. 1985) ..................... 26, 27

*Fenico v. City of Philadelphia*, 70 F.4th 151 (3d Cir. 2023) ................................10

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009) ....................................11

*In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267 (3d Cir. 2004) ............................32

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) ........ 37, 38

*In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256 (3d Cir. 2006) ...............11

*Logan v. Bd. of Ed. of Sch. Dist. of Pittsburgh*, 742 F. App'x 628 (3d Cir. 2018) .23

*Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323 (3d Cir. 2022) ..................40

*Maio v. Aetna, Inc.*, 221 F.3d 472 (3d Cir. 2000) ...................................................10

*Morano v. BMW of N. America, LLC*, 928 F. Supp. 2d 826 (D.N.J. 2013) ............11

*R&W Tech. Servs. Ltd. v. CFTC*, 205 F.3d 165 (5th Cir. 2000) ..............................29

*Saxe v. E.F. Hutton & Co.*, 789 F.2d 105 (2d Cir. 1986) ................................. 28, 30

*Schmidt v. Skolas*, 770 F.3d 241 (3d Cir. 2014) ......................................... 18, 20, 23

*SEC v. Gu*, No. 21-17578, 2022 WL 2753478  (D.N.J. July 13, 2022) .................11

*Shapiro v. UJB Fin. Corp.*, 964 F.2d 272 (3d Cir. 1992) .......................................11

iv

*Tatum v. Legg Mason Wood Walker, Inc.*, 83 F.3d 121 (5th Cir. 1996) .......... 26, 27

*Thompson v. Real Estate Mrtg. Network*, 748 F.3d 142 (3d Cir. 2014)........... 10, 11

*United States v. Litvak*, 889 F.3d 56 (2d Cir. 2018) ................................................35

**Statutes**

7 U.S.C. § 2(c)(2)(B)(v)................................................................................14

7 U.S.C. § 2(c)(2)(C) ...................................................................................13

7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) ....................................................................22

7 U.S.C. § 2(c)(2)(C)(ii)(III) .........................................................................14

7 U.S.C. § 6(a) ...................................................................................... 16, 22

7 U.S.C. § 6b ......................................................................................... 13, 28

7 U.S.C. § 6b(a)(2)........................................................................................16

7 U.S.C. § 6b(a)(2)(A) ..................................................................................13

7 U.S.C. § 6b(a)(2)(C) ..................................................................................13

7 U.S.C. § 6b(b) ...........................................................................................36

7 U.S.C. § 9(c)(2)..........................................................................................36

7 U.S.C. § 21 ................................................................................................19

**Regulations**

17 C.F.R. § 5 (2023) ....................................................................................15

17 C.F.R. § 5.1(h)(1) (2023) .................................................................. 15, 22

17 C.F.R. § 5.1(m) (2023)...................................................................... 15, 27

17 C.F.R. § 5.2(b) (2023)..............................................................................15

17 C.F.R. § 5.2(b)(1) (2023).........................................................................12

17 C.F.R. § 5.2(b)(3) (2023).........................................................................12

17 C.F.R. § 5.3(a)(6)(i) (2023) ........................................................ 15, 22

17 C.F.R. § 5.3(a)(6)(ii) (2023) ...............................................................21

17 C.F.R. § 5.5(b)(2) (2023) ........................................................... 17, 33

17 C.F.R. § 5.5(b)(4) (2023) ........................................................... 18, 33

17 C.F.R. § 5.18(b)(3) (2023) ..................................................................34

17 C.F.R. § 5.18(b)(4)(iv) (2023) ........................................................... 34

**Rules**

Fed. R. Civ. P. 12(b)(6) ........................................................ 10, 11, 20, 23

Fed. R. Civ. P. 9(b) ............................................................... 11, 32, 40

NFA Rule 2-36(p) ..................................................................................34

NFA Rule 2-36(p)(1)(ii) ................................................................. 20, 34

NFA Rule 2-36(p)(1)(iii) .........................................................................34

NFA Rule 2-36(s)(5) ...............................................................................20

NFA Rule 2-43 ........................................................................................34

**Other Authorities**

CFTC Staff Letter 04-03 [Re: National Futures Association Forex Rules], 2003
    WL 27291721 (Dec. 23, 2003) ........................................................19

75 Fed. Reg. 3,282 (Jan. 20, 2010) ........................................................14

75 Fed. Reg. 55,410 (Sept. 10, 2010) .....................................................15

NFA Manual Compliance Interpretive Notice 9053; CFTC Staff Letter 04-03 .....19

## I.   INTRODUCTION

Since at least November 2021, Defendant Murtuza Kazmi and his companies, Defendants Traders Global Group Inc., a New Jersey corporation, and Traders Global Inc, a Canadian business organization (together, "Traders Global"), operated a business called My Forex Funds.  Defendants' value proposition to the general public was clearly set out on the myforexfunds.com website: for a fee, customers would purportedly get the opportunity to become "professional traders" for Traders Global, using Traders Global's money to trade leveraged forex and commodity contracts against third-party liquidity providers and splitting the profits.  Traders Global's solicitation proved highly successful, enticing at least 135,000 customers who paid at least $310 million in fees to Traders Global.

Unfortunately for its customers, Traders Global's business was a fraud. Contrary to Traders Global's representations, Traders Global was nothing more than an unauthorized bucket shop, which internalized customers' trades on a trading platform that it controlled and secretly manipulated to hinder customers' trading success.  There is no reason to believe that thousands of customers would have forked over millions of dollars in fees had Traders Global disclosed the truth—i.e., that its customers would be on a rigged trading platform where the promised reward of trading against third parties was a lie.  Meanwhile, Traders Global's business

model was designed to avoid regulation and all of the CFTC retail customer protection rules for trading forex.

On August 28, 2023, the CFTC filed charges under the Commodity Exchange Act, as amended ("CEA"), 7 U.S.C. §§ 1-26, and Commission Regulations ("Regulations"), 17 C.F.R. §§ 1-190 (2023), against Defendants for fraud in connection with leveraged retail forex and off-exchange retail commodity transactions (Counts I and II), acting as an unregistered Retail Foreign Exchange Dealer ("RFED") and Associated Person ("AP") of an RFED (Counts III and IV), and dealing in illegal, off-exchange retail commodity transactions (Count V). Complaint, *CFTC v. Traders Global Group Inc*., No. 1:23-cv-11808-ESK-EAP (D.N.J. filed Aug. 28, 2023) (ECF No. 1. (hereinafter "Complaint" or "Compl.").)

In addition to filing its Complaint, the CFTC also moved for an *ex parte* statutory restraining order and sought a preliminary injunction. (*See Id*., ECF Nos. 1, 7.) On November 14, 2023, after a contested evidentiary hearing, the Court granted in part and denied in part the CFTC's motion for a preliminary injunction and found that the CFTC had made out a *prima facie* case for each of the counts on which it sought a preliminary injunction.[1] (*See* ECF No. 134.) As relevant here, the Court found that the CFTC made a *prima facie* showing that the transactions that customers entered on Traders Global's trading platform were leveraged retail forex

---

[1] The CFTC did not seek a preliminary injunction on Count IV.

and commodity transactions. (*Id*. at 15 (recognizing that "The environment may have been simulated, but the trading was real")).) It also found that the CFTC made a *prima facie* showing that Traders Global acted as counterparty to leveraged forex transactions with its retail customers, and thereby acted as an unregistered RFED. (*Id*. at 14–16.) It further found that the CFTC made a *prima facie* showing that Traders Global engaged in impermissible off-exchange leveraged retail commodity transactions with their customers. (*Id*. at 16.) And finally, the Court found that the CFTC made a *prima facie* showing that Defendants—through misrepresentations and omissions—committed fraud against their customers. (*Id*. at 18–21.)

Notwithstanding the Court's findings, Defendants now move to dismiss all of the claims for failure to state a claim. (Mem. ISO Mot. to Dismiss, ECF No. 186-1 (hereinafter "Mot.").) In so moving, Defendants rehash the same arguments they raised, and that the Court declined to credit, at the preliminary injunction stage. But they insist that the Court should reconsider them because, they claim, the Court misunderstood the nature of its business (for which they blame the CFTC).

The evidentiary record, developed at a contested hearing for which Defendants had months to prepare, does not support Defendants' position. The Court was apprised of the nature of the business and Defendants' misstatements and omissions related to it. The law and alleged facts did not support Defendants' arguments then, and they do not support dismissal of the claims now. Instead,

Defendants' central premise that drives most of their arguments—that the CFTC lacks jurisdiction because customers' transactions were not "real" forex or commodity transactions—presents a fundamentally inaccurate picture of off-exchange leveraged forex and commodity transactions, how regulated RFEDs operate, and the provisions of the CEA and Regulations that govern them.

## II.   RELEVANT FACTUAL BACKGROUND

As alleged in the Complaint, Defendant Kazmi is the CEO and sole shareholder of the entity Defendants Traders Global U.S. and Traders Global Canada ("Traders Global") and has controlled and operated Traders Global as a common enterprise.  (Compl., ¶¶ 16-20, 111.)  Since at least November 2021, Traders Global's My Forex Funds business solicited members of the public to become "professional traders" with an enticing value proposition:  sign up for a trading account and Traders Global will give you money to trade leveraged foreign exchange ("forex") and commodity contracts against third-parties and will split the trading profits with you.  (Compl. ¶¶ 1–2.)  As alleged, the commodity transactions Defendants offered customers to trade included financially settled leveraged forex, precious metals, digital asset commodities, broad-based stock indices, and oil contracts—all contracts under the CFTC's jurisdiction. (Compl. ¶¶ 20, 23, 24, 105.)

There were some significant catches, however.  First, as pled, to get this claimed profit-sharing opportunity, individuals had to pay Traders Global a

registration fee to open a trading account. (Compl. ¶¶ 22, 31–33.) Fees ranged from $49 to $4,900 depending on the type and size of the account the individual wanted. (*Id.* ¶¶ 32–33.) As to account size, the larger the size of the account, the larger the trades the individual could enter and thus, theoretically, the larger the profits. (*Id.* ¶ 33.) As to account type, some types required a customer to prove their trading capabilities by trading in a "demo" phase for a period of time before Traders Global would purportedly let them trade against third-parties using Traders Global's money. (*Id.* ¶ 34.) If a customer wanted to skip this step, then they could choose a different account type that purportedly allowed them to immediately start executing trades against third-parties using Traders Global's money. (*Id.* ¶¶ 29–30.)

Second, and importantly, for all accounts, the customer had to keep the account's balance above a certain amount (*i.e.* a "drawdown limit") that Traders Global set. (*Id.* ¶ 34.) If the customer's losses exceeded the drawdown limit— whether in the "demo" phase or "funded" phase—then Traders Global terminated the customer's account. (*Id.* ¶¶ 37–38.) If a customer wanted to keep trading, then the customer had to pay another registration fee to re-start their account. (*Id.* ¶ 37.)

On the myforexfunds.com website, Traders Global proclaimed to prospective customers that "Your success is our business" and that its goal was to foster a partnership with its customers, emphasizing that "we only make money if you make money" and "if you grow we grow." (*Id.* ¶ 39.) Similarly, the website explained:

5

> If you lose, we lose, so choose carefully the program that fits your FOREX and Prop Firm trading experience. We will do the rest when it comes to support and trading conditions to ensure your success when trading FOREX with a Prop Firm.

(*Id*. ¶ 40.)  Further, Defendant Kazmi told customers in a recorded video that the drawdown limits were meant "to force traders to get into that habit of locking in some of the profits."  (*Id*. ¶ 36.)  He explained: "If you lose all that money," then "it's not only you that's losing, it's us as well right.  Because we want to make you profitable so we can be profitable . . . ."  (*Id*.)

As alleged, Defendants' value proposition and marketing proved highly enticing to retail customers.  During the relevant period, more than 135,000 individuals paid Traders Global at least $310 million in fees for trading accounts.  (*Id*. ¶¶ 2, 44.)  Unfortunately for these customers, and as detailed with particularity in the Complaint, Defendants' business was a fraud.  Contrary to what Defendants claimed, customers were not getting an opportunity to trade leveraged forex and commodity contracts against third parties using Traders Global's money.  (*Compare id*. ¶¶ 21, 25 *with id*. ¶49.)  Instead, unbeknownst to customers, even when a customer's account was in the "funded" stage, their trades executed on a trading platform that Traders Global controlled and where there were no third-parties.  (*Id*. ¶ 49.)

The Complaint further alleges that Traders Global designed this trading platform to secretly handicap customers' trades to reduce the likelihood that

customers' trades executed profitably.  (*Id.* ¶ 48).  For example, Defendants configured specialized software to automatically "delay" the execution of customer orders for a specified period of time and thereby prevent customers from taking advantage of profitable arbitrage opportunities.  (*Id.* ¶¶ 59–60.)  Also with this software, Traders Global added parameters that imposed "slippage" on customer orders, which caused the customers' order to execute at a different price than the best bid or offer displayed to the customer at the time they entered the order.  (*Id.* ¶¶ 59, 61.)  As charged, if a customer managed to still execute profitable trades, then Traders Global subjected that customer's account to even longer delays and more slippage.  (*Id.* ¶ 62.)  To be clear, these devices were not designed to mimic some possible, random "real" market; they were deliberate devices to induce customer accounts into account termination and fee forfeiture.

Further, Traders Global added a $3 commission fee to each trade.  (*Id.* ¶¶ 27, 55.)  Because Traders Global told customers that their trades were being executed against third-party liquidity providers, Traders Global led them to believe that those commissions came from the third-party or an exchange.  In reality, however, there was no third-party commission charge; it was merely Traders Global adding a charge to the customer's trade to make each trade costlier and, therefore, less profitable and their account more susceptible to termination.  (*Id.* ¶¶ 55–58.)

Finally, despite being handicapped, some small percentage of Traders Global customers managed to profitably trade opposite Traders Global in its controlled environment. (*Id*. ¶ 64.) Some actually cost Traders Global money—and their reward was even more special treatment to limit their ability to profit. For fewer than 100 customers, Traders Global actually "straight-through processed" (*i.e.*, "STP'd") the trades to a third-party off-exchange foreign forex and commodities dealer. (*Id*. ¶¶ 64–65.) Yet, even there, Traders Global secretly used its specialized software to impose an additional "spread" on the prices that the customer saw. (*Id*. ¶¶ 70–71.) This spread caused the customers' trade to execute at a worse price than Traders Global got from the third-party off-exchange dealer. (*Id*.)

Why did Traders Global do all of this? Because, as alleged in the Complaint, contrary to what Traders Global's told its customers, Traders Global's interests were not aligned with its customers' interests. Instead, Traders Global's interests were directly adverse to its customers. This was so because if a customer managed to trade profitably at the funded stage, then customers were entitled to a payout. (*Id*. ¶¶ 21, 28–30, 49–50.) But, because there were no third-party liquidity parties, it was Traders Global who had to pay the customer. (*Id*. ¶¶ 3, 49–50, 72.) In other words, a customer's profits were not a "profit split" with Traders Global like Traders Global led customers to believe. (*Id.* ¶¶ 3, 21, 28–30, 49–50) Instead, the customer's profits were Traders Global's losses. And Traders Global paid these losses using money

collected from customers' registration fees.  (*Id.*)  Therefore, Traders Global did not want its customers to trade profitably, it wanted its customers to trade at a loss.

But Traders Global did not just want the customer to trade at a loss to avoid paying out money to the customer.  Traders Global also needed the customer to trade at a loss so that Traders Global could shut down the customers' account for breaching the drawdown limit and retain the customer's registration fees.  (*Id*. ¶¶ 51–54.)  In other words, Traders Global wanted its customers to sustain "massive" losses (*id*. ¶ 87) so that it could profit.

Communications from a key Traders Global employee to Defendants' third-party software advisor make clear that they wanted their customers to lose.  (*See Id*. ¶¶ 76–92.)  For example, this employee complained: "im pretty upset because we have so many accounts continuously trading and making huge amounts of money . . . . [W]e have record losses but we aren't picking out those accounts that dont lose[.]"  (*Id*. ¶ 83.)  Another day, the employee wrote to the advisor: "our traders are getting slaughtered today[.]"  (*Id*. ¶ 86.)  When the Advisor asked, "[L]ike overall?," "Or a ton getting shutoff from downdraws?", the employee responded "[B]oth i think."  (*Id.*)  "[N]ice," replied the Advisor.  (*Id*.)

In all, the Complaint's allegations paint a clear picture and viable causes of action:  Traders Global's value proposition to its customers was a lie.  It sold to individuals the false dream that they could become "professional traders" in

partnership with Traders Global.  But the customers' success was not Traders Global's business, as customers believed.  In truth, the customers' *failure* was Traders Global's business.  And the success of that business required that Traders Global take in more in customer fees than it had to pay out to customers who managed to trade profitably.  To assure this success, Traders Global configured its trading platform to secretly stack the deck against the customers.  This is fraud, and Traders Global and Defendant Kazmi profited well from it.  As alleged in the Complaint, during the relevant period, Traders Global took in approximately $310 million from customers' fees; paid out approximately $137 million mostly to customers as trading profits; and achieved a net income of $172 million.  (*Id*. ¶ 72.)

## III.   ARGUMENT

### A. The Court Must Evaluate the Complaint in the Light Most Favorable to the CFTC

On a motion to dismiss pursuant to Rule 12(b)(6), a federal court reviews the sufficiency of a complaint, and "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Fenico v. City of Philadelphia*, 70 F.4th 151, 161 (3d Cir. 2023) (*quoting Maio v. Aetna, Inc*., 221 F.3d 472, 482 (3d Cir. 2000)).  Under Rule 8 of the Federal Rules of Civil Procedure's "notice pleading" standard,  a complaint must allege sufficient factual matter, accepted as true, to state a "plausible" claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim is "plausible" so long as "the pleaded

10

factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Thompson v. Real Estate Mrtg. Network*, 748 F.3d 142, 147 (3d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).  Although a complaint must provide more than "a formulaic recitation of the elements of a cause of action," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), it survives a Rule 12(b)(6) motion so long as it contains factual allegations "that raise a reasonable expectation that discovery will reveal evidence of the necessary element," *Thompson*, 748 F.3d at 142 (quoting *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009)).

Here, Counts I and II are "grounded in fraud" for which Rule 9(b)'s heightened pleading standard applies.  *See Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 288 (3d Cir. 1992).  Rule 9(b) requires the complaint to "state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  Courts interpret this to require the complaint to include "the essential factual background that would accompany 'the first paragraph of a newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." *Morano v. BMW of N. America, LLC*, 928 F. Supp. 2d 826, 832 (D.N.J. 2013) (quoting *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276–77 (3d Cir. 2006)); *see also SEC v. Gu*, No. 21-17578, 2022 WL 2753478, at *3 (D.N.J. July 13, 2022) (same).

**B. The Complaint Sufficiently Alleges That the Transactions Involved Were Leveraged Retail Forex and Commodity Transactions**

Defendants' primary argument in support of dismissal is that the CEA and its Regulations do not reach their misconduct because there were no "real" commodity transactions involved.  (Mot. at 17–38.) This argument is the lynchpin for virtually every argument that they make in support of dismissal.  As set forth below, however, Defendants' foundational argument evinces a fundamental misconception about what off-exchange leveraged forex and commodity transactions are, how regulated RFEDs operate, and the relevant CEA provisions and CFTC regulations that govern them.  In addition, as also discussed, the Complaint's factual allegations do not support Defendants' position.  A brief history of the CFTC's jurisdiction over off-exchange leveraged commodity transactions proves useful and clarifies many of Defendants' inaccurate assertions on the CEA's history and the CFTC's jurisdiction.

**i. The Genesis of CFTC Jurisdiction over Off-Exchange Leveraged Retail Forex and Commodity Transactions Supports the Theory of the Complaint**

Here, the Complaint charges Defendants with operating a fraud in connection with leveraged retail foreign exchange transactions (Count I) and leveraged retail commodity transactions (Count II) in violation of Regulation 5.2(b)(1) and (3), 17 C.F.R. § 5.2(b)(1), (3) (2023), and Section 4b(a)(2)(A) and (C) of the CEA,

7 U.S.C. § 6b(a)(2)(A), (C), respectively.[2]  The Complaint also charges Defendants with operating an unregistered RFED (Count III) and impermissibly entering into and offering to enter into off-exchange leveraged commodity transactions with retail customers (Count V).  Further, it charges Defendant Kazmi with acting as an unregistered RFED Associated Person (Count IV).

Prior to 2008, and several years before the passage of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act") and related amendments to 7 U.S.C. § 2(c)(2)(C) among others, a circuit split developed about the breadth of the CFTC's jurisdiction over leveraged retail foreign exchange transactions that were executed off exchange (meaning, not executed on a board of trade registered and authorized by the CFTC).  *See, e.g., CFTC v. Paragon FX Enter., LLC*, Nos. 11 Civ. 7740(FM), 11 Civ. 7741(FM), 2015 WL2250390, at *1–2 (S.D.N.Y. Feb. 2, 2015) (describing the regulatory and legal history of the CFTC's jurisdiction over off-exchange leveraged retail commodity transactions).  At times, the CFTC faced jurisdictional challenges when it pursued charges against individuals and entities who ran fraudulent "bucket shops." *CFTC v. Baragosh*, 278 F.3d 319, 323 (4th Cir. 2002) (internal citations omitted) (examining in detail the

---

[2] This brief refers to statutory provisions by location in the U.S. Code, rather than by CEA section number. (For instance, 7 U.S.C. § 6b is the same as Section 4b of the CEA.) Should the Court require it, a conversion chart is located on the CFTC's website at: https://www.cftc.gov/LawRegulation/ceaconvchart.html.

history of the CEA and the laws and regulations regarding bucket shops).  "Bucket shop" describes "a business that allows customers to speculate on movements in commodity prices by" taking "the opposite side of a customer's order rather than openly and competitively executing the order on an exchange." *Id.*

Some circuits, like the Fourth Circuit, found that the CEA's anti-fraud provisions reached bucket shops offering any type of leveraged forex transaction to retail customers. *See id.* at 329.  Yet, other circuits, like the Seventh Circuit, held that the CEA's anti-fraud provisions did not reach alleged fraud involving off-exchange leveraged forex transactions if they were spot transactions. *See CFTC v. Zelener*, 373 F.3d 861, 866–69 (7th Cir. 2004), *reh'g and reh'g en banc denied*, 387 F.3d 624 (7th Cir. 2004).

Congress remedied this divide as part of the Dodd-Frank Act and the CFTC Reauthorization Act of 2008, when it clarified and expanded the CFTC's jurisdictional authority with respect to off-exchange leveraged retail foreign exchange transactions. *See* 7 U.S.C. §§ 2(c)(2)(B)(v), 2(c)(2)(C)(ii)(III).  Congress took these steps in part "[t]o remedy the large number of fraud cases where jurisdiction had been questioned" and to "allow the Commission to protect the public from fraud."  Regulation of Off-Exchange Retail Foreign Exchange Transactions and Intermediaries, 75 Fed. Reg. 3,282 (Jan. 20, 2010).

Pursuant to this authority, the CFTC added new, and amended existing, regulations, including those the Complaint alleges that Defendants violated.  Among others, the Regulations created a new registrant category: Retail Foreign Exchange Dealers ("RFEDs"), which the Regulation defined as "any person that is, or that offers to be, the counterparty to a retail forex transaction." 17 C.F.R. §§ 5.1(h)(1) and 5.3(a)(6)(i) (2023).  In addition to requiring an RFED to register with the CFTC, the CFTC also added a new section of regulations for RFEDs to protect retail customers and promote the integrity of the forex markets.  Such regulations include requirements related to disclosure, recordkeeping, financial reporting, minimal capital requirements, and operational standards.  *See* 17 C.F.R. § 5 (2023).

The CFTC also added anti-fraud provisions that specifically reach fraudulent conduct "in or connection with any retail forex transactions."  *See* 17 C.F.R. § 5.2(b) (2023).  Further, it defined "retail commodity transaction" broadly to include not only a contract or transaction, but also an "account." 17 C.F.R. § 5.1(m) (2023) ("Retail forex transaction means any account, agreement, contract or transaction described in section 2(c)(2)(B) or 2(c)(2)(C) of the Act.").  The CFTC added these regulations to account for "the essential differences between on-exchange transactions and retail forex transactions, and by the history of fraudulent practices in the retail forex transactions."  Regulation of Off-Exchange Retail Foreign Exchange Transactions and Intermediaries, 75 Fed. Reg. 55,410 (Sept. 10, 2010).

15

Overall, through these regulations, the CFTC created a regulatory framework through which retail forex "bucket shops" could lawfully operate, yet still protect retail investors against the inherent risks associated with such operations and the opportunities for fraud they present.  But, these regulations only permitted regulated off-exchange retail leveraged *forex* transactions.  The CEA and CFTC Regulations otherwise continue to make it unlawful, with only a few exceptions not applicable here, for anyone to engage or offer to engage in off-exchange retail leveraged transactions in or in connection with other types of commodities.  *See* 7 U.S.C. § 6(a).  Further, aside from making such transactions impermissible, the CEA also gives the CFTC jurisdiction over fraud that a person may commit in connection with such impermissible transactions.  *See* 7 U.S.C. §§ 6b(a)(2) (anti-fraud provision).

### ii. Customers' Transactions Were Forex and Commodity Transactions as Defined by the CEA.

To attack the CFTC's jurisdiction over their alleged misconduct, Defendants first insist that their customers did not execute "real" forex or commodity transactions because their "customers did not make actual trades in a real market." (Mot. at 11.)  In the same vein, Defendants also insist the trades customers executed were not actual commodity transactions because the trading platform was a "simulated" environment, akin to a "computer game[]."[3]  (*Id*.)  In other words,

---

[3] For this argument, Defendants rely, in part, on the deposition testimony of Matthew Chichester.  The CFTC discusses use of that testimony in Section III.C, *infra*.

according to Defendants' logic, the customers' trades remained on an internal trading platform that Traders Global controlled, therefore the customers trades were not in a "real market" but were just fake trades in a "game."  Thus, Defendants posit, there were no commodity transactions involved so the CFTC lacks jurisdiction to reach their alleged fraud and misconduct.

As demonstrated above, the CEA reaches these transactions, regardless of whether they were executed on an internal trading platform.  Further, the CFTC Regulation's disclosure requirements for RFEDs—which require, among other things, disclosure to customers about how an RFED functions—demonstrates that Defendants' reference to a "real market" is legally and factually nonsensical. Defendants fundamentally misconstrue the nature of an *off-exchange* leveraged commodity transaction.  Namely, Regulation 5.5(b)(2), 17 C.F.R. § 5.5(b)(2) (2023), requires an RFED to disclose to its customers that:

> AN ELECTRONIC TRADING PLATFORM FOR RETAIL FOREIGN CURRENCY TRANSACTIONS **IS NOT AN EXCHANGE. IT IS AN ELECTRONIC CONNECTION FOR ACCESSING YOUR DEALER**. THE TERMS OF AVAILABILITY OF SUCH A PLATFORM ARE GOVERNED ONLY BY YOUR CONTRACT WITH YOUR DEALER.
>
> **Any trading platform that you may use to enter off-exchange foreign currency transactions is only connected to your futures commission merchant or retail foreign exchange dealer**. You are accessing that trading platform only to transact with your dealer. **You are not trading with any other entities or customers of the dealer by accessing such platform**. The availability and operation of any such platform, including the consequences of the unavailability of the

17

trading platform for any reason, is governed only by the terms of your account agreement with the dealer.

(emphasis supplied).[4]  Further, Regulation 5.5(b)(4), 17 C.F.R. § 5.5(b)(4) (2023), also requires an RFED to disclose, in relevant part, that:

> YOU ARE LIMITED TO YOUR DEALER TO OFFSET OR LIQUIDATE ANY TRADING POSITIONS SINCE **THE TRANSACTIONS ARE NOT MADE ON AN EXCHANGE OR MARKET**, AND YOUR DEALER MAY SET ITS OWN PRICES.
>
> Your ability to close your transactions or offset positions is limited to what your dealer will offer to you, **as there is no other market for these transactions**.

(emphasis supplied.)

These disclosure requirements show that, just like Defendants' trading platform, a properly regulated RFED's trading platform is controlled by the RFED even if it is not connected to some broader market.  That does not make such a trading platform just a "game", however.  Nor does it mean that the trades executed on the platform are not real commodity transactions.  Instead, it simply means that an RFED, by definition, operates its own off-exchange foreign exchange market in which the only participants are the RFED on one side, and its customers on the other side.  This is exactly how Defendants actually structured their transactions with their

---

[4] On a motion to dismiss, the Court may take judicial notice of the CFTC Regulation's disclosure requirements to evaluate the plausibility of the CFTC's claims against Defendants because those Regulations are a matter of public record. *See Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (holding that on a motion to dismiss a court may consider "the allegations contained in the complaint, exhibits attached to the complaint and matters of public record.").

customers. Accordingly, Defendants' baseline premise of a "real market"—i.e., that a trading platform needs to be connected to a broader market for the trades on it to qualify as commodity transactions—is unsupportable.

To further their argument, Defendants also try to draw a distinction between the customer orders that remained on Defendants internal trading platform compared to the few customer orders that Defendants "STP'd" to a third-party dealer (i.e., the "A-Book" orders). (Mot. at 19.) Defendants suggest that only the STP'd orders qualified as real leveraged commodity transactions.[5] Again, Defendants' argument rests on the false premise that a leveraged commodity transaction must execute on some broader market for it to qualify as a "real" commodity transaction, and is inconsistent with the allegations in the Complaint.

Further, National Futures Association (NFA) rules for RFEDs confirm that registered RFEDs operate just like Defendants did by sometimes straight-through processing transactions.[6] Specifically, NFA rules define "straight-through

---

[5] Elsewhere, they also insist that, for these STP'd orders, the only parties to any transaction were Defendants and the third-party dealer. (Mot. at 26–27.) The CFTC addresses this argument in footnote 9, *infra*.

[6] NFA is a statutorily-authorized futures association registered with the CFTC pursuant to 7 U.S.C. § 21, and serves as an industry self-regulatory organization for the U.S. derivatives industry, with membership that includes RFEDs under the category "forex dealer members." (*See, e.g.*, NFA Manual Compliance Interpretive Notice 9053; CFTC Staff Letter 04-03 [Re: National Futures Association Forex Rules], 2003 WL 27291721 (Dec. 23, 2003).). The Court may take judicial notice

processing" as "when a Forex Dealer Member [RFED] automatically executes (without human intervention and without exception) an offsetting position to a customer order with another counterparty prior to providing an execution to the customer order."  NFA Rule 2-36(s)(5) (Requirements for Forex Transactions).[7] NFA rules also require that an RFED make different disclosures to customers depending on whether the RFED uses straight-through processing for a transaction or internalizes the transaction on its platform.  *See id.* at Rule 2-36(p)(1)(ii) & (ii).

Simply put, these NFA rules reflect that registered RFEDs operate just like Defendants operated, even with respect to STP'd transactions.  This is because, as the Complaint alleges, Defendants operated an unregistered RFED.

### iii. Defendants' Trading Platform Did Not Function As a "Paper-Trading" Educational Tool.

Next, Defendants attempt to analogize their trading platform to a "paper-trading" educational tool that merely provided customers "a risk-free way to hone your trading skills" where one "can't make or lose any money." (Mot. at 17 & n.3).[8]

---

of NFA rules to determine whether the Complaint asserts plausible claims against Defendants because they are in the public record. *See Schmidt*, 770 F.3d at 249.

[7] available online at https://www.nfa.futures.org/rulebooksql/rules.aspx?Section=4 &RuleID=RULE%202-36

[8] In explaining what "paper-trading" is, Defendants rely upon materials outside the four-corners of the Complaint.  (*See* Mot. at 17–18 n.3.)  They do not explain how a Court may properly consider these materials on a motion to dismiss pursuant to Rule 12(b)(6).  Regardless, as the CFTC explains here, the Complaint alleges plausible

Elsewhere, they also insist that their customers "bore no risk of loss" associated with the trades they executed. (Mot. at 25 n.8.) The Complaint's factual allegations belie Defendants' analogy, however.

Nothing about Defendants' trading platform was "risk-free." Instead, as alleged, at all points, customers' ability to continue trading on the platform depended upon the profits and losses from the trades that they executed. This was so because if a customer's trading losses caused their account to breach the drawdown limit, then Traders Global terminated the customer's account. (Compl. ¶¶ 22, 34–38.) If the customer wanted to continue trading, then he or she had to pay another fee to re-open the account. (*Id.* ¶ 37.) This was true even at the "demo" phase for those account types that had such a phase. (*Id.* ¶ 38.) And, at the funded stage, if a customer managed to trade profitably, then the amount Traders Global paid them was based on the profitability of those trades. (*Id.* ¶¶ 28–30, 50.) Overall, the customers' trades determined the profits and losses in their account and, in turn, those profits and losses determined whether Defendants paid them or whether Defendants terminated their account and kept their registration fee. None of these attributes suggest a "risk free" educational tool where one "can't make or lose any money."

---

facts to support that Defendants' myforexfunds.com did not operate as a "paper-trading" educational tool.

### C. Defendants Were The Counterparty to Their Customers' Trades

As outlined above, Count III charges Defendants with acting as an unregistered RFED in violation of Regulation 5.3(a)(6)(i); Count IV charges Defendant Kazmi with acting as an unregistered RFED AP in violation of Section 2(c)(2)(C)(iii)(I)(aa) and Regulation 5.3(a)(6)(ii); and Count V charges Defendants with having entered into, executed, and confirmed the execution of off-exchange commodity transactions in violation of 7 U.S.C.§ 6(a).  (Compl. Counts III, IV, V.) CFTC regulations define an RFED as "any person that is, or that offers to be, the counterparty to a retail forex transaction."  17 C.F.R. § 5.1(h)(1) (2023).

Defendants argue that, despite the clear allegations that Traders Global—not a third-party "liquidity provider"—was the counterparty to leveraged retail forex or commodity transactions with customers (*see, e.g.* Compl. ¶ 3), each of these counts fail because Traders Global was not in fact a counterparty.  In support, Defendants first rely on their incorrect view of a "real commodity transaction", arguing that they could not have been a counterparty to a forex or commodity transaction because the transactions were not real forex or commodity transactions.  (Mot. at 30–31.)  As discussed above, this position lacks legal or factual support.

Second, they point to the deposition testimony of Matthew Chichester, who is an employee of the third-party advisor that Traders Global used to help configure its trading platform.  (Mot. at 11–12, 31–36.)  Defendants excerpt portions of Mr.

Chichester's testimony not contained in the Complaint, in which he testified that customers' orders remained on Traders Global's internalized trading system. (*Id*. at 31–32.)  Then, they point to an excerpt in which the CFTC asked Mr. Chichester if Traders Global took "the opposite position" of the customers' trades, to which he responded "I would say that would be true if it was the customer's own money that they had deposited."  (*Id*. at 32.)  They insist that this deposition testimony establishes, as a matter of law, that Defendants were not the counterparties to their customers' trades and, therefore, that Counts III, IV and V fail.

Defendants' reliance on Mr. Chichester's testimony is improper.  As a preliminary matter, on a motion to dismiss pursuant to Rule 12(b)(6), a court generally only examines "the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).  The Third Circuit has held that "[u]nder the Rule 12(b)(6) standard, courts [] may consider deposition testimony, but only for the existence of the testimony—not for the truth of the facts asserted therein." *Logan v. Bd. of Ed. of Sch. Dist. of Pittsburgh*, 742 F. App'x 628, 632 (3d Cir. 2018) (citations omitted).

Regardless, Mr. Chichester's deposition comments about Traders Global's counterparty status are merely lay opinions.  They certainly do not determine, as a matter of law, Traders Global's counterparty status.  And, even if it were to be considered, Mr. Chichester's opinions do not support Defendants' proposition.  As

Defendants acknowledge in a footnote, in this portion of Mr. Chichester's testimony, he was primarily explaining that most of the customers' transactions at the funded stage (*i.e.* B-book) did "not go to a counterparty." (Mot. at 33 n. 11.) In other words, he was explaining that the transactions did not go out to a *third-party* liquidity provider as Traders Global falsely told their customers. That does not mean there was no counterparty at all. To the contrary, as Defendants also acknowledge in this footnote, Mr. Chichester stated that "I guess you would consider Traders Global the counterparty, like taking the other side of [the transaction]," but that he believed the term was "a little murky." (*Id.*) In all, Mr. Chichester's lay opinion on Traders Global's counterparty-status, whatever it may be, should not and does not establish as a matter of law whether Traders Global was a counterparty to its customers' transactions. His opinions are not a basis to dismiss any of the claims.

In essence, Defendants seek to use their interpretation of Mr. Chichester's testimony as a vehicle to repackage their same two arguments that: (1) these were not "real" forex and commodity transactions (Mot. at 35 ("no actual trading was occurring")); and (2) customers were not parties to any transaction because they purportedly faced "no risk of liability for any trading losses," (*id.*). As explained above, however, the Regulations and Rules, as well as the Complaint's factual allegations, do not support these arguments.

24

To re-summarize the well-pleaded facts: when a customer traded profitably, Traders Global paid the customer out of Traders Global's own assets.  When the customer lost and violated the drawdown limit, Traders Global terminated the customer's trading account and kept the customer's fee.  Defendants' interests and the customers' interests were adverse, not aligned like Defendants told customers. Defendants also controlled the trading platform on which customers executed orders, setting the spreads, introducing secret slippage and delays, and charging commissions to customer's transactions.[9]  Those are the actions and characteristics of a counterparty.  Those are the actions and characteristics of an RFED.

### D. The Complaint Plausibly Alleges the "In Connection" Element of Count I and II's Fraud Claims

Relying on this same mischaracterization of governing law, Defendants also argue that the Complaint fails to allege the "in connection" element of Count I and

---

[9] As relevant to whether customers were parties to "funded" stage transactions, Defendants try distinguish between internalized transactions (i.e., B-Booked), and the few that Defendants STP'd to a third-party.  They argue that the STP'd transactions were "real" commodity transactions, but cannot form the basis for the claims because only Defendants and the third-party were parties to the transactions. (Mot. at 26–27.)  This argument misses the mark.  As the Complaint alleges and Defendants' acknowledge, the STP'd transactions were customer-transactions that Traders Global "mirrored" with a third-party dealer. (Mot. at 26.)  But the pricing and execution that the customer received for those trades were not what Defendants received from the third-party. (Compl. ¶ 70.)  Thus, the STP process resulted in two commodity transactions:  one between the customer and Defendants; and a "mirrored" one between Defendants and the third-party.  The alleged fraud was in connection with the commodity transactions between the customer and Defendants. The customers had no interface with the mirrored transactions.

II's fraud claims since the customers' trades were not "regulated" (*i.e.* executed on a registered exchange subject to CFTC regulatory oversight).  (Mot. at 21–24.) Defendants cite myriad cases mostly involving other statutes to support their claim that the alleged fraud must be "in connection" with "real" and "regulated" commodity transactions to which the claimed victims were parties.  (Mot. at 20–24.) For example, they discuss *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377 (2014). (Mot. at 23–34.)  There, the Supreme Court considered whether private litigants' state-law class action involved misrepresentations or omissions of material fact "in connection with the purchase or sale of a covered security."  *Id*.  A central issue was whether the fraud was in connection with a "covered security" or an "uncovered security."   The Court held that, even though the misrepresentations were about covered securities, those misrepresentations only impacted the victims' decision to purchase uncovered securities. *Id.* at 395.  Defendants also rely upon *Tatum v. Legg Mason Wood Walker, Inc.*, 83 F.3d 121 (5th Cir. 1996), (Mot. at 21), in which a defendant covered his commodity trading losses from his unauthorized by secretly liquidating plaintiff's securities investments. *Tatum*, 83 F.3d at 122–23.  The court held that the fraud did not meet the "in connection" requirement because the plaintiff had no knowledge of the commodity trades.  As another example, Defendants cite *Crummere v. Smith Barney*, which dismissed a private litigant's securities claims

where "the alleged misstatements occurred after the unremarkable sale of [plaintiff's] bonds." 624 F. Supp. 751, 755 (S.D.N.Y. 1985).

Defendants' reliance on these cases remains premised on their erroneous underlying position that Traders Global's business did not involve real forex or commodity transactions to which the customers were a party. (*See* Mot. at 21–28.) As set forth above, the Complaint plausibly alleges the existence of real off-exchange forex and commodity transactions to which customers were a party. And, distinguishing *Tatum* in particular, Defendants' customers certainly believed they would be entering into forex and commodity transactions. Therefore, those cases do not support dismissal of the fraud charges here.

In addition, contrary to Defendants' argument, the fraud reached all of the customers regardless of what type of account they chose or whether they ever made it past the "demo" phase. Regulation 5.2(b) covers leveraged retail forex transactions, and defines "retail forex transaction" to include not only individual contracts and transactions, but "accounts." 17 C.F.R. § 5.1(m) (2023). Similarly, Section 2(c)(2)(C)(vii) specifies that "[t]his Act applies to, and the Commission shall have jurisdiction over an account . . . that is *offered for the purpose of trading*, or that trades," forex agreements, contracts, or transactions. 7 U.S.C. § 2(c)(2)(C)(vii) (emphasis supplied); (*see also* Compl. ¶ 105(c)). Here, Defendants' entire value proposition to customers was they would get an account to trade leveraged retail

27

forex and commodity transactions against third-party liquidity providers.  Thus, all of the accounts Defendants offered were for the purpose of trading leveraged forex and commodity transactions, even the account types with a "demo" phase.[10]

What is more, Defendants also ignore the broad language of the relevant anti-fraud provisions that the CFTC charges.  "By its terms, Section [6]b is not restricted…to instances of fraud or deceit 'in' orders to make or the making of contracts.  Rather, Section [6]b encompasses conduct 'in or in connection with' futures transactions.  The plain meaning of such broad language cannot be ignored." *CFTC v. Vartuli*, 228 F.3d 94, 101 (2d Cir. 2000) (quoting *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 110–11 (2d Cir. 1986)).

The facts in *Vartuli* prove instructive.  There, the CFTC charged a company and its sole shareholder with fraud under Section 4b of the CEA, 7 U.S.C. § 6b, for allegedly misrepresenting that software it sold would give purchasers in-the-moment profitable "buy" and "sell" futures trading instructions.  228 F.3d at 94.  The district court entered judgment against the defendants, and defendants appealed, arguing that their fraudulent claims about the software was not "in connection" with futures transactions.  *Id*.  The Second Circuit affirmed the district court's "in connection" finding.  *Id.* at 102.  It emphasized that the "expensive software [at issue] had no

---

[10] Certainly, nothing remotely suggests that those customers would have decided to open an account merely to stay in the "demo" phase where they risked their registration fee but would not receive any payouts.

purpose except as a device for choosing which trades to make," so fraud in the sale of that software was fraud "in connection with" commodities futures transactions. *Id.* (quoting *R&W Tech. Servs. Ltd. v. CFTC*, 205 F.3d 165, 172–73 (5th Cir. 2000)).

Here, Defendants did not offer software that provided trading advice. But they offered accounts for the purpose and opportunity to trade leveraged forex and commodity transactions. Thus, just like the software in *Vartuli* that customers purchased to allow them to increase their profits from futures trading, Traders Global's customers opened accounts to allow them the opportunity to trade leveraged forex and commodity transactions against third-party liquidity providers. Thus, all customers were defrauded "in connection" with offers of a commodity transaction even if they never managed to advance to the "funded" stage and, therefore, never found themselves unwittingly trading against Traders Global in an internal trading system that Traders Global controlled and manipulated.

As another example, the Commission also brought an enforcement action against an entity that solicited members of the public to enroll in what was actually described as a training program to become proprietary traders of the entity. *CFTC v. Regan*, No. 11-cv-8679, 2012 WL 2308368, at *3 (N.D. Ill. May 29, 2012) (default judgment). There, clients paid fees to enroll in the program for instruction on how to become successful commodity futures and forex proprietary traders. *Id.*, at *4. The entity told clients that those who completed the program routinely

advanced to higher trading levels, and by doing so, received large profit distributions, *id.*, but failed to disclose that no trader ever advanced or received payouts, *id.*, at \*5.  The entity thereby engaged in fraud and was also liable for failing to register with the Commission as a commodity trading advisor.  *Id.*, at \*\*6–7.

Further, Defendants are asserting a version of a never-accepted legal argument that scammers cannot be held liable under the CEA if they do no commodity transactions.   The law is clear, however, that the CFTC may bring fraud or registration charges even if there was no actual trade in a commodity interest.  *See, e.g., CFTC v. JBW Capital, LLC*, 812 F.3d 98, 109 (1st Cir. 2016) (noting that case law is settled on the broad interpretation of the "in connection with" language of the statute, and applying it to defendant's misrepresentations he made during his solicitations, despite no actual transactions flowing from those solicitations) (citing *Saxe*, 789 F.2d at 110–11); *CFTC v. Weinberg*, 287 F. Supp. 2d 1100, 1106 (C.D. Cal. 2003) (Defendant violated Section 4b of the Act where "investor funds were given to [defendant] for use in completing various commodity transactions," even though there was "no evidence of any trades or . . . trading account."); *CFTC v. Brockbank*, No. 2:00-cv-622 TS, 2006 WL 223835, at \*1, 4 (D. Utah. Jan. 30, 2006) (even where it was "undisputed that there was no actual commodities trading," court rejected contention that CFTC does not have jurisdiction unless commodities were actually traded, "especially . . . where the CFTC brings claims . . . alleging violation

of Section 6b(a), which prohibits fraud in connection with commodity futures transactions by any person regardless of their status as CPOs."); *CFTC v. Clothier*, 788 F. Supp. 490, 492 (D. Kan. 1992) (rejecting defendant's argument that the CEA requires actual commodities trading with investors' funds because "to accept defendants' argument . . . would remove such misappropriation from the statute."). The same has been true for persons who misappropriated funds entrusted to them for trading forex—an actual forex transaction is not required. *See, e.g.*, *CFTC v. Capitalstreet Fin., LLC*, No. 3:09-cv-387-RJC, 2012 WL 79758, at *3 (W.D.N.C. Jan. 11, 2012) (default judgment); *CFTC v. Smith*, No. 1:10CV9, 2012 WL 1642200, at **3, 9 (W.D. Va. Apr. 16, 2012) (defendants fraudulently solicited customers to trade forex, but opened no actual trading accounts); *CFTC v. Ramirez*, No. 4:19-cv-140, at **2, 9, 2019 WL 4198857 (S.D. Tex. July 12, 2019) (default judgment) (defendants never opened any forex accounts for trading pool); *CFTC v. Choi*, No. CV 18-3991-DMG, 2019 WL 1250576, at ** 1, 5 (C.D. Cal. Mar. 5, 2019) (defendant never opened actual trading accounts on behalf of clients). Overall, the Complaint alleges facts that plausibly satisfy the "in connection" requirement.

### E. The CFTC has Adequately Pled the Elements of its Fraud Claims

Finally, Defendants argue that the Complaint failed to adequately plead the materiality and scienter elements of the Complaint's fraud claims (Counts I & II) in

31

conformity to the particularity requirements of Rule 9(b).   (Mot. at 38–48.) Defendants are wrong.

### i.   The CFTC Has Adequately Pled Materiality

The Third Circuit, like other circuits, holds that "a statement is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision." *CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 447 (D.N.J. 2000).   In addition, "[m]ateriality is ordinarily an issue left to the factfinder and is therefore not typically a matter for Rule 12(b)(6) dismissal" unless "the alleged misrepresentations or omissions are so *obviously unimportant*."   *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274–75 (3d Cir. 2004).

Here, it is virtually self-evident that a reasonable customer, when deciding whether to pay Traders Global to open an account, would find it material that Traders Global's interests were actually adverse to theirs; that Traders Global's success did not depend on the customer's success, but instead depended on the customer's failure; and that to encourage that failure Traders Global secretly applied parameters to their customer's orders to make it harder for the customer to trade at a profit.

In fact, the Court already found in its Opinion on the CFTC's Motion for Preliminary Injunction that the CFTC established a *prima facie* case as to materiality.  Specifically, the Court held that "[t]he record evidence supports that the misrepresentations and omissions are material because they go to the fundamental

nature of the relationship between Traders Global and its customers, and the nature of the trading offered to customers." (Dkt. 134 at 19.)  The Court elaborated that:

> In deciding whether to purchase one of Traders Global's programs, a reasonable customer would likely find it important that Traders Global's interests are actually adverse to customers on substantially all "live account" trades.  Specifically, a reasonable customer would likely find it important that: (1) he or she would not be executing trades for Traders Global but, instead, Traders Global is the counterparty; (2) Traders Global actually lost money when the customer made money; and (3) any purported "profits" Traders Global promised to pay a customer for successful trading actually came from fees that other customers paid Traders Global. [...]

> Similarly, and particularly given that their interests were adverse, a reasonable customer would likely find it important that Traders Global controlled the environment in which the customer executed trades, setting the bid-ask spread, and imposing delay and slippage, as well as commissions, on customers' trades.

(*Id.* at 19-20.)  The Court's opinion was and remains informed and correct.

Yet, looking beyond this, the Regulations and Rules that govern RFEDs and provide safeguards for customers in the forex markets also show these misrepresentations and omissions were material.  As discussed above, the CFTC Regulations require RFEDs to disclose to their customers that:  (1) the RFED's interest are adverse to the customers; and (2) the customers' transactions are executed in an electronic environment the RFED controls and which is not connected to a broader market.  17 C.F.R. §§ 5.5(b)(2), (4). (2023).  The CFTC's Regulations also require, for example, that RFEDs "[f]airly and objectively establish settlement

prices for retail forex transactions."  17 C.F.R. § 5.18(b)(3) (2023).  Further, the

Regulations require that RFEDs make available to customers information on:

> Any method or algorithm used to determine the bid or asked price for
> any retail forex transaction or the prices at which customer orders are
> executed, including but not limited to any markups, fees, commissions
> or other items which affect the profitability or risk of loss of a retail
> forex customer's transaction.

17 C.F.R. § 5.18(b)(4)(iv) (2023).   These requirements each cover the same

important topics about which Defendants made misstatements or omissions.

Similarly, as discussed above, NFA Rules require RFEDs to make disclosures

regarding STP'd transactions.  NFA Rule 2-36(p).  In particular, they require that, if

an RFED uses STP for a customer's transaction, then the RFED must disclose "any

mark-up or mark-down the [RFED] imposes on the price the [RFED] received from

the offsetting position to the customer's order."  NFA Rule 2-36(p)(1)(ii).  If the

RFED does not use STP for a customer transaction, then it must disclose to the

customer the transaction's mid-point spread cost. NFA Rule 2-36(p)(1)(iii).   In

addition, NFA Rules also include restrictions and disclosure requirements that

RFEDs must follow related to price adjustments. NFA Rule 2-43 (Forex Orders).

These disclosure requirements all relate to the same types of facts that

Defendants misrepresented to their customers or failed to disclose, and these

regulations and rules serve "to protect all market participants from fraudulent or

other abusive sales practices and misuses of customer assets."  *See, e.g. CFTC v.*

*Monex Credit Co.*, 931 F.3d 966, 970 (9th Cir. 2019) (rejecting assertion that the structure of defendants' retail commodity transactions immunized them from the regulations and reversing dismissal of complaint for failure to state a claim). The fact that the Regulations and Rules governing RFEDs require such disclosures provides overwhelming support that such disclosures are, in fact, material.

Nonetheless, Defendants insist that a reasonable customer would not find any of Defendants' misstatements or omissions material.[11] They also suggest that the CFTC's Complaint necessarily fails to plausibly allege materiality because the CFTC did not interview customers as part of its investigation. (Mot. at 31.)

Although Defendants attempt to cast aspersions on the CFTC's investigation, that does not make their own misstatements and omissions to customers any less material. A court considers materiality based on an objective "reasonable customer" standard, which does not depend on the subjective beliefs of a particular customer. *United States v. Litvak*, 889 F.3d 56, 65 (2d Cir. 2018) (discussing in detail the "reasonable customer" standard for security fraud); *see also CFTC v. WorldWideMarkets, Ltd.*, 2022 WL 3535993 at *13 (D.N.J. Aug. 18, 2022). Nor

---

[11] Defendants also argue that none of their misstatements or omissions could be material to customers who never advanced past the "demo" phase. (Mot. at 40.) But, Defendants made their misstatements and omission in soliciting potential customers. Thus, these misstatements and omissions would have been material to a reasonable potential customer's decision to give Defendants money for an account in the first place; and also whether to pay to re-start an account if they breached a drawdown limit.

does the law require that a government agency, like the CFTC, prove reliance. *See Rosenberg*, 85 F. Supp. 2d at 446 (noting that "customer reliance on material misrepresentations need not be proven in an enforcement action alleging fraud."). Therefore, the Complaint sufficiently alleges material misrepresentations and omissions even if it does not include testimonials from individual customers.

Next, with respect to the alleged omissions, Defendants argue that the Complaint fails to plausibly establish a duty to disclose. This is wrong as a matter of fact and law. Section 4b(b) of the CEA states, with respect to omissions, that a person has a duty to disclose where "necessary to make any statement made to the other person in or in connection with the transaction not misleading in any material respect." 7 U.S.C. § 6b(b). *Cf. CFTC v. Arista LLC*, No. 12 CV 9043 PAE, 2013 WL 6978529, at *13 (S.D.N.Y. Dec. 3, 2013) (holding that Defendants "omitted to state in such statements material facts that were necessary to make statements of material facts made not misleading in any material respect, and Defendants knew, or reasonably should have known, the statements to be false or misleading") (consent order resolving charges under Section 6(c)(2) of the CEA, 7 U.S.C. § 9(c)(2)).

The omissions the Complaint alleges are precisely the type of information Defendants needed to disclose to make their other statements not misleading. Defendants failed to disclose that they both fully controlled the trading environment and had interests and incentives that were directly adverse to those of the customers

who were trading at Defendants' mercy. Further, the fact that slippage, delay and spreads exist in all markets, does not mean that it is not material *what* slippage, delay or spreads an order may face. In fact, the amounts of slippage, delay and spreads are essential factors that traders consider because they impact how a trade executes.

The cases Defendants cite are in accord. *CFTC v. Gorman*, No. 21 civ. 870 (VM), 2023 WL 2632111, at *8–9 (S.D.N.Y. Mar. 24, 2023) was a market manipulation case brought under Regulation 180.1 (not the charge at issue here), where the court held that Defendant had no duty to disclose his own trading activity to "other market participants" in the markets he allegedly manipulated. The court nevertheless reinforced that "[t]he rule gleaned from the case law is that a duty to disclose based on underlying misconduct arises where the fraudster has either (1) some fiduciary or other relationship with the investor; or (2) once the accused has spoken on the issue or topic and thus must tell the whole truth." *Gorman*, 2023 WL 2632111, at *13. Here, as alleged, Defendants spoke extensively about the trading opportunity they purportedly offered, but did not "tell the whole truth." Instead, they told half-truths and lies. Thus, *Gorman* supports the CFTC's position in this case.

Next, in *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1433 (3d Cir. 1997), the Third Circuit held that a company did not have a duty to update its prior forward-looking projection beyond what was called for by the securities reporting requirements, because "under the existing disclosure apparatus, the

voluntary disclosure of an ordinary earnings forecast does not trigger any duty to update." *Burlington*, 114 F.3d at 1433.  In so holding, the court contrasted this ordinary projection with a scenario where "the initial disclosures that were argued to have triggered the duty to update involved information about events that could *fundamentally change* the natures of the companies involved." *id.* (emphasis in original).  The omissions at issue here are more like the latter scenario considered in *Burlington*, where the omitted information, if disclosed, would have revealed a fundamental difference between the nature of Defendants' business as they represented it with the nature of how it actually operated.

Finally, Defendants are also wrong that they had no disclosure duties to their customers.  Because Defendants operated an unregistered RFED, the regulatory requirements applicable to an RFED also apply to Defendants.  In other words, because, as alleged, Defendants ought to be registered, they likewise had a duty to make disclosures like those outlined above. *See, e.g., CFTC v. Tallinex*, No. 2:17-CV-00483-DN, 2018 WL 3350347, at *3 (D. Utah July 9, 2018) ("By acting as an RFED, Tallinex had a duty to disclose this information under Regulation 5.5 in order to give a balanced and realistic view of the results of trading its forex contracts.") (default judgment order); *CFTC v. Sw. Servs., L.L.C.*, No. 1:20-CV-1440-WCG, 2020 WL 8812868, at *3, *6 (E.D. Wis. Dec. 17, 2020) (holding, in a default judgment order, that an unregistered RFED violated Regulations 5.5 and 5.13).

## ii.  The CFTC Has Adequately Pled Scienter

Finally, Defendants also argue that the Complaint fails to adequately allege Defendants acted with scienter.  Not so.  Systematic schemes such as the one the CFTC's Complaint alleges that Defendants operated, by their very nature, are not mistakes or oversights. They are deliberate actions, carried out with intent.

The CFTC's complaint alleges scienter with specificity, laying out the falsehoods that Defendant Kazmi knew of and precisely how he knew them, including from agreements that he executed (Compl. ¶¶ 97, 98) specific conversations he had with his employees (*id.* ¶ 99) and regular email updates that he received (*id.* ¶ 100), which are imputed to all Defendants as a matter of law (*e.g. id.* at ¶¶ 10-11; ECF No. 134 at 21 ("as the sole executive of Traders Global, Defendant Kazmi's scienter may be imputed to the corporate Defendants")).

In addition, the Complaint details communications that Defendants' key employee had in which he repeatedly acknowledged that they sought to find behind-the-scene ways to hamper customers' trading successes. (*See, e.g.,* Compl. ¶ 80 (lamenting of customer's successful trading: "if the strategy works for a month, we will lose more than a million dollars,"); *id.* ¶ 83 (complaining that a customer "got like 100k of pending to withdraw . . . so i need something to stop the money going out.").)  The Complaint also quotes a communication in which this employee explained how they should disadvantage customers: "I think we need another profile

just for these accounts. and just slip them to hell." (*Id.* ¶ 89).   Similarly, the Complaint includes communications in which this key employee celebrated the customers' losses, writing: "we violated more accounts than made today. So hopefully the net is massive loss." (*Id*. ¶ 87.)   This is more than sufficient to plead scienter, especially given that Rule 9(b) makes clear that "conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b)

Finally, Defendants claims that the CFTC misrepresented the purpose of the trading conditions, and insist that there were innocuous reasons for the imposition of those conditions.  The facts as alleged belie that argument, however, and instead show an egregious secret scheme to rig the system against customers.  In any case, at the motion to dismiss stage, inferences should be drawn in the CFTC's favor not against it.  *See Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 328 (3d Cir. 2022) (evaluating allegations on a motion to dismiss by "assuming their veracity, construing them in the light most favorable to the plaintiff, and drawing all reasonable inferences in the plaintiff's favor.").

## IV.   CONCLUSION

For the reasons set forth above, the Court should DENY Defendants' motion to dismiss the Complaint in its entirety.  To the extent the Court grants the motion, the CFTC requests leave to file an amended complaint.

May 10, 2024

Respectfully Submitted,

s/     *Katherine S. Paulson*

Nina Ruvinsky
Katherine S. Paulson
Elizabeth N. Pendleton

Commodity Futures Trading
Commission
Division of Enforcement
Ralph Metcalfe Federal Building
77 West Jackson Blvd., Ste 800
Chicago, IL 60604
(312) 596-0675
*nruvinsky@cftc.gov*
*kpaulson@cftc.gov*
*ependleton@cftc.gov*

Counsel for Plaintiff Commodity
Futures Trading Commission

## CERTIFICATE OF SERVICE

I certify that Plaintiff CFTC's Opposition to Defendants' Motion to Dismiss the Complaint was served on all counsel of record through the Court's CM/ECF system.

May 10, 2024                         */s/ Katherine S. Paulson*
                                    Katherine S. Paulson