# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
### Camden

| | |
|---|---|
| Commodity Futures Trading Commission, <br><br> Plaintiff, <br><br> v. <br><br> Traders Global Group Inc., a New Jersey corporation, d/b/a "My Forex Funds"; Traders Global Group Inc., a Canadian business organization; and Murtuza Kazmi, <br><br> Defendants. | Civil Action No. <br> 1:23-cv-11808-ESK-EAP |

## REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

Craig Carpenito
(NJ Bar No. 027102000)
Thomas J. Scrivo
(NJ Bar No. 307552019)
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
(212) 556-2100
ccarpenito@kslaw.com
tscrivo@kslaw.com

Anthony J. Staltari
(NJ Bar No. 233022017)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue
22nd Floor
New York, NY 10010
(212) 849-7000
anthonystaltari@quinnemanuel.com

*Counsel for Defendants Traders Global Group Inc., a New Jersey corporation; Traders Global Group Inc., a Canadian business organization; and Murtuza Kazmi*

## TABLE OF CONTENTS

Table of Authorities ................................................................................................... ii

Introduction ............................................................................................................... 1

Argument ................................................................................................................... 2

I.     The CFTC Fails to Show that the Alleged Conduct Falls Within the Scope of Its Authority ................................................................................... 2

II.    The CFTC Did Not Adequately Plead the Elements of Its Fraud Claims ........................................................................................................... 11

Conclusion .............................................................................................................. 15

## TABLE OF AUTHORITIES

**Cases**

*Actio v. IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995) .................................................................................14

*Callaway v. Small*,
  2022 WL 970214 (D.N.J. Mar. 31, 2022) ..........................................................4

*CFTC v. Baragosh*,
  278 F.3d 319 (4th Cir. 2002) ..........................................................................6, 7

*CFTC v. Calvary Currencies, LLC*,
  437 F. Supp. 2d 453 (D. Md. 2006) ...................................................................4

*CFTC v. EOX Holdings, L.L.C.*,
  90 F.4th 439 (5th Cir. 2024) ............................................................................10

*CFTC v. Mirror Trading Int'l Proprietary Ltd.*,
  2023 WL 5767493 (W.D. Tex. Sept. 6, 2023) ...................................................9

*CFTC v. Paragon FX Enters. LLC*,
  2015 WL 2250390 (S.D.N.Y. Feb. 2, 2015) ......................................................7

*CFTC v. Rosenberg*,
  85 F. Supp. 2d 424 (D.N.J. 2000) ....................................................................11

*CFTC v. Vartuli*,
  228 F.3d 94 (2d Cir. 2000) .................................................................................9

*CFTC v. Vasquez*,
  2014 WL 7404126 (W.D.N.C. Dec. 30, 2014) ..................................................9

*CFTC v. Weinberg*,
  287 F. Supp. 2d 1100 (C.D. Cal. 2003) ............................................................10

*Dravo Corp. v. Occupational Safety & Health Rev. Comm'n*,
  613 F.2d 1227 (3d Cir. 1980) ...........................................................................10

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ...........................................................................14

*Ketchum v. Green*,
  557 F.2d 1022 (3d Cir. 1977) .................................................................................. 9

*Mayer v. Belichick*,
  605 F.3d 223 (3d Cir. 2010) .................................................................................... 5

*Mourning v. Fam. Publ'ns Serv., Inc.*,
  411 U.S. 356 (1973) .............................................................................................. 13

*United States v. Reynolds*,
  710 F.3d 498 (3d Cir. 2013) .................................................................................. 13

*Williamsport Firemen Pension Bds. I & II v. E.F. Hutton & Co.*,
  567 F. Supp. 140 (M.D. Pa. 1983) .......................................................................... 9

**Statutes, Regulations, & Rules**

7 U.S.C. § 2(c)(2)(C)(vii) ................................................................................................. 8

17 C.F.R. § 5.18(b)(4)(iv) .............................................................................................. 13

Fed. R. Civ. P. 11 ............................................................................................................ 5

Fed. R. Civ. P. 9(b) ........................................................................................... 11, 12, 14

## INTRODUCTION

The CFTC's opposition confirms that this unprecedented action is beyond the scope of its authority. The CFTC does not seriously contest that it lacks authority to regulate simulated trading. The CFTC fails to cite a single case upholding liability under the Commodity Exchange Act or its implementing regulations against a firm with MFF's business model. Instead, the CFTC tries to sidestep that fundamental defect by characterizing MFF, for the first time, as an unauthorized "bucket shop"—a term that appears nowhere in the complaint or the CFTC's preliminary-injunction briefing, but that the CFTC appears to use to refer to certain off-exchange retail forex or commodities dealers. Calling MFF a "bucket shop," however, does not make it so, any more than baselessly defaming MFF as a "Ponzi scheme" could make that true (*see* Compl. ¶ 4). The problem for the CFTC remains that Defendants did not engage in retail forex or commodities transactions, period. MFF's customers were not parties to actual trades. Instead, they paid a flat fee for access to a simulator.

The CFTC's claim that TGG was the "counterparty" to retail forex or commodities transactions fails for the same reason. Customers did not enter into any such transactions, so TGG can't have been their counterparty in such transactions. A transaction that does not exist has no party and no counterparty. Calling TGG the "counterparty" to nonexistent transactions is literal nonsense. The CFTC's effort to pin the word "counterparty" on Defendants also conspicuously backs away from the

testimony of Chichester—the sole witness the CFTC interviewed on the record before filing suit. The CFTC's belated recognition that Chichester's testimony does not support the agency lays bare the truth: the CFTC had no basis to bring this action.

The CFTC fares no better in its arguments regarding the elements of its fraud claims. Defendants' motion specifically identified each alleged misrepresentation and omission and explained why the complaint's allegations are inadequate. Yet the CFTC does not even try to show it pleaded materiality with particularity, instead asking the Court to take its word that materiality is "virtually self-evident." (It would have to be, because the CFTC has no customer-witnesses.) The CFTC similarly fails to justify its conclusory allegations of scienter.

The Court should dismiss the complaint in its entirety and with prejudice.

## ARGUMENT

**I.    The CFTC Fails to Show that the Alleged Conduct Falls Within the Scope of Its Authority.**

The CFTC does not dispute (nor could it) that all of its claims depend on the existence of actual retail forex and commodities transactions. Under Counts I and II, the alleged fraud must be "in connection with" a "specific" retail forex or commodities transaction. *See* MTD 12–21. Likewise, counts III, IV, and V all depend on the notion that MFF was a "counterparty" to retail trades. *See* MTD 22–29. The CFTC's failure to establish that key premise is fatal to its case.

1. As Defendants have explained, MFF customers were not parties to retail trades. Instead, customers paid a flat fee for access to simulated funds on MFF's platform. MFF informed customers that they would either be (a) engaging in simulated trading for "simulated profits" or (b) gaining the opportunity to earn monetary rewards based on TGG's "proprietary" trading with "Traders Global's money." *See* MTD 17 (quoting Compl. ¶¶ 2, 26, 29, 55); Opp. 1 (acknowledging that any trading involved only "Traders Global's money"). "[D]emo" and "B-book" customers' "'trades'" were "'completely simulated'" and did "'not go to a counterparty.'" MTD 18, 23 (quoting ECF No. 23-43 at 45–49). And even as to the "A-book" (100 customers out of 135,000 total), the CFTC now appears to acknowledge that customers did not enter into actual trades but rather had their simulated trades "mirrored" by TGG, which executed its own trades with its own money in its own account with a third party. *See* MTD 29; Opp. 25 n.9. At no point did MFF serve as a platform for retail forex or commodities trades.

The CFTC suggests that customers were engaged in real trading because TGG "kept" their fee if customers exceeded the disclosed drawdown limits. Opp. 20–21. But that is not how real trading works. Customers had *already* paid a flat fee upfront for access to simulated funds (*e.g.*, a fee of $49 for $5,000 in simulated funds, Compl. ¶ 32). Although a series of poorly performing simulated trades might mean "game over" because the simulated account balance might fall below the drawdown

3

limit, losing a game is not the same as losing money on an actual trade. After a big "loss," customers could simply walk away. They were not required to pay TGG for the "loss" or to reopen an account.

2. The CFTC also relies heavily on its conclusory allegation that TGG acted as counterparty to customer trades. *See* Opp. 22–23 (citing Compl. ¶ 3). But the CFTC ignores that "unsupported conclusions" are entitled to no weight. MTD 8 (quoting *Callaway v. Small*, 2022 WL 970214, at *2 (D.N.J. Mar. 31, 2022)). The CFTC fails to cite a single case supporting its redefinition of "counterparty," which would sweep in not only trading simulators but gaming arcades. *See* MTD 26–27. And it ignores the authority in Defendants' motion, which refers to a "counterparty" as "the party engaging in or offering to engage in a foreign currency futures transaction with a non-eligible party [*i.e.*, with a retail customer]." MTD 22 (quoting *CFTC v. Calvary Currencies, LLC*, 437 F. Supp. 2d 453, 461 n.17 (D. Md. 2006)).

Both the complaint's allegations as a whole and the CFTC's interview with Chichester confirm that TGG never acted as a counterparty. The simple fact—which the CFTC does not appear to dispute—is that all "trading" on MFF's platform was simulated, and customers never entered into any actual forex or commodities transactions. *See* MTD 22–29. Because no customer was a party to a retail forex or commodities transaction, TGG could not have been a "counterparty" to such a

4

transaction. If a transaction doesn't exist, it can't have parties or counterparties. The CFTC's opposition is an extended effort to obfuscate this basic reality.

The CFTC should have known from its interview with Chichester that TGG did not act as counterparty to its customers in forex or commodities transactions. *See* MTD 23–24. The CFTC now downplays Chichester's account as "merely lay opinions," Opp. 23, but that misses the point: the CFTC told this Court that it interviewed Chichester because it needed to understand "what Traders Global is and what Traders Global does *because we did not know*." ECF No. 130 at 107 (emphasis added). Of course Chichester's definition of "counterparty" is not binding on the Court, but Chichester's testimony was the CFTC's *only* purported basis to allege that TGG was its customers' counterparty in retail forex and commodities transactions.[1] And now the CFTC is running away from Chichester's testimony—making clear that it has no factual basis for that critical allegation. *Cf.* Fed. R. Civ. P. 11.

Perhaps recognizing that it cannot run away from Chichester's testimony altogether, the CFTC also distorts it. Opp. 23–24. Putting words in his mouth, the

---

[1] The CFTC does not deny that Chichester was the only person it interviewed on the record before filing this action, that it relied on his interview in drafting the complaint, or that he provided the only purported evidentiary basis for the CFTC's strained "counterparty" allegation. The CFTC's claim that the interview cannot be considered because it is not "attached to the complaint," Opp. 23 (quotation marks omitted), ignores that documents "integral" to the complaint, even if not explicitly referenced in or attached to the complaint, can be considered on a motion to dismiss. MTD 3 n.1 (citing *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010)).

5

CFTC argues that when he said that B-book and demo "trades" do "'not go to a counterparty,'" he meant only a "*third-party*" counterparty. *Id.* at 24. But there is no getting around his repeated statements contradicting the CFTC's theory of the case. *See* MTD 23–24. Chichester's testimony that there was no "'counterparty to any of these trades'" was directly connected to his testimony that the environment was "'completely simulated.'" MTD 23 (quoting ECF No. 23-43 at 45). And when the CFTC asked whether TGG took the "opposite position" from B-book customers, he stated in no uncertain terms: "[T]hat *would* be true *if it was the customer's own money*." ECF No. 23-43 at 48–49 (emphasis added). But it was a simulated account balance—and *not* the customer's own money—being used to make simulated trades, *see* MTD 24, and the CFTC cannot contend otherwise. Because customers did not make actual trades, Defendants could not have been a counterparty to customer trades.

3. Faced with that reality, the CFTC tries to pivot and repackage its theory of the case by labeling MFF, for the first time, a "bucket shop." Opp. 1, 13–16. But this turns out to be no more than a variation on the same misguided theme. In referring to a "bucket shop," the CFTC appears to mean an entity that enters into forex or commodities transactions with retail customers instead of executing customers' orders "openly and competitively" on an exchange. Opp. 14 (quoting *CFTC v. Baragosh*, 278 F.3d 319, 322 (4th Cir. 2002)). Because such entities are

counterparties to retail trades, the CFTC explains that those entities now fall within its jurisdiction over off-exchange retail forex and commodity transactions and must register as RFEDs. *See* Opp. 14–20.

So what? Defendants have never disputed that the CFTC has jurisdiction over off-exchange *retail forex and commodities transactions*. Defendants' point is that they never engaged in those covered transactions in the first place—whether on-exchange or off-exchange. None of the CFTC's cited cases involved anything like MFF's business model: the defendants in those cases engaged in actual retail trading, with customers investing their own real money in order to become parties to real trades in forex or commodities. *See, e.g.*, *CFTC v. Paragon FX Enters. LLC*, 2015 WL 2250390, at *1–2 (S.D.N.Y. Feb. 2, 2015); *Baragosh*, 278 F.3d at 322–23. Here, in contrast, customers paid a fee for access to a simulator. That is not a forex or commodities transaction. And as discussed above, because the "trades" on MFF's platform were simulated, Defendants could not have acted as a counterparty to any retail trades. The CFTC's winding digression about "the genesis of CFTC jurisdiction over off-exchange leveraged retail forex and commodity transactions" therefore has no relevance to this case. Opp. 12–16 (capitalization altered).

The CFTC's digression about "disclosure requirements *for RFEDs*" and "National Futures Association (NFA) rules *for RFEDs*," Opp. 17–20 (emphasis added), is similarly beside the point because Defendants were not RFEDs. The

CFTC cites regulations requiring an RFED to disclose that "[a]n electronic trading platform for retail foreign currency transactions is not an exchange," Opp. 17, and that "[Y]our dealer may set its own prices," *id.* at 18. As discussed above, however, MFF was not a "platform for retail foreign currency transactions" or a "dealer" in forex or commodities; it was a platform for simulated trading with simulated funds.

    4. Nor does it matter that the CEA applies to certain "accounts" for actual trading. *See* Opp. 15, 27–28. The CEA refers only to an "'account . . . that is offered for the purpose of trading, or that trades' *forex agreements, contracts, or transactions*." Opp. 27 (emphasis altered) (quoting 7 U.S.C. § 2(c)(2)(C)(vii)). The regulatory regime does not apply to an "account" filled with simulated funds any more than it applies to a customer's token-filled "account" at an arcade. The CFTC's discussion of "accounts" thus turns out to be another detour to another dead end.

    The CFTC is especially hard-pressed to claim authority over MFF's "demo" account customers, who comprised the vast majority of users. Strangely, the CFTC suggests that even demo accounts were for "transactions against third-party liquidity providers." Opp. 28. The complaint says just the opposite. *See* MTD 5; Compl. ¶ 29 ("Some account types require a customer to generate *simulated profits* in a 'demo' account before receiving access to so-called 'live' trading funds" (emphasis added)). As this Court's preliminary-injunction opinion observed, "the website suggested [it] was a simulated trading account." ECF No. 134 at 5. Indeed, the CFTC also ignores

8

court findings in its own prior enforcement actions that simulated trading accounts do not engage in actual trades. *See CFTC v. Vasquez*, 2014 WL 7404126, at *4 (W.D.N.C. Dec. 30, 2014) (a "simulated account function . . . does not reflect actual trades or funds"); *CFTC v. Mirror Trading Int'l Proprietary Ltd.*, 2023 WL 5767493, at *5 (W.D. Tex. Sept. 6, 2023) (a "simulated 'demo' account . . . never actually traded forex, Bitcoin or anything else").

     5. The CFTC also appeals to what it calls the "broad language" of the CEA's anti-fraud provisions, relying principally on the Second Circuit's discussion of the "in connection with" requirement in *CFTC v. Vartuli*, 228 F.3d 94, 101 (2d Cir. 2000). *See* Opp. 28–29. As an initial matter, the Third Circuit has expressly rejected the broader interpretation of the "in connection with" requirement favored by "other circuits" and has held that "in connection with" demands a "causal connection between the alleged fraud and the purchase or sale of stock" (or here, commodity). MTD 15 (emphasis omitted) (quoting *Williamsport Firemen Pension Bds. I & II v. E.F. Hutton & Co.*, 567 F. Supp. 140, 143–44 (M.D. Pa. 1983) (citing *Ketchum v. Green*, 557 F.2d 1022, 1028–29 (3d Cir. 1977)). And in any event, *Vartuli* is readily distinguishable. The software in *Vartuli* gave customers "*specific* buy or sell recommendation[s]" for actual forex trades. *Vartuli*, 228 F.3d at 99 (quotation marks omitted). Here, Defendants did not offer MFF customers the opportunity to become parties to trades, let alone recommend that they make specific trades on the platform.

9

The CFTC's other "in connection with" cases are also far afield because they involve examples of misappropriation of "investor funds." Opp. 30–31 (quoting *CFTC v. Weinberg*, 287 F. Supp. 2d 1100, 1106 (C.D. Cal. 2003)). As discussed above, MFF customers did not "entrust[ ]" money, Opp. 31, to Defendants to engage in forex or commodities transactions. How close a relationship is needed between alleged fraud and a forex or commodities transaction for the fraud to be "in connection with" that transaction is irrelevant here given that Defendants did not enter into any such transactions with customers in the first place.

Finally, while Defendants have shown that their business model clearly falls outside of the CFTC's jurisdiction, the CFTC does not dispute that any perceived ambiguity in the statutes or regulations should be resolved in favor of Defendants under the "basic" principle of "fair notice." MTD 20–21 (quoting *CFTC v. EOX Holdings, L.L.C.*, 90 F.4th 439, 441–48 (5th Cir. 2024)); *see also Dravo Corp. v. Occupational Safety & Health Rev. Comm'n*, 613 F.2d 1227, 1231 (3d Cir. 1980) ("Historically, the applicability of penal sanctions has been narrowly construed by the judiciary"). The CFTC's faulty pre-suit investigation, its evolving characterizations and mischaracterizations of MFF's business model, its persistent inability to identify any legal text or precedent on point, and its shifting legal and factual rationales all highlight that—at minimum—Defendants did not have fair notice of the CFTC's attempt to expand its authority via this enforcement action.

10

## II. The CFTC Did Not Adequately Plead the Elements of Its Fraud Claims.

The CFTC's fraud claims must be dismissed for the additional, independently dispositive reason that the complaint does not adequately allege the elements of fraud. The CFTC ignores the requirement to plead the materiality of each alleged misrepresentation with particularity under Rule 9(b), and the CFTC mistakenly assumes that it can rely on vague, conclusory allegations of scienter.

1. As the CFTC acknowledges, a statement is material only if "there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision." Opp. 32 (quoting *CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 447 (D.N.J. 2000)). Despite the demands of Rule 9(b), the CFTC makes little effort to rebut Defendants' arguments with respect to the materiality of each alleged statement or omission. For example, the CFTC does not even attempt to defend as material the alleged statements regarding customers' potential access to "live funds," the purpose of the "drawdown limit," or the source of customers' monetary rewards, *see* MTD 32–35 (quotation marks omitted), or the alleged omissions regarding the source of the commissions charged to customers or the expected profitability of STP'd transactions, *see id.* at 35–38. The CFTC has therefore forfeited any opposition to Defendants' motion with respect to those allegations.

The CFTC addresses materiality only for a subset of the alleged statements and omissions and then only at a very high level of generality. The CFTC declares it "virtually self-evident" that customers would find it material that "Traders Global's success did not depend on the customer's success" and that "Traders Global secretly applied parameters to their customer's orders." Opp. 32. Yet the CFTC offers little response to Defendants' arguments regarding those alleged misrepresentations. For example, the CFTC does not engage with Defendants' point that statements such as "Your success is our business" are classic immaterial "puffery," *see* MTD 33–34, and it concedes that "slippage, delay and spreads exist in all markets," Opp. 37; *see* MTD 36–38. Although the CFTC emphasizes that "the amounts of slippage, delay and spreads are essential factors that traders consider," *id.*, it identifies no allegations that these parameters materially differed from ordinary market conditions.[2]

Unable to establish materiality based on the allegations in the complaint, the CFTC tries to rely on its own rules and regulations governing RFEDs, which it says provide "overwhelming support" that certain disclosures "are, in fact, material." Opp. 33–35, 38. But the CFTC is again putting the cart before the horse; it has not plausibly alleged that any Defendants were RFEDs in the first place, because

---

[2] The CFTC's reliance on the Court's preliminary-injunction opinion, Opp. 33, is misplaced. That portion of the opinion made only *prima facie* findings in an emergency posture and did not address all of the arguments Defendants make here or conduct the Rule 9(b) analysis that governs here.

Defendants did not act as counterparties to retail trades. Disclosure requirements for RFEDs, which engage in actual retail trading, cannot establish the materiality of disclosures in a very different context like MFF's business. For example, a disclosure rule designed to inform about the "risk of loss" on "a retail forex customer's transaction," Opp. 34 (quoting 17 C.F.R. § 5.18(b)(4)(iv)), has no relevance to simulated trades with simulated funds where the customer bore no risk of loss if the "trade" was unsuccessful.[3]

Finally, with respect to the alleged omissions, while the CFTC pays lip service to the requirement that it allege with particularity a "duty to disclose," *see* MTD 31, 35–39, the CFTC fails to demonstrate that it actually satisfied that requirement, *see* Opp. 36–37. The CFTC does not dispute that Defendants lacked a fiduciary or other special relationship with customers that would automatically give rise to a duty to disclose. And the CFTC simply asserts that Defendants made "other statements" that created such a duty, Opp. 36, without identifying which statements supposedly gave rise to a duty with respect to which omissions. The vague assertion that Defendants

---

[3] Moreover, just because the CFTC or the National Futures Association has promulgated a disclosure rule does not mean that whatever information required by that rule must be held "material" to investment decisions. Disclosure rules may be "prophylactic" or precautionary, *Mourning v. Fam. Publ'ns Serv., Inc.*, 411 U.S. 356, 377 (1973), and even if an agency purportedly intended a rule to elicit material information, courts do not accept "the agency's ipse dixit" at face value, *United States v. Reynolds*, 710 F.3d 498, 520 (3d Cir. 2013).

13

"did not 'tell the whole truth,'" Opp. 37, cannot substitute for a demonstration that the complaint satisfies Rule 9(b)'s particularity standard.

2. The CFTC similarly fails to establish the element of scienter. *See* Opp. 40–41. Although the CFTC predictably emphasizes that Rule 9(b) permits scienter to be "alleged generally," Opp. 40, "the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind" should not be mistaken "for a license to base claims of fraud on speculation and conclusory allegations," MTD 39 (quoting *Actio v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)). Meanwhile, the CFTC ignores the requirement to demonstrate a "strong inference of scienter," including knowledge that the alleged statement or omission was material. *Id.* (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1422 (3d Cir. 1997)). And the CFTC breezes past the Third Circuit's admonition that it is "not enough for plaintiffs to allege generally that defendants knew or recklessly disregarded each of the false and misleading statements for which [they were] sued." *Burlington Coat Factory*, 114 F.3d at 1422 (quotation marks omitted).

The CFTC does not even attempt to demonstrate a "strong inference" that Defendants knew of the alleged falsity and materiality of each alleged statement or omission. Instead, the CFTC continues its broad-brush approach, alluding vaguely to "agreements," "conversations," and "email updates" that Mr. Kazmi allegedly received. Opp. 39. As in the complaint itself, however, the CFTC fails to connect

14

those alleged communications with any specific "statements set forth in paragraphs 18 through 45." MTD 40 (quoting Compl. ¶¶ 97–101). The CFTC also attempts to rely on out-of-context snippets of messages between a TGG staff member and a third-party consultant. But as the complaint itself makes clear, the staff member made those statements in the context of efforts to address cheating by users "beating our system with arb [arbitrage]" or using "automated trading program[s]." Compl. ¶¶ 80, 82 (quotation marks omitted). Those allegations hardly raise a "strong inference" of scienter.

## CONCLUSION

Whether the CFTC failed to understand Defendants' business and brought this suit based on a mistaken belief that Defendants entered into actual forex and commodities transactions with customers—as opposed to understanding that customers' "trading" was entirely simulated and bringing this suit anyway, as part of an unacknowledged agenda to assert authority over simulated trading—is unclear. Regardless, the CFTC now appears to recognize that Defendants' customers' "trading" was entirely simulated. That basic fact requires dismissal, as Defendants could not, as a matter of law, have entered into retail forex or commodities transactions—or been the "counterparty" to such transactions—given that all "trading" on MFF was entirely simulated. Moreover, the CFTC failed to plead its claims adequately. The complaint should be dismissed in its entirety with prejudice.

15

Dated: May 17, 2024

Respectfully submitted,

*/s/ Anthony J. Staltari*
Anthony J. Staltari
(NJ Bar No. 233022017)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
anthonystaltari@quinnemanuel.com

Craig Carpenito
(NJ Bar No. 027102000)
Thomas J. Scrivo
(NJ Bar No. 307552019)
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
(212) 556-2100
ccarpenito@kslaw.com
tscrivo@kslaw.com

*Counsel for Defendants Traders Global Group Inc., a New Jersey corporation; Traders Global Group Inc., a Canadian business organization; and Murtuza Kazmi*