**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| Commodity Futures Trading Commission, Plaintiff, | Civil Action No. 3:23-cv-11808 |
| v. | District Judge Edward S. Kiel |
| Traders Global Group, Inc., a New Jersey corporation d/b/a "My Forex Funds"; Traders Global Group Inc., a Canadian business organization; and Murtuza Kazmi Defendants. | Mag. Judge Elizabeth A. Pascal |
|  | Special Master Jose L. Linares |

**CFTC'S FINDINGS OF FACT, CONCLUSIONS OF LAW, AND SUPPORTING ARGUMENTS WITH RESPECT TO DEFENDANTS' MOTION FOR SANCTIONS**

# TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................... 1

**I.     (PROPOSED) FINDINGS OF FACT** ................................................................ 2

**II.    ARGUMENT IN SUPPORT OF CONCLUSIONS OF LAW** ........................... 25

**A. The CFTC's Mistakes Regarding the $31.5 Million CAD Transfers Were Unintentional and Not Presented for Any Improper Purpose.** ............................. 25

**1.     The Mistake in the Declaration Was Inadvertent.** ................................. 25

**2.     The CFTC Was Unaware of the Mistake When it Referenced the Transfers in its September 22, 2023 Filing.** ................................................................ 28

**3.     Waiting to Correct the Mistake was a Lapse in Judgment, Not an Intentional Attempt to Mislead.** ............................................................................... 29

*a.     The CFTC Made an Error in Judgment.* ............................................. 30

*b.     This Error is Understandable in Context.* ........................................... 30

*c.     The CFTC Never Intended to "Stand On" its Error.* ........................... 31

*d.     Sanctions Cannot be Imposed Based on Speculation.* ......................... 33

**4.     Misstatements in the preliminary injunction testimony were inadvertent** .... 34

**B. The CFTC's Mistakes Regarding the $31.5 Million CAD Transfers Did Not Harm Defendants.** ............................................................................................. 35

**1.     The SRO Was Not Based on the Mistake.** ........................................... 36

**2.     The Mistake was Corrected Before the Preliminary Injunction.** ............ 37

**3.     OSC Independently Obtained Similar Relief in Canada.** ....................... 38

**C. The Timing and Method of the CFTC's Disclosure of the OSC Email is Not Sanctionable.** .................................................................................................... 39

**1.     The Timing of the Correction Was Appropriate.** ................................. 39

**2.     The Method of Correction Was Reasonable.** ........................................ 40

**D. The CFTC Cured Its Mistakes Prior to or During the Safe Harbor Period.** ....... 41

**E. No Sanction is Appropriate or Necessary.** ......................................................... 43

**1.     No Sanction Should Be Imposed** ......................................................... 44

**2.     Dismissal Would Not Be Appropriate.** ................................................ 44

**3.     Monetary Sanctions Would Not Be Appropriate.** ................................. 45

**III    (PROPOSED) CONCLUSIONS OF LAW** ......................................................... 47

**A. The CFTC's Mistakes Regarding the $31.5 Million CAD Transfers Were Unintentional and Not Presented for Any Improper Purpose.** ............................. 47

**B. The CFTC's Mistakes Regarding the $31.5 Million CAD Transfers Did Not Harm Defendants.** ........................................................................... 48

**C. The Timing and Method of the CFTC's Disclosure of the OSC Email is Not Sanctionable.** ................................................................................. 48

**D. The CFTC Cured Its Mistakes Prior to or During the Safe Harbor Period.** ....... 48

**E. No Sanction is Appropriate or Necessary.** ................................................ 49

**CONCLUSION** .................................................................................................. 50

# TABLE OFAUTHORITES

## Cases

*DiPaolo v. Moran*, 407 F.3d 140 (3d Cir. 2005) ................................................................. 45, 46

*Fonti v. Health Profs. and Allied. Emp., AFT/AFL-CIO*, No. 13-4231, 2018 WL 6787482, at \*4 (D.N.J. Dec. 26, 2018) ........................................................................................................ 42

*Ideal Inst., Inc. v. Rivard Inst., Inc.*, 243 F.R.D. 322 (N.D. Iowa 2007) ...................................... 42

*In re Cendant Corp. Deriv. Action Litig.,* 96 F. Supp. 2d 403 (D.N.J. 2000)................... 32, 44, 45

*In re Prudential Ins. Co.*, 278 F.3d 175, 189 (3d Cir. 2002) .......................................................... 42

*In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90 (3d Cir. 2008)..................................................... 43

*Keith v. Itoyama*, No. 06-424, 2006 WL 3069481, (D.N.J. Oct. 27, 2006)..................................... 43

*Kuhns v. CoreStates Fin. Corp.*, 998 F. Supp. 573 (D.N.J. 1998)................................................. 43

*Kuithe v. Gulf Caribe Maritime, Inc.*, No. 08-458, 2009 WL 4030524, n. 1 (S.D. Ala. Nov. 13, 2009)................................................................................................................................... 33

*Landon v. Hunt*, 938 F.2d 450, 453 (3d Cir. 1991)................................................................ 35, 42

*Liggon-Redding v. Estate of Sugarman*, 659 F.3d 258 (3d Cir. 2011) ......................................... 45

*Loops, LLC v. Phoenix Trading, Inc.*, 594 Fed. App'x 614 (Fed. Cir. 2014).............................. 33

*Magerman v. Mercer*, 17 C 3490, 2018 WL 68406, (E.D. Pa. Feb. 2, 2018)............................... 33

*Muller v. Sherburne, Powers & Needham*, 147 F.R.D. 34 (S.D.N.Y. 1993)................................. 39

*Patel v. Cole Schotz, P.C.*, No. 17-4868, 2018 WL 585764, (D.N.J. Jan. 29, 2018) ................... 43

*Shaikh v. Germadnig*, No. 23-2301, 2024 WL 2861845, (3d Cir. June 6, 2024) ......................... 43

*Soules v. Kauaians for Nukolii Campaign Committee*, 849 F.2d 1176 (9th Cir. 1988) .............. 33

*Uptown Grill, LLC v. Camelia Grill Holdings, Inc.*, 46 F.4th 374 (5th Cir. 2022)...................... 42

*Waltz v. Cnty. of Lycoming*, 974 F.2d 387 (3d Cir. 1992) .......................................................... 47

*Wang v. Chapei LLC*, No. 15-2950, 2020 WL 5500428, (D.N.J. Sept. 10, 2020) ...................... 43

## Statutes

7 U.S.C. § 13a-1................................................................................................................... 4

## Rules

Fed. R. Civ. P. 11 .............................................................................................. 42, 44, 46, 47

## INTRODUCTION

Sanctions are not necessary or appropriate to redress the CFTC's mistakes in this matter. Despite Defendants' months of insistence that the CFTC's actions were intentional and their claims that the CFTC "manufactur[ed] a false justification for a total asset freeze and receivership" (ECF No. 172-1 at 4) and "knowingly inserted misrepresentations into *ex parte* submissions" (ECF No. 179 at 15), when the time came to *prove* their allegations, Defendants presented scant evidence of any intentional misconduct.  Instead, all of the documents, including contemporaneous internal communications over which the CFTC waived privilege, and testimony at the evidentiary hearing point to the same conclusion: the CFTC's mistakes were limited and inadvertent.  Though CFTC staff overlooked an important email leading to mistakes including filing and citing to an inaccurate statement in a declaration, the CFTC did not act in bad faith or commit intentional misconduct. The record is also clear that the CFTC corrected its errors within Rule 11's safe harbor period. And Defendants have failed to prove any harm resulting from the CFTC's mistakes.  The Court entered a preliminary injunction shutting down Defendants' business and freezing funds far in excess of Defendants' U.S. assets *after* it knew of the CFTC's mistake in the declaration, and similar freeze orders in Canada independently shut down Defendants' allegedly fraudulent enterprise.  Although the CFTC holds itself to the highest standards, that standard does not require perfection.  These are not the sort of "exceptional circumstances" that would warrant any sanction, much less dismissal—the sanction of "last resort" Defendants request.  Defendants' motion for sanctions should be denied.

## I.    (PROPOSED) FINDINGS OF FACT[1]

1.    Ashley Burden was the lead CFTC attorney responsible for the CFTC's investigation of Defendants Traders Global Group, Inc. (New Jersey), Traders Global Group, Inc. (Canada), and Murtuza Kazmi.  (Evidentiary Hearing Transcript ("Tr.") at 88:8-89:1).  Mr. Burden has been a lawyer for 19 years and a CFTC enforcement attorney for ten years.  (*Id.*)  Matthew Edelstein was the CFTC investigator assigned to the case.  (*Id.* at 408:21-23).  Chief Trial Attorney Elizabeth Streit supervised the CFTC's investigation.  (*Id.* at 95:12-16).

2.    The Ontario Securities Commission ("OSC") conducted a parallel investigation of Defendants Kazmi and Traders Global Group in Canada. (Tr. at 413:16-19)  The CFTC and OSC shared information pursuant to the Internal Organization of Securities Commissions Multilateral Memorandum of Understanding Concerning Consultation and Cooperation and the Exchange of Information.  (*Id.* at 413:10-414:6).

3.    In connection with the CFTC's investigation, Mr. Burden and Mr. Edelstein conducted a review of Defendants' bank records, including bank records received from the OSC. (Tr. at 290:13-19; 412:21-413:11).

4.    On June 9, 2023, in connection with a review of one of Defendants' bank account records, Mr. Burden sent an email to Mr. Edelstein and Ms. Streit, writing, in relevant part: "███ ████████████████████████████████████████████████████████████████████████ ████████████████████████████" (Ex. D-4 at 2).  On June 12, 2023, Mr. Edelstein responded to Mr. Burden, stating ████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████" (*Id.* at 1).

---

[1]  Jointly stipulated facts appear in plain typeface.  Facts that are not stipulated appear in **bold** typeface.

5.    On June 16, 2023, Mr. Edelstein sent an email to **OSC Senior Forensic Accountant Stephanie** Collins and Mr. Burden, excerpting a page from TGG's banking records showing a $4,500,000 CAD debit on March 6, 2023, with the reference ' ███████████ ███████████ and a $27,000,000 CAD debit on the same day with the reference ' ███████████ ███████████ " (Ex. D-6 at 1-2). Mr. Edelstein asked Ms. Collins, ' ███████████ ███████████ " (*Id.* at 1).

6.    On June 16, 2023, Ms. Collins responded to Mr. Edelstein:



(Ex. D-6 at 1).

7.    As of July 7, 2023, Mr. Edelstein had drafted a declaration to support an anticipated motion for a Statutory Restraining Order ("SRO"). (Ex. P-15, Tr. 509:4-6). In that draft, Mr. Edelstein described the $31.5 million CAD debits as a ' ███████████████████████ ." (Ex. P-15 at 9-10; Tr. at 509:7-11). **At the time, Mr. Edelstein believed this was a transfer to an account controlled by Mr. Kazmi because the other large transfers of similar size that he had seen transmitted to other accounts in Mr. Kazmi's control. (Tr. at 509:12-510:7).**

8.    On August 17, 2023, Ms. Collins sent an email to Mr. Burden and Mr. Edelstein, writing:

> [A]fter months of back and forth, we finally have an answer to the destination of the wires in the amounts of CAD 27m and CAD 4.5m from the BMO TGG CAD account ****-995. CAD 27m was paid to [the] Canada Revenue Agency (CRA), which is our equivalent of the IRS, for corporation tax due. CAD 4.5m was paid to [the] CRA for an instalment payment for the next year's taxes. This should help both of us account for a significant amount of funds!

(Ex. D-15).

9.       Mr. Burden was on vacation when he received Ms. Collins's email and testified at the evidentiary hearing that he did not recall reading it at the time, but he acknowledged that he saved it to his "Kazmi folder."  (Tr. at 157:11-14, 158:1-3, 386:22-25).  It was Mr. Burden's practice to "put [emails] into folders if [he] felt that they had been dealt with."  (*Id.* at 158:12-14). **Mr. Burden does not have a memory of reading the OSC email until November 2023.  (Tr. at 158:1-3, 158:22-24, 159:18-21, 161:9-11).**

10.       Also on August 17, 2023, **at 7:25 pm CT,** Mr. Edelstein responded, "▅▅▅▅" to Ms. Collins's email stating that the transfers in question were for "corporation tax[es]."  (Ex. D-15). **Mr. Edelstein sent his email to Collins only; he did not copy Mr. Burden.  (*Id.*)**

11.       **On August 21, 2023, Mr. Burden sent OSC a copy of the Edelstein Declaration that he said was "▅▅▅▅▅▅▅▅▅▅▅."  (Ex. P-3; Tr. at 312:21-322:1; 323:7-14).  That copy of the Edelstein Declaration incorrectly stated that the $31.5 million CAD transfer was a "▅▅▅▅▅▅▅▅▅▅▅▅  (Ex. P-4, Tr. at 323:20-24; 325:17-23).**

12.       **Mr. Edelstein testified that he would not have intentionally sent a declaration with an error regarding the $31.5 million CAD transfer four days after OSC informed him that the transfer was for tax payments.  (Tr. at 513:6-9).  In hindsight, Mr. Edelstein recognized that after receiving the OSC email he should have immediately made the change in his draft declaration to correct the error.  (Tr. at 511:21-25).**

13.       On August 28, 2023, Mr. Burden signed and caused to be filed under seal a Complaint (ECF No. 1), an *ex parte* Motion for Expedited Discovery (ECF No. 6), and an *ex parte* Motion for Statutory Restraining Order and Preliminary Injunction Pursuant to 7 U.S.C. § 13a-1 (the "SRO/PI Motion", ECF No. 7).  As set forth in the SRO/PI Motion, the CFTC asked the Court to enter an SRO against Defendants, freezing Defendants' assets, requiring them to submit books

and records as requested by the CFTC, and appointing a temporary receiver, among other relief. (ECF No. 7).

14.    Mr. Edelstein executed a declaration in support of the SRO/PI Motion. (Declaration of Matthew S. Edelstein Pursuant to 28 U.S.C. § 1746 ("Edelstein Declaration"), ECF No. 23-44). **The Edelstein Declaration included a summary of all transfers for each of Defendants' bank accounts for which the CFTC had records.  (Tr. at 506:15-18).  Not all transfers were directly relevant to the CFTC's action or relied upon in seeking the asset freeze.  (Tr. at 190:13-191:2).  At the evidentiary hearing, Mr. Burden explained this was done "for the sake of completeness" as "to sort of show our work, we included everything." (Tr. at 190:16-19).  In total, the Edelstein Declaration included five tables describing credits and debits in six bank accounts controlled by Defendants.  (ECF No. 23-44 at 8-13).**

15.    Paragraph 29 of the Edelstein Declaration included a chart summarizing activity in the "TGG #995 Account" between December 2022 and April 2023.  In that summary, Mr. Edelstein incorrectly identified debits of $31,500,000 CAD from "the TGG #995 Account" as "Transfer to unidentified Kazmi Account." (ECF No. 23-44 at ¶ 29).  **The misidentified $31,500,000 CAD transfer constituted over 97% of the debits from that account (totaling $32,416,612.99), but only 5.4% of the debits from all of Defendants' bank accounts identified in the declaration (totaling $582,112,048.22) during the stated period.  (*Id.*)  In the SRO/PI Motion, the CFTC cited these charts to show that the Traders Global U.S. and Traders Global Canada accounts "are used interchangeably to receive fees that customers paid via WooCommerce" and to "pay Defendants' business expenses."  (ECF No. 7 at 92-93).**

16.    **Mr. Edelstein testified that he included this bank account analysis in part to demonstrate the ultimate destination of customers' money, but primarily to show that there**

were no large flows of money to third-party counterparties or exchanges where trading could be taking place.  (Tr. at 521:2-12).

17.    **Mr. Edelstein** also testified that a secondary purpose of the bank account analysis was to show dissipation of assets.  The entries on the bank account tables that relate to private jet memberships, luxury car purchases, and other profligate spending were intended to show dissipation.  (Tr. at 521:13-24).  The entries on the bank account tables showing transfers of money from one defendant account to another were not meant to show dissipation.  (Tr. at 521:25-522:5).

18.    **The Edelstein Declaration** also revealed that Kazmi received over $107 million of funds into his personal checking account which ultimately came from customer fees.  (ECF No. 23-44 at 8; Tr. at 522:20-523:14).  Information about these transfers was described in the Edelstein Declaration as a transfer from Woo Commerce, a payment processor through which Traders Global's customers paid their fees.  (ECF No. 23-44 at 8).  Defendants did not challenge the accuracy of the Edelstein Declaration with respect to these transfers.

19.    **Defendants** transferred $10 million from a Traders Global Group account in the United States to a Traders Global Group trust account in Canada.  (ECF No. 23-44 at 9, Tr. at 524:10-25).  Information about this transfer was described as a transfer to a "TGG TD Canada Trust account" in the Edelstein Declaration.  (ECF No. 23-44 at 9).

20.    In the SRO/PI Motion, the CFTC stated: "In the absence of an asset freeze, Kazmi may—and is likely to—transfer or dissipate assets held in the US, either at banks or with payment companies like WooCommerce or Deel.  Kazmi can easily transfer those assets to Canada, beyond the immediate reach of the Court.  Indeed, this is where most of Defendants' assets are currently." (ECF No. 7 at 45-46, *citing* Edelstein Declaration ¶ 28).  The SRO/PI Motion contained more than

30 references to the Edelstein Declaration, although it did not specifically cite **or reference** the $31,500,000 CAD transfer.  (*See* generally ECF No. 7).

21.     **In the SRO/PI Motion, the CFTC identified specific transactions that it considered to be evidence of dissipation including Kazmi's purchase of a $12.6 million CAD home, another $1.1 million home, a $1.6 million Lamborghini, a $3.3 million Bugatti racecar, and $433,500 paid to a private jet charter company.  (ECF No. 7 at 28-29).**

22.     Also on August 28, 2023, Mr. Burden signed and filed the CFTC's Complaint against Defendants. (ECF No. 1).  The CFTC's Complaint did not reference the $31,500,000 CAD transfer.  (*See generally* ECF No. 1).

23.     On August 29, 2023, U.S. District Judge Robert B. Kugler of the District of New Jersey issued an order granting the CFTC's Motion for an Ex Parte Statutory Restraining Order, Appointment of a Temporary Receiver, and Other Equitable Relief under seal and without a hearing.  (ECF No. 13).  **The Court found that the CFTC made a proper *prima facie* showing that Defendants violated the Commodity Exchange Act and Commission regulations as charged.  (*Id.* at 2-3).**  The Court's order (a) placed the Defendant companies into receivership, (b) appointed a Temporary Receiver authorized to suspend the Company's business operations, and (c) restrained all corporate and personal assets of Defendants, without limitation (among other restraints).  (ECF No. 13 at 6-23).  The Order—which Mr. Burden prepared for the Court to sign (Tr.at 172:18-24)—stated that the Court "considered the pleadings, declarations, exhibits, and memorandum filed in support of the Commission's motion" and found that there was "good cause to believe that it is necessary to preserve the status quo and prevent damage to the Court's ability to grant effective final relief for customers in the form of monetary or other redress . . . from the withdrawal, transfer, removal, dissipation or other disposition of funds, assets or other property."

(ECF No. 13 at ¶ 8).  Judge Kugler's Order also stated that there was "a reasonable likelihood that Defendants will transfer or dissipate assets or destroy or alter records."  (*Id.* at ¶ 14).

24.    **Also on August 29, 2023, OSC issued freeze directions covering Defendants' assets derived from Traders Global Group and prohibiting disposal, transfer, or dissipation of those funds.  (ECF No. 158-5 at ¶ 2; Tr. at 359:4-12).  OSC also issued a temporary freeze trade order prohibiting all trading in securities by Traders Global Group.  Cease Trade Order,** *available* *at* **https://www.capitalmarketstribunal.ca/sites/default/files/2023-09/ord_20230829_trader-global-group.pdf.**

25.    On August 31, 2023, Mr. Burden sent an email to Mr. Edelstein, Ms. Streit, and CFTC Trial Attorney Katherine Paulson stating:



(Ex. D-43 at 1).  The redline comparison between the Edelstein Declaration filed in the District of New Jersey and the draft declaration for Mr. Edelstein proposed by the OSC showed that ███████

████████████████████████████████████████████████████████████████████████████

████████████████████" (Ex. D-43-A at 10-13).

26.    On September 5, 2023, the OSC filed an affidavit from Ms. Collins in connection with an application filed in the parallel proceedings against Defendants in Canada captioned *In the Matter of Traders Global Group Inc. and Muhammed Murtuza Kazmi*, File No. 2023-21, pending before the Ontario Capital Markets Tribunal ("Collins Affidavit", Ex. D-19).  The CFTC did not receive a draft of the Collins Affidavit before it was filed in the OSC action.  (Tr. at 197:13-198:8, Ex. D-19).  The Collins Affidavit correctly stated: "The largest expenditures to third parties from the CAD accounts were described as 'TXBAL' (CAD 32.9 million) and 'TXINS' (CAD 4.5

million).  These payments appear to be for corporation tax instalments, respectively."  (Ex. D-19 at 3).

27.     The CFTC received a 1,943-page copy of the entire OSC application on September 7, 2023.  The Collins Affidavit appears at pages 1634 through 1641 of that document.  The OSC application was uploaded into the CFTC's database on September 13, 2023 and was first accessed by Mr. Edelstein on September 18, 2023, and downloaded by him on September 20, 2023.  It was accessed by Mr. Burden on September 26, 2023, although never downloaded by him.  (Tr. at 199:17 -200:1).

28.     On September 6, 2023, and again on September 11, 2023, the CFTC refiled the Edelstein Declaration in support of the SRO/PI Motion.  (ECF No. 23-44 at 13; Ex. D-18 at 13; ECF No. 33-44; Ex. D-20).  The Edelstein Declaration continued to misidentify the $31.5 million CAD debit as a "Transfer to an unidentified Kazmi account."  (*Id.*)  **These filings did not cite to or reference the $31.5 million CAD error.  (*Id.*)**

29.     On September 19, 2023, Defendants filed an Emergency Moton to Modify the Ex Parte Statutory Restraining Order, seeking relief from the asset freeze ordered in response to the CFTC's SRO/PI Motion.  (ECF No. 42).

30.     On September 22, 2023, Ms. Paulson sent an email to Mr. Burden and Ms. Streit, copying Mr. Edelstein, regarding the CFTC's draft Opposition to Defendants' Emergency Motion to Modify, which was subsequently finalized and filed that same day.  (Ex. D-21 at 1; ECF No. 72).  Ms. Paulson stated: "█████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████."

(*Id.*)

31.     In its opposition brief, the CFTC argued in part:

> The CFTC's SRO motion appends evidence showing that a large portion of the $310 million in customer fees were paid directly into the personal accounts of Defendant Kazmi. (*See* Doc. 33, CFTC's Mot for SRO and PI; Doc. 33-4, Aff. of M. Edelstein). For example, between November 1, 2021 through December 13, 2022, WooCommerce—the vendor that processed customer fees for MyForexFunds—deposited over $107 million into a personal account in Defendant Kazmi's name. (Aff. of M. Edelstein ¶ 22.) The evidence also shows substantial transfers from Traders Global's corporate accounts to Defendant Kazmi. (*Id*. ¶ 29.) For example, between December 2022 and April 2023, $31.55 million was transferred from one of Traders Global's corporate accounts in Canada to another account in Defendant Kazmi's name. *Id*. ¶ 29.

(ECF No. 72 at 10, 12-13).

32.     **At the time they wrote and filed the September 22, 2023 brief, CFTC staff did not realize that the Edelstein Declaration had mischaracterized the destination of the $31.5 million CAD transfer.  (Tr. at 334:12-335:4; 532:14-18).  This was the first and only time the CFTC cited to the $31.5 million CAD transfer reflected in the Edelstein Declaration.**

33.     On September 26, 2023—prior to the hearing on the CFTC's Motion for a Preliminary Injunction (the "PI Hearing")—Burden emailed defense counsel: "Your position is that the CFTC is required to 'produce' at the hearing, in person, those witnesses whose declarations the CFTC relies upon in the SRO motion.  We do not agree with your position."  (Ex. D-38 at 3).  That same day, defense counsel replied that "live testimony subject to cross examination[] is necessary."  (*Id.* at 2).

34.     Also on September 26, 2023, in a Reply in Support of the Motion to Modify, Defendants notified the Court about the CFTC's mischaracterization of the $31.5 million CAD transfers in (a) the Edelstein Declaration and (b) the CFTC's Opposition to Defendants' Motion to Modify.  (ECF No. 73).  Defendants wrote:

> Most egregiously, the CFTC asserts, relying on a declaration from its own investigator, Matthew Edelstein, that $31,550,000 CAD was transferred to an "unidentified Kazmi account" sometime between December 2022 and April 2023. As the CFTC should have known, ***this is demonstrably false***. Defendants' bank records clearly show that two pre-authorized payments of $4,500,000 CAD and $27,000,000 CAD during the period were made with reference to "TXINS" and "TXBAL," respectively—common bank codes used to designate ***tax payments to the Canadian government***. A simple Google search would have revealed this. To repeat: ***the CFTC misrepresented that Traders Global transferred $31.55 million CAD to Mr. Kazmi, when in reality Traders Global transferred that money to the Canadian tax authorities***. This is just one example (albeit, a critical one) of a factual misrepresentation that the CFTC submitted to the Court when requesting its all-encompassing SRO on an *ex parte* basis. (Ex. D-23 at 9) (internal citations omitted).

(ECF No. 73 at 6) (emphasis in original).  Included with the Defendants' Motion to Modify was a declaration from Dakota Speas, counsel for the Defendants.  (ECF No. 73-1).  Exhibit 11 to the declaration of Mr. Speas demonstrated that "TXBAL" and "TXINS" were and are standard bank codes for Canadian corporate tax payments.  (ECF No. 73-12 at 2).

35.      **Defendants' September 26, 2023 brief caused Mr. Burden and Mr. Edelstein to realize that they had made a mistake with regard to the nature of the $31.5 million CAD transfer.  (Tr. at 326:18-327:15; 533:8-12).  Mr. Burden considered the Court to have been duly advised by Defendants' brief that the transfer was for tax payments.  (Tr. at 279:19-23).  Nevertheless, Mr. Burden acknowledged at the evidentiary hearing that he should not have assumed the Court understood that the CFTC agreed with Defendants' disclosure and should have done more to correct the record sooner.  (Tr. at 249:7-22).**

36.      **As of September 26, 2023, the preliminary injunction hearing was scheduled to occur on October 11, 2023.  (ECF No. 37).**

37.     Mr. Edelstein reviewed Defendants' Reply in Support of the Motion to Modify and then, in an effort to see if Defendants were correct, reviewed the Collins Affidavit which confirmed the "TXBAL" and "TXINS" transfers were, in fact, tax payments.  (Tr. at 400:20-401:4; 446:3-9).

38.     At the evidentiary hearing, Mr. Edelstein testified that after this review, he asked Mr. Burden: "Do I need to do something about this?  Like, do I need to correct the declaration in some way?"  (Tr. at 401:20-24).  Mr. Edelstein further recalled telling Mr. Burden:

> There's a mistake in my declaration.  The defendants have—as I'm sure you've seen—have pointed it out in their filing.  I looked at Ms. Collins'[s] declaration and she has the same information in there.  You know, what do we need to do about this?

(*Id.* at 448:10-25).

39.     Mr. Burden told Mr. Edelstein "that the Court was . . . informed via the defendants' filing of the nature of those transfers" (Tr. at 402:3-5), and "that we didn't need to do anything further at the time."  (*Id.* at 449:5-6).

40.     On October 4, 2023, Mr. Burden sent an "edelstein mock cross outline" to Mr. Edelstein, Ms. Streit, and Ms. Paulson.  (Ex. D-24).  Mr. Burden's "mock cross outline" for Mr. Edelstein included a section titled: "██████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████" (Ex. D-24 at 3).

41.     **On October 6, 2023, and following the submission of a joint stipulation by the parties (ECF No. 87), the Court entered an Order extending the SRO through November 8, 2023 to allow the parties to continue discussions to determine whether they could reach an**

agreement on the CFTC's request for a preliminary injunction without the need for hearing and continued the hearing until November 6, 2023.  (ECF No. 88).

42.    On October 16, 2023, the CFTC filed with the Court a letter representing that it "plan[ned] to call two live witnesses, Devin Malinowski and Matthew Edelstein" at the PI Hearing. (ECF No. 98).

43.    On October 19, 2023, Defendants submitted an 18-page proposed supplemental memorandum in support of their emergency motion to modify the SRO and release funds.  (ECF No. 99-1).  This brief did not mention the $31.5 million CAD transfers or the related error in the Edelstein Declaration.  (*Id.*)

44.    On October 26, 2023, the Court held a telephonic hearing on Defendants' Motion to Modify.  (*See* ECF No. 111 at 4-32).  Mr. Burden and Ms. Paulson attended the hearing on behalf of the CFTC.  (*Id.*)  **Neither party raised the issue of the $31.5 million CAD transfers or the related error in the Edelstein Declaration at that hearing.  (Tr. at 208:16-209:1).**

45.    **On October 31, 2023, Defendants filed a 34-page brief in opposition to the CFTC's motion for an SRO and preliminary injunction.  (ECF No. 114).  This brief did not mention the $31.5 million CAD transfers or the related error in the Edelstein Declaration.**

46.    **On November 1, 2023, Mr. Burden sent an email to defense counsel, writing:**

> **We plan to stand on Mr. Edelstein's declaration at the PI hearing, and will not seek to supplement it, either in writing or via testimony at the hearing.  If Defendants still wish to cross-examine him, you are welcome to do so (we all have plane tickets). If not, you should let us know so we can tell the court. If we show up with our witness and no one has any questions for him, I think that will be poorly received by the court.**

**(Ex. D-26 at 1).  At the evidentiary hearing, Mr. Burden explained what he meant:**

> **I meant that we weren't going to update the declaration or include new information.  We had received additional information, documents in production from iSRisk.  We had**

**thought about and considered supplementing the declaration and ultimately decided not to. I did not mean to suggest by this email that we were going to dispute in our error or that I meant to dispute that these were tax payments.**

**(Tr. at 224:14-225:1).**

47. Also on November 1, 2023, defense counsel responded to Mr. Burden's email "[c]onfirming that we plan to cross-examine Mr. Edelstein" at the PI Hearing. (Ex. D-26 at 1).

48. **In the week before the preliminary injunction hearing, Mr. Burden took the depositions of Mr. Kazmi and Mr. Chichester, and prepared and filed a reply brief in support of the CFTC's motion for a preliminary injunction. (Tr. at 283:6-22; ECF No. 123).**

49. On November 4, 2023, Mr. Burden sent an email to Mr. Edelstein, Ms. Paulson, and Ms. Streit attaching "███████████████████████████████████ ███████████████" (Ex. P-1 at 1). The attachment ("2023.11.4 M. Edelstein direct exam for PI hearing.docx") included "████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████" (*Id.* at 2). The outline did not include ████████████ ███████████████████████████████ (*Id.*)

50. On November 5 or 6, 2023, Mr. Burden met with Mr. Edelstein in the lobby of their hotel to prepare for the PI Hearing. (Tr. at 231:11-16; 405:5-23; 476:22-24). Mr. Burden did not review his own emails to confirm Mr. Edelstein's recollection of relevant events. (*Id.* at 227:22-24; 231:5-21). Likewise, Mr. Edelstein did not review any of his own emails, messages, or files to ensure that his recollection of events set forth in his Declaration was accurate, and Mr. Burden never asked him to do so. (*Id.* at 420:9-16; 476:17-21).

51. **As of November 6, 2023, neither Mr. Edelstein nor Mr. Burden recalled that they had received an email from OSC indicating that the $31.5 million CAD transfer was for**

tax payments.  (Tr. at 334:12-335:8, 478:6-479:13, 549:8-12).  **Neither Mr. Edelstein nor Mr. Burden understood that the mistake regarding this transfer was due to a missed email, and therefore neither of them believed they had any reason to search their emails.  (Tr. 334:24-335:4, 549:8-12).  Mr. Burden first asked Mr. Edelstein about the timing of when he learned that the $31.5 million CAD was a tax transfer either the night before or the morning of the November 6th PI hearing. (Tr. at 231:11-16; 405:5-23).**

52.    Mr. Edelstein had never before testified in federal court (Tr. at 484:16-18) and relied on Mr. Burden in preparing for the hearing.  (*Id.* at 406:7-9).

53.     At the evidentiary hearing, Mr. Edelstein testified that CFTC attorneys make the decision whether a disclosure must be made to the court.  (Tr. at 410:1-19).

54.    **At the preliminary injunction hearing, Mr. Edelstein testified that he made an error in his declaration and the $31.5 million CAD transfer was for tax payments.  (PI Tr. at 7:24-8:9).  He also testified, erroneously, that he first learned these transfers were tax payments after his declaration was filed.  (Tr. 468:21-470:8).  He actually first learned, but did not sufficiently appreciate, that these were tax payments in the forgotten August 17 email from OSC.  (Tr. at 469:17-24).**

55.    At the evidentiary hearing, Mr. Edelstein agreed that this testimony was "inaccurate" as he was "unable to find any record of a conversation with the OSC investigator in the first few weeks of September," (Tr. at 467:25-468:7) and could not recall any such phone conversation with OSC.  (*Id.* at 399:5-17).

56.    At the PI hearing, when asked if "[t]he purpose of the flow of money in your declaration should not be meant to be read as evidence of potential dissipation of assets," Mr. Edelstein replied "I would say that that could be part of it. . . But it's not the whole part."  (Ex. D-

2) (PI Tr. at 50:13-19).  Mr. Edelstein also agreed that another part of "[t]he idea [was to] restrain [Defendants'] money so [Mr. Kazmi] c[ouldn't] squander it or hide it."  (*Id.* at 50:20-22).

57.     During the evidentiary hearing, when asked about correcting the error regarding the $31.5 CAD million transfers, Mr. Burden testified that he "should have corrected the declaration or emailed the defendants to say, hey, I agree with you" after Defendants filed their Reply in Support of the Motion to Modify.  (Tr. at 277:12-14).  Mr. Burden also testified: "I didn't consider that we needed to do anything" because "the Court was duly advised of the premises by defendants' September 26 filing, their reply where they said, [']no, it's a tax payment.'"  (*Id.*)

58.     On November 14, 2023, Judge Quraishi entered his Opinion and Order addressing the PI Motion. (ECF Nos. 134, 135).  The Court's opinion stated that "the CFTC's failure to disclose or to correct Mr. Edelstein's error, and continued citation to the error even after realizing it was an error, is troubling at best."  (ECF No. 134 at 25).

59.     Judge Quraishi held: "[To] the extent that the transfer of $31,550,000 to an 'unidentified Kazmi account' was a factor supporting the grant of the ex parte SRO, the Court now assigns it no weight." (*Id.* at 26).

60.     **Judge Quraishi also found that the CFTC had made a *prima facie* showing of each violation alleged in its complaint, and specifically "Defendants made misrepresentations, misleading statements and deceptive omissions" (ECF No. 134 at 18), that the misrepresentations and omissions were material (*Id.* at 19), that Kazmi had acted with scienter (*Id.* at 20-21).  He also found that the CFTC "demonstrated a likelihood of future violations by Defendants that justifies preliminary injunctive relief."  (*Id.* at 22).**

61.     **Therefore, Judge Quraishi entered a preliminary injunction enjoining Defendants from, among other things, "soliciting customers for participation in the My**

Forex Funds programs" and "acting as a counterparty to customers in retail forex or retail commodity transactions." (*Id.* at 23). He also continued a freeze of $12,080,000 of Defendants' assets. (*Id.* at 27).

62.    The OSC freeze directions remained in place, freezing all of Kazmi's and Traders Global Group Inc's assets derived from Traders Global Group. (ECF No. 158-5 at ¶¶ 69-70). OSC estimates that over $90 million CAD in funds were frozen pursuant to its freeze directions. (*Id.* at ¶ 11). About $860,000 of those frozen assets were located in the United States. (*Id.* at ¶ 11; ECF Nos. 131-2 at 7, 94 at 4).

63.    On November 14, 2023, Mr. Burden sent an email to the Chicago-based Division of Enforcement Deputy Director and Deputy Regional Counsel, copying Ms. Streit, Ms. Paulson, and Mr. Edelstein, that stated:



(Ex. P-5 at 1).

64.    On November 15, 2023, the CFTC Director of Enforcement sent an email to the Deputy Director writing: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" (Ex. D-27 at 1). That same day, the Deputy Director responded, stating: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." (*Id.*)

65.    At the evidentiary hearing, Mr. Burden testified that on or about November 16, 2023, he reviewed his emails and "was horrified to discover this August 17th email" in which Ms. Collins informed Mr. Burden and Mr. Edelstein that the $31.5 million CAD transfers were, in fact,

Canadian corporate tax payments. (Tr. at 375:3-5; Ex. D-15). **When Mr. Burden re-discovered the OSC email, he immediately apprised his supervisor of it. (Tr. at 335:9-14).**

66.     Mr. Burden testified that he "had considered that the matter was closed, the record was corrected. I was justifiably chastised by his Honor for failing to correct the declaration in that PI hearing. I didn't worry too much about what happened, but when Ms. Streit said that -- rather I should say [the Deputy Director and Deputy Regional Counsel] wanted to talk to her about Mr. Edelstein's declaration, I felt, well, I should look and I should see if there's any back-and-forth between me and Mr. Edelstein or Ms. Streit or anybody else on this subject that could explain how we had failed to apprehend this error." (Tr. at 374:7-375:2).

67.     **Also on November 16, 2023, Mr. Burden informed Mr. Edelstein of the OSC email. (CFTC Ex. 7, Tr. at 535:25-536:6). Thereafter, Mr. Edelstein wrote, in an instant message to Mr. Burden, "███████████████████████." (Ex. P-7 at 1 (capitalization and punctuation added)). Mr. Edelstein was apologizing for the mistake in his declaration and the fact that he had overlooked the OSC email. (Tr. at 536:7-15).**

68.     **On that same date, Mr. Burden proposed and began drafting a letter to apprise the court of the August 17, 2023 email and the errors in Mr. Edelstein's testimony. (Ex. P-6, Tr. at 343:20-344:15).**

69.     On November 17, 2023, Mr. Burden sent an email to Ms. Streit, Mr. Edelstein, and Ms. Paulson, that included a link to a "draft letter to court re testimony." (Ex. P-8, P-9 at 1). In the attached draft letter Mr. Burden wrote:

- ████████████████████████████████████



70.    **Also on November 17, 2023, in an email to Mr. Burden, Ms. Streit, and Ms. Paulson, Mr. Edelstein offered his "**                              **" (Ex. P-10 at 1-2).  Mr. Edelstein felt responsible for and embarrassed about the mistake in his declaration.  (Tr. at 538:3-10).**

71.    On November 17, 2023, Defendants filed their Response to the Temporary Receiver's Motion for Fees and Expenses, in which they asked the Court to order the CFTC to pay half of the dismissed receiver's fees on the ground that "the CFTC procured the receiver wrongfully—that is, at least in part, through the submission of, and continued reliance upon, material information it knew to be erroneous." (ECF No. 139 at 2).  **The Court ultimately denied the Defendants' request.  (ECF No. 164).**

72.    On or about November 16-17, 2023, Mr. Burden took handwritten notes of "internal discussions" at the CFTC.  (Tr. at 244:12-17).  Mr. Burden wrote:                              ." (Ex. D-29; Tr. at 247:5-13).                              ." (Ex. D-29).  At the evidentiary hearing, Mr. Burden testified that he "was referring there to the Court" and agreed that

"at the time" he thought Judge Quraishi had ▮▮▮▮▮▮▮▮▮▮▮▮ but "I don't think that now." (Tr. at 247:5-18).

73.    On November 20, 2023, **after learning of the error related to the re-discovery of the OSC email, CFTC management met with Mr. Burden to discuss the error (Tr. at 251:19-252:3) and** the CFTC Enforcement Director took notes during an internal meeting among certain CFTC staff regarding "Kazmi."    (Ex. D-30 at 1-2).    In the Enforcement Director's handwritten notes, he wrote: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" (*Id.*)  When asked if he knew who "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ were in reference to, Mr. Burden testified "I don't, but I don't think it refers to me." (Tr. at 252:19-252:25).  At that November 20, 2023 meeting, CFTC management asked ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Tr. at 356:12-357:5).

74.    On November 27, 2023, the CFTC's Director of Enforcement sent a message following up and referencing the November 20 meeting: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" (Tr. at 356:12-357:5; Ex. P-12).

75.    On November 28, 2023, Mr. Burden sent an email to Ms. Streit, Ms. Paulson, Mr. Edelstein and the Chicago-based Deputy Regional Counsel, with the subject line: "RE: Kazmi declaration and testimony items for re-review" stating that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████ (Ex. D-34 at 3). In a series of emails, those same individuals exchanged comments regarding their review of the declaration and testimony. (*Id.* at 1-3).

76.    On November 29, 2023, one Special Counsel to the CFTC Enforcement Director sent the Enforcement Director, the Chief Counsel of the Division of Enforcement, and the other Special Counsel an email attaching "Draft Reply re Receiver Fees.docx" writing:



(Ex. D-35 at 1).

77.    **After consideration by many levels of CFTC management, the CFTC decided to disclose the OSC's August 17, 2023 email in a brief rather than in a stand-alone letter. (Tr. at 265:3-266:8).**

78.    On December 1, 2023, the CFTC filed its Reply to the Defendants' Response to Temporary Receiver's Motion for Fees and Expenses. (Ex. D-33; ECF Nos. 148). **The CFTC again acknowledged its error regarding the $31.5 million CAD transfer in the body of that brief. (ECF No. 148 at 4).** In the second footnote, on page five of that filing, the CFTC stated:

> Mr. Edelstein testified at the hearing that he learned of the error shortly after the declaration was filed from talking to the Ontario Securities Commission ("OSC"). (Trans. of PI Hearing, ECF 130 at 8:17 through 8:24.) After the PI hearing, CFTC counsel undertook a closer review of communications between the CFTC and OSC. Based on this review, and by way of correction, the OSC emailed Mr. Edelstein shortly before the filing of the declaration that the transfer was comprised of tax payments. (*See* Ex. A, Email S. Collins, OSC, to M. Edelstein and A. Burden, CFTC, et al., Aug. 17, 2022).

(*Id.* at 5 n.2; Ex. A). The CFTC attached the OSC email as Exhibit A to that brief. (ECF No. 148-1). This was the first time the CFTC disclosed the August 17, 2023 OSC email to the Court or the Defendants.

79.    **On January 12, 2024, the Special Master denied Defendants' request that the CFTC be ordered to pay half of the Temporary Receiver's fees and expenses. (ECF No. 164).**

80.    On February 15, 2024, defense counsel notified the CFTC, via email, that Defendants intended to move for Rule 11 sanctions. (Ex. D-45 at 2-3). **Defense counsel stated that the conduct giving rise to the threatened sanctions motion "intersects" with the conversation about a path to a potential settlement. (*Id.*) The email invited the CFTC to discuss settlement before filing of the motion for sanctions: "[i]f you intend to take appropriate corrective measures, or if you'd like to meet before we file, please let us know. If possible, we'd still like to find a path forward without the need to file a sanctions motion against the agency." (*Id.*) Defendants attached a draft brief in support of a motion for sanctions. (ECF Nos. 177-2, 172–3).**

81.    On February 29, 2024, the Deputy Director of the CFTC Division of Enforcement responded to Defendants' February 15, 2024 email, writing: "The CFTC has acknowledged its error, expressed its regret, and corrected the record in Court that CAD $31,550,000 was in fact a tax payment and not an 'unidentified Kazmi Account.'" (*Id.* at 1). The Deputy Director continued: "Further, to ensure that the documentary record before the court is clear, the CFTC will be filing a corrected declaration with the Court." (*Id.*) The Deputy Director also noted that "[t]he Division of Enforcement will staff the litigation with a new Chief Trial Attorney and new lead line attorney." (*Id.* at 2).

82.    On March 7, 2024, the CFTC filed a "Corrected Declaration of Matthew S. Edelstein" which stated, among other things, that the $31.55 million CAD transfers—which were previously described as a "Transfer to unidentified Kazmi Account"—were for "Canadian Tax Payments." (ECF No.171-1 at 12). **The filing of the corrected declaration occurred within the 21-day "safe harbor" period provided by Rule 11. (ECF No. 171).**

83.    Also on March 7, 2024, Defendants filed their Motion for Sanctions against the CFTC. (ECF No. 172).

84.    **In connection with the resolution of Defendants' sanctions motion, the CFTC entered into a limited privilege waiver to voluntarily produce certain privileged materials for the period of May 23, 2023 to December 1, 2023, relating to the $31.5 million CAD error. (ECF No. 180-3; ECF No. 212 at 3-5).**

85.    **The Commission did not waive privilege over materials dated December 2, 2023 or later and those materials were ultimately reviewed *in camera* by Magistrate Judge Pascal who upheld the CFTC's privilege assertions and found that "upon thorough review of the various emails, the Court finds no reasonable basis to suspect that the attorneys were committing or intended [to] commit any crime or fraud." (ECF No. 229 at 7).**

86.    An evidentiary hearing on Defendants' Motion for Sanctions was held on September 19 and 20, 2024. (ECF No. 220). Counsel for the parties made opening statements, and Mr. Burden and Mr. Edelstein testified.

87.    **Of the three claimed bases for sanctions identified in their motion, Defendants offered evidence relating to only the $31.5 million CAD transfer at the evidentiary hearing. (Tr. *passim*).**

88.     During the evidentiary hearing, Mr. Burden provided two explanations for the CFTC's failure to correct the record after realizing, belatedly, that the $31.5 million CAD transfers were tax payments: (1) there was no need to correct the record because the mistake was immaterial (*Id.* at 277:15-21); and (2) Defendants had already apprised the Court of the error in their Reply in Support of the Motion to Modify and therefore he considered the record corrected and "didn't consider that we needed to do anything." (*Id.* at 279: 20-23; 280:7-12).

89.     During the evidentiary hearing, Mr. Burden also testified the transfer of $31.5 million CAD to an "unidentified Kazmi account" was not included in the Edelstein Declaration as evidence of dissipation.  (Tr. at 183:14-19; 188:2-6).  Further, Mr. Burden testified that, "a purpose" of the summary table in Paragraph 29 of the Edelstein Declaration was "to demonstrate dissipation, but that is not the purpose of this transfer to unidentified Kazmi account." (*Id.* at 185:25-186:3).

90.     On September 19, 2024—during the evidentiary hearing—Mr. Burden agreed that his conduct was "careless and sloppy." (Tr at 87:15-88:71).  When asked if "[a]s an officer of the court, it's not enough to rely on your adversary's advocacy to satisfy your own duty of candor," Mr. Burden replied "Right."  (*Id*. at 249:19-25).

91.     On September 19, 2024—during the evidentiary hearing—Mr. Edelstein testified that he was "unaware of the email and . . . had missed it" and agreed that he did not go back and search all his emails before the SRO/PI Motion was filed: "I receive hundreds of emails probably a day. I don't believe it is incumbent upon me to review every one of my emails prior to a filing . . . I don't know that is something I have time or the resources to do."  (Tr. at 542:13-543:14).

## II.    ARGUMENT IN SUPPORT OF CONCLUSIONS OF LAW

### A.    The CFTC's Mistakes Regarding the $31.5 Million CAD Transfers Were Unintentional and Not Presented for Any Improper Purpose.

Defendants assert that the CFTC committed several sanctionable acts relating to the misclassification of the $31.5 million CAD transfers as going to "an unidentified Kazmi account."[2] Each of those actions was indisputably inadvertent, and reflect negligence at worst. The CFTC did not offer evidence for an improper purpose, intentionally make any misstatement, or otherwise engage in any action to intentionally mislead the Court.

### 1.    The Mistake in the Declaration Was Inadvertent.

The evidence that Defendants adduced at the evidentiary hearing does not come close to supporting their allegation that the CFTC intentionally misrepresented the destination of the $31.5 million CAD transfer in the CFTC's declaration. Prior to the evidentiary hearing, Defendants had insisted that the CFTC had purposefully lied about the transfers. *See, e.g.,* Mtn. for Sanctions (ECF No. 172-1) at 4 (the CFTC "manufactur[ed] a false justification for a total asset freeze and receivership"); Reply Br. (ECF No. 179) at 15 ("The CFTC knowingly inserted misrepresentations into *ex parte* submissions . . . ."); 5/31/24 Joint Letter to Judge Linares (ECF No. 202) at 7 ("The CFTC has misled the Court on at least ten occasions."). But after opening statements at the

---

[2] Defendants have, at various times, also argued that the CFTC should be sanctioned for other categories of conduct, including: (1) Asking questions regarding potentially attorney-client privileged information at Kazmi's deposition; (2) Misrepresenting that Mr. Edelstein had interviewed iS Risk employee Jason Meyer; (3) Improperly relying on Mr. Chichester's testimony to establish CFTC jurisdiction over this matter. *See, e.g.,* ECF 172-1 at 12-13 (alleging that the CFTC improperly sought privileged information from Mr. Kazmi); *id.* at 11 (expressing skepticism that the CFTC interviewed Jason Meyer); ECF 202 at 8 (arguing that the CFTC made "misrepresentations or omissions relating to the substance of Matthew Chichester's testimony"). The CFTC does not address these accusations because they appear not to be live disputes. In their sanctions motion Defendants did not argue that the CFTC improperly relied on Mr. Chichester's testimony to establish jurisdiction. *See, e.g.* ECF 172-1 Appendix A (Defendants' timeline of what they characterize as the "relevant events" related to the motion). And at the evidentiary hearing, Defendants did not present any evidence of improper deposition questioning or that the CFTC misrepresented whether Mr. Edelstein interviewed Mr. Meyer (he had).

evidentiary hearing, Defendants appeared to abandon that line of argument; they did not present evidence or elicit testimony that the CFTC had intentionally lied in the declaration. This is despite Defendants' prior repeated insistence that the CFTC purposefully lied about those transfers.

To the contrary, the evidence at the hearing—specifically Mr. Edelstein and Mr. Burden's testimony—established that the mistakes were inadvertent. Mr. Edelstein explained that he initially assumed the transfers in question went to another Kazmi account because the other, similar large transfers he had analyzed went from one of Defendants' accounts to another. Tr. at 509:12-510:7. Notably, Mr. Edelstein inserted the "unidentified Kazmi account" language into a draft of his declaration *before* OSC advised that they were tax payments. Ex. P-15; Tr. at 509:7-11. Though Mr. Edelstein's assumption was in error, and in retrospect he should have initially described the destination of the $31.5 million CAD as simply "unknown," the mistake was not purposeful, nor made with any nefarious intent.

When OSC later informed Mr. Edelstein and Mr. Burden that the transfers were for Canadian tax payments, they simply missed that fact. Mr. Edelstein read and responded to the email at 7:25 p.m. CT, likely on his phone. Ex. D-15; Tr. at 511:8-17. He meant to update his declaration in the morning, but he simply forgot. Tr. at 511:8-17. Meanwhile, Mr. Burden was out on vacation on the week the OSC email arrived and does not recall reading it. Tr. at 157:22-158:3. These circumstances do not excuse the CFTC's error—the Commission expects staff will read and react accordingly to emails that arrive in the evening or while on vacation. Rather, these circumstances explain *how* both Mr. Edelstein and Mr. Burden genuinely failed to appreciate that the transfers were for payment of taxes in Canada even after receiving OSC's email and illustrate that they did not place any evidence before the Court that they knew to be false.

The facts and circumstances demonstrate that it is not plausible that either Mr. Edelstein or Mr. Burden would intentionally lie about the destination of the $31.5 million CAD transfers.

First, there was no reason for the CFTC to misstate the recipient of the $31.5 million CAD transfers. The CFTC had bona fide evidence, also summarized in the Edelstein Declaration, to support an SRO including transfers of more than $107 million of customer fees into Kazmi's personal checking account (Tr. 522:20-523:14, ECF No. 23-44 at ¶ 22) and that Defendants transferred $10 million from an account in the United States to a trust account in Canada. ECF No. 23-44 at ¶ 24, Tr. at 524:10-25. Because larger amounts were actually being transferred to a Kazmi account, there simply was no reason to lie about an additional $31.5 million CAD transfer.

Second, the CFTC did not cite to the $31.5 million CAD transfer in its SRO/PI Motion or in its Complaint. ECF No. 1, ECF No. 7, Tr. at 322:8-14. It is not plausible that the CFTC would make up a $31.5 million lie and then bury it in one line of one table of a 17-page declaration.

Third, Mr. Burden and Mr. Edelstein would have had to understand that any misrepresentation would almost certainly be caught. Defendants obviously had access to their own banking records, and they would be able to catch and disprove any material mistake in the banking analysis. Tr. at 513:19-514:10.

Fourth, Mr. Burden and Mr. Edelstein's actions after re-discovering the OSC email are inconsistent with an intentional lie. Once he realized he had overlooked the OSC email, Mr. Burden immediately disclosed it to his supervisor and began planning for how to publicly disclose it to the Court and Defendants. Tr. at 335:9-14; Ex. P-6; Tr. at 343:20-344:15. Mr. Edelstein apologized for his role in the mistake, first to Mr. Burden directly and then to the CFTC litigation team. Ex. P-7, Tr. at 536:7-15, Ex. P-10, Tr. at 538:3-10. These are the actions of individuals owning up to an error and not trying to mislead the Court.

Taken together, the evidence overwhelmingly points to the conclusion that the CFTC inadvertently made the error in its declaration, with no intent to mislead the Court in that document.

### 2. The CFTC Was Unaware of the Mistake When it Referenced the Transfers in its September 22, 2023 Filing.

For the same reasons, the evidence shows that the CFTC was still unaware of its mistake when it cited to the $31.5 million CAD transfer in its September 22, 2023 brief. All of the evidence cited above applies with equal force to show that the CFTC was unaware of the error when it cited to the transfer on September 22.

If anything, the evidence is even stronger that the CFTC's citation to the mistake in its September 22 brief was inadvertent and not, as Defendants assert, "a conscious decision to rely upon the same misrepresentations to the Court." Tr. at 30:16-18. In that one filing, in opposition to Defendants' argument that the freeze was overbroad, the CFTC cited to the $31.5 million CAD transfer to support its argument that "it is 'plausible' that any asset Defendant Kazmi owns today derived from his role as CEO and sole shareholder of the corporate Defendants and, more specifically, from the fees that Defendants fraudulently took from customers." ECF No. 72 at 9. In other words, the CFTC was seeking only to refute Defendants' argument that the asset freeze was overbroad because some of Kazmi's money could have come from sources other than the Traders Global scheme. ECF No. 72 at 7-9; ECF No. 42.1 at 11 (Defendants' argument that it is "implausible" that all of Kazmi's assets derived from the scheme). In that same paragraph, the CFTC *also* cited to the $107 million in customer fees that were transferred to Kazmi's personal checking account—transfers that Defendants do not contest. *Id.*

To conclude that the CFTC knowingly sought to mislead the Court in its filing, one would have to believe that CFTC staff thought the $107 million traceable to an *identified* Kazmi checking account did not sufficiently show that Kazmi's money came from customer fees, so they decided

to add a lie about an additional $31.5 million CAD to win the argument. That conclusion is not logical—the *real* transfer of $107 million was much larger—and it is inconsistent with the evidence. The reasonable conclusion is that the CFTC unwittingly cited to the $31.5 million CAD transfer without realizing its error.

### 3. Waiting to Correct the Mistake was a Lapse in Judgment, Not an Intentional Attempt to Mislead.

The CFTC's decision to wait until the preliminary injunction hearing to confirm that it agreed with Defendants about the destination of the $31.5 million CAD transfer was an error in judgment, but the CFTC did not intend to mislead the Court as Defendants have argued. *See* ECF No. 172-1 at 18 (arguing that the CFTC made "a deliberate choice to mislead the Court and prejudice Defendants. There is no other explanation."). CFTC staff first realized the declaration contained an error when Defendants pointed out the error in their filing on September 26, 2023. ECF No. 73 at 5; Tr. at 326:20-327:20; 398:18-22. At that time, the preliminary injunction hearing was scheduled for only two weeks away: October 11. ECF No. 37. On October 4, Mr. Burden began preparing Mr. Edelstein to correct the error at the hearing. Ex.D-24 at 3. But the next day, the parties stipulated to adjourn the hearing until November 6. ECF No. 87. At the hearing on November 6, the CFTC confirmed that it agreed with Defendants that the destination of the transfer was in error. During the intervening period of just under six weeks, the CFTC did not correct the record, but neither did it dispute Defendants' prior correction. And the CFTC did not cite to or rely on the error. There is no evidence that the CFTC took any affirmative action during this period to mislead the Court. As the CFTC admitted at the evidentiary hearing, the decision to wait until the preliminary injunction hearing was negligent. But it was not an intentional attempt to mislead anyone.

### a.  The CFTC Made an Error in Judgment.

Failing to promptly correct the record was an error in judgment.  Mr. Burden testified that he believed the Court had been "duly advised of the [facts] by defendants' September 26th filing, their reply where they said 'no, it's a tax payment.'"  Tr. at 279:20-23.  Mr. Burden further testified that he believed at the time that Defendants' brief sufficiently corrected the record and that the CFTC did not need to confirm Defendants' correction.  Tr. at 280:7-12.  He now admits that he was wrong, and that he "should either have filed a corrected declaration or sent defendants an email" agreeing with their correction and seeking input on how to proceed.  Tr. at 280:13-21.

### b.  This Error is Understandable in Context.

The decision to wait was not a "demonstrably false" action taken "in bad faith" to "continue to mislead the Court" as Defendants charge.  ECF No. 180 at 3-4.  At the time the CFTC learned of its mistake regarding the $31.5 million CAD transfer, the preliminary injunction hearing was scheduled to take place two weeks later on October 11, 2023.  ECF No. 37.  The contemporaneous documentary evidence establishes that in preparing for that hearing, which was ultimately held on November 6, the CFTC expected Mr. Edelstein to testify regarding the error in the declaration.  Ex. P-1.  The CFTC acknowledged at the sanctions hearing and acknowledges here that the error should have been acknowledged promptly and before the scheduled hearing.  The facts, however, reflect the intention to confirm the error and not to mislead.

Further, the evidence indicates that the $31.5 million CAD transfer was not a prominent issue between September 26, the date the Defendants identified the error, and the preliminary injunction hearing.  Defendants rightly note that the CFTC did not reference the $31.5 million transfer in the briefs or a hearing that took place between September 26 and the PI hearing.  Notably, neither did Defendants.  Though they filed an 18-page supplemental memorandum in support of their motion to modify the SRO on October 19 (ECF No. 99-1) and a 34-page brief in

opposition to the CFTC's motion for SRO and preliminary injunction on October 31 (ECF No. 114), Defendants did not discuss the 31.5 million CAD error or argue that the error had any bearing on the relief they requested.  Nor did Defendants (or the CFTC) raise the error at the October 26 hearing on Defendants' motion to modify the SRO.  Tr. at 208:16-209:1.

If Defendants had believed during the fall of 2023 that the $31.5 million CAD mistake was crucial to the Court's analysis of the SRO or preliminary injunction, they would and should have been shouting it from the rooftops.  Instead, after pointing out the mistake, Defendants were silent about it, even within the context of a renewed request that the Court modify the SRO.  While that does not excuse the CFTC's slowness in correcting the error, it puts it into context.  Strange though it may seem today after so much attention has been devoted to the $31.5 million CAD transfer, the actions of both parties between September 26 and November 6, 2023 reveal that *neither* party considered the ultimate destination of that transfer to be a critical issue at the time.  And, as discussed in more detail below, Judge Quraishi's preliminary injunction order reflected that the parties were correct that the $31.5 million transfer was not critical to whether a preliminary injunction should issue.  Judge Quraishi found that regardless of the fact that the $31.5 million went to pay Canadian taxes, the CFTC had made a *prima facie* showing that Defendants had committed fraud and other violations of the Commodity Exchange Act and Regulations, and he continued the asset freeze over  more than $12 million in Defendants' assets.  ECF No. 134 at 27. This "reduced" freeze was still over an order of magnitude more than the $860,000 in U.S. assets that were actually frozen.  ECF No. 158-5 at ¶ 11.

### c.    The CFTC Never Intended to "Stand On" its Error.

Defendants have repeatedly argued that an email sent by Mr. Burden on November 1, 2023, one of a series the parties exchanged in an effort to reach an agreement on the request for a preliminary injunction without the need for a hearing as ordered by the Court (ECF Nos. 37, 88),

showed the CFTC intended to continue to rely on the $31.5 million CAD mistake. Defendants misread the email. In the communication, Mr. Burden writes, in relevant part: "We plan to stand on Mr. Edelstein's declaration for the PI hearing, and *will not seek to supplement it*, either in writing or via testimony at the hearing. If Defendants still wish to cross-examine him, you are welcome to do so (we all have plane tickets)." Ex. D-26 at 1 (emphasis added). At the evidentiary hearing, Mr. Burden explained that he "meant that we weren't going to update the declaration or include new information," but he "did not mean to suggest that we were going to persist in our error or that [the CFTC] meant to dispute that these were tax when we agreed with you that they were." Tr. at 224:14-225:2.

The facts bear out Mr. Burden's explanation. On September 26, Defendants had not only informed the Court that the payments were for Canadian taxes, they also presented documents showing irrefutably that these were Canadian corporate tax payments. ECF No. 73-19 at 6, 8. It simply is not plausible that Mr. Burden intended to "stand on" the declaration by arguing at the preliminary injunction hearing that these were transfers to an "unknown Kazmi account" when the documentary evidence showed otherwise. And Mr. Burden's account is further bolstered by the fact that, at the preliminary injunction hearing, he *didn't* quixotically argue that the $31.5 million CAD went to a Kazmi account, but instead immediately elicited testimony from Mr. Edelstein that these were tax payments. Even were the Court to conclude that Mr. Burden's email is ambiguous, when it comes to the drastic remedy of sanctions, ambiguity should be resolved in favor of the non-moving party. This is because courts in this district "have denied sanctions where the law and facts, even if not adopted by the court, are ambiguous and could be reasonably interpreted in more than one way." *In re Cendant Corp. Deriv. Action Litig.*, 96 F. Supp. 2d 403, 405 (D.N.J. 2000).

### d. *Sanctions Cannot be Imposed Based on Speculation.*

Defendants argue that the CFTC only corrected the record because Defendants wished to cross-examine Mr. Edelstein at the preliminary injunction hearing. ECF No. 180 at 3-4 ("The agency had *no* intention to correct itself until it was forced to do so because Defendants' insisted on cross-examining Mr. Edelstein"). Even crediting Defendants' assertion that the preliminary injunction hearing only took place because they wanted to challenge Mr. Edelstein's credibility on the stand, what *might* have happened if Mr. Edelstein didn't testify is speculative, and not a proper basis for sanctions.[3] *See, e.g., Loops, LLC v. Phoenix Trading, Inc.*, 594 Fed. App'x 614, 619 (Fed. Cir. 2014) ("a party cannot be sanctioned on the basis of mere speculation"); *Soules v. Kauaians for Nukolii Campaign Committee*, 849 F.2d 1176, 1185 (9th Cir. 1988) ("A district court cannot award Rule 11 sanctions on the basis of its speculation . . . ."); *Magerman v. Mercer*, 17 C 3490, 2018 WL 68406, at *4 (E.D. Pa. Feb. 2, 2018) (speculation "is not enough to establish that sanctions are warranted"); *Kuithe v. Gulf Caribe Maritime, Inc.*, No. 08-458, 2009 WL 4030524, at *1 n. 1 (S.D. Ala. Nov. 13, 2009) ("speculation is no basis for sanctions, especially the extreme one proposed here"). The proper question is whether the CFTC should be sanctioned for what it *actually did*—it corrected the record at the preliminary injunction hearing—not whether it should be sanctioned for some other theoretical outcome that did not occur.

The testimony and evidence support a conclusion that the CFTC's delay in confirming Defendants' explanation of the $31.5 million CAD transfer was an error in judgment but was not unreasonable or an intentional attempt to mislead the Court.

---

[3] Defendants' premise that Mr. Edelstein's testimony at the PI hearing was necessary to correct the record is specious. There were many other ways that the record could have been fully corrected without Mr. Edelstein's testimony. For example, Defendants could have presented documents or testimony demonstrating at the preliminary injunction hearing demonstrating these were tax payments. Or the CFTC would have conceded in open court that the transfers went to pay Canadian taxes.

### 4. Misstatements in the preliminary injunction testimony were inadvertent.

Finally, the misstatements made by Mr. Edelstein at the preliminary injunction hearing were inadvertent and the product of the CFTC's failure to appreciate until the eve of the preliminary injunction hearing the importance of *when* it learned that the $31.5 million CAD transfers went to pay Canadian taxes, which in turn resulted in insufficient pre-hearing witness preparation on this topic. But these statements were not a knowing violation of the CFTC's duty of candor, as Defendants claim. ECF No. 172-1 at 18-19. At that hearing, Mr. Edelstein testified from memory about the timing and method by which he learned that the transfers were for tax payments. There is no doubt that his recollection was inaccurate. He testified, incorrectly, that he first learned the transfers were for tax payments through a conversation with an OSC investigator *after* the declaration was filed (Tr. 468:21-470:8), when in reality OSC emailed him identifying the tax payments on August 17. Tr. at 468:3-20, 469:17-24. But the circumstances—and Mr. Edelstein and Mr. Burden's decision to immediately disclose the OSC email once it was re-discovered—show that these mistakes were inadvertent, not the product of an attempt to mislead the Court.

As of November 6, 2023, the day of the preliminary injunction hearing, no one at the CFTC recalled that they had received an email from OSC about the tax payments. Tr. at 334:12-335:8, 478:6-479:13, 549:8-12. Because they did not recall having received an email, neither Mr. Edelstein nor Mr. Burden had any reason to search their emails prior to the hearing. Tr. at 334:24-335:4, 549:8-12. Mr. Burden and the entire CFTC team were incredibly busy leading up to the preliminary injunction hearing, as Mr. Burden took deposition testimony from two important witnesses and prepared and filed a reply brief in support of the CFTC's motion for a preliminary injunction in the week before the hearing. Tr. at 283:6-22; ECF No. 123. Because of that schedule, and because it did not occur to them that the precise date they learned of the error would be

important, Mr. Burden first asked Mr. Edelstein when he learned of the error only very shortly before the hearing, when there was little time to test Mr. Edelstein's recollection.  Tr. at 231:11-16; 405:5-23.  If Mr. Burden or Mr. Edelstein had intended to lie, they certainly would not have made up the timeline that Mr. Edelstein testified to at the preliminary injunction hearing, which indicated that the CFTC knew the transfers went to pay Canadian taxes *before* it cited to the transfers in its September 22 briefing.

Further, Mr. Burden and Mr. Edelstein's actions after re-discovering the OSC email are inconsistent with having intentionally lied at the preliminary injunction hearing.  When they re-discovered the email, Mr. Burden immediately disclosed it to his supervisors and the entire team supported quickly disclosing it to the Court and Defendants.  Tr. at 335:9-14; Ex. P-6; Tr. at 343:20-344:15.  If Mr. Burden or Mr. Edelstein had intentionally obfuscated at the hearing about when the CFTC first learned these were tax payments, surely they would not have proven themselves liars by turning over the OSC email to Defendants and the Court a few weeks later.

While the CFTC should have better prepared Mr. Edelstein to testify about the timing when he learned the transfers were tax payments, that is not the proper basis for Rule 11 sanctions.  *Landon v. Hunt*, 938 F.2d 450, 453 (3d Cir. 1991) ("Rule 11 sanctions are proper *only* in situations involving a signed pleading.") (emphasis added).  And Mr. Edelstein did not "lie to the Court, repeatedly" as Defendants have asserted.  ECF No. 172-1 at 2.  This mistake, like the others, was accidental, not intentional.

## B.  The CFTC's Mistakes Regarding the $31.5 Million CAD Transfers Did Not Harm Defendants.

Moreover, the CFTC's error in its declaration had *no significant impact* on Defendants.  Though Defendants claim the CFTC "manufactur[ed] a false justification for a total asset freeze" that "caused irreparable harm" and "destroy[ed] overnight a business that took years to build"

(ECF No. 172-1 at 4), there is no evidence that the mistakes harmed Defendants at all. The reasons for this are at least threefold: (1) the Court did not cite or refer to the $31.5 million CAD transfer in his SRO order (ECF No. 13) freezing assets and appointing a receiver; (2) Judge Quraishi entered a preliminary injunction prohibiting Defendants from soliciting customers for participation in their scheme and freezing assets far in excess of Defendants' U.S. assets *after* he knew the $31.5 million CAD transfer was for tax payments; and (3) OSC issued freeze directions that impaired *all* of Defendants' funds and property derived from their business without reliance on the mistake.

**1.    The SRO Was Not Based on the Mistake.**

First, there is no reason to believe that the Court's decision to grant the SRO and asset freeze turned on the $31.5 million CAD transfer when entering the SRO, but there are good reasons to believe that it did not. The most prominent materials before the Court included a 40-page complaint that did not refer to the transfer (ECF No. 1), a 47-page motion that did not refer to the transfer (ECF No. 7), and a 17-page declaration from Mr. Edelstein that included the transfer in the fourth of five tables, as one line of 89 total lines describing over $500 million[4] in total debits from Defendants' accounts. ECF No. 23-44 at 8-13. The day after these documents were filed, the Court granted the motion for an SRO without making any reference to the $31.5 million CAD transfer. ECF No. 13. Though $31.5 million CAD is a substantial amount of money, it is dwarfed by other transfers to Kazmi's personal checking account that the CFTC *accurately* described in the declaration. There simply is no basis to conclude that the Court relied on the $31.5 million CAD transfer in granting the CFTC's motion.

The very first table of the Edelstein Declaration described a credit of more than $107 million from WooCommerce—the payment processor that collected Traders Global's ' customer

---

[4] This amount includes *all* debits from Defendants' bank accounts, including transfers from one account to another (which is what the CFTC initially believed the $31.5 million CAD debit to be).

fees—to Kazmi's personal checking account.  ECF No. 23-44 at 8.  The second table in the declaration described an additional $84 million from WooCommerce being deposited into an account in the name of Traders Global Group.  *Id.* at 9.  The third table described an additional $100 million from WooCommerce that went into yet another account in the name of Traders Global.  *Id.* at 11.  And the declaration also described an additional $20 million in transfers that Defendants received from Traders Global customers who paid in cryptocurrency.  *Id.* at 14-16. Mr. Edelstein highlighted these transfers in the summary of his declaration, stating, correctly, that the records showed more than $290 million in customer fees that went into Defendants' bank accounts, and an additional $20 million went into their crypto account.  *Id.* at ¶ 47.  The CFTC *did* cite to these transfers of more than $310 million in its motion for entry of an SRO and a preliminary injunction.  ECF No. 7 at 15-16.  There is no evidence that the Court ignored the evidence of $310 million in transfers that the CFTC accurately described in its declaration and brief and instead relied on the $31.5 million CAD transfer to an "unidentified Kazmi account" as justification for entering the SRO.

### 2.    The Mistake was Corrected Before the Preliminary Injunction.

Second, when Judge Quraishi entered the preliminary injunction on November 14, 2023, he was fully apprised that the $31.5 million CAD transfer was for payment of Canadian taxes. ECF No. 134 at 24-25.  He went on to rule that "to the extent that the transfer of $31,550,000 to an 'unidentified Kazmi account' was a factor supporting the grant of the *ex parte* SRO, the Court now assigns it no weight."  *Id.* at 26.  Nonetheless, even without reliance on the $31.5 million CAD error, Judge Quraishi held that the CFTC made *prima facie* showings on all required elements of all of its claims, including fraud (*id.* at 13-22) and had demonstrated a likelihood that Defendants would commit future violations (*id.* at 22-23), and he enjoined Defendants from soliciting customers (*id.* at 23) and froze $12,080,000 of Defendants' assets.  *Id.* at 27 ("The Court therefore

finds that it is appropriate to limit the amount of an asset freeze to Defendants' profits associated with the 8% of customers who had 'live accounts' in either the B Book or the A Book.").  Judge Quraishi's preliminary injunction order—which prohibited Defendants from operating their business *even after* the $31.5 million CAD mistake was known—belies Defendants' overwrought accusation that the mistake "destroy[ed] overnight a business that took years to build."  ECF No. 172-1 at 4.  In any event, only about $860,000 of Defendants' assets were ever located and frozen in the United States, so the reduced asset freeze did not result in any assets becoming unrestrained.  ECF No. 158-5 at ¶ 11; ECF No. 131-2 at 7; ECF No. 94 at 4.

Judge Quraishi's preliminary injunction order, therefore, demonstrates that regardless of the $31.5 million CAD it was always appropriate for an SRO to be entered, and that an asset freeze of at least $12 million was always justified.  Therefore, Defendants suffered no cognizable financial harm from the CFTC's error.

### 3.    OSC Independently Obtained Similar Relief in Canada.

Third, on the same day that the SRO was entered in this case, OSC issued freeze directions in Canada impairing all of Defendants' assets derived from the proceeds of their business and prohibiting the disposal, transfer, or dissipation of those funds.  ECF No. 158-5 at ¶ 2.  OSC also issued a temporary cease trade order.  *Id.*; *see also https://www.capitalmarketstribunal.ca /sites/default/files/2023-09/ord_20230829_trader-global-group.pdf*.  Over $90 million CAD of Defendants' funds were frozen under OSC's freeze directions, including $860,000 frozen in the United States.  ECF No. 158-5 at ¶ 12.  OSC's freeze directions have remained in place ever since, freezing *all* of Defendants' assets, even after the CFTC's mistake regarding the $31.5 million CAD transfer was discovered and the asset freeze in the United States was limited.  *Id.* ¶¶ 69-70.

The OSC actions in Canada would have shut down Defendants' business and restrained all of their assets regardless of what, if anything, happened in the United States.  Therefore, *even if*

Defendants could show that the SRO would not have been entered but for the $31.5 million CAD error, which they cannot, Defendants *still* would not be able to show that they were harmed by the mistake because the actions in Canada would have led to the exact same outcome.

The Commission's mistake—though regrettable and criticizable—resulted in no cognizable harm to Defendants, and certainly did not "destroy" their business. Rather, Defendants' business was destroyed by their own conduct, which led to *prima facie* findings here that they committed fraud and other violations and to an asset freeze and cease trade order in Canada. Because the CFTC's mistake caused no harm, sanctions would be inappropriate. *See Muller v. Sherburne, Powers & Needham*, 147 F.R.D. 34, 38 (S.D.N.Y. 1993) ("We know of no authority suggesting that such harmless misconduct should result in sanctions.").

### C. The Timing and Method of the CFTC's Disclosure of the OSC Email is Not Sanctionable.

After re-discovering the OSC email, the CFTC appropriately took the time it needed to digest the information, search for any other potential mistakes, and ventilate the issue with management before filing the email with the Court. And the way in which the CFTC disclosed the email—by discussing the $31.5 million CAD error in the text of a brief, identifying and explaining the email in a footnote, and attaching the email as Exhibit A—was reasonable.

#### 1. The Timing of the Correction Was Appropriate.

The CFTC re-discovered the OSC email on November 16, 2023—the Thursday before Thanksgiving—and filed it with the Court on December 1, 2023. Tr. at 334:12-20; ECF No. 148-1. The CFTC acted promptly upon re-discovering the email, as Mr. Burden immediately put together an initial draft of a disclosure (Ex. P-6), and scheduled a meeting between the litigation team and CFTC management on Monday, November 20, 2023. Tr. at 251:19-252:3. At that meeting, the CFTC's Director of Enforcement instructed Mr. Burden to send him the declaration

and Mr. Edelstein's testimony, and asked Mr. Burden to make sure there were no other errors to correct.  Tr. at 356:23-357:5.  Through subsequent review, the CFTC determined that Mr. Edelstein had also incorrectly testified at the preliminary injunction hearing regarding the number of iS Risk employees he had spoken with—he testified that he had spoken to one, but actually spoke to two— and corrected that misstatement as well.  ECF No. 148 at 5 n. 2.

On November 27, 2023, the Monday after the Thanksgiving holiday, the Director asked for an update on this matter, stating that he wanted to give the team "████████████

████████████████████████████████████

████████████"  Ex. P-12.  The next day, November 28, Mr. Burden circulated an email identifying a number of items from the declaration and Mr. Edelstein's testimony that he wanted to confirm.  Ex. D-34 at 3-6.  Mr. Edelstein and Ms. Paulson responded later that day.  *Id.* at 2-3.  Mr. Burden finalized the proposed corrections on Wednesday, November 29, and, after giving management the chance to weigh in on the proposed correction, filed the corrections on Friday, December 1, 2023.

Nothing about this timeline is notable, much less sanctionable.  Having already made mistakes in the declaration and at the preliminary injunction hearing, the CFTC was acutely aware that it needed to get it right this time.  Staff diligently reviewed the relevant materials to ensure that they would not need to correct their correction.  And the time it took to disclose the email had no impact on Defendants.

### 2.    The Method of Correction Was Reasonable.

The day after the CFTC re-discovered the OSC email, Defendants filed a brief arguing that because of the $31.5 million CAD mistake, the CFTC should bear half of the costs of the U.S. receivership.  ECF No. 139 at 2-3.  Because the CFTC needed to address the mistake in response

to Defendants' brief anyway, it made the reasonable decision disclose the OSC email in that same filing rather than in a stand-alone letter.

The CFTC's intention not to conceal the OSC email is clear from its decision to *attach the email as Exhibit A* to the filing. ECF No. 148-1. Both the Court and Defendants were exceedingly unlikely to miss this document or the footnote explaining the error, which consumed nearly half a page. And the CFTC's attachment of the document itself likely was not required—because the document was a communication with a foreign regulator. But the CFTC disclosed the document just as it ultimately disclosed hundreds of other documents over which it had a valid claim of privilege. The manner in which the CFTC disclosed the OSC email was appropriate.

### D.  The CFTC Cured Its Mistakes Prior to or During the Safe Harbor Period.

The CFTC cured all of its mistakes prior to or within the 21-day safe harbor provided by Rule 11. Under the Rule, a movant must first serve its motion for sanctions on the respondent, but the motion "must not be filed or presented to the court if the challenged paper [or] claim . . . is withdrawn or appropriately corrected within 21 days after service." Fed. R. Civ. P. 11(c)(2). On February 15, 2024, two-and-a-half months after they were fully apprised of the CFTC's error and OSC's email, and more than a month after Your Honor denied their request to order the CFTC to pay for half the cost of the receivership based in part on the $31.5 million CAD error (ECF No. 164), Defendants served a Rule 11 motion on the CFTC accompanied by a request to discuss "the path to resolution" under terms more favorable to Defendants. Ex. D-45 at 3. Without identifying any other requested actions, Defendants asked the CFTC to let them know if the CFTC "intend[ed] to take appropriate corrective measures." *Id.* On February 29, 2024—within the safe harbor period—the CFTC responded to Defendants' email and (1) once again acknowledged the error and stated that the CFTC would file a corrected declaration; (2) addressed the other issues raised in

Defendants' motion that Defendants apparently abandoned[5] at or before the evidentiary hearing; and (3) announced that the litigation would be staffed with a new chief trial attorney and line attorney. *Id.* at 1-2. On March 7, 2024—still within the safe harbor period—the CFTC filed a corrected declaration and a letter explaining the correction. ECF Nos. 171 and 171-1. But rather than engage with the CFTC regarding its corrective action, Defendants went ahead and filed a substantially revised Rule 11 motion anyway. ECF Nos. 172 and 172-1.[6]

The CFTC corrected its mistake to the fullest extent possible within the safe harbor period, and therefore sanctions are not appropriate under Rule 11.[7] Although Defendants critique what they view as "[t]he CFTC's paltry attempts to address its staff's misconduct at the eleventh hour" (ECF No. 172-1 at 4), they cannot identify any further actions that the CFTC should have taken in

---

[5] These issues include (1) Defendants' allegation that Mr. Edelstein had not actually spoken with iS Risk employee Jason Meyer, an allegation that was conclusively disproven by an electronic record showing that Mr. Edelstein participated in a 78-minute Teams call with Mr. Meyer on September 16, 2022; (2) Defendants' allegation that the CFTC made misrepresentations regarding a cryptocurrency wallet that was resolved when the CFTC pointed out that Defendants were looking at the wrong document and then, when Defendants remained unconvinced, provided step-by-step instructions for performing the required calculation (ECF 177-7); and (3) Defendants' allegation that the CFTC inappropriately asked for privileged information at Kazmi's deposition (no privileged information was revealed), which is not covered by Rule 11 because it involves no signed pleading. Ex. D-45 at 1-2. Defendants did not pursue these theories at the evidentiary hearing.

[6] As the CFTC noted in its response to Defendants' motion for sanctions (ECF 177 at 29-30), Defendants' decision to file a substantially different motion than the "draft" they had served on the CFTC violates Rule 11 and provides sufficient grounds on its own to deny their motion. *See, e.g., Uptown Grill, LLC v. Camelia Grill Holdings, Inc.*, 46 F.4th 374, 389 (5th Cir. 2022) (denying motion for sanctions that, as filed, "contained substantial differences" from the served version because "the Rule 11 safe harbor provision requires identicality"). Defendants' citations to the contrary are distinguishable because they involve cases where, unlike here, the grounds asserted in the draft motion were "the same as the grounds asserted" in the filed motion. *Ideal Inst., Inc. v. Rivard Inst., Inc.*, 243 F.R.D. 322, 339 (N.D. Iowa 2007); ECF 179 at 1.

[7] The Defendants also seek sanctions under the Court's inherent power—perhaps because they recognize that their complaints do not fit under Rule 11. But "a court should invoke its inherent power sparingly and under limited circumstances where misconduct is clear." *Fonti v. Health Profs. and Allied. Emp., AFT/AFL-CIO*, No. 13-4231, 2018 WL 6787482, at *4 (D.N.J. Dec. 26, 2018). A finding of bad faith is usually required for inherent-power sanctions—and bad faith is always required when attorney's fee sanctions are sought. *Id.* at *4 (citing *Landon*, 938 F.2d at 454). "Generally a court should not resort to [inherent-power] sanctions unless the conduct of a party or attorney is egregious and no other basis for sanctions exists." *In re Prudential Ins. Co.*, 278 F.3d 175, 189 (3d Cir. 2002) (internal quotation omitted).

response to their threatened motion and instead seek dismissal of this case with prejudice, nor any legal basis to overcome the fact that the CFTC cured the error within the safe harbor period.  *Id*. at 4-5.  Where, as here, "the offending party withdraws or corrects the challenged paper, claim, defense, or denial within the twenty-one-day safe harbor period, the rule forecloses sanctions." *Wang v. Chapei LLC*, No. 15-2950, 2020 WL 5500428, at \*5 (D.N.J. Sept. 10, 2020) (citing *In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90, 99 (3d Cir. 2008)).

Thus, pursuant to the express text of the Rule Defendants should not have filed or presented their motion to the Court.  Fed. R. Civ. P. 11(c)(2) (a Rule 11 motion "must not be filed or be presented to the court if the challenged [document] is withdrawn or appropriately corrected within 21 days").  "To impose sanctions here under Rule 11 would undermine the purpose of the safe harbor provision, which is to curb apprehension that withdrawal [of a filing or error] may be viewed as evidence of a violation."  *Patel v. Cole Schotz, P.C.*, No. 17-4868, 2018 WL 585764, at \*2 (D.N.J. Jan. 29, 2018); *see also In re Schafer Salt Recovery*, 542 F.3d at 99 ("purpose of the safe harbor is to give parties the opportunity to correct their errors").

### E.  No Sanction is Appropriate or Necessary.

Even if sanctions were allowable under Rule 11, Your Honor should decline to enter any sanctions because there are no exceptional circumstances meriting sanctions, or at most, should admonish the CFTC for its mistakes.  "[W]hile Rule 11 authorizes sanctions, it does not mandate them."  *Shaikh v. Germadnig*, No. 23-2301, 2024 WL 2861845, at \*4 (3d Cir. June 6, 2024).  Rather, "[s]anctions are only awarded in exceptional circumstances."  *Keith v. Itoyama*, No. 06-424, 2006 WL 3069481, at \*20 (D.N.J. Oct. 27, 2006) (Linares, J.) (denying sanctions because, among other reasons, "Rule 11 sanctions are a drastic remedy").  Courts within this district refrain from imposing sanctions "where conduct does not reach the point of clear abuse."  *Kuhns v. CoreStates Fin. Corp.*, 998 F. Supp. 573, 577 (D.N.J. 1998).  Courts also "have denied sanctions

where the law and facts, even if not adopted by the court, are ambiguous and could be reasonably interpreted in more than one way." *In re Cendant Corp. Deriv. Action Litig.*, 96 F. Supp. 2d 403, 405 (D.N.J. 2000).

### 1. No Sanction Should Be Imposed.

The CFTC's mistakes in this case do not constitute the "exceptional circumstances" that would warrant the "drastic" remedy of Rule 11 sanctions. Although the CFTC holds itself to the highest standards, it is not required to be perfect. And although the CFTC made mistakes, all of its actions were taken in good faith, it has repeatedly owned up to its mistakes, and it corrected them before the Rule 11 motion was filed. Moreover, the CFTC and its staff have already been admonished several times—by Judge Quraishi at the preliminary injunction hearing and in the preliminary injunction order (ECF No. 134 at 23-26), and by Your Honor in an order denying Defendants' request that the CFTC pay half of the receiver's fees (ECF No. 164 at 6). Admonishments are sanctions in and of themselves, and the CFTC has heard the message loud and clear. After these admonishments, the CFTC replaced the chief trial attorney and line attorney on this matter and has devoted substantial resources to addressing the Court's concerns, including by approving a limited waiver of privilege over documents that explained how the CFTC's mistakes occurred. *See* ECF No. 212. The CFTC has already committed to resolving its errors and avoiding similar errors in the future.

### 2. Dismissal Would Not Be Appropriate.

Even if sanctions were imposed—and for all the reasons described above they should not be—the sanction should be limited to an admonishment or reprimand of the CFTC itself. Rule 11 expressly states that "[a]ny sanction imposed under [Rule 11] must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). "[T]he guiding purpose in fixing Rule 11 sanctions is fashioning a sanction adequate

to deter undesirable future conduct." *DiPaolo v. Moran*, 407 F.3d 140, 146 (3d Cir. 2005). The main sanction Defendants request—dismissal of the CFTC's complaint—is particularly inappropriate because Defendants' *victims* would bear the consequence by losing their opportunity for restitution even though multiple judges have already found as a *prima facie* matter that Defendants committed fraud. Further, dismissal pursuant to Rule 11 is a "last resort" only available in cases of "extreme misbehavior." *Liggon-Redding v. Estate of Sugarman*, 659 F.3d 258, 263 (3d Cir. 2011) ("Dismissing an action under Rule 11, however, is a sanction of last resort."); Wright & Miller § 1336.3 (Rule 11 dismissal "is reserved for the rare case involving extreme misbehavior by the offending party such as fraud, contempt, and willful bad faith"). The facts here do not come close to warranting such an extreme sanction.

### 3. Monetary Sanctions Would Not Be Appropriate.

Nor is Defendants' alternative suggestion that the Court impose monetary sanctions appropriate. "In assessing the appropriateness of levying monetary sanctions, as opposed to a simple reprimand, courts within this circuit have considered:

> (1) the willfulness of counsel's conduct; (2) whether the conduct was part of a pattern; (3) whether counsel engaged in past similar conduct; (4) whether the conduct was intended to injure; (5) what effect the conduct had on the time or expense of litigation; and (6) the type of sanction sufficient to deter a repetition of such conduct."

*In re Cendant Corp.*, 96 F. Supp. 2d at 407-08 (D.N.J. 2000). Here, each factor weighs in favor of a simple reprimand. As explained above, the CFTC's conduct was not willful (factor 1) nor was there any intent to injure (factor 4). *See* § II.A, *supra*. The conduct was not part of a pattern (factor 2)—it all related to the commission, discovery, and disclosure of a single error—and there is no evidence that the CFTC has engaged in similar conduct in the past (factor 3). The mistake had no significant effect on the time or expense of this litigation (factor 5) until Defendants filed their Rule 11 motion, sought extensive discovery, obtained an incredibly burdensome *in camera*

45

inspection of internal CFTC attorney communications (which Magistrate Judge Pascal appropriately recognized as attorney work product), and demanded an evidentiary hearing that failed to reveal anything significant beyond what the CFTC had already admitted prior to the filing of the motion. And a reprimand would be more than sufficient to deter this conduct in the future, as noted, CFTC staff have already been chastened and embarrassed publicly for their error (factor 6). Pursuant to these factors, therefore, even if the Court were to impose sanctions, a reprimand would do.

And even if Your Honor were to determine that monetary sanctions were appropriate, any such sanctions should be paid to the Court as a penalty, not to Defendants as legal fees. "Since the purpose of Rule 11 sanctions is to deter rather than to compensate, the rule provides that, if a monetary sanction is imposed, it should ordinarily be paid into the court as a penalty." 1993 Amendment to Fed. R. Civ. P. 11. Only under "unusual circumstances," usually where the violation is of Rule 11(b)(1) (filings presented for an improper purpose such as harassment, delay, or increasing cost), deterrence may require that "some or all" of the payment be made to those injured by the violation. *Id.* The Third Circuit has "emphasized that the main purpose of Rule 11 is to deter, not to compensate." *DiPaolo*, 407 F.3d at 145.

Payment to Defendants would not be equitable. Though Defendants have doubtlessly spent a considerable amount in legal fees on the Rule 11 proceedings, all of those fees were within their control, and there are any number of ways Defendants could have avoided or reduced them. Moreover, Defendants raised several theories of supposed misconduct in their motion, but dropped them at or before the evidentiary hearing. They cannot under any circumstances recover costs spent pursuing those meritless theories, nor their other fruitless conduct such as seeking to compel

the production of privileged documents. *Waltz v. Cnty. of Lycoming*, 974 F.2d 387, 391 (3d Cir. 1992) (limiting fee award to, at most, "only the successful aspect of the pursuit of sanctions").

Your Honor should not require the CFTC to take money appropriated for the purpose of preventing and eliminating fraud in the commodity markets and pay it to parties against whom the Court has already found a *prima facie* showing of fraud. ECF No. 134 at 17-21 (finding that the CFTC met its *prima facie* burden to show false and misleading statements, deceptive omissions, materiality, and scienter). Defendants' request that you order the CFTC to pay their fees and costs should be rejected.

## III    (PROPOSED) CONCLUSIONS OF LAW

### A. The CFTC's Mistakes Regarding the $31.5 Million CAD Transfers Were Unintentional and Not Presented for Any Improper Purpose.

1.      Paragraph 29 of the Edelstein Declaration executed on August 24, 2023 inaccurately and erroneously described the $31.5 million CAD transfers as being made to "an unidentified Kazmi account" when in fact those transfers were related to Canadian tax payments.

2.      The characterization of the specific transfers to an "unidentified Kazmi account" lacked sufficient evidentiary support.

3.      The erroneous statement in the declaration that the $31.5 million CAD was a "transfer to an unknown Kazmi account" was not presented for any improper purpose.

4.      The CFTC did not manufacture a false justification for an asset freeze.

5.      In presenting the Edelstein Declaration to the Court, the CFTC acted negligently, but did not abuse the judicial system or litigation process.

6.      The CFTC did not knowingly make any false statements to the Court, nor did the CFTC knowingly rely on any inaccurate statement or position. The CFTC also did not fail to

disclose a material fact knowing that the omission was reasonably certain to mislead the Court or Defendants.

7.      There is no reasonable basis to suspect that the CFTC committed or intended to commit any crime or fraud in connection with remedial measures or other actions taken to address the mistakes regarding the $31.5 million CAD transfers.

### B. The CFTC's Mistakes Regarding the $31.5 Million CAD Transfers Did Not Harm Defendants.

8.      The SRO issued in this matter was justified whether or not the Court considered the $31.5 million CAD transfer.

9.      The erroneous statement that the $31.5 million CAD was a "transfer to an unknown Kazmi account" was not necessary to the Court's entry of a statutory restraining order (SRO).  The error regarding the recipient of the $31.5 million transfer did not cause the Court to issue or withdraw the SRO.

10.     The District Court found that the CFTC made a prima facia showing on all required elements on each count of the complaint, including the fraud charges, even after being fully apprised that the $31.5 million CAD transfer was for tax payments.  That decision was correct and supported by the evidence.

### C. The Timing and Method of the CFTC's Disclosure of the OSC Email is Not Sanctionable.

11.     The CFTC's disclosure of the August 17, 2023 OSC email in the brief filed on December 1, 2023 was reasonable under the circumstances.

### D. The CFTC Cured Its Mistakes Prior to or During the Safe Harbor Period.

12.     Rule 11 prohibits the filing of a sanctions motion where the challenged claim is withdrawn or corrected within twenty-one days after service of a draft motion.

13.     The CFTC corrected the error regarding the $31.5 million CAD transfer in open Court before Defendants notified the CFTC that they may file a sanctions motion.  The CFTC filed a corrected Edelstein Declaration during the 21-day "safe harbor period."  At the conclusion of the safe harbor period, the CFTC had fully corrected its error.

14.     Defendants' motion does not comply with the requirements of Rule 11.

**E.  No Sanction is Appropriate or Necessary.**

15.     The CFTC has not acted in bad faith, vexatiously, wantonly or for oppressive reasons.

16.     The CFTC has not engaged in a pattern of wrongdoing.

17.     CFTC counsel was already admonished in court for lack of care.

18.     Rule 11 sanctions are proper only in situations involving signed pleadings.

19.     A proper Rule 11 analysis focuses on the circumstances that existed at the time counsel filed the challenged paper.

20.     Where sanctions are imposed, the least severe sanction adequate to serve the purpose should be imposed.

21.     The CFTC engaged in an objectively reasonable inquiry into Defendants' bank records and the flow of customer funds.

22.     The CFTC's allegations regarding Defendants' dissipation of assets were supported by sufficient evidence, including Mr. Kazmi's purchases of multi-million-dollar homes and luxury automobiles.

23.     To the extent sanctions are imposed, a reprimand would appropriately and sufficiently address the mistakes.

24.     Dismissal is of an action is a sanction of last resort.  Dismissal of this action would not deter repetition of the conduct or comparably conduct by other litigants and would instead result in further harm to the victims of Defendants' alleged fraud.

## CONCLUSION

For all of the reasons described above, Your Honor should deny Defendants' motion for Rule 11 sanctions.  Alternatively, if Your Honor grants Defendants' motion, the appropriate sanction is a reprimand for the mistakes that the CFTC made.  Fees should not be awarded, and Defendants should not avoid the consequences of their fraud through dismissal of the CFTC's complaint.

December 6, 2024                          Respectfully Submitted,


_s/ Douglas Snodgrass_

Brian Young
Elizabeth N. Pendleton
Douglas Snodgrass
Candice Haan
Commodity Futures Trading Commission
Division of Enforcement
77 West Jackson Blvd.
Suite 800
Chicago, IL 60604
(312) 596-0663
byoung@cftc.gov
ependleton@cftc.gov
dsnodgrass@cftc.gov
chaan@cftc.gov

_Counsel for Plaintiff Commodity Futures Trading Commission_