## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### Camden

| | |
|---|---|
| Commodity Futures Trading Commission, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ) <br> Traders Global Group Inc., a New Jersey ) <br> corporation, d/b/a "My Forex Funds"; Traders ) <br> Global Group Inc., a Canadian business ) <br> organization; and Murtuza Kazmi, ) <br> ) <br> ) <br> Defendants. ) <br> ) | Civil Action No. <br> 1:23-cv-11808-ESK-EAP |

**DEFENDANTS' FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO DEFENDANTS' MOTION FOR SANCTIONS**

Craig Carpenito
(NJ Bar No. 027102000)
Thomas J. Scrivo
(NJ Bar No. 307552019)
KING & SPALDING LLP
1185 Avenue of the Americas
35th Floor
New York, NY 10036
(212) 556-2100
ccarpenito@kslaw.com
tscrivo@kslaw.com

Anthony J. Staltari
(NJ Bar No. 233022017)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
anthonystaltari@quinnemanuel.com

*Counsel for Defendants Traders Global Group Inc., a New Jersey corporation; Traders Global Group Inc., a Canadian business organization; and Murtuza Kazmi*

## TABLE OF CONTENTS

Page

I.    (PROPOSED) FINDINGS OF FACT ........................................................................ 1

    A.    Pre-Filing CFTC Conduct and Communications (June 9, 2023-August 17, 2023) ..................................................................................................................1

    B.    The CFTC Files an (a) Application for an SRO and (b) Civil Complaint (August 28-29, 2023) ....................................................................................4

    C.    Post-Filing CFTC Conduct and Communications (August 31, 2023-November 6, 2023) .........................................................................................6

    D.    The Preliminary Injunction Hearing (November 6, 2023)....................................14

    E.    The Court's Preliminary Injunction Ruling (November 14, 2023)........................17

    F.    Post-Ruling Conduct and Communications by the CFTC (November 14, 2023-November 29, 2023) ............................................................................18

    G.    The CFTC's December 1, 2023 Court Filing .......................................................22

    H.    Defendants Notify the CFTC of His Intent to Pursue Sanctions and the CFTC's Response (February 15-29, 2024)........................................................22

    I.    Defendants' Sanctions Motion and the Revised Edelstein Declaration (March 7, 2024) ...............................................................................................23

    J.    Public Statements of CFTC Commissioner Pham (July 3, 2024).........................23

    K.    The Evidentiary Hearing (September 19-20, 2024)..............................................24

II.    LEGAL STANDARDS ........................................................................................... 27

    A.    Counsel's Duties and Obligations in *Ex Parte* Proceedings.................................27

        1.    Duty of Candor .........................................................................................27

        2.    Ethical Obligations....................................................................................27

        3.    Special Responsibilities of Government Counsel......................................28

    B.    Rule 11 of the Federal Rules of Civil Procedure .................................................28

        1.    Rule 11 Requirements................................................................................28

        2.    Rule 11 Mental State Standards ................................................................29

        3.    Rule 11 Sanctions .....................................................................................31

    C.    The Court's Inherent Power to Impose Sanctions ................................................33

        1.    Standard to Impose Sanctions Under the Court's Inherent Power ...........33

        2.    Sanctions Under the Court's Inherent Power............................................33

    D.    DEBT Box ............................................................................................................35

        1.    Facts and Reasoning .................................................................................35

        2.    Sanctions Imposed ...................................................................................35

III.    DISCUSSION ................................................................................................ 36

    A.    Defendants' Motion for Sanctions ..........................................................36

    B.    Undisputed Key Facts ............................................................................36

    C.    Overview of Findings ............................................................................37

    D.    The CFTC's Pattern of Willful Conduct ................................................37

        1.    The SRO Application and the Edelstein Declaration ...............................38

        2.    The CFTC's Failure to Correct the SRO Application and the Edelstein Affidavit .......................................................................42

        3.    The CFTC's Testimony and Conduct at the Preliminary Injunction Hearing ...................................................................48

        4.    The CFTC's December 1, 2023, Filing ...................................49

        5.    The CFTC's Re-Filing of the Edelstein Declaration ...............................52

        6.    The CFTC's Testimony and Conduct at the Evidentiary Hearing.............53

    E.    The Significance of the CFTC's Misrepresentations................................55

    F.    The Tactical and Injurious Nature of the CFTC's Misconduct ..........................55

    G.    The Length and Expense of Litigation Associated with the CFTC's Misconduct ................................................................................56

    H.    The Time and Resources Available to the CFTC to Investigate the Underlying Conduct .......................................................................56

    I.    The Need for Specific Deterrence ..........................................................57

IV.    Appropriate Sanctions.................................................................................. 58

    A.    Option 1—Dismissal..............................................................................59

    B.    Option 2—Attorneys' Fees, Evidentiary Preclusion, and Potential Admission of CFTC Misconduct ..........................................................59

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. Trustees of New Jersey Brewery Employees' Pension Tr. Fund*,
  29 F.3d 863 (3d Cir. 1994)......................................................................................30

*Agabiti v. Home Depot Corp.*,
  No. 13-cv-4499, 2015 WL 7313862 (D.N.J. Nov. 20, 2015) ...........................................30, 37

*Andrews v. Holloway*,
  256 F.R.D. 136 (D.N.J. 2009).....................................................................................31

*Ashkinazi v. Sapir*,
  No. 02Civ.00002(RCC), 2005 WL 937597 (S.D.N.Y. Apr. 20, 2005) ..................................30

*Bowers v. Nat'l Collegiate Athletic Ass'n*,
  564 F. Supp. 2d 322 (D.N.J. 2008) ...............................................................................31

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991)...................................................................................................33

*In re Conte*,
  33 F.3d 303 (3d Cir. 1994)..........................................................................................30

*Del Giudice v. S.A.C. Cap. Mgmt., LLC*,
  No. CIV. A. 06-1413 SRC, 2009 WL 424368 (D.N.J. Feb. 19, 2009)...............................32, 59

*Derzack v. Cnty. of Allegheny, Pa.*,
  173 F.R.D. 400 (W.D. Pa. 1996), *aff'd sub nom. Derzack v. Cnty. of Allegheny
  Child. & Youth Servs.*, 118 F.3d 1575 (3d Cir. 1997)......................................................59

*Dixon v. Legacy Transp. Sys., LLC*,
  No. 2:15-cv-01359-JAD-PAL, 2017 WL 3927141 (D. Nev. Sept. 6, 2017) ....................34, 60

*Egersheim v. Gaud*,
  No. 07-cv-5116, 2011 WL 13238544 (D.N.J. Nov. 30, 2011) .........................................33, 34

*Ellis v. Beemiller, Inc.*,
  287 F.R.D. 326 (W.D. Pa. 2012) .................................................................................29

*Fagan v. City of Vineland*,
  22 F.3d 1296 (3d Cir. 1994).......................................................................................30

*Fink v. Gomez*,
  239 F.3d 989 (9th Cir. 2001) ..................................................................................33, 38

*Gavrieli Brands LLC v. Soto Massini (USA) Corp.*,
No. 18-462 (MN), 2020 WL 1443215 (D. Del. Mar. 24, 2020) ............................................34

*Goodyear Tire & Rubber Co. v. Haeger*,
581 U.S. 101 (2017)..........................................................................................................33

*H.P.D Consolidation, Inc. v. Pina*,
Case No, 15-cv-05309-EMC, 2017 WL 1046960 (N.D. Cal. Mar. 20, 2017)........................31

*Hoxworth v. Blinder, Robinson and Co.*,
980 F.2d 912 (3d Cir. 1992), *abrogated on other grounds Morgan v.
Sundance*, *Inc.*, 596 U.S. 411 (2022) .....................................................................................59

*Kvitka v. Puffin Co., LLC*,
No. 1:06-CV-0858, 2009 WL 2588693 (M.D. Pa. Aug. 21, 2009) .......................................33

*Larkin v. Heckler*,
584 F. Supp. 512 (N.D. Cal. 1984) .......................................................................................32

*Lighthouse Point Marina & Yacht Club, LLC v. Int'l Marine Underwriters*,
No. CIV. 14-2974 WHW CLW, 2015 WL 1969360 (D.N.J. May 1, 2015)....................32, 33

*Mindek v. Rigatti*,
964 F.2d 1369 (3d Cir. 1992)................................................................................................34

*O'Brien v. Alexander*,
101 F.3d 1479 (2d Cir. 1996)................................................................................................29

*Poulis v. State Farm Fire & Cas. Co.*,
747 F.2d 863 (3d Cir. 1984)............................................................................................34, 59

*In re Prudential Ins. Co. Am. Sales Prac. Litig. Actions*,
278 F.3d 175 (3d Cir. 2002)..................................................................................................33

*SEC v. Digital Licensing Inc.*,
2:23-cv-00482-RJS-DBP, 2024 WL 1157832 (D. Utah Mar. 18, 2024)......................... *passim*

*In re Theokary*,
592 F. App'x 102 (3d Cir. 2015) ...........................................................................................33

*United States v. Brace*,
1 F.4th 137 (3d Cir. 2021) ....................................................................................................31

*United States v. Grass*,
239 F. Supp. 2d 535 (M.D. Pa. 2003) ....................................................................................34

*United States v. Samango*,
607 F.2d 877 (9th Cir. 1979) ................................................................................................59

*United States v. Tildiz,*
    355 F.3d 80 (2d Cir. 2004)................................................................................60

*Wharton v. Superintendent Graterford SCI,*
    95 F.4th 140 (3d Cir. 2024) .................................................................. *passim*

*Wharton v. Vaughn,*
    No. 01-cv-6049, 2022 WL 1488038 (M.D. Pa. May 11, 2022).......................27, 28

*In re WinNet R CJSC,*
    No. 16mc484(DLC), 2017 WL 2728436 (S.D.N.Y. June 23, 2017)................27, 38

**Statutes**

7 U.S.C. § 13a-1................................................................................................4

28 U.S.C. § 1746..............................................................................................5

**Other Authorities**

Fed. R. Civ. P. 11 .................................................................................. *passim*

Fed. R. Civ. P. Rule 30(d)(2) ...........................................................................36

Fed. R. Evid. 801(d)(2)(B)...............................................................................60

N.J. Rules Prof'l Conduct R. 3.3 ...............................................................28, 38

Defendants Traders Global Group Inc. (a New Jersey corporation), Traders Global Group Inc. (a Canadian corporation), and Murtuza Kazmi (collectively, "Defendants") respectfully submit their proposed findings of fact and conclusions of law in connection with Defendants' Motion for Sanctions (ECF No. 172). For the reasons set forth below, the Court should grant Defendants' Motion for Sanctions and levy appropriate sanctions against Plaintiff Commodity Futures Trading Commission ("CFTC").

## I.     (PROPOSED) FINDINGS OF FACT[1]

### A.     Pre-Filing CFTC Conduct and Communications (June 9, 2023-August 17, 2023)

Ashley Burden was the lead CFTC attorney responsible for the CFTC's investigation of Defendants Traders Global Group, Inc. (New Jersey), Traders Global Group, Inc. (Canada), and Murtuza Kazmi. (Evidentiary Hearing Transcript ("Tr.") at 88:8-89:1). Mr. Burden has been a lawyer for 19 years and a CFTC enforcement attorney for ten years. (*Id.*). Matthew Edelstein was the CFTC investigator assigned to the case, **working under Mr. Burden's supervision**. (*Id.* at 408:21-23; 409:12-22; 410:1-19). **The CFTC's investigation was limited to collecting records from third parties and taking the testimony of one witness. (*Id.* at 120:13-121:5). The CFTC did not interview any of Defendants' employees or customers. (Ex. D-2) (PI Hearing Transcript ("PI Tr.") at 36:20-21; 54:4-6).**

The Ontario Securities Commission ("OSC") conducted a parallel investigation of Defendants Kazmi and Traders Global Group in Canada. (Tr. at 142:15-23, 151:25-152:10; 154:3-13; 156:16-157:2; 413:16-19). The CFTC and OSC shared information pursuant to the Internal

---

[1]     The parties' jointly stipulated facts appear in plain typeface. Facts that are not stipulated appear in **bold** typeface.

Organization of Securities Commissions Multilateral Memorandum of Understanding Concerning Consultation and Cooperation and the Exchange of Information. (*Id.* at 413:10-414:6).

In connection with the CFTC's investigation, Mr. Burden and Mr. Edelstein conducted a review of Defendants' bank records, including bank records received from the OSC. (Tr. at 290:13-19; 412:21-413:11).

On June 9, 2023, in connection with a review of one of Defendants' bank account records, Mr. Burden sent an email to Mr. Edelstein and Ms. Streit, writing, in relevant part: ████████

████████████████████████████████████

████████████ (Ex. D-4 at 2). On June 12, 2023, Mr. Edelstein responded to Mr. Burden, stating, ████████████████████████████████

████████████████████████████████████████

████████████████████ (*Id.* at 1).

On June 15, 2023, Mr. Edelstein emailed OSC Senior Forensic Accountant Stephanie Collins asking for a ████████████████████ open issues, including issues relating to Defendants' ████████ (Ex. D-5).

On June 16, 2023, Mr. Edelstein sent an email to Ms. Collins and Mr. Burden, excerpting a page from TGG's banking records showing a CAD $4,500,000 debit on March 6, 2023, with the reference ████████████ and a CAD $27,000,000 debit on the same day with the reference ████████████ (Ex. D-6 at 1-2). Mr. Edelstein asked Ms. Collins, ███

████████████████████ (*Id.* at 1). On June 16, 2023, Ms. Collins responded to Mr. Edelstein:

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████

(Ex. D-6 at 1). When testifying at the evidentiary hearing, Mr. Burden agreed that this email placed him "on notice of at least the possibility that these [transfers] were tax payments." (Tr. at 146:23-147:1). **Yet** Mr. Burden "took no steps on [his] own to verify" whether the transfers were indeed tax payments. (*Id*. at 147:2-4).

Also on June 16, 2023, Mr. Edelstein sent an Outlook calendar invitation to Mr. Burden and OSC staff, including Ms. Collins, scheduled for the same day and bearing the subject line, ██████████████████ (Ex. D-8). Mr. Burden attended subsequent calls with the OSC on August 2, 4, 8, and 11, 2023. (Ex. D-9, D-10, D-11, D-12, D-13).

As of July 7, 2023, Mr. Edelstein had drafted a declaration to support an anticipated motion for a Statutory Restraining Order ("SRO"). (Ex. P-15, Tr. at 509:4-6). In that draft, **despite knowing the transfers were likely tax payments,** Mr. Edelstein described the $31.5 million CAD debits as a ██████████████ (Ex. P-15 at 9-10; Tr. at 509:7-11).

**On August 11, 2023, CTFC Commissioner Caroline Pham delivered remarks during a closed-door Commission meeting regarding the "filing of Complaint in *CFTC v. Traders Global Group*." (Ex. D-3 at 1). Mr. Burden attended the meeting. (Tr. at 122:18-124:12). In her remarks, Commissioner Pham stated: "I am seriously concerned about the Commission's rush to the wrong side of history because we are failing to put in the bare minimum amount of work necessary to get it right." (*Id.*). Commissioner Pham also stated: "Once again, the Commission is taking a 'ready, shoot, aim' approach to its enforcement actions, without allowing for a process that ensures appropriate legal review and a robust administrative record to enable reasoned decision-making by the Commission." (*Id.*). Commissioner Pham further questioned the legal basis for one of the CFTC's prospective causes of action against Defendants—specifically, Count V of the Complaint. (*Id.*).**

Notwithstanding Commissioner Pham's concerns, no one communicated to Mr. Edelstein any concerns or any need to be "more careful." (Tr. at 427:1-6).

On August 17, 2023, Ms. Collins sent an email to Mr. Burden and Mr. Edelstein, writing:



(Ex. D-15). **Mr. Burden agreed that, upon receipt of Ms. Collins's email, he was "appris[ed] . . . in no uncertain terms that these [transfers were], in fact, tax payments." (Tr. at 156:1-3).** Mr. Burden was on vacation when he received Ms. Collins's email and testified at the evidentiary hearing that he did not recall reading it at the time, but he acknowledged that he saved it to his "Kazmi folder." (*Id.* at 157:11-14; 158:1-3; 386:22-25). It was Mr. Burden's practice to "put [emails] into folders if [he] felt that they had been dealt with." (*Id.* at 158:12-14).

Also on August 17, 2023, Mr. Edelstein responded, ███████ to Ms. Collins's email stating that the transfers in question were for ███████████ (Ex. D-15).

**B.    The CFTC Files an (a) Application for an SRO and (b) Civil Complaint (August 28-29, 2023)**

On August 28, 2023, Mr. Burden signed and caused to be filed under seal **and without notice to Defendants** a Complaint for Injunctive Relief, Civil Monetary Penalties, and Other Equitable Relief ("Complaint," ECF No. 1), an *ex parte* Motion for Expedited Discovery (ECF No. 6), and an *ex parte* Motion for Statutory Restraining Order and Preliminary Injunction Pursuant to 7 U.S.C. § 13a-1 (the "SRO/PI Motion," ECF No. 7). As set forth in the SRO/PI Motion, the CFTC asked the Court to **halt Defendants' business**, enter an SRO against Defendants, freeze Defendants' assets, require them to submit books and records as requested by

the CFTC, and appoint a temporary receiver, among other relief. (ECF No. 7). At the evidentiary hearing, Mr. Burden agreed that, in the context of an *ex parte* application for an SRO, his "duty of diligence and candor [was] at its apex." (Tr. at 163:12-14).

Mr. Edelstein executed a declaration in support of the SRO/PI Motion. (Declaration of Matthew S. Edelstein Pursuant to 28 U.S.C. § 1746 ("Edelstein Declaration"), ECF No. 23-44). In Paragraph 29 of the Edelstein Declaration, Mr. Edelstein included a chart summarizing activity in the "TGG #995 Account" between December 2022 and April 2023. In that summary, Mr. Edelstein incorrectly identified debits of CAD $31,500,000 from "the TGG #995 Account" as "Transfer to unidentified Kazmi Account." (ECF No. 23-44 at ¶ 29). **The misidentified $31.5 CAD transfers constituted more than 97% of the debits from that account during the stated period. (*Id.*).**

In the SRO/PI Motion, the CFTC stated: "In the absence of an asset freeze, Kazmi may— and is likely to—transfer or dissipate assets held in the US, either at banks or with payment companies like WooCommerce or Deel. Kazmi can easily transfer those assets to Canada, beyond the immediate reach of the Court. Indeed, this is where most of Defendants' assets are currently." (ECF No. 7 at 53, *citing* Edelstein Declaration ¶ 28). The SRO/PI Motion contained more than 30 references to the Edelstein Declaration, although it did not specifically cite the $31.5 million CAD transfers. (*See* generally ECF No. 7).

Also on August 28, 2023, Mr. Burden signed and filed the CFTC's Complaint against Defendants. (ECF No. 1). The CFTC's Complaint did not reference the $31.5 million CAD transfers. (*See generally id.*).

On August 29, 2023, U.S. District Judge Robert B. Kugler of the District of New Jersey issued an order granting the CFTC's Motion for an Ex Parte Statutory Restraining Order, Appointment of a Temporary Receiver, and Other Equitable Relief under seal and without a

hearing. (ECF No. 13). The Court's order (a) placed Defendant companies into receivership, (b) appointed a Temporary Receiver authorized to suspend Defendants' business operations, and (c) restrained all corporate and personal assets of Defendants, without limitation (among other restraints). (ECF No. 13 at 6-23). The Order—which Mr. Burden prepared for the Court to sign (Tr. at 172:18-24)—stated that the Court "considered the pleadings, declarations, exhibits, and memorandum filed in support of the Commission's motion" and found that there was "good cause to believe that it is necessary to preserve the status quo and prevent damage to the Court's ability to grant effective final relief for customers in the form of monetary or other redress . . . from the withdrawal, transfer, removal, dissipation or other disposition of funds, assets or other property." (ECF No. 13 at ¶ 8). Judge Kugler's Order also stated that there was "a reasonable likelihood that Defendants will transfer or dissipate assets or destroy or alter records." (*Id.* at ¶ 14).

During the evidentiary hearing, Mr. Burden agreed that "the Court in granting the SRO reviewed, considered, and relied on the Mr. Edelstein declaration . . . [i]ncluding the false information about the tax payments." (Tr. at 175:13-19).

### C. Post-Filing CFTC Conduct and Communications (August 31, 2023-November 6, 2023)

On August 31, 2023, Mr. Burden sent an email to Mr. Edelstein, Ms. Streit, and CFTC Trial Attorney Katherine Paulson stating:



(Ex. D-43 at 1). The redline comparison between the Edelstein Declaration filed in the U.S. District Court for the District of New Jersey and the **version of the** draft declaration for Mr. Edelstein proposed by the OSC showed

███████████████████████████████████████

████████ (Ex. D-43-A at 10-13).

On September 5, 2023, the OSC filed an affidavit from Ms. Collins in connection with an application filed in the parallel proceedings against Defendants in Canada captioned *In the Matter of Traders Global Group Inc. and Muhammed Murtuza Kazmi*, File No. 2023-21, pending before the Ontario Capital Markets Tribunal ("Collins Affidavit", Ex. D-19). The CFTC did not receive a draft of the Collins Affidavit before it was filed in the OSC action. (Tr. at 197:13-198:8, Ex. D-19). The Collins Affidavit correctly stated: "The largest expenditures to third parties from the CAD accounts were described as 'TXBAL' (CAD 32.9 million) and 'TXINS' (CAD 4.5 million). These payments appear to be for corporation tax instalments, respectively." (Ex. D-19 at 3).

The CFTC received a 1,943-page copy of the entire OSC application on September 7, 2023. The Collins Affidavit appears at pages 1634 through 1641 of that document. The OSC application was uploaded into the CFTC's database on September 13, 2023 and was first accessed by Mr. Edelstein on September 18, 2023, and downloaded by him on September 20, 2023. It was accessed by Mr. Burden on September 26, 2023, although never downloaded by him. (Tr. at 199:17 -200:1).

On September 6, 2023, and again on September 11, 2023, the CFTC refiled the Edelstein Declaration in support of the SRO/PI Motion**.** (ECF No. 23-44 at 13; Ex. D-18 at 13; ECF No. 33-44; Ex. D-20). The **refiled** Edelstein Declaration continued to misidentify the $31.5 million CAD debit as a "Transfer to an unidentified Kazmi account." (*Id.*)

**In early September 2023, Mr. Burden proposed to defense counsel that Defendants could consent to the entry of a Preliminary Injunction. (Tr. at 218:11-15).**

On September 19, 2023, Defendants filed an Emergency Moton to Modify the Ex Parte Statutory Restraining Order, seeking relief from the asset freeze ordered in response to the CFTC's SRO/PI Motion. (ECF No. 42).

On September 22, 2023, Ms. Paulson sent an email to Mr. Burden and Ms. Streit, copying Mr. Edelstein, regarding the CFTC's draft Opposition to Defendants' Emergency Motion to Modify, which was subsequently finalized and filed that same day. (Ex. D-21 at 1; ECF No. 72).

Ms. Paulson stated: ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ (*Id.*).

In its opposition brief, the CFTC **specifically cited the false statement in Paragraph 29 of the Edelstein Declaration regarding the $31.5 million CAD transfers:**

> The evidence also shows substantial transfers from Traders Global's corporate accounts to Defendant Kazmi. (*Id.* ¶ 29.) For example, between December 2022 and April 2023, $31.55 million was transferred from one of Traders Global's corporate accounts in Canada to another account in Defendant Kazmi's name. *Id.* ¶ 29.

(ECF No. 72 at 12).

At the evidentiary hearing, Mr. Burden agreed that he included this argument in the opposition brief because he "hoped that it would influence the judge's decision on the motion to modify." (Tr. at 204:21-24). When asked if "you were, at least here, relying on this error to try to obtain relief or prevent defendants from obtaining relief," Mr. Burden testified "That's right." (Tr. at 204:25-205:3).

On September 26, 2023—prior to the hearing on the CFTC's Motion for a Preliminary Injunction (the "PI Hearing")—Burden emailed defense counsel: "Your position is that the CFTC is required to 'produce' at the hearing, in person, those witnesses whose declarations the CFTC relies upon in the SRO motion. We do not agree with your position." (Ex. D-38 at 3). That same

day, defense counsel replied that "live testimony subject to cross examination[] is necessary." (*Id.* at 2).

Also on September 26, 2023, in a Reply in Support of the Motion to Modify, Defendants notified the Court about the CFTC's mischaracterization of the $31.5 million CAD transfers in (a) the Edelstein Declaration and (b) the CFTC's Opposition to Defendants' Motion to Modify. (ECF No. 73). Defendants wrote:

> Most egregiously, the CFTC asserts, relying on a declaration from its own investigator, Matthew Edelstein, that $31,550,000 CAD was transferred to an "unidentified Kazmi account" sometime between December 2022 and April 2023. As the CFTC should have known, ***this is demonstrably false***. Defendants' bank records clearly show that two pre-authorized payments of $4,500,000 CAD and $27,000,000 CAD during the period were made with reference to "TXINS" and "TXBAL," respectively—common bank codes used to designate ***tax payments to the Canadian government***. A simple Google search would have revealed this. To repeat: ***the CFTC misrepresented that Traders Global transferred $31.55 million CAD to Mr. Kazmi, when in reality Traders Global transferred that money to the Canadian tax authorities***. This is just one example (albeit, a critical one) of a factual misrepresentation that the CFTC submitted to the Court when requesting its all-encompassing SRO on an *ex parte* basis. (Ex. D-23 at 9) (internal citations omitted).

(*Id.* at 6) (emphasis in original). Included with Defendants' Motion to Modify was a declaration from Dakota Speas, counsel for Defendants. (ECF No. 73-1). Exhibit 11 to the declaration of Mr. Speas demonstrated that "TXBAL" and "TXINS" were and are standard bank codes for Canadian corporate tax payments. (ECF No. 73-12 at 2).

Mr. Edelstein reviewed Defendants' Reply in Support of the Motion to Modify in an effort to see if Defendants were correct **that the $31.5 million CAD transfers were tax payments**. **Specifically, he** reviewed the Collins Affidavit which confirmed the "TXBAL" and "TXINS" transfers were, in fact, tax payments. (Tr. at 400:20-401:4; 446:3-9).

9

At the evidentiary hearing, Mr. Edelstein testified that after this review, he asked Mr. Burden: "Do I need to do something about this? Like, do I need to correct the declaration in some way?" (Tr. at 401:20-24). Mr. Edelstein further recalled telling Mr. Burden:

> There's a mistake in my declaration. The defendants have—as I'm sure you've seen—have pointed it out in their filing. I looked at Ms. Collins'[s] declaration and she has the same information in there. You know, what do we need to do about this?

(*Id.* at 448:10-25).

Mr. Burden told Mr. Edelstein "that the Court was . . . informed via the defendants' filing of the nature of those transfers" (*Id.* at 402:3-5), and "that we didn't need to do anything further at the time." (*Id.* at 449:5-6). **Thus, the CFTC remained silent. It did not file a sur-reply, letter, amended Edelstein Declaration, or any other document correcting the record or acknowledging the CFTC's false representation about the nature of the $31.5 million CAD transfers in (a) the Edelstein Declaration or (b) its Opposition to Defendants' Motion to Modify. (*Id.* at 207:8-25).**

On September 27, 2023, Mr. Burden again disagreed with defense counsel that "'live' testimony" was required at the PI Hearing. (Ex. D-38 at 2). The same day, defense counsel responded, writing:

> An evidentiary hearing is necessary before the Court can rule on the CFTC's motion for a preliminary injunction because the CFTC's likelihood of success on the merits hinges on disputed factual issues. . .. For example, the credibility of Mr. Edelstein is highly suspect (he mischaracterized two tax payments to the Canadian government as transfers to Mr. Kazmi), and Defendants are entitled to test the truth of his assertions through live cross examination. *See Arrowpoint*, 793 F.3d at 324; *Visual Sciences*, 660 F.2d at 58 ('The opposing party must be afforded the opportunity to cross-examine the moving party's witnesses and to present evidence.'). Failure to hold an evidentiary hearing under these circumstances is reversible error. *Arrowpoint*, 793 F.3d at 326; *Visual Sciences*, 660 F.2d at 58.

(Ex. D-38 at 1). **Even after receiving this communication, the CFTC—for the second time— remained silent. It did not correct the record or acknowledge that it had made a false**

statement regarding the $31.5 million CAD transfers in (a) the Edelstein Declaration or (b) its Opposition to Defendants' Motion to Modify. (Tr. at 380:21-381:24).

On October 4, 2023, Mr. Burden sent an "edelstein mock cross outline" to Mr. Edelstein, Ms. Streit, and Ms. Paulson. (Ex. D-24). **Mr. Burden circulated the outline twenty-two days before the hearing on Defendants' Motion to Modify (October 26, 2023) and approximately one month before the PI Hearing (November 6, 2023). (Tr. at 212:2-8; ECF No. 111 at 4-32; ECF No. 127).** Mr. Burden's "mock cross outline" for Mr. Edelstein included a section titled:

███████████████████████████████████████████ with a sub-point for the █

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████ (Ex. D-24 at 3). **Nevertheless, the CFTC—for the third time—remained silent. It did not correct the record or acknowledge it had made a false statement regarding the $31.5 million CAD transfers in (a) the Edelstein Declaration or (b) its Opposition to Defendants' Motion to Modify.**

On October 16, 2023, the CFTC filed with the Court a letter representing that it "plan[ned] to call two live witnesses, Devin Malinowski and Matthew Mr. Edelstein" at the PI Hearing. (ECF No. 98). The CFTC did not mention the $31.5 million CAD transfers or the related error in the Edelstein Declaration in this filing. (*Id.*) **Thus, the CFTC—for the fourth time—remained silent. It did not correct the record or acknowledge that it made a false statement regarding the $31.5 million CAD transfers in (a) the Edelstein Declaration or (b) its Opposition to Defendants' Motion to Modify.**

On October 26, 2023, the Court held a telephonic hearing on Defendants' Motion to Modify. (*See* ECF No. 111 at 4-32). Mr. Burden and Ms. Paulson attended the hearing on behalf

of the CFTC. (*Id.*). **The CFTC did not raise the issue of the $31.5 million CAD transfers or the related error in the Edelstein Declaration at that hearing. (Tr. at 208:16-209:1). Thus, the CFTC—for the fifth time—remained silent. It did not correct the record or acknowledge that it had made a false statement regarding the $31.5 million CAD transfers in (a) the Edelstein Declaration or (b) its Opposition to Defendants' Motion to Modify.**

On October 31, 2023, the CFTC filed a letter with the Court that stated:

> In reviewing the docket, the CFTC discovered that it inadvertently failed to file Exhibit C-4 to the Malinowski Declaration. The CFTC also identified a typo in the Malinowski Declaration at paragraph 7, where it stated that "I downloaded and preserved copies of relevant URLs from the WooCommerce website." It should read, "I downloaded and preserved copies of relevant URLs from the WordPress website." The CFTC hereto attaches an Updated Declaration of Devin Malinowski Pursuant to 28 U.S.C. § 1746, which corrects the typographical error. It also attaches all four of the exhibits referenced therein, namely, Exhibits C-1, C-2, C-3, and C-4.

(Ex. D-25 at 1) (internal citations omitted). **Despite acknowledging and correcting a typographical error in Mr. Malinowski's declaration, the CFTC did not mention the $31.5 million CAD transfers or the related error in the Edelstein Declaration in this filing. The CFTC—for the sixth time—remained silent. It did not correct the record or acknowledge that it had made a false statement regarding the $31.5 million CAD transfers in (a) the Edelstein Declaration or (b) its Opposition to Defendants' Motion to Modify.**

**On November 1, 2023, Mr. Burden sent an email to defense counsel that stated:**

> **We plan to stand on Mr. Edelstein's declaration at the PI hearing, and will not seek to supplement it, either in writing or via testimony at the hearing. If Defendants still wish to cross-examine him, you are welcome to do so (we all have plane tickets). If not, you should let us know so we can tell the court. If we show up with our witness and no one has any questions for him, I think that will be poorly received by the court.**

(Ex. D-26 at 1). **The CFTC—for the seventh time--remained silent. It did not correct the record or acknowledge that it made a false statement regarding the $31.5 million CAD**

**transfers in (a) the Edelstein Declaration or (b) its Opposition to Defendants' Motion to Modify.** Mr. Edelstein acknowledged that "it seems like it was not the correct . . . action" for the CFTC to stand on Mr. Edelstein's declaration without correcting it. (Tr. at 463:20-24).

Also on November 1, 2023, defense counsel responded to Mr. Burden's email "[c]onfirming that we plan to cross-examine Mr. Edelstein" at the PI Hearing. (Ex. D-26 at 1).

On November 4, 2023, Mr. Burden sent an email to Mr. Edelstein, Ms. Paulson, and Ms. Streit attaching ███████████████████████████████████████████████████ ████ (Ex. P-1 at 1). The attachment ("2023.11.4 M. Edelstein direct exam for PI hearing.docx") included ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████ (*Id.* at 2). The outline did not include ███████████████████ ██████████████████████████████████.

On November 5 or 6, 2023, Mr. Burden met with Mr. Edelstein in the lobby of their hotel to prepare for the PI Hearing. (Tr. at 231:11-16; 405:5-23; 476:22-24). Mr. Edelstein had never testified in federal court (*id.* at 484:16-18) and relied on Mr. Burden in preparing for the hearing. (*Id.* at 406:7-9**).** Mr. Burden did not review his own emails to confirm Mr. Edelstein's recollection of relevant events. (*Id.* at 227:22-24; 231:5-21). Likewise, Mr. Edelstein did not review any of his own emails, messages, or files to ensure that his recollection of events set forth in his Declaration was accurate, and Mr. Burden never asked him to do so. (*Id.* at 420:9-16; 476:17-21).

**At no time before the PI Hearing—not while Defendants' Motion to Modify was pending before the Court, and not after Defendants brought the CFTC's error to the Court's attention—did the CFTC correct the record or acknowledge that it had made a false**

**statement regarding the $31.5 million CAD transfers in (a) the Edelstein Declaration or (b) the CFTC's Opposition to Defendants' Motion to Modify.**

At the evidentiary hearing Mr. Edelstein testified:

I could have conducted a more thorough review of my communications prior to the PI hearing. You know, I've since become aware that the proper course of action is as soon as you become aware of an inaccuracy in a declaration, it should be corrected, you know, through amending the declaration and re-filing with the Court. That didn't happen here.

(Tr. at 498:4-11).

At the evidentiary hearing, Mr. Edelstein testified that CFTC attorneys make the decision whether a disclosure must be made to the court. (*Id.* at 410:1-19).

### D.    The Preliminary Injunction Hearing (November 6, 2023)

On November 6, 2023, at the PI Hearing, Mr. Edelstein testified:

On the summary table below paragraph 29 [of the Edelstein Declaration], there is a table with three columns: Category, credits, debits. And the line entry "entry to unidentified Kazmi account" in the total amount of $31,550,000. Since filing this declaration, I have become aware that the two transactions that make up this category were, in fact, tax payments made on behalf of Mr. Kazmi.

(Ex. D-2, PI Tr. at 8:3-9).

On November 6, 2023, at the PI Hearing, Mr. Edelstein **falsely** testified as follows:

QUESTION:    Mr. Edelstein, when did you learn that these were tax payments?

EDELSTEIN:    I believe it was in the days after filing, if not – if not the first two weeks.

(PI Tr. at 8:17-20).

Mr. Edelstein testified at the evidentiary hearing: "It's very clear that I had testified inaccurately about the timeline." (Tr. at 490:14-15; *see also* Exs. D-15 and D-33 at 8 n.2). At the evidentiary hearing, Mr. Burden agreed that, as he was "leading [Mr. Edelstein] through this direct,

14

[Mr. Burden] had no memory of this happening, but [he] sponsored the direct testimony anyway." (Tr. at 233:4-8).

On November 6, 2023, at the PI Hearing, Mr. Edelstein testified as follows:

QUESTION:    How did you find, Mr. Mr. Edelstein, that these were tax payments?

EDELSTEIN:    Through a conversation with an investigator at the Ontario Securities Commission.

(PI Tr. at 8:21-24).

***    ***    ***

QUESTION:    Did you learn of your mistake before or after that defense filing?

EDELSTEIN:    Before.

(*Id*. at 48:21-23).

At the evidentiary hearing, Mr. Edelstein agreed that this testimony was "inaccurate" as he was "unable to find any record of a conversation with the OSC investigator in the first few weeks of September," (Tr. at 467:25-468:7) and could not recall any such phone conversation with the OSC. (*Id*. at 399:5-17).

At the PI Hearing, when asked if "[t]he purpose of the flow of money in your declaration, should not be meant to be read as evidence of potential dissipation of assets," Mr. Edelstein replied "I would say that that could be part of it. . . But it's not the whole part." (Ex. D-2) (PI Tr. at 50:13-19). Mr. Edelstein also agreed that another part of "[t]he idea [was to] restrain [Defendants'] money so [Mr. Kazmi] c[ouldn't] squander it or hide it." (*Id.* at 50:20-22).

During Mr. Edelstein's direct examination at the PI Hearing, the following exchange occurred between Judge Quraishi and Mr. Burden:

THE COURT:    Mr. Burden, let me just ask you a question then. Did you inform the defense of this change prior to today's hearing?

BURDEN:    No. Not expressly, Your Honor.

15

|                |                                                                                                                                                   |
|----------------|---------------------------------------------------------------------------------------------------------------------------------------------------|
| THE COURT:     | Why not?                                                                                                                                           |
| BURDEN:        | Counsel is aware of it. They apprised us of it in their response. After analysis, we believe that they were correct.                               |

(PI Tr. at 9:13-21).

At the evidentiary hearing, Mr. Burden testified that, when being questioned by Judge Quraishi, he should have just said "No" instead of saying, "Not Expressly." (Tr. at 234:13-18).

During Mr. Edelstein's cross-examination at the PI Hearing, Judge Quraishi called Mr. Burden to a sidebar, and the following exchange occurred:

|                |                                                                                                                                                                                                                                                                              |
|----------------|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| THE COURT:     | I'm trying to understand the timeline of this. You learned of this discrepancy, this mistake a week or two after the filing, and you didn't inform the Court or defense counsel. They raised it in their papers? Because if that's accurate, CFTC is going to be in a lot of trouble today. So please tell me that that's not accurate what they're implying on cross-examination. |
| BURDEN:        | Your Honor, I think it is correct that we --                                                                                                                                                                                                                                  |
| THE COURT:     | You learned of it and didn't tell the Court or defense counsel?                                                                                                                                                                                                               |
| BURDEN:        | Correct, Your Honor.                                                                                                                                                                                                                                                          |
| THE COURT:     | Why was that?                                                                                                                                                                                                                                                                 |
| BURDEN:        | Because, Your Honor, we considered that it was not material to the purpose of the declaration, and it was a small mischaracterization of this transfer that doesn't relate to trading by --                                                                                     |
| THE COURT:     | Here's the total in the chart, right? $32 million and change. The discrepancy is $31 and a half million. And you didn't find that material? Is that really what you're going to say? Because then you're going to say it out there and not on sidebar.                          |
| BURDEN:        | It is, Your Honor.                                                                                                                                                                                                                                                            |
| THE COURT:     | I'll wait to hear from you later. Go back to cross-examination. You guys have a lot of explaining to do today. Get ready to do it.                                                                                                                                             |

(Ex. D-2) (PI Tr. at 51:11-52:12).

16

During the evidentiary hearing, when asked about **not** correcting the error regarding the $31.5 million CAD transfers, Mr. Burden testified that he "should have corrected the declaration or emailed the defendants to say, hey, I agree with you" after Defendants filed their Reply in Support of the Motion to Modify. (Tr. at 277:12-14). Mr. Burden also testified: "I didn't consider that we needed to do anything" because "the Court was duly advised of the premises by defendants' September 26 filing, their reply where they said, [']no, it's a tax payment.'" (*Id.* at 279:19-23*).*

E.      **The Court's Preliminary Injunction Ruling (November 14, 2023)**

On November 14, 2023, Judge Quraishi entered his Opinion and Order addressing the PI Motion. (ECF Nos. 134, 135). The Court's opinion stated that "the CFTC's failure to disclose or to correct Mr. Edelstein's error, and continued citation to the error even after realizing it was an error, is troubling at best." (ECF No. 134 at 25). Judge Quraishi further noted that:

> The record reflects that CFTC knows how to submit a corrected declaration. On October 31, 2023, the CFTC submitted a revised declaration of another CFTC Investigator, Devin Malinowski, to correct a typo and to attach an exhibit that previously had been omitted.

(*Id.* at 25 n.12).

**Judge Quraishi ultimately unfroze approximately 92% of Defendants' assets and removed the temporary receiver, noting that: "[To] the extent that the transfer of $31,550,000 to an 'unidentified Kazmi account' was a factor supporting the grant of the *ex parte* SRO, the Court now assigns it no weight." (*Id.* at 26). Judge Quraishi found "[t]he CFTC has provided scant particularized evidence that supports a finding that Defendants intend to dissipate any assets." (*Id.*).**

**F.    Post-Ruling Conduct and Communications by the CFTC (November 14, 2023-November 29, 2023)**

On November 14, 2023, Mr. Burden sent an email to the Chicago-based Division of Enforcement Deputy Director and Deputy Regional Counsel, copying Ms. Streit, Ms. Paulson, and Mr. Edelstein, that stated:



(Ex. P-5 at 1).

On November 15, 2023, the CFTC Director of Enforcement sent an email to the Deputy Director, writing: ███████████████████████████████████████████████ ████████████████████████████████████ (Ex. D-27 at 1). That same day, the Deputy Director responded, stating: ██████████████████████████████████████████████ ██████████████████████████ (*Id.*).

At the evidentiary hearing, Mr. Burden testified that on or about November 16, 2023, he reviewed his emails and "was horrified to discover this August 17th email" in which Ms. Collins **(the OSC Senior Forensic Accountant)** informed Mr. Burden and Mr. Edelstein that the $31.5 million CAD transfers were, in fact, Canadian corporate tax payments. (Tr. at 375:3-5; Ex. D-15). **Mr. Burden only undertook a review of his emails relating to the $31.5 million CAD transfers after (a) Judge Quraishi reprimanded Mr. Burden during the PI Hearing and (b) supervisors within the CFTC became aware of Judge Quraishi's Opinion and Order that criticized the CFTC's conduct. (*Id.* at 374:7-375:2).**

Mr. Burden testified during the evidentiary hearing that he "had considered that the matter was closed, the record was corrected. I was justifiably chastised by his Honor for failing to correct

the declaration in that PI hearing. I didn't worry too much about what happened, but when Ms. Streit said that -- rather I should say [the Deputy Director and Deputy Regional Counsel] wanted to talk to her about Mr. Edelstein's declaration, I felt, well, I should look and I should see if there's any back-and-forth between me and Mr. Edelstein or Ms. Streit or anybody else on this subject that could explain how we had failed to apprehend this error." (Tr. at 374:7-375:2).

On November 17, 2023 Mr. Burden sent an email to Ms. Streit, Mr. Edelstein, and Ms. Paulson, that included a link to a "draft letter to court re testimony." (Exs. P-8; P-9 at 1). In the attached draft letter Mr. Burden wrote:



**Mr. Burden agreed at the evidentiary hearing that he intended to "put this information in front of a federal judge." (Tr. at 361:4-6).**

On November 17, 2023, Defendants filed their Response to the Temporary Receiver's Motion for Fees and Expenses, in which they asked the Court to order the CFTC to pay half of the dismissed receiver's fees on the ground that "the CFTC procured the receiver wrongfully—that is, at least in part, through the submission of, and continued reliance upon, material information it knew to be erroneous." (ECF No. 139 at 2).

On or about November 16-17, 2023, Mr. Burden took handwritten notes of "internal discussions" at the CFTC. (Tr. at 244:12-17). Mr. Burden wrote: ███████████

███████ (Ex. D-29; Tr. at 247:5-13). On the same page of handwritten notes, Mr. Burden wrote that ██████████████████████████████████████████ (Ex. D-29). At the evidentiary hearing, Mr. Burden testified that he "was referring there to the Court" and agreed that "at the time" he thought Judge Quraishi had ████████████████████ but "I don't think that now." (Tr. at 247:5-18).

On November 20, 2023, the CFTC Enforcement Director took notes during an internal meeting among certain CFTC staff regarding "Kazmi." (Ex. D-30 at 1-2). In the Enforcement Director's handwritten notes, he wrote: ██████████████████████

██████████████████████████████████████████

██████████████████ (*Id.*) (emphasis added). When asked **at the evidentiary hearing** if he knew who ████████████████ and ████████████ were in reference to, Mr. Burden testified "I don't, but I don't think it refers to me." (Tr. at 252:19-25). At that November 20, 2023 meeting, CFTC management asked ██████████████████████████████████

██████████████████████████████ (Tr. at 356:12-357:5).

On November 27, 2023, the CFTC's Director of Enforcement sent a message following up and referencing the November 20 meeting: ██████████████████████████

██████████████████████████████████████████

██████████████ (Tr. at 356:12-357:5; Ex. P-12.)

**On November 27, 2023, a Special Counsel to the CFTC's Director of Enforcement sent an email to himself that stated:** ██████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████ **(Ex. D-32). The CFTC's response to Defendants' request to split**

the Temporary Receiver's fees was ultimately filed on December 1, 2023. (ECF Nos. 142, 148). When asked what ███████████████████████ meant, Mr. Burden testified that he "think[s]" the Enforcement Director "was referring to Judge Quraishi." (Tr. at 255:10-13). Mr. Burden agreed that the Enforcement Director shared that concern with Mr. Burden and other CFTC staff during a meeting on November 20, 2023. (*Id.* at 255:19-21).

On November 28, 2023, Mr. Burden sent an email to Ms. Streit, Ms. Paulson, Mr. Edelstein and the Chicago-based Deputy Regional Counsel, with the subject line: "RE: Kazmi declaration and testimony items for re-review" stating ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ (Ex. D-34 at 3). In a series of emails, these same individuals exchanged comments regarding their review of the declaration and testimony. (*Id.* at 1-3). On November 29, 2023, Mr. Burden wrote: ████████████████████████████████████████████

████████████████████████████████████████████████ (*Id.*).

On November 29, 2023, a Special Counsel to the CFTC Enforcement Director sent the Enforcement Director, the **Principal Deputy Director** and Chief Counsel of the Division of Enforcement, and another Special Counsel an email attaching "Draft Reply re Receiver Fees.docx" writing:



(Ex. D-35 at 1).

G.      **The CFTC's December 1, 2023 Court Filing**

On December 1, 2023, the CFTC filed its Reply to Defendants' Response to Temporary Receiver's Motion for Fees and Expenses. (Ex. D-33; ECF No. 148). In the second footnote, on page five of that filing, the CFTC stated:

> Mr. Edelstein testified at the hearing that he learned of the error shortly after the declaration was filed from talking to the Ontario Securities Commission ("OSC"). (Trans. of PI Hearing, ECF 130 at 8:17 through 8:24.) After the PI hearing, CFTC counsel undertook a closer review of communications between the CFTC and OSC. Based on this review, and by way of correction, the OSC emailed Mr. Edelstein shortly before the filing of the declaration that the transfer was comprised of tax payments. (*See* Ex. A, Email S. Collins, OSC, to M. Edelstein and A. Burden, CFTC, et al., Aug. 17, 2022).

(*Id.* at 5 n.2; Ex. A). The CFTC attached the OSC email as Exhibit A to that brief. (ECF No. 148-1). This was the first time the CFTC disclosed the August 17, 2023 OSC email to the Court or Defendants.

**At the evidentiary hearing, Mr. Burden agreed that "CFTC Enforcement Management" gave the direction not to make the correction in a standalone letter. (Tr. at 255:6-9). Mr. Burden testified:**

**QUESTION**:    **Who made the decision to file a footnote and not a standalone letter?**

**BURDEN**:    **I would say the director. It's hard to attribute a decision of the CFTC to one particular person. The director.**

**(*Id.* at 386:12-16). Mr. Burden testified that, while a "number of people" edited the footnote, "I filed it so I take responsibility for what's in there." (*Id.* at 264:16-23).**

H.      **Defendants Notify the CFTC of His Intent to Pursue Sanctions and the CFTC's Response (February 15-29, 2024)**

On February 15, 2024, defense counsel notified the CFTC, via email, that Defendants intended to move for Rule 11 sanctions. (Ex. D-45 at 2-3).

On February 29, 2024, the Deputy Director of the CFTC Division of Enforcement responded to Defendants' February 15, 2024 email, writing: "The CFTC has acknowledged its error, expressed its regret, and corrected the record in Court that CAD $31,550,000 was in fact a tax payment and not an 'unidentified Kazmi Account.'" (*Id.* at 1). The Deputy Director continued: "Further, to ensure that the documentary record before the court is clear, the CFTC will be filing a corrected declaration with the Court." (*Id.*). The Deputy Director also noted that "[t]he Division of Enforcement will staff the litigation with a new Chief Trial Attorney and new lead line attorney." (*Id.* at 2).

At the evidentiary hearing, Mr. Burden testified that, despite being removed from this case, he has not been disciplined and continues to actively handle other cases for the CFTC. (Tr. at 275:6-11).

**I.    Defendants' Sanctions Motion and the Revised Edelstein Declaration (March 7, 2024)**

On March 7, 2024, **after being notified by Defendants of their intent to seek sanctions**, the CFTC filed a "Corrected Declaration of Matthew S. Edelstein" which stated, among other things, that the $31.5 million CAD transfers—which were previously described as a "Transfer to unidentified Kazmi Account"—were for "Canadian Tax Payments." (ECF No. 171-1 at 12).

Also on March 7, 2024, Defendants filed their Motion for Sanctions against the CFTC. (ECF No. 172).

**J.    Public Statements of CFTC Commissioner Pham (July 3, 2024)**

**On July 3, 2024, Commissioner Pham released a statement addressing the "Rule 11 Sanctions Motion in *CFTC v. Traders Global Group*." (ECF No. 207-1 at 2-4). In her statement, Commissioner Pham described the CFTC's alleged misconduct as "a grave matter" that "cannot be tolerated at a law enforcement agency." (*Id.* at 2). Commissioner**

Pham urged her fellow Commissioners to consider taking "appropriate corrective action to address the conduct issues and support CFTC staff." (*Id.*). She recommended that the case be "reassigned to Division of Enforcement staff in a different CFTC regional office or at CFTC headquarters." (*Id.*). Commissioner Pham also recommended, given "the inherent conflict of interest between the CFTC's Division of Enforcement and the Commission (its client) regarding the alleged misconduct by the Division and failure to disclose and correct multiple false statements to the Court," that the "CFTC's Office of the General Counsel or the U.S. Department of Justice should be handling the Rule 11 sanctions motion, not the CFTC's Division of Enforcement." (*Id.*). Commissioner Pham concluded her statements with this admonition: "It is unacceptable to 'hide the ball' from the Commission, especially in order to get a rubber stamp approval to railroad the public into settlements that deprive Americans of their Constitutional rights and property." (*Id.* at 3).

K.      **The Evidentiary Hearing (September 19-20, 2024)**

The evidentiary hearing on Defendants' Motion for Sanctions was held on September 19 and 20, 2024. (ECF No. 220). Counsel for the parties made opening statements, and Mr. Burden and Mr. Edelstein testified.

During opening statements, a CFTC Chief Trial Attorney represented that the CFTC's conduct was "absolutely . . . negligent" and "sloppy." (Tr. at 72:8-11; 74:9). Referring to the $31.5 million CAD transfers, the same CFTC Chief Trial Attorney represented that "[n]obody at the CFTC realized that these were for tax payments or that there was a mistake in the declaration until the defendants pointed it out on September 26th [2023]," and afterwards Mr. Burden "determined that the record had been corrected" sufficiently by Defendants. (*Id.* at 57:11-19). The Chief Trial Attorney stated:

> **They made a mistake when they incorrectly classified the transfer. They made a mistake by deciding that the record had been sufficiently corrected by the defendants in their September 26th brief, and they further compounded it by not preparing sufficiently for the preliminary injunction hearing to be able to answer the question of when they learned of the error.**

(*Id.* at 59:24-60:6).

The CFTC Chief Trial Attorney also argued that the error was not material because **"it did not matter whether the money went to a Kazmi account or was used to pay Kazmi taxes. And the reason for that is we were not arguing that he . . . dissipated $31 million." (***Id.* at 60:11-15).**

During the evidentiary hearing, Mr. Burden provided two explanations for the CFTC's failure to correct the record after realizing, belatedly, that the $31.5 million CAD transfers were tax payments: (1) there was no need to correct the record because the mistake was immaterial (*id.* at 277:15-21); and (2) Defendants had already apprised the Court of the error in their Reply in Support of the Motion to Modify, and therefore he considered the record corrected and "didn't consider that we needed to do anything." (*Id.* at 279:20-23; 280:7-12).

During the evidentiary hearing, Mr. Burden also testified **repeatedly that the false statement concerning** the transfers of $31.5 million CAD to an "unidentified Kazmi account" was not included in the Edelstein Declaration as evidence of dissipation. (*Id.* at 183:14-19; 188:2-6). Further, Mr. Burden testified that, "a purpose" of the summary table in Paragraph 29 of the Mr. Edelstein Declaration was "to demonstrate dissipation, but that is not the purpose of this transfer to unidentified Kazmi account." (*Id.* at 185:25-186:3). **Mr. Burden answered "yes" when asked "you are submitting a declaration in support of an SRO asset freeze and you're arguing as to dissipation of assets. Do you think it's reasonable to assume that a reviewing judge would know which line items they should look at for that and which ones they should ignore for that?" (***Id.* at 191:7-14).**

When cross-examined about the draft letter in which he wrote  Mr. Burden **nonetheless** maintained that he did not view the $31.5 million CAD transfers as ████████████████ (Tr. at 361:15-24). In fact, Mr. Burden testified that his "own words in a draft letter that [he was] planning to file with a Court should not be taken as probative of [his] views at the time that ████████████ ████████" (*Id*. at 364:11-16).

During the evidentiary hearing, Mr. Burden agreed that his conduct was "careless and sloppy." (Tr at 87:15-88:71). When asked if "[a]s an officer of the court, it's not enough to rely on your adversary's advocacy to satisfy your own duty of candor," Mr. Burden replied "Right." (*Id*. at 249:19-25).

During the evidentiary hearing, Mr. Edelstein testified that he was "unaware of the email and . . . had missed it" and agreed that he did not go back and search all his emails before the SRO/PI Motion was filed: "I receive hundreds of emails probably a day. I don't believe it is incumbent upon me to review every one of my emails prior to a filing . . . I don't know that is something I have time or the resources to do." (Tr. at 542:13-543:14).

**Mr. Edelstein's testimony concluded with this exchange:**

**QUESTION:**   **Is it necessary and important to review your emails before a restraining order is filed restraining $300 million in assets and putting a company into receivership and out of business?**

**EDELSTEIN:**   **I do not have the time or resources to review every single email that I have received in the past prior to doing work that is going into a filing.**

**(*Id.* at 544:6-14).**

## II.    LEGAL STANDARDS

### A.    Counsel's Duties and Obligations in *Ex Parte* Proceedings

#### 1.    Duty of Candor

"An attorney has a duty of candor at all times . . . and a heightened duty to disclose all material facts in an *ex parte* proceeding." *In re WinNet R CJSC*, No. 16mc484(DLC), 2017 WL 2728436, at *2 (S.D.N.Y. June 23, 2017); *see also Wharton v. Vaughn*, No. 01-cv-6049, 2022 WL 1488038, at *17 (M.D. Pa. May 11, 2022) (holing that the duty "is further heightened where the proceeding lacks the balance of presentation by opposing advocates.").[2]

"[A]n *ex parte* TRO is a profound and extraordinary invocation of the power of the federal judiciary. And it affects citizens in a direct way without any notice or opportunity to be heard." *SEC v. Digital Licensing Inc.* ("*DEBT Box*"), 2:23-cv-00482-RJS-DBP, 2024 WL 1157832, at *4 (D. Utah Mar. 18, 2024). Indeed, the court in *DEBT Box* reasoned:

> [The *ex parte* nature of the case] underscores the extraordinary nature of the relief the [agency] obtained here and the grave harm suffered when a party abuses the judicial process to obtain that relief. Before a party has an opportunity to respond to the allegations against it, long before the truth of those allegations is determined, the court grants a TRO, freezes assets, and appoints a receiver to seize control of entire companies—all without notice to the affected party. Given the profoundly significant consequences of this relief, the court must trust counsel take their duties to the court seriously.

*Id.* at *21. Thus, the *DEBT Box* court stated in unequivocal terms: "[W]hen an attorney makes a false statement of material fact to a court, the lawyer is required to correct it." *Id.* at *22.

#### 2.    Ethical Obligations

Similarly, the New Jersey Rules of Professional Conduct require that, "[i]n an *ex parte* proceeding, a lawyer shall inform the tribunal of all relevant facts known to the lawyer that should

---

[2]    Unless otherwise noted, internal citations and quotations are omitted.

be disclosed to permit the tribunal to make an informed decision, whether or not the facts are adverse." N.J. Rules Prof'l Conduct R. 3.3(d). In addition, Rule 3.3(a) requires that a lawyer "shall not knowingly" (1) "make a false statement of material fact . . . to a tribunal," (2) "offer evidence that the lawyer knows to be false," or (3) "fail to disclose to the tribunal a material fact knowing that the omission is reasonably certain to mislead the tribunal." N.J. Rules Prof'l Conduct R. 3.3(a)(1), (4), and (5).

### 3.    Special Responsibilities of Government Counsel

"[A]ttorneys who represent the government [in criminal justice matters] . . . have special responsibilities to both the court and the public at large and a concomitant obligation to ensure that the tribunal is aware of . . . significant events that may bear directly on the outcome of the litigation." *Wharton,* 2022 WL 1488038, at *17 (collecting cases). "These lawyers must be minister[s] of justice and not simply . . . advocates." *Id.*

### B.    Rule 11 of the Federal Rules of Civil Procedure

#### 1.    Rule 11 Requirements

Rule 11(a) of the Federal Rules of Civil Procedure requires that "[e]very pleading, written motion, and other paper [] be signed by at least one attorney of record in the attorney's name." Fed. R. Civ. P. 11(a). Rule 11(b) makes clear that "[b]y presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the particular pleading, written motion, paper, or piece of advocacy, among other things, "is not being presented for any improper purpose" and that "the factual contentions have evidentiary support." Fed. R. Civ. P. 11(b)(1), (3).

Rule 11 also imposes a duty of candor and a continuing duty to correct court filings. *See Wharton v. Superintendent Graterford SCI*, 95 F.4th 140, 148 (3d Cir. 2024). In the Third Circuit,

"[c]andor means more than just not lying. It also means not saying things that are literally true but actually misleading. And it means steering clear of half-truths, inconsistencies, mischaracterizations, exaggerations, omissions, evasions, and failures *to correct known misimpressions* created by [the lawyers'] own conduct." *Id.* (emphasis added); *see also Ellis v. Beemiller, Inc.*, 287 F.R.D. 326, 347 (W.D. Pa. 2012) (counsel has "an affirmative and *continuing duty* . . . to ensure that each and every paper he submit[s] to the Court contain[s] allegations that were . . . well-grounded in fact") (emphasis added); Fed. R. Civ. P. 11, Notes of Advisory Committee on Rules—1993 Amendment ("[A] litigant's obligations with respect to the contents of these papers are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions *after learning that they cease to have any merit*.") (emphasis added).

Importantly, the duties imposed by Rule 11 also extend to oral representations made to a court when "there is a close nexus between the oral statement and the underlying written paper." *O'Brien v. Alexander*, 101 F.3d 1479, 1489 (2d Cir. 1996).

2.  Rule 11 Mental State Standards

**Negligence.** "Rule 11 requires only negligence, not bad faith." *Wharton*, 95 F.4th 140 at 147. As the Third Circuit has recognized, "Rule 11 is an important tool to deter litigation misconduct." *Id.* "The lodestar of Rule 11 is thus reasonableness, not bad faith. Unlike sanctions under a court's inherent power, Rule 11 imposes an objective standard of reasonable inquiry which does not mandate a finding of bad faith." *Id.* Rule 11 imposes a requirement of "prefiling inquiry into both the facts and the law to satisfy the affirmative duty imposed by the rule." Fed. R. Civ. P. 11, Notes of Advisory Committee on Rules—1983 Amendment. "Thus, what constitutes a reasonable inquiry may depend on such factors as how much time for investigation was available

29

to the signer . . . [and] whether he had to rely on a client for information as to the facts underlying the pleading, motion, or other paper." *Id.*

Under Rule 11, "lawyers can be sanctioned for objectively unreasonable conduct—in a word, negligence." *Wharton*, 95 F.4th at 148. "In other words, courts can sanction lawyers for what they should have known, not just what they knew." *Id.* "This objective test has teeth. There is no 'empty-head pure-heart justification.'" *Id.* "Lawyers cannot avoid sanctions by unreasonably failing to investigate whether their factual contentions have support . . . which is doubly true if [counsel is] aware of facts that could undermine their contentions." *Id.*

**Willfulness and Recklessness.** In the sanctions context, "[a] party's conduct is willful when it is intentional or self-serving." *Agabiti v. Home Depot Corp.*, No. 13-cv-4499, 2015 WL 7313862, at *4 (D.N.J. Nov. 20, 2015) (citing *Adams v. Trustees of New Jersey Brewery Employees' Pension Tr. Fund*, 29 F.3d 863, 875 (3d Cir. 1994)); *see also Ashkinazi v. Sapir*, No. 02Civ.00002(RCC), 2005 WL 937597, at *5 (S.D.N.Y. Apr. 20, 2005) (stating that willfulness, in the sanctions context, includes conduct that is "done deliberately" or "intentional[ly]").

The Third Circuit has noted that, "[i]n common law tort cases, willfulness has generally been equated with recklessness . . . [and that this standard requires] that the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow." *In re Conte*, 33 F.3d 303, 305-06 (3d Cir. 1994) (cleaned up). The Third Circuit also has noted that, under the Model Penal Code, "reckless conduct is established if the actor was aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in conscious and unreasonable disregard of the consequences." *Fagan v. City of Vineland*, 22 F.3d 1296, 1323-24 (3d Cir. 1994). In the sanctions context, one court has found that "reckless" conduct occurs when

30

there is "a departure from ordinary standards of care that disregards a known or obvious risk of material misrepresentation." *H.P.D Consolidation, Inc. v. Pina*, Case No, 15-cv-05309-EMC, 2017 WL 1046960, at *3 (N.D. Cal. Mar. 20, 2017).

Determining whether conduct is willful "requires examination of the context." *Bowers v. Nat'l Collegiate Athletic Ass'n*, 564 F. Supp. 2d 322, 340 (D.N.J. 2008). Repeated transgressions show willfulness. *United States v. Brace*, 1 F.4th 137, 144 (3d Cir. 2021) (affirming district court's finding that lawyer acted in bad faith and explaining that "it is hard to classify counsel's repeated flouting of court rules as anything else"). When a party gives "dishonest, evasive and misleading testimony" motivated by a desire to avoid a negative consequence, that party acts willfully. *See Andrews v. Holloway*, 256 F.R.D. 136, 150 (D.N.J. 2009) (finding that conduct was willful where the party's "motive . . . was to avoid paying the judgment entered against him").

3.    Rule 11 Sanctions

Under Rule 11, "[t]hough intent is not required, it still matters. Whether the improper conduct was willful[] or negligent may bear on whether to impose sanctions and what those sanctions should be." *Wharton*, 95 F.4th at 148. "[I]n considering the nature and severity of the sanctions to be imposed, the court should take account of the state of the attorney's or party's actual or presumed knowledge when the pleading or other paper was signed." Fed. R. Civ. P. 11, Notes of Advisory Committee on Rules—1983 Amendment. In determining whether or to what extent to impose sanctions under Rule 11, a court should consider:

> Whether the improper conduct was willful, or negligent; whether it was part of a pattern of activity, or an isolated event; whether it infected the entire pleading, or only one particular count or defense; whether the person has engaged in similar conduct in other litigation; whether it was intended to injure; what effect it had on the litigation process in time or expense; whether the responsible person is trained in the law; what amount, given the financial resources of the responsible person is needed to deter that person from repetition in the same case; what amount is needed to deter similar activity by other litigants.

Fed. R. Civ. P. 11, Notes of Advisory Committee on Rules—1993 Amendment.

Under Rule 11(c), if "the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). The federal government, as a party to litigation, is subject to Rule 11 sanctions. *See, e.g.*, *Larkin v. Heckler*, 584 F. Supp. 512, 513-14 (N.D. Cal. 1984); *see also* Fed. R. Civ. P. 11; Fed. R. Civ. P. 11, Notes of Advisory Committee on Rules—1993 Amendment ("The sanction should be imposed on the persons—whether attorneys, law firms, or parties—who have violated the rule or who may be determined to be responsible for the violation."). "A sanction imposed under [Rule 11] must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated," Fed. R. Civ. P. 11(c)(4), but may include attorneys' fees, dismissal, or evidentiary preclusion.

**Attorneys' Fees.** "The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." *Id.* A fee award "to another party, however, should not exceed the expenses and attorneys' fees for the services directly and unavoidably caused by the violation of the certification requirement." Fed. R. Civ. P. 11, Notes of Advisory Committee on Rules—1993 Amendment.

**Dismissal.** A district court also has the power to dismiss an action under Rule 11. *See, e.g.*, *Del Giudice v. S.A.C. Cap. Mgmt., LLC*, No. CIV. A. 06-1413 SRC, 2009 WL 424368, at *7 (D.N.J. Feb. 19, 2009); *see also Lighthouse Point Marina & Yacht Club, LLC v. Int'l Marine Underwriters*, No. CIV. 14-2974 WHW CLW, 2015 WL 1969360, at *10 (D.N.J. May 1, 2015)

("An order of dismissal is an appropriate consequence of Plaintiff's attorney's lack of diligence [under Rule 11].").

      **Evidentiary Preclusion.** "Preclusion orders are another form of sanctions under Rule 11." *Kvitka v. Puffin Co., LLC*, No. 1:06-CV-0858, 2009 WL 2588693, at *1 (M.D. Pa. Aug. 21, 2009).

      **C.**      **The Court's Inherent Power to Impose Sanctions**

      1.      <u>Standard to Impose Sanctions Under the Court's Inherent Power</u>

      "Among the implied and incidental powers of a federal court is the power to discipline attorneys who appear before it." *In re Prudential Ins. Co. Am. Sales Prac. Litig. Actions*, 278 F.3d 175, 189 (3d Cir. 2002). "Circumstances that may justify sanctions pursuant to a court's inherent power include cases where a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons[.]" *Id.* The Supreme Court has stated that this power extends to circumstances where "fraud has been practiced upon [the Court], or the very temple of justice has been defiled," *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991), or "for conduct which abuses the judicial process," *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017). "[B]ad faith or conduct tantamount to bad faith" may include "an attorney's reckless misstatements of law and fact, when coupled with an improper purpose." *Fink v. Gomez*, 239 F.3d 989, 994 (9th Cir. 2001).

      2.      <u>Sanctions Under the Court's Inherent Power</u>

      A court's inherent power ranges from "the outright dismissal of a lawsuit" to the "less severe sanction" of attorney's fees. *Chambers*, 501 U.S. at 45; *see also In re Theokary*, 592 F. App'x 102, 106 (3d Cir. 2015) ("[I]t is beyond dispute that courts are endowed with the intrinsic authority to dismiss an action . . . ."); *Egersheim v. Gaud*, No. 07-cv-5116 (RBK/AMD), 2011 WL 13238544, at *3 (D.N.J. Nov. 30, 2011) ("[T]he Supreme Court has also recognized that a court's inherent power is a reasonable means and an acceptable ground to dismiss an action where

appropriate."). A court may sanction the government pursuant to its inherent power. *See, e.g.*, *DEBT Box*, 2024 WL 1157832, at *32, 35.

**Attorney's Fees.** "An award of attorneys' fees pursuant to the Court's inherent authority requires a finding of bad faith." *Gavrieli Brands LLC v. Soto Massini (USA) Corp.*, No. 18-462 (MN), 2020 WL 1443215, at *12 (D. Del. Mar. 24, 2020).

**Dismissal**. Courts in the Third Circuit consider six factors before dismissing a case as a sanction: (1) the extent of the *party*'s personal *responsibility;* (2) the *prejudice* to the adversary caused by the misconduct; (3) the party's *history* of dilatoriness; (4) whether the conduct of the party or the attorney was *willful* or in *bad faith;* (5) the effectiveness of *alternative sanctions;* and (6) the *meritoriousness* of the claim or defense. *Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863, 868 (3d Cir. 1984) (emphasis in original). The Third Circuit has made clear that "not all of the *Poulis* factors need be satisfied in order to dismiss a complaint." *Mindek v. Rigatti*, 964 F.2d 1369, 1373 (3d Cir. 1992).

**Evidentiary Preclusion**. Exclusion of evidence for "abusive litigation tactics and practices" is an appropriate sanction under a court's inherent authority. *Dixon v. Legacy Transp. Sys., LLC*, No. 2:15-cv-01359-JAD-PAL, 2017 WL 3927141, at *3 (D. Nev. Sept. 6, 2017) (excluding "an expert witness in this case" under the court's "inherent authority" for "providing false testimony"); *see also United States v. Grass*, 239 F. Supp. 2d 535, 546 (M.D. Pa. 2003) ("[T]he exclusion of otherwise admissible evidence is sanctioned [under the Court's inherent authority] only where the need to curb Government misconduct outweighs the public's very substantial right to every man's evidence.").

### D.    *DEBT Box*

#### 1.    Facts and Reasoning

Recently, a federal district court sanctioned the SEC for its misconduct in connection with an *ex parte* application for a temporary restraining order that led to a "sweeping asset freeze and court-appointed receiver to assume control of Defendants' companies." *DEBT Box*, 2024 WL 1157832, at *27. The misrepresentations at issue related to defendants' purported (a) rapid closure of bank accounts, (b) transfer of funds overseas (no more than $2.25 million in total), and (c) efforts to obstruct the SEC. *See id.* at *8-9. The Court found that:

> It was not just a single imprecise statement or inadvertent misstatement. Each piece of support the Commission offered in seeking the TRO—and then later reiterated in defending the TRO—proved to be some combination of false, mischaracterized, and misleading. Further, the Commission not only repeated and affirmed its misrepresentations in the face of contrary evidence, it presented new falsehoods to the court in an effort to subtly shift from its previous misrepresentations without acknowledging its previous errors. The Commission's conduct demonstrated it knew its representations were false and it was deliberately perpetuating those falsehoods—continuing to abuse the judicial process in defense of the *ex parte* TRO that should not have issued.

*Id.* at *28. The Court continued "[g]iven the myriad and repeated instances of misconduct, the court cannot write these issues off as non-willful, inadvertent mistakes." *Id.* "[T]he court can only conclude the Commission made these strategic decisions because it knew if it made clear the tenuous nature of the evidentiary support for its self-described inferences, the court would not issue the TRO and asset freeze the Commission sought." *Id.*

#### 2.    Sanctions Imposed

The court in *DEBT Box* concluded that the SEC's conduct "constitute[d] a gross abuse of the power entrusted to it by Congress and substantially undermined the integrity of these proceedings and the judicial process." *Id.* at *32. The court ultimately imposed "a sanction of attorneys' fees and costs for all expenses arising from the TRO and appointment of the Receiver—

to include payment of all the Receiver's costs and fees." *Id.* On the award of attorneys' fees, the court rejected the SEC's claim of sovereign immunity and imposed a fee award. *See id.* at *30-32. The lead attorneys resigned from the SEC, and the case was dismissed. (Austin Weinstein, Two SEC Lawyers Resign After Agency Censured for Abuse of Power in Crypto Case, Bloomberg (April 22, 2024)).

## III.    DISCUSSION

### A.    Defendants' Motion for Sanctions

This matter comes before the Special Master by way of Defendants' Motion for Sanctions against the CFTC for, among other things, the CFTC's conduct relating to its false representations regarding the $31.5 million CAD transfers.[3] (ECF No. 172.) Defendant has moved for sanctions under (a) Rule 11(c) of the Federal Rules of Civil Procedure, (b) the Court's inherent authority, and (c) the rules of professional conduct.[4]

### B.    Undisputed Key Facts

There is no dispute that, at a minimum, the CFTC acted negligently in making false representations to the Court regarding the nature of the $31.5 million CAD transfers, and in failing to correct those misrepresentations. Indeed, the CFTC conceded during the evidentiary hearing that its conduct was negligent. (Tr. at 72:8-11). For his part, Mr. Burden agreed that his conduct

---

[3]    Defendants raised Mr. Burden's deposition conduct in their Motion for Sanctions, but the thrust of Defendants' motion and the evidentiary hearing focused overwhelmingly on conduct relating to the CAD $31.55 million transfers. Therefore, my report and recommendation addresses only conduct relating to the $31.5 million CAD transfers.

[4]    Defendants also raised Rule 30(d)(2) as a basis to impose sanctions for the CFTC's conduct during the course of certain deposition testimony. ECF No. 172 at 15. Again, however, because this report and recommendation focuses only on conduct relating to the CFTC's representations about the nature of the $31.5 million CAD in transfers, I need not decide whether and to what extent Rule 30(d)(2) was violated and, if so, what the appropriate relief might be.

was "careless and sloppy." (*Id.* at 88:5-7). Nor does the CFTC dispute that certain factual contentions at issue—specifically, the CFTC's representations that $31.5 million CAD was transferred to an "unidentified Kazmi account"—lack evidentiary support. (Tr. at 54:7-18).

### C.    Overview of Findings

The CFTC's concessions alone justify the imposition of sanctions under Rule 11. *See Wharton*, 95 F.4th 140 at 147. However, I also find that the CFTC acted willfully and in bad faith and, therefore, sanctions are warranted under both Rule 11 and the Court's inherent authority.

I do not arrive at these conclusions lightly, but I am compelled to do so here because: (a) the CFTC acted willfully and in bad faith on several occasions; (b) the CFTC's conduct was not isolated and instead was part of a broader pattern of improper misconduct; (c) the CFTC's representations relating to the $31.5 million CAD transfers likely affected the outcome of the SRO/PI Motion and the PI Hearing; (d) the CFTC's conduct was meant to gain a tactical advantage in the litigation by restraining all or substantially all of Defendants' assets and placing Defendant companies into receivership; (e) the improper conduct at issue has triggered approximately one year in litigation and associated expenses; (f) the CFTC had ample time and resources to acquire all the necessary facts in order to present a comprehensive, accurate, and ultimately truthful set of facts to the Court, but failed to do so; and (g) specific deterrence is necessary to impress upon the CFTC the significance of its improper conduct and to deter future instances of misconduct.

### D.    The CFTC's Pattern of Willful Conduct

I find that the CFTC's conduct was willful and undertaken in bad faith. Specifically, I find that the CFTC's conduct, as set forth below, was (a) intentional and self-serving and, therefore, meets the standard for "willfulness" under Rule 11, *Agabiti*, 2015 WL 7313862 at *4, and (b) involved both intentional and reckless conduct undertaken for an improper purpose and, therefore,

meets the standard for "bad faith" under both Rule 11 and the Court's inherent authority to impose sanctions. Fed. R. Civ. P. 11(b)(1), (3); *Fink*, 239 F.3d at 994.

I also find that the CFTC's conduct, as set forth below, violated (a) its general duty of candor to the Court, *In re WinNet R CJSC*, 2017 WL 2728436 at *2, (b) the heightened duty of candor that applies in *ex parte* proceedings, *Id.*, and (c) attendant obligations under the applicable rules of professional conduct. N.J. Rules Prof'l Conduct R. 3.3(a), (d).

### 1.    The SRO Application and the Edelstein Declaration

The CFTC has relied extensively on Mr. Edelstein's sworn declaration, *see* ECF Nos. 7, 14, 23, which expressly stated that $31.5 million CAD was transferred "to an unidentified Kazmi account." (ECF 23-44 at ¶ 29). This representation was false and lacked any evidentiary basis. The transfers at issue were, in fact, made to the Canada Revenue Agency. (*See, e.g.*, ECF No. 148-1). The SRO/PI Motion, for its part, stated: "In the absence of an asset freeze, Kazmi may—and is likely to—transfer or dissipate assets held in the US . . . . Kazmi can easily transfer those assets to Canada, beyond the immediate reach of the Court." (ECF No. 14 at 46.) The CFTC cited the Edelstein Declaration no fewer than thirty times in its *ex parte* SRO Application. (ECF No. 14). Although the CFTC did not explicitly cite the $31.5 million CAD transfers in the SRO/PI Motion, Mr. Burden agreed during the evidentiary hearing that "the Court in granting the SRO reviewed, considered, and relied on the Mr. Edelstein declaration . . . [i]ncluding the false information about the tax payments." (Tr. at 175:13-19). That concession is both self-evident and refutes any argument by the CFTC that the misrepresentation was immaterial. I, therefore, find that the CFTC acted willfully and in bad faith when it filed the SRO/PI Motion and the Edelstein Declaration. I reach this conclusion based on the following facts.

**First**, on June 16, 2023, the CFTC's lead investigator on the case—Mr. Edelstein—highlighted for the CFTC's lead attorney on the case—Mr. Burden—excerpts of Defendants'

Canadian bank records that reflect the wire transfers at issue: wire transfers totaling $31.5 million CAD to ███████████████████ and ████████████████████████ A rudimentary internet search for the prefixes "TXINS" and TXBAL" reveals that the prefix "TXINS" denotes payments for Canadian "Federal – Corporate Tax Payments" if "you are paying installments" and the prefix "TXBAL" denotes Canadian "Federal – Corporate Income Tax Balance Due" if "you are paying for year-end."[5] This basic investigative effort, on its own, would have given a reasonable investigator or attorney a clear indication that the payments at issue were not transfers to Mr. Kazmi but were, in fact, corporate tax payments to the Canada Revenue Agency.

**Second**, that same day, on June 16, 2023, an OSC forensic accountant working in parallel to the CFTC, Ms. Collins, emailed Mr. Edelstein and Mr. Burden that: ████████████████████ ████████████████████████████████ (Ex. D-6 at 1). This communication, on its own, also would have given a reasonable investigator or attorney a clear indication that the payments at issue were not transfers to Mr. Kazmi but instead were Canadian tax payments.

**Third**, Mr. Burden agreed during the evidentiary hearing that while Ms. Collins' June 16, 2023, email placed him "on notice of at least the possibility that these [transfers] were tax payments," (Tr. at 146:23-147:1), he "took no steps on [his] own to verify" whether the transfers were tax payments. (*Id.* at 147:2-4). A failure to conduct investigative follow-up on this point is inconsistent with a reasonable inquiry under the circumstances, as required by Rule 11.

---

[5]     *See, e.g.*, Canada Revenue Agency, *Pay online with your bank or credit union*, https://www.canada.ca/en/revenue-agency/services/about-canada-revenue-agency-cra/pay-online-banking.html (last visited Dec. 4, 2024); Canada Revenue Agency, *Businesses: You can pay your taxes online through your bank or directly on the CRA website*, https://www.canada.ca/en/revenue-agency/news/newsroom/tax-tips/tax-tips-2016/businesses-you-pay-your-taxes-online-through-your-bank-directly-on-cra-website.html (last visited Dec. 4, 2024).

**Fourth**, the record reveals that several discussions took place between OSC staff and CFTC staff between June 16, 2023 and August 11, 2023. (*See, e.g.*, Ex. D-8, D-9, D-10, D-11, D-12, D-13). There is no record evidence that the CFTC followed-up with OSC staff regarding the nature of the $31.5 million CAD transfers during this timeframe. Again, a failure to conduct investigative follow-up during this timeframe with the principal Canadian regulatory agency that (a) flagged the possibility that the transfers were tax payments and (b) was investigating the case alongside the CFTC is inconsistent with a reasonable inquiry under the circumstances.

**Fifth**, on August 11, 2023, CFTC Commissioner Caroline Pham delivered remarks to the staff about this very case during a closed-door Commission meeting. (Ex. D-3). Mr. Burden attended this meeting. (Tr. at 123:1-15). In her remarks, Commissioner Pham stated—about this case—that: "I am seriously concerned about the Commission's rush to the wrong side of history because we are failing to put in the bare minimum amount of work necessary to get it right." (Ex. D-3 at 1). Commissioner Pham also stated: "Once again, the Commission is taking a 'ready, shoot, aim' approach to its enforcement actions, without allowing for a process that ensures appropriate legal review and a robust administrative record to enable reasoned decision-making by the Commission." (*Id.*). Despite the concerns raised by a member of the Commission—the CFTC's enforcement staff's own client—about the hasty investigative approach undertaken in this very case, no member of the CFTC legal team assigned to the case communicated to Mr. Edelstein, after the closed-door session, any concerns regarding the need to be more diligent or "careful" with respect to the CFTC's investigation. (*Id.*). A failure to conduct investigative follow-up at this stage is inconsistent with good faith and demonstrates willfulness.

**Sixth**, on August 17, 2023, in an email to Mr. Burden and Mr. Edelstein, Ms. Collins—the same OSC forensic accountant who initially flagged that the $31.5 million CAD transfers ███ ████████████████████████ stated, unequivocally, that:

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████

(Ex. D-15). Mr. Burden admits that, upon receiving this email, he was "appris[ed] in no uncertain terms that these [transfers] were, in fact, tax payments." (Tr. at 156:1-3). Although Mr. Burden did not recall receiving the email, he saved it to his "Kazmi folder," (*id.* at 157:11-14, 158:1-3, and 386:22-25), which was his practice "if [he] felt that [an email] had been dealt with." (*Id.* at 158:12-14). Mr. Edelstein acknowledged Ms. Collins's email, responding, ████████ (*Id.*). Thus, the record establishes that both Mr. Edelstein and Mr. Burden were aware of the email and took some action—either responding or foldering it—upon receiving it.

These six points—taken in the aggregate and occurring over a two-month timeframe—leave little doubt that the CFTC acted willfully and in bad faith when it incorrectly and inaccurately represented to the Court that the $31.5 million CAD transfers were to "an unidentified Kazmi account." There was no basis for that assertion and, in fact, it was false. The facts demonstrate that the CFTC knew, or willfully disregarded, the truth that the transfers at issue were corporate tax payments. The only inference I can draw based on this record is that the CFTC ignored the truth because it could impact its chances of successfully obtaining the SRO. And, of course, the SRO was an important legal lever exercised by the CFTC to deprive Defendants of their assets and, as a result, their ability to fight any claims asserted against them by the CFTC.

2.    The CFTC's Failure to Correct the SRO Application and the Edelstein Affidavit

I find that the CFTC also acted willfully and in bad faith from when it failed to correct the Edelstein Declaration prior to the PI Hearing on November 6, 2023. The CFTC's misconduct during this timeframe is deeply troubling. This conclusion is based on the following facts.

**First**, the OSC expressly placed the CFTC on notice of its misstatements on numerous occasions soon after the SRO/PI Motion and Edelstein Declaration were filed; nevertheless, the CFTC repeatedly failed to correct the record and, in fact, re-filed the Edelstein Declaration containing the misrepresentation regarding the $31.5 million CAD transfers. Specifically, on August 31, 2023, Mr. Burden circulated to CFTC staff ███████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████ (Ex. D-43 at 1). This redline comparison revealed that ███████████████ ████████████████████████████████████████████████████ ████████████ Ex. D-43-A at 10-13). Yet there is no evidence that the CFTC made any attempt whatsoever to understand ███████████████████ (and with it, the false representation that is the subject of Defendants' sanction motion) ██████████████ This fact is consistent with bad faith and willful conduct.

Moreover, on September 5, 2023, the OSC filed its own sworn affidavit in connection with Canadian proceedings. This declaration was authored by Ms. Collins and, critically, stated that the Canadian transfers at issue "appear to be for corporation tax installments." (Ex. D-19 at 3). The evidence shows that the CFTC received a copy of the application on September 7, 2023, but that (a) Mr. Edelstein failed to download the document until September 20, 2023 and (b) Mr. Burden never downloaded the document. (Tr. at 199:17-200:1). What's worse, on September 11, 2023, the

CFTC re-filed the SRO/PI Motion and Edelstein Declaration containing the false representation regarding the $31.5 million CAD transfers. (ECF No. 33-44). It is inexplicable that the CFTC made no effort to compare and analyze the information contained in the Ms. Collins's affidavit, notwithstanding the fact that her affidavit was filed within one month of the Edelstein Declaration and concerned the very same subject.

**Second**, and most problematically, even after Defendants expressly alerted the CFTC to the fact that the $31.5 million CAD transfers were Canadian corporate tax payments, the CFTC did not acknowledge its error or correct the record even though it had no fewer than seven opportunities to do so. Specifically, on September 19, 2023, Defendants filed an Emergency Motion to Modify the SRO. (ECF No. 42). In its September 22, 2023 opposition brief, the CFTC specifically cited the false statement in Paragraph 29 of the Edelstein Declaration regarding the $31.5 million CAD "Transfer to an unidentified Kazmi account," stating:

> The evidence also shows substantial transfers from Traders Global's corporate accounts to Defendant Kazmi. (*Id*. ¶ 29.) For example, between December 2022 and April 2023, $31.55 million was transferred from one of Traders Global's corporate accounts in Canada to another account in Defendant Kazmi's name. *Id*. ¶ 29.

(ECF No. 72 at 12). Mr. Burden acknowledged that he included this argument in the CFTC's opposition because he "hoped it would influence the judge's decision on the motion to modify." (Tr. at 204:21-24). And another member of the CFTC trial team, Ms. Paulson, had said, about a draft of the opposition brief, that ████████████████████████████████████

████████████████████████████████████████████████████ (Ex. D-21 at 1).

On September 26, 2023, Defendants filed their reply, emphasizing the error:

> Most egregiously, the CFTC asserts, relying on a declaration from its own investigator, Matthew Edelstein, that $31,550,000 CAD was transferred to an "unidentified Kazmi account" sometime between December 2022 and April 2023. As the CFTC should have known, ***this is demonstrably false***. Defendants' bank records clearly show that two pre-authorized payments of $4,500,000 CAD and

$27,000,000 CAD during the period were made with reference to "TXINS" and "TXBAL," respectively—common bank codes used to designate *tax payments to the Canadian government*. A simple Google search would have revealed this. To repeat: *the CFTC misrepresented that Traders Global transferred $31.55 million CAD to Mr. Kazmi, when in reality Traders Global transferred that money to the Canadian tax authorities*. This is just one example (albeit, a critical one) of a factual misrepresentation that the CFTC submitted to the Court when requesting its all-encompassing SRO on an *ex parte* basis.

(ECF No. 73 at 9) (internal citations omitted) (emphasis in original).

Defendants' Motion to Modify included a declaration from counsel for Defendants which demonstrated that "TXBAL" and "TXINS" were, and are, standard bank codes for Canadian corporate tax payments. (ECF No. 73-12 at 2). The CFTC has conceded that, at the very latest, it knew at this point in time that the $31.5 million CAD transfers were tax payments and, as a result, the Edelstein Declaration was incorrect. (Tr. at 249:14-17). Mr. Edelstein testified that he flagged the "mistake in [his] declaration" for Mr. Burden, (*id.* at 448:20), but Mr. Burden told him "that the Court was . . . informed via the defendants' filing of the nature of those transfers" and "that we didn't need to do anything further at the time." (*Id.* at 449:5-6).

There can be no better example of willful, bad faith conduct than this exchange between Mr. Edelstein and Mr. Burden. When faced with a material false statement contained in (a) a sworn declaration and related SRO/PI Motion used to restrain all, or substantially all, of Defendants' assets and (b) re-asserted in a government filing opposing relief from the very same SRO at issue, Mr. Burden elected to stay silent, make no correction, and allow the Court to languish with competing explanations regarding the nature of the disputed transfers. This conduct is deplorable.

Mr. Edelstein's testimony regarding Mr. Burden's statements is corroborated by the CFTC's course of conduct from September 26, 2023 (the date Defendants filed their Reply noting the true nature of the $31.5 million CAD transfers) through November 5, 2023 (the day before the PI Hearing). During this timeframe, the CFTC had no fewer than <u>seven</u> opportunities, over the

course of over five weeks, to correct the record prior to the PI Hearing. (*See supra* at 9-14). At no point before the PI Hearing, however, did the CFTC alert the Court or Defendants to the material error in (a) the Edelstein Declaration and (b) the CFTC's Opposition to Defendants' Motion to Modify. The CFTC's failure to alert the Court to these errors constitutes another egregious instance of willful bad faith by the CFTC.

**Third**, the facts demonstrate that the CFTC was unwilling to agree to make Mr. Edelstein available for testimony, likely because, if they did so, the CFTC would be forced to reveal their error regarding the $31.5 million CAD transfers. Specifically, shortly after the SRO/PI Motion and Complaint were filed, Mr. Burden suggested to Defendants that they simply consent to a Preliminary Injunction (Tr. at 218:11-22), which would have obviated the need for a contested hearing and Mr. Edelstein's testimony. Then on September 26, 2023—prior to the PI Hearing— Mr. Burden communicated to Defendants that he did "[did] not agree with your position" that the CFTC was required to produce live witnesses, including Mr. Edelstein, at the PI Hearing, (Ex. D-38 at 3). And on November 1, 2023—just five days before the PI Hearing—Mr. Burden sent the following email to Defendants:

> We plan to stand on Mr. Edelstein's declaration at the PI hearing, and will not seek to supplement it, either in writing or via testimony at the hearing. If Defendants still wish to cross-examine him, you are welcome to do so (we all have plane tickets). If not, you should let us know so we can tell the court. If we show up with our witness and no one has any questions for him, I think that will be poorly received by the court.

(Ex. D-26 at 1). This communication unambiguously demonstrates that Mr. Burden had no intention of correcting the record until Defendants insisted on calling Mr. Edelstein to testify at the PI Hearing. Although Mr. Burden testified during the evidentiary hearing that, in this email, he meant only that the CFTC would not add *new* information to the Edelstein Declaration (Tr. at 224:18-19), the email speaks for itself. Mr. Burden's statement that the CFTC "plan[ned] to stand

on Mr. Edelstein's declaration" is inconsistent with an intent to correct the record, especially since the CFTC failed to correct the Edelstein Declaration when it corrected the Malinowski Declaration on October 31, 2023—the day before Mr. Burden sent this email. And when asked during the evidentiary hearing whether the CFTC would have corrected the record if Defendants had *not* insisted on cross-examining Mr. Edelstein at the PI Hearing, Burden testified that he did not know. (Tr. at 228:5-9). Plainly, that testimony is inconsistent with, and undercuts, the assertion that the CFTC always planned to have Mr. Edelstein testify and correct the record at the PI Hearing.

This communication by the CFTC to Defendants is particularly troubling given that the CFTC knew full well, since at least September 26, 2023—by its own admission—that (a) the Edelstein Declaration and (b) the CFTC's Opposition to Defendants' Motion to Modify were false. Worse yet, the ███████████████████████████████████████████████████

███████████████—well before Burden's November 1, 2023, email to Defense counsel—show that Mr. Burden was keenly aware of the CFTC's error and was formulating a strategy to address the issue, should Mr. Edelstein be forced to testify. Specifically, on October 4, 2023, Mr. Burden circulated ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████ (Ex. D-24).

In sum, I find that the CFTC had no intention of calling Edelstein to testify at the PI Hearing because to do so would have required disclosure of the CFTC's error regarding the $31.5 million CAD transfers. I also find the CFTC's communication to Defense counsel on November 1, 2023, that the CFTC "plan[ned] to stand on Mr. Edelstein's declaration at the PI Hearing, and will not

seek to supplement it, either in writing or via testimony at the hearing" was meant to persuade Defendants not to call Mr. Edelstein to testify at the PI Hearing and, in any event, shocks the conscience, given the overwhelming evidence of the CFTC's affirmative knowledge by that point of the falsity of the Edelstein Declaration. This conduct constitutes yet another egregious example of willful, bad faith conduct.

**Fourth**, the decision by another CFTC attorney—not Mr. Burden—to correct Mr. Malinowski's declaration is telling. Specifically, on October 31, 2023, Ms. Paulson filed a corrective disclosure for Mr. Malinowski, who she was expecting to examine at the PI Hearing, noting:

> In reviewing the docket, the CFTC discovered that it inadvertently failed to file Exhibit C-4 to the Malinowski Declaration. The CFTC also identified a typo in the Malinowski Declaration at paragraph 7 . . . The CFTC hereto attaches an Updated Declaration of Devin Malinowski Pursuant to 28 U.S.C. § 1746, which corrects the typographical error.

(ECF No. 112 at 1). This correction was appropriate and timely. But the corrected declaration— which only corrected a typographical error and added a missing exhibit—was not of the same order of magnitude as the CFTC's inaccurate representations in the Edelstein Declaration regarding the nature of the $31.5 million CAD transfers. The only reasonable inference from these facts is that the CFTC (a) knew how to make a corrective disclosure, (b) was comfortable making a corrective disclosure when the facts did not threaten the viability of the relief sought, and (c) chose not to make a corrective disclosure with respect to the Edelstein Declaration because it might be harmful to the CFTC's ability to maintain the preliminary injunction and other relief.

I find that the CFTC's failure to correct the Edelstein Declaration, when the CFTC (a) possessed undeniable knowledge of the falsity of the Edelstein Declaration and (b) had filed a corrective disclosure for another potential CFTC witness based on a less significant error, constitutes willful bad faith.

3.     The CFTC's Testimony and Conduct at the Preliminary Injunction Hearing

I find that the CFTC acted willfully and in bad faith during the PI Hearing on November 6, 2023. This conclusion is based on the following facts.

**First**, notwithstanding the CFTC's belated attempt to correct the record during the PI Hearing regarding the $31.5 million CAD transfers, the CFTC's only witness—Mr. Edelstein—testified falsely about three additional topics during his short direct examination. Of significance is Mr. Edelstein's false testimony regarding when he learned of the true nature of the $31.5 million CAD transfers. Edelstein testified at the PI Hearing that he learned that the "transfers" were, in fact, tax payments after the SRO/PI Motion and his sworn Declaration were filed when, in truth, he learned of this fact before those filings. (Tr. at 490:14-15; 533:13-18). Mr. Edelstein conceded that he had never testified in federal court before, prepared for his testimony in the lobby of the hotel with Mr. Burden prior to the hearing, and failed to review his own emails, messages, or files to ensure that his testimony was accurate. At the evidentiary hearing, Mr. Edelstein stated: "I receive hundreds of emails probably a day. I don't believe it is incumbent upon me to review every one of my emails prior to a filing . . . I don't know that is something I have time or the resources to do." (*Id.* at 542:13-543:14). Edelstein continued: "I do not have the time or resources to review every single email that I have received in the past prior to doing work that is going into a filing." (*Id.* at 544:6-14). I find that Edelstein's false sworn testimony at the PI Hearing was the result of an utter disregard by the CFTC to take seriously, and properly prepare for, a hearing at which the CFTC sought extraordinary relief—that is, the pre-trial restraint of all, or substantially of, of Defendants' assets and the placement of Defendant companies into receivership. This disregard and manifestly inadequate preparation constitutes willful bad faith—especially since the CFTC already knew that the Edelstein Declaration and its Opposition to Defendants' Motion to Modify

48

contained misrepresentations. The failure to investigate *how* those misrepresentations were made, and to ensure truthful testimony at the PI Hearing, is impossible to square with good faith conduct.

**Second**, during the PI Hearing, the following exchange occurred with Mr. Burden:

THE COURT:    Mr. Burden, let me just ask you a question then. Did you inform the defense of this change [regarding the $31.5 million CAD transfers] prior to today's hearing?

BURDEN:    No. Not expressly, Your Honor.

THE COURT:    Why not?

BURDEN:    Counsel is aware of it. They apprised us of it in their response. After analysis, we believe that they were correct.

(PI Tr. at 9:13-21). Mr. Burden now acknowledges that, when being questioned by the Court, he should have just said "No" instead of saying, "Not Expressly." (Tr. at 234:4-18). Burden makes this concession because, of course, he must. Mr. Burden's statement to the Court that he did not "expressly" inform Defendants of the CFTC's change in position was, at best, misleading. At no point before the PI Hearing did the CFTC inform Defendants of any "change" or correction to the Edelstein Declaration; in fact, only five days before the hearing, the CFTC communicated to Defendants that the CFTC "plan[ned] to stand on Mr. Edelstein's declaration at the PI Hearing, and [would] not seek to supplement it, either in writing or via testimony at the hearing." (Ex. D-26 at 1). The CFTC's representations to the Court on this point demonstrate willful bad faith.

### 4.    The CFTC's December 1, 2023, Filing

I also find that the CFTC acted willfully and in bad faith in connection with its December 1, 2023, Reply to Defendants' Response to Temporary Receiver's Motion for Fees and Expenses. Specifically, in its filing—contained on page five and in a footnote—the CFTC stated:

Mr. Edelstein testified at the hearing that he learned of the error shortly after the declaration was filed from talking to the Ontario Securities Commission ("OSC"). After the PI hearing, CFTC counsel undertook a closer review of communications between the CFTC and OSC. Based on this review, and by way of correction, the

OSC emailed Mr. Edelstein shortly before the filing of the declaration that the transfer was comprised of tax payments. (*See* Ex. A, Email S. Collins, OSC, to M. Edelstein and A. Burden, CFTC, et al., Aug. 17, 2022).

(ECF No. 148 at 5 n.2). The CFTC's conduct with respect to this filing is problematic and demonstrates willful bad faith for the following reasons.

**First**, the CFTC effectively buried the fact that Mr. Edelstein testified falsely at the PI Hearing by disclosing this information in a footnote, on page 5 of a responsive filing. What's more, the CFTC also effectively buried that it affirmatively knew <u>before</u> the SRO/PI Motion and Edelstein Declaration were filed that the $31.5 million CAD transfers were lawful tax payments to the Canadian government, notwithstanding Mr. Edelstein's sworn testimony at the PI Hearing to the contrary. Far more is expected from a federal enforcement agency when it makes a mistake of this magnitude. Nevertheless, far from learning its lesson through its nondisclosure of the false representation contained in the Edelstein Declaration, the CFTC doubled down on its strategy, choosing obfuscation over clarity and transparency by electing to disclose this material fact in a footnote, on page 5 of a responsive filing.

**Second**, Mr. Burden undertook a review of his emails on November 16, 2023, only after the Court chastised the CFTC at the PI Hearing and in its November 14, 2023 Opinion and Order. (ECF Nos. 134, 135; *see* ECF No. 134 at 25 ("the CFTC's failure to disclose or to correct Mr. Edelstein's error, and continued citation to the error even after realizing it was an error, is troubling at best.")). The failure to review emails or files before the Opinion and Order deprived the Court of critical information relating to the circumstances surrounding the $31.5 million CAD transfers, allowing the Court to make its ruling on an incomplete record. Given Judge Quraishi's justifiable consternation with the CFTC, I think it is likely it would have made a difference if he had learned, during the PI Hearing or before finalizing his Opinion and Order, that the CFTC had known of its false representation *before* even the SRO/PI Motion and Edelstein Declaration were filed.

**Third**, the CFTC's conduct and communications in the lead-up to the CFTC's December 1, 2023 filing are alarming, to say the least. The conduct and communications implicate involvement of both CFTC line attorneys and the highest levels of management in the CFTC's Division of Enforcement. The conduct described below falls well below the standards the American people deserve from their public officials. Specifically, ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████ (Ex. D-29). Mr. Burden clarified at the evidentiary hearing that this notation "was referring to the Court" and that "at the time" Burden thought Judge Quraishi had ███████

███████ the CFTC's errors. (Tr. at 247:5-18).

On November 27, 2023, a Special Counsel to the CFTC's Director of Enforcement sent an email to himself, writing: ██████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

(Ex. D-32). When asked what ████████████████████ meant, Mr. Burden testified that he "think[s]" the Enforcement Director "was referring to Judge Quraishi." (Tr. at 255:10-13). Mr. Burden testified that the Enforcement Director shared that concern with him (and others) during a meeting on November 20, 2023. (*Id.* at 255:19-21). Mr. Burden testified that "CFTC Enforcement Management" gave the direction not to make the correction in a standalone letter. (*Id.* at 255:6-9).

On November 29, 2023, a Special Counsel to the CFTC Enforcement Director sent to the Enforcement Director, the Principal Deputy Director, the Enforcement Division's Chief Counsel, and another Special Counsel an email attaching "Draft Reply re Receiver Fees.docx," writing:

████████████████████████████████████████



(Ex. D-35 at 1). The Special Counsel's statement is especially troubling. ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ notwithstanding the fact that (a) there is no evidence of any misunderstanding by CFTC counsel and (b) the CFTC had been investigating the case for well over a year, (Tr. at 94:19-25), and was under no time constraints when it elected to file its SRO/PI Motion and Complaint in August 2023.

In confronting yet another mistake, the CFTC elected not to be transparent with the Court for fear of ▮▮▮▮▮▮▮▮▮▮▮▮ and chose a strategy—*i.e.*, correcting false sworn testimony via a footnote on page 5 of a responsive filing—that prioritized minimizing harm to the CFTC, its reputation, and its case over the interests of transparency, fairness, and justice. The CFTC only reviewed its emails and files after it was scolded by the Court, depriving the Court of critical information relevant to its Order on the PI Motion. Internally, the CFTC accused the Court of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Based on these facts, I have little trouble finding willful bad faith by the CFTC.

     5.    <u>The CFTC's Re-Filing of the Edelstein Declaration</u>

I find that the CFTC, in filing Edelstein's corrected declaration on March 7, 2024, did so only after being notified by Defendants—on February 15, 2024—of Defendants' intent to file a motion for sanctions against the CFTC. (Ex. D-45). I note that, under Rule 11, Defendants were prohibited from filing any sanctions motion until March 7, 2024, and, as a result, the CFTC could

have—but did not—file its corrected Edelstein Declaration at any time before March 7, 2024. The clear inference is that the CFTC waited until the last possible moment to correct the official record and only did so when it became clear that Defendants would file a Motion for Sanctions. This is especially troubling since the CFTC Deputy Director recognized, as early as November 15, 2023, that the CFTC ███████████████████████ (Ex. D-27 at 1). This conduct constitutes willful bad faith and is inconsistent with the standards for the government in court proceedings.

###### 6.    The CFTC's Testimony and Conduct at the Evidentiary Hearing

Finally, I find that Mr. Burden provided false testimony at the evidentiary hearing. I do not make this finding lightly but am compelled to do so because at least one aspect of Mr. Burden's testimony defies explanation. Specifically, Mr. Burden testified that "the $31.5 million tax payments were not evidence of dissipation, were not intended to be evidence of dissipation." (Tr. at 359:22-360:1). Mr. Burden's testimony on this point was not credible and was controverted by other reliable evidence.

**First**, in an internal email from Mr. Burden to the CFTC Division of Enforcement Deputy Director and Deputy Regional Counsel on November 14, 2023, Mr. Burden evinced a clear understanding that at least Judge Quraishi perceived the false statement regarding the $31.5 million CAD transfers to have been included as evidence of dissipation:

> The court justified this limited freeze on the grounds that . . . (b) to the extent our "dissipation" was based on a 31M transfer we later learned was a tax payment, we should have amended Matt's declaration. The court saw this [as] a[n] undermining [of] the case that D[efendant]s would "dissipate" assets. The court took me to task on this point, and I can go into detail if you would like to discuss."

(Ex. P-5 at 1).

**Second**, Mr. Burden's own "draft letter to court re testimony," which he wrote and circulated internally within the CFTC on November 17, 2023, directly refutes his testimony at the evidentiary hearing. This draft, which Mr. Burden intended to submit to the Court, states, "Counsel

recognizes that it . . . mistakenly cited to the $31.55 million transfer in CFTC's September 22, 2023 opposition (ECF No. 72 at 9) to Defendants' September 19 emergency motion (ECF No. 42) to modify the asset freeze as being a fact indicative of dissipation." (Ex. P-9 at 2). Mr. Burden's efforts during the evidentiary hearing to distance himself from his own draft letter were unconvincing. And while Mr. Burden disagreed that his "own words in a draft letter that [he was] planning to file with a Court should not be taken as probative of [his] views at the time that this was indicative of dissipation," (Tr. at 364:11-16), I disagree. Mr. Burden's contemporaneous views, expressed in his November 14, 2023 email and his November 17, 2023 draft letter, are far more reliable than his testimony during the evidentiary hearing after weeks of preparation and with a clear motive to exonerate both himself and the CFTC.

Moreover, Mr. Burden's testimony that the $31.5 million CAD transfers were not intended to be evidence of dissipation is contradicted by Mr. Edelstein's testimony during the PI Hearing. Mr. Edelstein agreed that a purpose of including the summary tables in his declaration, including Paragraph 29, was to be "read as evidence of potential dissipation of assets." (PI Tr. at 50:13-17). Mr. Burden's attempt to blunt this testimony was, again, unconvincing. Mr. Burden conceded during the evidentiary hearing that "a purpose" of the summary table in Paragraph 29 of the Edelstein Declaration was "to demonstrate dissipation, but that is not the purpose of this transfer to unidentified Kazmi account." (Tr. at 185:25-186:3). This degree of entry-by-entry parsing is illogical. When asked "you are submitting a declaration in support of an SRO asset freeze and you're arguing as to dissipation of assets. Do you think it's reasonable to assume that a reviewing judge would know which line items they should look at for that and which ones they should ignore for that?" Mr. Burden answered "yes." (*Id.* at 191:7-14). But again, I disagree. The erroneous entry reflecting $31.5 million CAD transfers to an "unidentified Kazmi account" clearly stands out in

the table in Paragraph 29 of the Edelstein Declaration; indeed, it comprises 97% of debits from that account during the relevant period. If "a purpose of this table . . . [was] to demonstrate dissipation," as Mr. Burden conceded in his testimony, (*id.* at 185:25-186:1), it is nonsensical to conclude that the line-item accounting for 97% of the debits in that table was not intended to be indicative of dissipation. And of course, that conclusion would contradict how Judge Quraishi perceived the entry and Mr. Burden's own words in his "draft letter to court re testimony." For these reasons, I find that Mr. Burden did not testify credibly that the false entry regarding the $31.5 million CAD transfers was not intended to be evidence of dissipation.

###    E.    The Significance of the CFTC's Misrepresentations

There can be no question that the CFTC's representations regarding the $31.5 million CAD transfers were significant. As Judge Quraishi noted in the Preliminary Injunction Opinion and Order, in the absence of a $31.5 million CAD transfers, "[t]he CFTC has provided scant particularized evidence that supports a finding that Defendants intend to dissipate any assets." (ECF No. 134 at 26). Thus, the Court removed the temporary receiver and reduced the SRO by over $135 million USD (92%). Put simply, the CFTC's representation regarding the $31.5 million CAD transfers was relied upon by the Court to grant the SRO; and when the true nature of the transfers came to light, the Court cited that figure as a basis to curtail the SRO by removing the temporary receiver and reducing the asset freeze to only $12 million USD. (ECF No. 135).

###    F.    The Tactical and Injurious Nature of the CFTC's Misconduct

As noted above, I find that that the CFTC's decision to include, maintain reliance on, and fail to promptly correct the record regarding the $31.5 million CAD transfers was undertaken as a strategic measure to first obtain the SRO and then maintain the SRO in the face of incontrovertible evidence demonstrating that the CFTC's representation was false. The net result of this misconduct cannot be understated—all or nearly all of Defendants' assets were restrained, the Defendant

companies were placed into receivership and, almost immediately, became non-operational. The CFTC's conduct was tactical in nature and caused permanent, unquantifiable harm to Defendants.

G. **The Length and Expense of Litigation Associated with the CFTC's Misconduct**

For more than a year, this litigation has been largely consumed by issues relating to the CFTC's misconduct—all at considerable expense to Defendants. Even before Defendants filed a motion for sanctions, Defendants expended substantial resources bringing to the Court's attention the CFTC's misrepresentations relating to the $31.5 million CAD transfers. Since Defendants filed a motion for sanctions, the CFTC has shown little regard for the time and expense associated with litigating the motion. The CFTC has repeatedly caused delays in the process and needlessly driven up Defendants' litigation costs by, for example, repeatedly missing Court-ordered production deadlines, which led to motions practice; rejecting out of hand Defendants' proposals to streamline the discovery process, like requesting that the Court review certain materials *in camera*; and engaging in spurious motions practice to combat Defendants' reasonable discovery requests. As a result, the CFTC effectively postponed an evidentiary hearing on Defendants' motion for sanctions *for four months*. Closing arguments on the motion will not be held until December—more than one year after Defendants brought the CFTC's misrepresentations to the Court's attention, and more than one year after Judge Quraishi made an initial finding that "the CFTC's failure to disclose or to correct Mr. Edelstein's error, and continued citation to the error even after realizing it was an error, is troubling at best." (ECF No. 134 at 25). The CFTC must not be rewarded for its careless and wasteful litigation tactics, which only compounded the harm caused by its own misconduct.

H. **The Time and Resources Available to the CFTC to Investigate the Underlying Conduct**

The CFTC "fail[ed] to put in the bare minimum amount of work necessary to get it right. . . [,] taking a 'ready, shoot, aim' approach to its enforcement actions, without allowing for a process

that ensures appropriate legal review and a robust administrative record to enable reasoned decision-making by the Commission." (Ex. D-3 at 1). Commissioner Pham's remarks relating to this case hit the mark. Federal law enforcement agencies like the CFTC have at their disposal incredibly powerful investigative tools and resources and considerable tactical advantages.

Despite these overwhelming advantages, in this case, the CFTC failed to put in the bare minimum amount of work necessary to get it right before rushing to the courthouse. During its perfunctory investigation, the CFTC interviewed a single witness. The CFTC did not seek documents or information from Defendants, did not interview any of Defendants' staff members, and did not seek documents or information from any of Defendants' customers. The most cogent evidence the CFTC could muster in support of its SRO/PI Motion was an analysis of Defendants' bank records. And the CFTC failed to put in the bare minimum amount of work necessary to understand those records—failed even to run a simple Google search to decipher a common banking code. Instead, the CFTC knowingly and in bad faith mischaracterized the nature of $31.5 million CAD transfers to show that Defendants could move money out of the United States— beyond the CFTC's reach—and that a total asset freeze was necessary. We must hold our federal law enforcement agencies to a higher standard than the CFTC's slapdash investigation in this case.

**I.    The Need for Specific Deterrence**

Specific deterrence in this case, based on these specific facts, is necessary. CFTC Commissioner Pham recently stated that the CFTC's conduct, in this very case, was "a grave matter" that "cannot be tolerated by a law enforcement agency." (ECF No. 207-1 at 2). I agree. Commissioner Pham further noted that, given the "inherent conflict of interest between the CFTC's Division of Enforcement and the Commission (its client) regarding the alleged misconduct by the Division and failure to disclose and correct multiple false statements to the Court," the "CFTC's Office of the General Counsel or the U.S. Department of Justice should be

handling the Rule 11 sanctions motion, not the CFTC's Division of Enforcement." (*Id.*). I agree. Commissioner Pham concluded: "It is unacceptable to 'hide the ball' from the Commission, especially in order to get a rubber stamp approval to railroad the public into settlements that deprive Americans of their Constitutional rights and property." (*Id.* at 3). I agree.

The CFTC's conduct in this case involves (a) misleading its client, (b) misleading the Court before which it appeared in obtaining the SRO, (c) misleading a different court in connection with Preliminary Injunction matters, and (d) misleading the Special Master during the Evidentiary Hearing. I can draw no other conclusion other than the CFTC's conduct, perhaps as an agency and certainly in the context of this case, cannot be reformed if left unaddressed with severity.

## IV.    APPROPRIATE SANCTIONS

The CFTC's conduct: (a) has been willful and undertaken in bad faith; (b) was undertaken over the course of a year and involved numerous instances of sanctionable behavior; (c) may well have affected the Court's decision to order the SRO or, at the very least, maintain it; (d) likely affected the Court's decision on the PI Motion; (e) was undertaken for the purpose of gaining a tactical advantage, that is, restraining all or substantially all of Defendants' assets to impair their ability to effectively challenge the CFTC; (f) has caused significant expense and diversion of Court and party resources; and (g) without Court intervention, appears likely to repeat itself.

The CFTC, as one of the primary prudential regulators in the United States, has an obligation to get it right and discharge all of its obligations—statutory, regulatory, and ethical—faithfully. Yet at every turn, the CFTC has acted in a manner which leads me to believe the agency cares more about winning and saving face and less about honesty, transparency, and justice. In this case in particular, the need for specific deterrence is paramount. I do not believe the CFTC will reform its behavior in this case absent a significant sanction.

### A.     Option 1—Dismissal

I believe the CFTC's tactics will become more abusive, will embolden the agency, and will vindicate their problematic behavior if this case were to continue. Therefore, I can only recommend that this case be dismissed, with prejudice and without leave to amend, under Rule 11(c) and the Court's inherent authority. *Del Giudice*, 2009 WL 424368, at \*39 (recognizing the "rare situation in which a case is dismissed as a Rule 11 sanction without an evaluation of the substantive merit of the claims" but "the conduct is so egregious, and the futility of imposing alternate sanctions so clear, that dismissal is the only appropriate sanction"); *see also, e.g.*, *Poulis*, 747 F.2d at 868; *Hoxworth v. Blinder, Robinson and Co.*, 980 F.2d 912, 921 (3d Cir. 1992) (lying to court, among other misconduct, constituted "extensive evidence of willful conduct," warranting dismissal), *abrogated on other grounds Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022); *Derzack v. Cnty. of Allegheny, Pa.*, 173 F.R.D. 400, 416 (W.D. Pa. 1996) (dismissing where "plaintiffs have engaged in a pattern and practice of stonewalling, bad faith and lack of candor"), *aff'd sub nom. Derzack v. Cnty. of Allegheny Child. & Youth Servs.*, 118 F.3d 1575 (3d Cir. 1997); *United States v. Samango*, 607 F.2d 877, 884-85 (9th Cir. 1979) (affirming dismissal of an indictment for "government misconduct" under court's "inherent supervisory powers").  In addition to dismissal, I recommend that the CFTC be ordered to pay all (i) Defendants' attorneys' fees directly caused by the CFTC's misconduct and (ii) fees associated with the Special Master's work.

### B.     Option 2—Attorneys' Fees, Evidentiary Preclusion, and Potential Admission of CFTC Misconduct

In the alternative, I recommend that, pursuant to Rule 11(c) and the Court's inherent authority: (a) the CFTC be ordered to pay all (i) Defendants' attorneys' fees directly caused by the CFTC's misconduct and (ii) fees associated with the Special Master's work, *see, e.g.*, *DEBT Box*, 2024 WL 1157832, at \*30-32; and (b) the CFTC be precluded from introducing at any stage in

this litigation evidence concerning funds received by Defendants, as this evidence relates directly to the misconduct at issue here, *see, e.g.*, *Dixon*, 2017 WL 3927141, at *3.

I also recommend that the Court allow briefing and argument regarding whether evidence of the CFTC's misconduct is admissible against the CFTC (both for purposes of summary judgment and at trial) under Rule 801(d)(2)(B) of the Federal Rules of Evidence, among other Rules, to demonstrate that Defendants lacked the requisite mental state for the offenses alleged. Specifically, I would like to consider whether the CFTC's statements that it did not act with an offending mental state may be offered against the CFTC by Defendants to demonstrate that Defendants too did not act with an offending mental state with respect to the violations alleged. *United States v. Tildiz*, 355 F.3d 80, 82 (2d Cir. 2004) (explaining that "government's attorneys can bind the government with their in-court statements" and are admissible under Rule 801(d)(2)(B)); *see also United States v. Jordan*, Criminal No. 7:17-cr-56, 2021 WL 816948, at *15 (W. D. Va. Mar. 1, 2021) (defendant may present evidence of government misconduct at trial).

## CONCLUSION

For the foregoing reasons, I recommend that this case be dismissed, with prejudice and without leave to amend, under Rule 11(c) and the Court's inherent authority. In the alternative, I recommend that, pursuant to Rule 11(c) and the Court's inherent authority: (a) the CFTC be ordered to pay all (i) Defendants' attorneys' fees directly caused by the CFTC's misconduct and (ii) fees associated with the Special Master's work; and (b) the CFTC be precluded from introducing at trial, or any stage in this litigation, evidence concerning funds received by Defendants.

Dated: December 6, 2024

Respectfully submitted,

*/s/ Craig Carpenito*
Craig Carpenito
(NJ Bar No. 027102000)
Thomas J. Scrivo
(NJ Bar No. 307552019)
KING & SPALDING LLP
1185 Avenue of the Americas, 35th Floor
New York, NY 10036
(212) 556-2100
ccarpenito@kslaw.com
tscrivo@kslaw.com

Anthony J. Staltari
(NJ Bar No. 233022017)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
anthonystaltari@quinnemanuel.com

*Counsel for Defendants Traders Global Group Inc., a New Jersey corporation; Traders Global Group Inc., a Canadian business organization; and Murtuza Kazmi*

61