UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>            Plaintiff,<br><br>    v.<br><br>TRADERS GLOBAL GROUP INC., *et al.,*<br><br>          Defendants. | Civil Action No. 23-11808 (ESK) (EAP)<br><br><br>REPORT AND RECOMMENDATION OF THE SPECIAL MASTER |

**LINARES, J.**

      This matter comes before the Special Master by way of a Motion for Sanctions filed by Defendants Traders Global Group Inc., a New Jersey corporation, d/b/a "My Forex Funds"; Traders Global Group Inc., a Canadian business organization; and Murtuza Kazmi (ECF No. 172) against Plaintiff Commodity Futures Trading Commission ("CFTC"). CFTC filed opposition (ECF No. 177) and Defendants filed a reply. (ECF No. 179). The Motion was referred to the Special Master for a Report and Recommendation. (ECF No. 174). An evidentiary hearing was conducted before the Special Master on September 19 and 20, 2024. Thereafter, the parties submitted post-hearing proposed findings of fact and conclusions of law. (ECF Nos. 232, 236). Closing arguments were held on December 18, 2024.

      By letter dated January 7, 2025, CFTC advised the Special Master that it had received two union grievances filed on behalf of Attorney 1       CFTC Senior Trial Attorney, and Investigator 1 , a CFTC Investigator, concerning their annual performance assessments which contain

statements concerning their actions in this matter.  On March 10, 2025, Defendants filed a request to compel CFTC to produce the grievance materials, arguing that they were relevant to the Motion for Sanctions. (ECF No. 245).  CFTC submitted a response to that request.  Defendants' request was granted by Order of the Special Master. (ECF No. 246).  The Special Master then conducted an *in camera* review of the union grievance materials.

For the reasons set forth below, the Special Master respectfully recommends that the Motion for Sanctions be granted.

## I.    RELEVANT BACKGROUND AND PROCEDURAL HISTORY

The Special Master presumes the parties' familiarity with the factual background and procedural posture of this matter.  Accordingly, the Special Master will only recite the facts relevant to the disposition of the subject dispute.

CFTC commenced this action on August 28, 2023, against Defendants by filing a Complaint for Injunctive Relief, Civil Monetary Penalties, and Other Equitable Relief ("Complaint," ECF No. 1), an *ex parte* Motion for Expedited Discovery (ECF No. 6), and an *ex parte* Motion for Statutory Restraining Order and Preliminary Injunction Pursuant to 7 U.S.C. § 13a-1 (the "SRO/PI Motion," ECF No. 7).  The matter was assigned to the Honorable Zahid N. Quraishi, U.S.D.J.

The Complaint was signed by Attorney 1          , Senior Trial Attorney for CFTC. ██. Attorney 1 has been a lawyer for 19 years and a CFTC enforcement attorney for ten years. (Evidentiary Hearing Transcript ("Tr.") at 88:8-89:1). Investigator 1          was the CFTC investigator assigned to the case. (*Id.* at 408:21-23). Chief Trial Attorney Chief Trial Attorney supervised the CFTC's investigation. (*Id.* at 95:12-16).

In support of the SRO/PI Motion, CFTC submitted to Judge Quraishi a Declaration  from Investigator 1          Pursuant to 28 U.S.C. § 1746 ("Investigator 1 Declaration"), dated August 24, 2023.

(ECF No. 33-44). The Investigator 1 Declaration included a summary of all transfers for each of Defendants' bank accounts for which the CFTC had records. (Tr. at 506:15-18). In total, the Investigator 1 Declaration included five tables describing credits and debits in six bank accounts controlled by Defendants. (ECF No. 23-44 at 8-13). In Paragraph 29 of the Investigator 1 Declaration, Investigator 1 included a chart summarizing activity in the "TGG #995 Account" between December, 2022 and April, 2023. In that summary, Investigator 1 incorrectly identified debits of CAD $31,500,000 from "the TGG #995 Account" as "Transfer to unidentified Kazmi Account." (ECF No. 33-44 at ¶ 29). As will be discussed further below, the $31.5 million CAD transfers, instead of a "transfer to unidentified Kazmi account," were in fact tax payments to the Canadian tax authority.

Although the Complaint did not specifically reference the $31.5 million CAD transfers, the SRO/PI Motion referenced the Investigator 1 Declaration repeatedly. (*See* generally ECF No. 7). In the SRO/PI Motion, the CFTC stated: "In the absence of an asset freeze, Kazmi may -- and is likely to -- transfer or dissipate assets held in the US, either at banks or with payment companies like WooCommerce or Deel. Kazmi can easily transfer those assets to Canada, beyond the immediate reach of the Court. Indeed, this is where most of Defendants' assets are currently." (ECF No. 7 at 53, *citing* Investigator 1 Declaration ¶ 28).

### The August 29, 2023 Statutory Restraining Order

On August 29, 2023, the Honorable Robert B. Kugler, U.S.D.J., entered an Order Granting Plaintiff's Motion for an *Ex Parte* Statutory Restraining Order, Appointment of a Temporary Receiver and Other Equitable Relief ("SRO"). (ECF No. 13). The Court found that the CFTC made a proper *prima facie* showing that Defendants violated the Commodity Exchange Act and Commission regulations as charged. (*Id.* at 2-3). The SRO placed Defendant companies into receivership, appointed a Temporary Receiver authorized to suspend Defendants' business operations,

and restrained all corporate and personal assets of Defendants, among other restraints. (ECF No. 13 at 6-23).

Issuing the SRO, the Court found that there was "good cause to believe that it is necessary to preserve the *status quo* and prevent damage to the Court's ability to grant effective final relief for customers in the form of monetary or other redress will occur from the withdrawal, transfer, removal, dissipation or other disposition of funds, assets or other property ("assets"), and/or the destruction, alteration or disposition of books and records and other documents ("records") by Defendants, unless Defendants are immediately restrained and enjoined by Order of the Court." SRO, at ¶8.  The Court further found that "there is also a reasonable likelihood that Defendants will transfer or dissipate assets or destroy or alter records."  SRO, at ¶14.  The Court held that "there is good cause for the Court to freeze assets owned, controlled, managed or held by Defendants or in which they have any beneficial interest." *Id*.

### Parallel proceedings before Ontario Securities Commission

During this same time period, there were parallel proceedings against Defendants, Traders Global Group Inc. and Kazmi, in Canada being conducted by the Ontario Securities Commission. (Tr. at 142:15-23, 151:25-152:10; 154:313; 156:16-157:2; 413:16-19). The CFTC and OSC shared information pursuant to the Internal Organization of Securities Commissions Multilateral Memorandum of Understanding Concerning Consultation and Cooperation and the Exchange of Information. (*Id.* at 413:10-414:6).  In connection with the CFTC's investigation, Attorney 1    and Investigator 1   conducted a review of Defendants' bank records, including bank records received from the OSC. (Tr. at 290:1319; 412:21-413:11).

On June 9, 2023, in connection with the review of one of Defendants' bank account records, Attorney 1    sent an email to Investigator 1   and Chief Trial Attorney writing, in relevant part: "TGG opens

the 955 business account in 12/22 with like $200k. In 3/23 he transfers 31.5M in and out again. I don't know where it goes**.**" (Ex. D-4 at 2).  On June 12, 2023, Investigator 1   responded to █████ Attorney 1, stating, "[T]here are some big gaps that we can hopefully fill with [the] OSC's help. The gaps mainly relate to . . . [REDACTED TEXT], and what happens to the $31.55MM ($CAD) that leaves the #995 account as 'pre-authorized transfers.'" (*Id.* at 1).  On June 15, 2023, Investigator 1 emailed OSC Senior Forensic Accountant OSC staff        asking for a "OSC Communication                             open issues, including issues relating to Defendants' OSC Communication (Ex. D-5).

On June 16, 2023, Investigator 1   sent an email to OSC staff     and Attorney 1     excerpting a page from TGG's banking records showing a CAD $4,500,000 debit on March 6, 2023, with the reference "TXINS 3031010 BUS/ENT" and a CAD $27,000,000 debit on the same day with the reference "TXBAL 3028610 BUS/ENT." (Ex. D-6 at 1-2). Investigator 1   asked OSC staff    ████ OSC Communication                             (*Id.* at 1). On June 16, 2023, OSC staff responded to Investigator 1

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████

(Ex. D-6 at 1). When testifying at the evidentiary hearing, Attorney 1    agreed that this email placed him "on notice of at least the possibility that these [transfers] were tax payments." (Tr. at 146:23147:1). Attorney     "took no steps on [his] own to verify" whether the transfers were indeed tax payments. (*Id.* at 147:2-4).  Also on June 16, 2023, Investigator 1    sent an Outlook calendar invitation to Attorney    and OSC staff, including OSC staff    , scheduled for the same day and bearing the subject line, ██████████████████████ (Ex. D-8). Attorney

attended subsequent calls with the OSC on August 2, 4, 8, and 11, 2023. (Ex. D-9, D-10, D-11, D-12, D-13).

As of July 7, 2023, Investigator 1 had drafted a declaration to support an anticipated motion for a Statutory Restraining Order. (Ex. P-15, Tr. at 509:4-6). In that draft, Investigator 1 described the $31.5 million CAD debits as a "Transfer to unidentified Kazmi Account." (Ex. P-15 at 9-10; Tr. at 509:7-11). At the evidentiary hearing, Investigator 1 testified that, at this point in time, he believed this was a transfer to an account controlled by Mr. Kazmi based on the other large transfers of similar size that Investigator 1 had seen transmitted to other accounts in Mr. Kazmi's control. (Tr. at 509:12-510:7).

On August 17, 2023, OSC staff sent an email to Attorney 1 and Investigator 1 , writing:

> [A]fter months of back and forth, we finally have an answer to the destination of the wires in the amounts of CAD 27m and CAD 4.5m from the BMO TGG CAD account ****-995. CAD 27m was paid to [the] Canada Revenue Agency (CRA), which is our equivalent of the IRS, for corporation tax due. CAD 4.5m was paid to [the] CRA for an instalment [sic] payment for the next year's taxes. This should help both of us account for a significant amount of funds!

(Ex. D-15).

It is clear, therefore, that as a result of the above email, as of August 17, 2023 both Attorney and Investigator 1 were placed on notice that the payments were for corporate taxes due. Attorney testified at the evidentiary hearing that he was on vacation when he received █ OSC staff's email. Attorney also testified that he did not recall reading the email at the time, but he acknowledged that he saved it to his "Kazmi folder." (Tr. at 157:11-14; 158:1-3; 386:22-25). It was Attorney's practice to "put [emails] into folders if [he] felt that they had been dealt with." (Id. at 158:12-14). Attorney testified that he does not have a memory of viewing the OSC email until November, 2023. (Tr. at 158:1-3, 158:22-24, 159:18-21, 161:9-11). Investigator 1 however,

was clearly aware of the email since on August 17, 2023, Investigator 1 responded, ███ to OSC staff's email stating that the transfers in question were for "corporation tax[es]." (Ex. D-15).

On August 21, 2023, subsequent to having received the August 17, 2023 email from ██ OSC staff, Attorney 1 sent a copy of the Investigator 1 Declaration to OSC. (Ex. P-3; Tr. at 312:21-322:1; 323:7-14). Investigator 1 testified at the evidentiary hearing that he would not have intentionally sent a declaration with an error regarding the $31.5 million CAD transfer four days after OSC informed him that the transfer was for tax payments. (Tr. at 513:6-9). In hindsight, Investigator 1 recognized that, after receiving the OSC email, he should have immediately made the change in his draft declaration to correct the error. (Tr. at 511:21-25).

On August 31, 2023, Attorney 1 sent an email to Investigator 1, Chief Trial Attorney, and CFTC Trial Attorney Attorney 2 stating:

> Hey gang. Please find attached a redline comparing Investigator 1's declaration in DNJ to the draft declaration proposed by OSC. There is not much to review. OSC deleted Investigator 1's lengthy analysis of Defendants' many bank accounts because OSC wants to use its own forensic accountant to do the bank stuff.

(Ex. D-43 at 1). The redline comparison between the Investigator 1 Declaration filed in the U.S. District Court for the District of New Jersey and the draft declaration for Investigator 1 proposed by the OSC demonstrated that the OSC deleted Investigator 1's banking analysis, including the statement that the CAD $31,550,000 debit was a "Transfer to unidentified Kazmi Account." (Ex. D-43-A at 10-13). At this time, there was no mention as to whether the erroneous Declaration submitted to Judge Quraishi should be corrected.

On September 5, 2023, the OSC filed an affidavit from OSC staff in connection with an application filed in the parallel proceedings against Defendants in Canada, captioned *In the Matter*

*of Traders Global Group Inc. and Muhammed Murtuza Kazmi*, File No. 2023-21, pending before the Ontario Capital Markets Tribunal ("OSC staff Affidavit", Ex. D-19). The CFTC did not receive a draft of the OSC staff Affidavit before it was filed in the OSC action. (Tr. at 197:13-198:8, Ex. D19). The OSC staff Affidavit correctly stated: "The largest expenditures to third parties from the CAD accounts were described as 'TXBAL' (CAD 32.9 million) and 'TXINS' (CAD 4.5 million). These payments appear to be for corporation tax instalments, respectively." (Ex. D-19 at 3).

The CFTC received a 1,943-page copy of the entire OSC application on September 7, 2023. The OSC staff Affidavit appears at pages 1634 through 1641 of that document. The OSC application was uploaded into the CFTC's database on September 13, 2023 and was first accessed by ▮▮ Investigator 1 on September 18, 2023, and downloaded by him on September 20, 2023. It was accessed by Attorney 1 on September 26, 2023, although never downloaded by him. (Tr. at 199:17 -200:1).

**<u>Motion to Modify the SRO</u>**

On September 19, 2023, Defendants filed an Emergency Motion to Modify the Ex Parte Statutory Restraining Order, seeking relief from the asset freeze ordered in response to the CFTC's SRO/PI Motion. (ECF No. 42).

In its opposition brief, the CFTC specifically cited and relied on what they already knew by then was an erroneous statement by Investigator 1 at Paragraph 29 of the Investigator 1 Declaration regarding the $31.5 million CAD transfers:

> The evidence also shows substantial transfers from Traders Global's corporate accounts to Defendant Kazmi. (*Id.* ¶ 29.) For example, between December 2022 and April 2023, $31.55 million was transferred from one of Traders Global's corporate accounts in Canada to another account in Defendant Kazmi's name. *Id.* ¶ 29.

(ECF No. 72 at 12).

In their Reply in Support of the Motion to Modify, filed on September 26, 2023, Defendants notified the Court about the CFTC's mischaracterization of the $31.5 million CAD transfers in the Investigator 1 Declaration and the CFTC's Opposition to Defendants' Motion to Modify. (ECF No. 73). Defendants wrote:

> Most egregiously, the CFTC asserts, relying on a declaration from its own investigator, Investigator 1 , that $31,550,000 CAD was transferred to an "unidentified Kazmi account" sometime between December 2022 and April 2023. As the CFTC should have known, ***this is demonstrably false***. Defendants' bank records clearly show that two pre-authorized payments of $4,500,000 CAD and $27,000,000 CAD during the period were made with reference to "TXINS" and "TXBAL," respectively—common bank codes used to designate ***tax payments to the Canadian government***. A simple Google search would have revealed this. To repeat: ***the CFTC misrepresented that Traders Global transferred $31.55 million CAD to Mr. Kazmi, when in reality Traders Global transferred that money to the Canadian tax authorities***. This is just one example (albeit, a critical one) of a factual misrepresentation that the CFTC submitted to the Court when requesting its all-encompassing SRO on an *ex parte* basis. (Ex. D-23 at 9) (internal citations omitted).

(*Id.* at 6) (emphasis in original). Included with Defendants' Motion to Modify was a declaration from Defense attorney, counsel for Defendants. (ECF No. 73-1). Exhibit 11 to the declaration of Defense attorney demonstrated that "TXBAL" and "TXINS" were and are standard bank codes for Canadian corporate tax payments. (ECF No. 73-12 at 2).

Investigator 1 reviewed Defendants' Reply in Support of the Motion to Modify and reviewed the OSC staff Affidavit which confirmed the "TXBAL" and "TXINS" transfers were, in fact, tax payments. (Tr. at 400:20-401:4; 446:3-9).

At the evidentiary hearing, Investigator 1 testified that after this review, he asked ███ Attorney 1: "Do I need to do something about this? Like, do I need to correct the declaration in some way?" (Tr. at 401:20-24). Investigator 1 further recalled telling Attorney 1

9

> There's a mistake in my declaration. The defendants have—as I'm sure you've seen—have pointed it out in their filing. I looked at ▮ OSC staff's declaration and she has the same information in there. You know, what do we need to do about this?

(Id. at 448:10-25).

Attorney 1    told Investigator 1    "that the Court was . . . informed via the defendants' filing of the nature of those transfers" (Id. at 402:3-5), and "that we didn't need to do anything further at the time." (Id. at 449:5-6).  Attorney 1    testified at the evidentiary hearing that he considered the Court to have been duly advised by Defendants' brief that the transfer was for tax payments. (Tr. at 279:19-23).

On October 26, 2023, the Court held a telephonic hearing on Defendants' Motion to Modify. (*See* ECF No. 111 at 4-32). Attorney 1    and Attorney 2    attended the hearing on behalf of the CFTC. (*Id.*)  By Order entered on October 26, 2023, Judge Quraishi granted in part and denied in part the Motion to Modify, permitting certain funds to be released. (ECF No. 107).

## II.       PRELIMINARY INJUNCTION HEARING AND ORDER

A.  Events leading up to Preliminary Injunction Hearing

On October 16, 2023, the CFTC filed a letter with Judge Quraishi representing that it "plan[ned] to call two live witnesses, Investigator 2        and Investigator 1        " at the PI Hearing. (ECF No. 98)  Prior to that date, on October 4, 2023, Attorney 1    sent an "Investigator 1 mock cross outline" to Investigator 1    Chief Trial Attorney and Attorney 2    (Ex. D-24).  Attorney 1's    "mock cross outline" for Investigator 1    included a section titled: "There are numerous ambiguous or wrong entries in the summaries," with a sub-point for the "¶ 29, 31.5M transfer to unidentified Kazmi account: 1. Where did you get this idea from that it is transfer to unidentified Kazmi account? 2. Do you agree that this is a tax payment? 3. How did you miss that? 4. Don't you think this impugns your credibility?" (Ex. D-24 at 3).

10

On October 31, 2023, the CFTC filed a letter with the Court that stated:

> In reviewing the docket, the CFTC discovered that it inadvertently failed to file Exhibit C-4 to the Investigator 2 Declaration. The CFTC also identified a typo in the Investigator 2 Declaration at paragraph 7, where it stated that "I downloaded and preserved copies of relevant URLs from the WooCommerce website." It should read, "I downloaded and preserved copies of relevant URLs from the WordPress website." The CFTC hereto attaches an Updated Declaration of Investigator 2   Pursuant to 28 U.S.C. § 1746, which corrects the typographical error. It also attaches all four of the exhibits referenced therein, namely, Exhibits C-1, C-2, C-3, and C-4.

(Ex. D-25 at 1) (internal citations omitted).

The erroneous assertion in Investigator 1's   declaration is not mentioned or corrected in the aforesaid letter.

On November 1, 2023, Attorney 1   sent an email to defense counsel that stated:

> We plan to stand on Investigator 1's   declaration at the PI hearing, and will not seek to supplement it, either in writing or via testimony at the hearing. If Defendants still wish to cross-examine him, you are welcome to do so (we all have plane tickets). If not, you should let us know so we can tell the court. If we show up with our witness and no one has any questions for him, I think that will be poorly received by the court.

(Ex. D-26 at 1).

At the evidentiary hearing, Investigator 1   acknowledged that "it seems like it was not the correct . . . action" for the CFTC to stand on Investigator 1's   declaration without correcting it. (Tr. at 463:20-24).  Attorney 1   explained what he meant:

> I meant that we weren't going to update the declaration or include new information. We had received additional information, documents in production from iSRisk. We had thought about and considered supplementing the declaration and ultimately decided not to. I did not mean to suggest by this email that we were going to dispute in our error or that I meant to dispute that these were tax payments.

(Tr. at 224:14-225:1).

On November 4, 2023, Attorney 1 sent an email to Investigator 1, Attorney 2, and Chief Trial attaching "an outline with a very short direct, plus some additional questions Ds may ask Investigator 1." (Ex. P-1 at 1). The attachment ("2023.11.4 Investigator 1 direct exam for PI hearing.docx") included "[p]otential additional questions from Ds on bank analysis," including the questions: "How does the error effect the analysis/conclusions in your declaration" and "Why didn't you file a corrected declaration?" (*Id.* at 2). The outline did not include a question as to when Investigator 1 first learned that the $31.5 million was a tax payment. (*Id.*).

On November 5 or 6, 2023, Attorney 1 met with Investigator 1 in the lobby of their hotel to prepare for the PI Hearing. (Tr. at 231:11-16; 405:5-23; 476:22-24). Investigator 1 had never testified in federal court (*id.* at 484:16-18) and relied on Attorney 1 in preparing for the hearing. (*Id.* at 406:7-9)**.** Attorney 1 did not review his own emails to confirm Investigator 1's recollection of relevant events. (*Id.* at 227:22-24; 231:5-21). Likewise, Investigator 1 did not review any of his own emails, messages, or files to ensure that his recollection of events set forth in his Declaration was accurate, and Attorney 1 never asked him to do so. (*Id.* at 420:9-16; 476:17-21).

At the evidentiary hearing, Investigator 1 and Attorney 1 testified that as of November 6, 2023, neither Investigator 1 nor Attorney 1 recalled that they had received an email from OSC indicating that the $31.5 million CAD transfer was for tax payments. (Tr. at 334:12-335:8, 478:6-479:13, 549:8-12). Investigator 1 and Attorney 1 claimed that neither of them understood that the mistake regarding this transfer was due to a missed email and therefore, neither of them believed they had any reason to search their emails. (Tr. 334:24335:4, 549:8-12). Attorney 1 testified that he first asked Investigator 1 about the timing of when he learned that the $31.5 million CAD was a tax transfer either the night before or the morning of the November 6th PI hearing. (Tr. at 231:11-16; 405:5-23).

B.  The November 6, 2023 Preliminary Injunction Hearing

Judge Quraishi conducted the preliminary injunction hearing on November 6, 2023.  At the PI Hearing, Investigator 1 testified on direct about the errors in paragraph 29 of this Declaration:

> On the summary table below paragraph 29 [of the Investigator 1 Declaration], there is a table with three columns: Category, credits, debits. And the line entry "entry to unidentified Kazmi account" in the total amount of $31,550,000. Since filing this declaration, I have become aware that the two transactions that make up this category were, in fact, tax payments made on behalf of Mr. Kazmi.

(Ex. D-2, PI Tr. at 8:3-9).  Investigator 1 was also asked when he learned about these tax payments.

> QUESTION:  Mr. Edelstein, when did you learn that these were tax payments?
>
> Answer:        I believe it was in the days after filing, if not – if not the first two weeks.

(PI Tr. at 8:17-20).

However, this testimony was false.  As discussed above, Investigator 1 and Attorney 1 both had received an email from the Ontario Securities Commission on August 17, 2023, prior to the filing of the Complaint and the Investigator 1 Declaration, clearly stating that the payments were tax payments.

During Investigator 1's direct examination at the PI Hearing, the following exchange occurred between Judge Quraishi and Attorney 1

> THE COURT: Mr. Burden, let me just ask you a question then. Did you inform the defense of this change prior to today's hearing?
>
> Answer:        No. Not expressly, Your Honor.
>
> THE COURT: Why not?
>
> Answer:        Counsel is aware of it. They apprised us of it in their response. After analysis, we believe that they were correct.

(PI Tr. at 9:13-21).  At the evidentiary hearing, Attorney 1    testified that, when being questioned by the Court at the PI Hearing on this topic, he should have just said "No" instead of saying, "Not Expressly." (Tr. at 234:13-18).

During Investigator 1's    cross-examination at the PI Hearing, Judge Quraishi called Attorney 1 to a sidebar, and the following exchange occurred:

> THE COURT: I'm trying to understand the timeline of this. You learned of this discrepancy, this mistake a week or two after the filing, and you didn't inform the Court or defense counsel. They raised it in their papers? Because if that's accurate, CFTC is going to be in a lot of trouble today. So please tell me that that's not accurate what they're implying on cross-examination.
>
> Answer:        Your Honor, I think it is correct that we --
>
> THE COURT: You learned of it and didn't tell the Court or defense counsel?
>
> Answer:        Correct, Your Honor.
>
> THE COURT: Why was that?
>
> Answer:        Because, Your Honor, we considered that it was not material to the purpose of the declaration, and it was a small mischaracterization of this transfer that doesn't relate to trading by --
>
> THE COURT: Here's the total in the chart, right? $32 million and change. The discrepancy is $31 and a half million. And you didn't find that material? Is that really what you're going to say? Because then you're going to say it out there and not on sidebar.
>
> Answer:        It is, Your Honor.
>
> THE COURT: I'll wait to hear from you later. Go back to cross-examination. You guys have a lot of explaining to do today. Get ready to do it.

(Ex. D-2) (PI Tr. at 51:11-52:12).

C.  The Preliminary Injunction Opinion and Order

On November 14, 2023, Judge Quraishi entered his Opinion and Order granting in part and denying in part the PI Motion. (ECF Nos. 134, 135).  The Court enjoined Defendants from engaging in certain activities, rolled back the asset freeze in the SRO, leaving $12,080,000 million frozen, and discharged the Temporary Receiver.  The Court found that the CFTC had made a *prima facie* showing of each violation alleged in its complaint, and specifically "Defendants made misrepresentations, misleading statements and deceptive omissions" (ECF No. 134 at 18), that the misrepresentations and omissions were material (*Id.* at 19), and that Kazmi had acted with scienter (*Id.* at 20-21). The Court also found that the CFTC "demonstrated a likelihood of future violations by Defendants that justifies preliminary injunctive relief." (*Id.* at 22).  Therefore, the Court entered a preliminary injunction enjoining Defendants from, among other things, "soliciting customers for participation in the My Forex Funds programs" and "acting as a counterparty to customers in retail forex or retail commodity transactions." (*Id.* at 23).

The Court's opinion stated that "the CFTC's failure to disclose or to correct Investigator 1's error, and continued citation to the error even after realizing it was an error, is troubling at best." (ECF No. 134 at 25).  The Court further stated: "[To] the extent that the transfer of $31,550,000 to an 'unidentified Kazmi account' was a factor supporting the grant of the *ex parte* SRO, the Court now assigns it no weight." (*Id.* at 26). The Court noted the following: "The record reflects that CFTC knows how to submit a corrected declaration. On October 31, 2023, the CFTC submitted a revised declaration of another CFTC Investigator, Investigator 2     , to correct a typo and to attach an exhibit that previously had been omitted." (*Id.* at 25 n.12). The Court found that "[t]he CFTC has provided scant particularized evidence that supports a finding that Defendants intend to dissipate any assets." (*Id.*).

15

### III.     DISCLOSURE OF AUGUST 17, 2023 EMAIL TO COURT

After the PI Order was entered, on November 14, 2023, Attorney 1      sent an email to the

Chicago-based Division of Enforcement Deputy Director and Deputy Regional Counsel, copying

Chief Trial Attorney Attorney 2      and Investigator 1     that stated:

> The court justified this limited freeze on the grounds that . . . (b) to
> the extent our "dissipation" was based on a 31M transfer we later
> learned was a tax payment, we should have amended Investigator 1's
> declaration. The court saw this [as] a[n] undermining [of] the case
> that D[efendant]s would "dissipate" assets. The court took me to
> task on this point, and I can go into detail if you would like to discuss.

(Ex. P-5 at 1).

On November 15, 2023, the CFTC Director of Enforcement sent an email to the Deputy

Director**,** writing: "The Judge does have some harsh language for us at the end about the 31M tax

payment. Should we have disclosed that? (Ex. D-27 at 1). That same day, the Deputy Director

responded, stating: "My read is that we should have amended the declaration, but I say that without

talking to Chief Trial Attorney and Attorney 1  in detail yet." (*Id.*).

Attorney 1     testified during the evidentiary hearing that, at this point in time, he "had

considered that the matter was closed, the record was corrected.  I was justifiably chastised by His

Honor for failing to correct the declaration in that PI hearing. I didn't worry too much about what

happened, but when Chief Trial Attorney said that -- rather I should say [the Deputy Director and Deputy

Regional Counsel] wanted to talk to her about Investigator 1's     declaration, I felt, well, I should

look and I should see if there's any back-and-forth between me and Investigator 1     or Chief Trial Attorney or

anybody else on this subject that could explain how we had failed to apprehend this error." (Tr. at

374:7-375:2).  At the evidentiary hearing, Attorney 1     testified that on or about November 16,

2023, he reviewed his emails and "was horrified to discover this August 17th email" in which ██

OSC staff from the OSC informed Attorney 1 and Investigator 1 that the $31.5 million CAD transfers were, in fact, Canadian corporate tax payments. (Tr. at 375:3-5; Ex. D-15).

Attorney 1 began drafting a letter to apprise the court of the August 17, 2023 email and the errors in Investigator 1's testimony. (Ex. P6, Tr. at 343:20-344:15). On November 17, 2023, Attorney 1 sent an email to Chief Trial Attorney, Investigator 1 and Attorney 2 that included a link to a "draft letter to court re testimony." (Exs. P-8; P-9 at 1). In the attached draft letter Attorney 1 wrote:

> In June 2023, the OSC speculated in an email to counsel and Investigato that the payments might be some kind of taxation payments, and advised that the OSC would follow up with additional document requests to a financial institution. On August 17, 2023, the OSC sent an email to counsel and Investigator 1 to advise that the two payments totaling $31.55 million were to the Canadian taxing authorities. Investigator 1 inadvertently failed to reflect this information in his declaration, and the undersigned failed to apprehend its significance. Counsel for the CFTC deeply regrets the error in the declaration, as well as the error in testimony as to when CFTC staff learned the transfers were for taxes, and apologies to the Court and Defendants for the mistake. . . . Counsel recognizes that it nonetheless mistakenly cited to the $31.55 million transfer in CFTC's September 22, 2023 opposition (ECF 72 at p.9) to Defendants' September 19 emergency motion (ECF 42) to modify the asset freeze as being a fact indicative of dissipation."

Attorney 1 agreed at the evidentiary hearing that he intended to "put this information in front of a federal judge." (Tr. at 361:4-6).

On November 27, 2023, the CFTC's Director of Enforcement sent a message following up and referencing a November 20th internal meeting among certain CFTC staff regarding "Kazmi.: "What's the latest on Kazmi? Should we check in with the team? I wanted to give them time to do a deep dive, but also need to be mindful of getting this letter to the court." (Tr. at 356:12-357:5; Ex. P-12.)

On November 27, 2023, a Special Counsel to the CFTC's Director of Enforcement sent an email to himself that stated: "[the Enforcement Director/co-Special Counsel] had suggested not to file the letter, asking to have faces stomped on. Instead, co[rr]ect record in connection with this brief they had to file Dec. 4. [Enforcement Director]: Likes this posture wise better than the letter." (Ex. D-32). The CFTC's response to Defendants' request to apportion the Temporary Receiver's fees was ultimately filed on December 1, 2023. (ECF Nos. 142, 148). When asked what "asking to have faces stomped on" meant, Attorney 1 testified that he "think[s]" the Enforcement Director "was referring to Judge Quraishi." (Tr. at 255:1013). Attorney 1 agreed that the Enforcement Director shared that concern with Attorney 1 and other CFTC staff during a meeting on November 20, 2023. (*Id.* at 255:19-21).

On November 28, 2023, Attorney 1 sent an email to Chief Trial Attorney, Attorney 2, Investigator 1 and the Chicago-based Deputy Regional Counsel, with the subject line: "RE: Kazmi declaration and testimony items for re-review" stating that "[the Enforcement Director] and his staff suggested that we carefully review Investigator 1 dec and testimony to see if there are any other corrections we need to make. To that end, I went through the dec and testimony and identified some items we should take a look at. Investigator, Chief Trial At, and Attorney 2, I would appreciate it if you guys could do the same to see if I've missed anything." (Ex. D-34 at 3). In a series of emails, these same individuals exchanged comments regarding their review of the declaration and testimony. (*Id.* at 1-3). On November 29, 2023, ▮ Attorney 1 wrote: "So to be very very clear we are not correcting anything about the declaration. We are correcting Investigator 1's testimony about when we learned of the tax payment." (*Id.*).

On November 29, 2023, a Special Counsel to the CFTC Enforcement Director sent the Enforcement Director, the Chief Counsel of the Division of Enforcement, and another Special Counsel an email attaching "Draft Reply re Receiver Fees.docx" writing:

>[Director], how do you want to attack this. [REDACTED TEXT] And, we need a line in the FN explaining the Investigator 1 misstatements that offers some generic explanation, even if it's only like (more eloquent than this) "as a result of a series of misunderstandings by counsel resulting from counsel's work in a fast-paced, scorched earth litigation in which the CFTC was attempting to race to preserve assets for the benefit of victims."

(Ex. D-35 at 1).

After consideration by many levels of CFTC management, the CFTC decided to disclose the OSC's August 17, 2023 email in a brief rather than in a stand-alone letter. (Tr. at 265:3-266:8).[1]

On December 1, 2023, the CFTC filed its Reply to Defendants' Response to Temporary Receiver's Motion for Fees and Expenses. (Ex. D-33; ECF No. 148).  In Defendants' Response, they had asked the Court to order the CFTC to pay half of the dismissed receiver's fees on the ground that "the CFTC procured the receiver wrongfully—that is, at least in part, through the submission of, and continued reliance upon, material information it knew to be erroneous." (ECF No. 139 at 2).

In its Reply Brief, in the second footnote, on page five of that filing, the CFTC stated:

>Investigator 1  testified at the hearing that he learned of the error shortly after the declaration was filed from talking to the Ontario Securities Commission ("OSC"). (Trans. of PI Hearing, ECF 130 at 8:17 through 8:24.) After the PI hearing, CFTC counsel undertook a closer review of communications between the CFTC and OSC. Based on this review, and by way of correction, the OSC emailed Investigator 1  shortly before the filing of the declaration that the transfer was comprised of tax payments. (*See* Ex. A, Email ■ OSC staff OSC, to Investigator 1  and Attorney 1 , CFTC, et al., Aug. 17, 2022).

---

[1] It is telling that one of the Commissioners of the CFTC, in a statement issued on July 3, 2024, addressed the Motion for Sanctions and described the CFTC's alleged misconduct as "a grave matter" that "cannot be tolerated at a law enforcement agency." (ECF No. 207-1 at 2-4). The statement further urged the Commissioners to consider taking "appropriate corrective action to address the conduct issues and support CFTC staff."  Id.

(*Id.* at 5 n.2; Ex. A). The CFTC attached the August 17, 2023 OSC email as Exhibit A to that brief. (ECF No. 1481). <u>This was the first time the CFTC disclosed the August 17, 2023 OSC email to the Court or Defendants</u>.

At the evidentiary hearing, Attorney 1 agreed that "CFTC Enforcement Management" gave the direction not to make the correction in a standalone letter. (Tr. at 255:6-9). Attorney 1 testified as follows:

> <u>QUESTION</u>: Who made the decision to file a footnote and not a standalone letter?
>
> Attorney 1    I would say the director. It's hard to attribute a decision of the CFTC to one particular person. The director.

(*Id.* at 386:12-16).

## IV.    <u>MOTION FOR SANCTIONS</u>

On February 15, 2024, Defendants' counsel notified the CFTC, via email, that Defendants intended to move for Rule 11 sanctions. (Ex. D-45 at 2-3).  On February 29, 2024, the Deputy Director of the CFTC Division of Enforcement responded to Defendants' February 15, 2024 email, writing: "The CFTC has acknowledged its error, expressed its regret, and corrected the record in Court that CAD $31,550,000 was in fact a tax payment and not an 'unidentified Kazmi Account.'" (*Id.* at 1). The Deputy Director continued: "Further, to ensure that the documentary record before the court is clear, the CFTC will be filing a corrected declaration with the Court." (*Id.*) The Deputy Director also noted that "[t]he Division of Enforcement will staff the litigation with a new Chief Trial Attorney and new lead line attorney." (*Id.* at 2).

On March 7, 2024, the CFTC filed a "Corrected Declaration of Investigator 1 which stated, among other things, that the $31.55 million CAD transfers—which were previously

described as a "Transfer to unidentified Kazmi Account" were for "Canadian Tax Payments." (ECF No.171-1 at 12).

On March 7, 2024, Defendants filed their Motion for Sanctions under Rule 11 of the Federal Rules of Civil Procedure and the Court's inherent authority. They sought dismissal of the complaint and/or an award of attorneys' fees and costs. (ECF No. 172.)

In opposition, CFTC acknowledged that mistakes were made, which it called unintentional and inadvertent. The CFTC said it "failed to recognize" that it had information in an email from the Ontario Securities Commission before it filed the complaint. The CFTC also acknowledged that it made an "error in judgment" in not timely notifying the Court of the mistake in the Investigator 1 Declaration. CFTC argued that this mistake did not have a material effect on the CFTC's case, explaining that Defendants' use of money fraudulently obtained from victims to pay its own debt, here taxes, is no more justified or lawful than transferring such money to a personal account for another purpose. CFTC also argued that because it filed a corrected Declaration within the 21-day safe harbor provision under Rule 11, the Motion was improperly filed. (ECF No. 177.)

## V.    LEGAL STANDARDS

### Rule 11

Rule 11(a) of the Federal Rules of Civil Procedure requires that "[e]very pleading, written motion, and other paper [] be signed by at least one attorney of record in the attorney's name." Fed. R. Civ. P. 11(a). Rule 11(b) makes clear that "[b]y presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the particular pleading, written motion, paper,

or piece of advocacy, among other things, "is not being presented for any improper purpose" and that "the factual contentions have evidentiary support." Fed. R. Civ. P. 11(b)(1), (3).

A motion for sanctions under Rule 11 must describe the specific conduct that violates Rule 11(b). The motion must be served, but it must not be filed if the challenged paper, claim, defense, contention or denial is withdrawn or appropriately corrected within 21 days after service. Fed. R. Civ. P. 11(c)(2).

Rule 11 also imposes a duty of candor and a continuing duty to correct court filings. *See Wharton v. Superintendent Graterford SCI*, 95 F.4th 140, 148 (3d Cir. 2024). In the Third Circuit, "[c]andor means more than just not lying. It also means not saying things that are literally true but actually misleading. And it means steering clear of half-truths, inconsistencies, mischaracterizations, exaggerations, omissions, evasions, and failures *to correct known misimpressions* created by [the lawyers'] own conduct." *Id.* (emphasis added); Fed. R. Civ. P. 11, Notes of Advisory Committee on Rules—1993 Amendment ("[A] litigant's obligations with respect to the contents of these papers are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions *after learning that they cease to have any merit*.") (emphasis added).

The standard under Rule 11 is an objective standard of reasonableness under the circumstances. "Rule 11 requires only negligence, not bad faith." *Wharton,* 95 F.4th 140 at 147. As the Third Circuit has recognized, "Rule 11 is an important tool to deter litigation misconduct." *Id.* "The lodestar of Rule 11 is thus reasonableness, not bad faith. Unlike sanctions under a court's inherent power, Rule 11 imposes an objective standard of reasonable inquiry which does not mandate a finding of bad faith." *Id.* (quoting, *Chambers*, 501 U.S. at 47).

Under Rule 11, "lawyers can be sanctioned for objectively unreasonable conduct—in a word, negligence." *Wharton*, 95 F.4th at 148. "In other words, courts can sanction lawyers for **what they should have known**, not just what they knew." *Id*. (emphasis added). "This objective test has teeth. There is no 'empty-head pure-heart justification.'" *Id*. "Lawyers cannot avoid sanctions by unreasonably failing to investigate whether their factual contentions have support . . . [which] is doubly true if [counsel is] aware of facts that could undermine their contentions." *Id*.

Under Rule 11, "[t]hough intent is not required, it still matters. 'Whether the improper conduct was willful[] or negligent' may bear on whether to impose sanctions and what those sanctions should be." *Wharton,* 95 F.4th at 148 (quoting Fed. R. Civ. P. 11, Notes of Advisory Committee on Rules—1983 Amendment). "[I]n considering the nature and severity of the sanctions to be imposed, the court should take account of the state of the attorney's or party's actual or presumed knowledge when the pleading or other paper was signed." Fed. R. Civ. P. 11, Notes of Advisory Committee on Rules—1983 Amendment.

In the sanctions context, "[a] party's conduct is willful when it is intentional or self-serving." *Agabiti v. Home Depot Corp.*, No. 13-cv-4499, 2015 WL 7313862, at *4 (D.N.J. Nov. 20, 2015) (citing *Adams v. Trustees of New Jersey Brewery Employees' Pension Tr. Fund*, 29 F.3d 863, 875 (3d Cir. 1994)); *see also Ashkinazi v. Sapir*, No. 02Civ.00002(RCC), 2005 WL 937597, at *5 (S.D.N.Y. Apr. 20, 2005) (stating that willfulness, in the sanctions context, includes conduct that is "done deliberately" or "intentional[ly]").

Determining whether conduct is willful "requires examination of the context." *Bowers v. Nat'l Collegiate Athletic Ass'n*, 564 F. Supp. 2d 322, 340 (D.N.J. 2008). Repeated transgressions show willfulness. *United States v. Brace*, 1 F.4th 137, 144 (3d Cir. 2021) (affirming district court's

finding that lawyer acted in bad faith and explaining that "it is hard to classify counsel's repeated flouting of court rules as anything else").

In determining whether, or to what extent, to impose sanctions under Rule 11, a court should consider:

> Whether the improper conduct was willful, or negligent; whether it was part of a pattern of activity, or an isolated event; whether it infected the entire pleading, or only one particular count or defense; whether the person has engaged in similar conduct in other litigation; whether it was intended to injure; what effect it had on the litigation process in time or expense; whether the responsible person is trained in the law; what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case; what amount is needed to deter similar activity by other litigants.

Fed. R. Civ. P. 11, Notes of Advisory Committee on Rules—1993 Amendment.

### Inherent authority

"Circumstances that may justify sanctions pursuant to a court's inherent power include cases where a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons[.]" *In re Prudential Ins. Co. Am. Sales Prac. Litig. Actions*, 278 F.3d 175, 189 (3d Cir. 2002) (quoting *Chambers*, 501 U.S. at 45-46). "[B]ad faith or conduct tantamount to bad faith" may include "an attorney's reckless misstatements of law and fact, when coupled with an improper purpose." *Fink v. Gomez,* 239 F.3d 989, 994 (9th Cir. 2001).

A court's inherent power ranges from the "outright dismissal of a lawsuit" to the "less severe sanction" of attorney's fees. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991); *see also In re Theokary*, 592 F. App'x 102, 106 (3d Cir. 2015) ("[I]t is beyond dispute that courts are endowed with the intrinsic authority to dismiss an action . . . .")

24

Courts in the Third Circuit consider six factors before dismissing a case as a sanction: (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the misconduct; (3) the party's history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of alternative sanctions; and (6) the meritoriousness of the claim or defense. *Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863, 868 (3d Cir. 1984). The Third Circuit has made clear that "not all of the *Poulis* factors need be satisfied in order to dismiss a complaint." *Mindek v. Rigatti*, 964 F.2d 1369, 1373 (3d Cir. 1992). "An award of attorneys' fees pursuant to the Court's inherent authority requires a finding of bad faith." *Gavrieli Brands LLC v. Soto Massini (USA) Corp.*, No. 18-462 (MN), 2020 WL 1443215, at *12 (D. Del. Mar. 24, 2020).

### <u>Counsel's Duties and Obligations in *Ex Parte* Proceedings</u>

"An attorney has a duty of candor at all times . . . and a heightened duty to disclose all material facts in an *ex parte* proceeding." *In re WinNet R CJSC*, No. 16mc484(DLC), 2017 WL 2728436, at *2 (S.D.N.Y. June 23, 2017); *see also Wharton v. Vaughn*, No. 01-cv-6049, 2022 WL 1488038, at *17 (M.D. Pa. May 11, 2022) (holding that the duty "is further heightened where the proceeding lacks the balance of presentation by opposing advocates.") (internal citation omitted).

"[A]n *ex parte* TRO is a profound and extraordinary invocation of the power of the federal judiciary. And it affects citizens in a direct way without any notice or opportunity to be heard." *SEC v. Digital Licensing Inc.* ("*DEBT Box*"), 2:23-cv-00482-RJS-DBP, 2024 WL 1157832, at *4 (D. Utah Mar. 18, 2024). Indeed, the court in *DEBT Box* reasoned:

> [The *ex parte* nature of the case] underscores the extraordinary nature of the relief the [agency] obtained here and the grave harm suffered when a party abuses the judicial process to obtain that relief. Before a

> party has an opportunity to respond to the allegations against it, long before the truth of those allegations is determined, the court grants a TRO, freezes assets, and appoints a receiver to seize control of entire companies—all without notice to the affected party. Given the profoundly significant consequences of this relief, the court must trust counsel take their duties to the court seriously.

*Id.* at \*21. Thus, the *DEBT Box* court stated in unequivocal terms: "[W]hen an attorney makes a false statement of material fact to a court, the lawyer is required to correct it." *Id.* at \*22.

Similarly, the New Jersey Rules of Professional Conduct require that, "[i]n an *ex parte* proceeding, a lawyer shall inform the tribunal of all relevant facts known to the lawyer that should be disclosed to permit the tribunal to make an informed decision, whether or not the facts are adverse." N.J. Rules of Professional Conduct R. 3.3(d). In addition, Rule 3.3(a) requires that a lawyer "shall not knowingly" (1) "make a false statement of material fact . . . to a tribunal," (2) "offer evidence that the lawyer knows to be false," or (3) "fail to disclose to the tribunal a material fact knowing that the omission is reasonably certain to mislead the tribunal." N.J. Rules Professional Conduct R. 3.3(a)(1), (4), and (5).

Briefing from both parties discuss a recent case entitled *SEC v. Digital Licensing Inc.* ("DEBT Box"), 2:23-cv-00482-RJS-DBP, 2024 WL 1157832, at \*4 (D. Utah Mar. 18, 2024). The facts and holding of that case are as follows. On July 26, 2023, SEC sought a Temporary Restraining Order ("TRO"), asset freeze, and Temporary Receivership (collectively, "Temporary Relief") to be ordered *ex parte* against several Defendants involved in the cryptocurrency business. At the hearing, SEC made many representations that they were in possession of several pieces of direct evidence that show that Defendants were actively and intentionally transferring millions of dollars of assets outside of the United States for the express purpose of evading SEC jurisdiction. SEC also claimed to have direct evidence that showed Defendants were attempting to block SEC investigators from viewing their social media accounts. SEC argued that the Temporary Relief was

required to prevent the irreparable harm of Defendants transferring all funds outside of SEC jurisdiction. The District Court granted SEC's motion for Temporary Relief.

Defendants later moved to dissolve the Temporary Relief. At the hearing on Defendants' Motion to Dissolve, the Court became aware that many of SEC's representations were false, including:

(1) SEC claimed that Defendants closed over 33 U.S. bank accounts in the preceding months, and multiple accounts within the 48 hours before requesting the Temporary Relief, and that these closures were evidence of Defendants' intent to transfer all funds overseas to escape SEC investigation. In reality, only 24 accounts were closed out, and half of the closings were initiated by the banks themselves, rather than Defendants. Further, no accounts were closed within the 48 hours window SEC initially represented. In fact, no closings occurred in the entire month preceding the request for Temporary Relief.

(2) SEC represented that one Defendant made a YouTube video that indicated Defendants were in the process of moving assets to foreign nations in order to evade SEC jurisdiction. In reality, Defendant was featured in a YouTube video where he explained that he had *already* transferred all of his company's operation to the United Arab Emirates because that country presented a "clearer regulatory framework than the United States." SEC omitted the fact that Defendant's comments in the YouTube video only discuss what actions he had taken previously. SEC further mischaracterized Defendant's comments in the YouTube video to represent that Defendants were actively moving assets overseas for the express purpose of evading SEC jurisdiction; rather than because Defendant believed the UAE presented a clearer regulatory framework.

(3) SEC represented that a particular transfer between two Defendants for $35,000, with the memo line "Set up office in UAE", was indicative of transferring funds to overseas accounts.  In reality, there was no evidence that the transfer was sent to an overseas account. Additionally, the transfer occurred nearly six weeks before the Temporary Relief was requested, which further weakened SEC's ability to show that Defendants were actively transferring funds to overseas accounts to evade SEC jurisdiction.

(4) SEC represented that they were in possession of direct evidence that Defendants took measures to block or prevent SEC attorneys from viewing their YouTube content. In reality, SEC inferred this from their own difficulties in accessing the YouTube content. SEC had no evidence that Defendants took such steps, and in fact, Defendants never took such steps.

Defendants pointed out the material falsity of each of these representations to SEC. Nonetheless, SEC doubled down on the veracity of each of their claims, and refused to recant any of their representations. The Court entered an Order to Show Cause ordering SEC to address why it shouldn't be sanctioned for these multiple misrepresentations. SEC defended their misrepresentations by arguing that their attorneys weren't aware of how material these misrepresentations were at the time they were made. SEC also argued that they felt that correction was not required as other pieces of evidence in support of Temporary Relief were strong enough to warrant it being granted.

The Court found both of these arguments to be unpersuasive and concluded that SEC had violated Rule 11, made these misrepresentations in bad faith, and intentionally abused judicial process to secure a TRO against Defendants. The Court also stated that the Temporary Relief would have never been granted but for SEC's misrepresentations. Therefore, as a sanction, the

Court ordered SEC to compensate Defendants for all attorney's fees and other costs associated with the imposition of the Temporary Relief.

## VI.    <u>ANALYSIS</u>

This matter comes before the Special Master by way of Defendants' Motion for Sanctions against the CFTC for, among other things, the CFTC's conduct relating to its false representations regarding the $31.5 million CAD transfers.[2] (ECF No. 172.)  Defendants have moved for sanctions under (a) Rule 11(c) of the Federal Rules of Civil Procedure, (b) the Court's inherent authority, and (c) the rules of professional conduct.[3]

There is no dispute that, at a minimum, the CFTC acted negligently in making false representations to the Court regarding the nature of the $31.5 million CAD transfers, and failing to correct those misrepresentations.  Indeed, the CFTC conceded during the evidentiary hearing that its conduct was negligent. (Tr. at 72:8-11). For his part, Attorney 1    agreed that his conduct was "careless and sloppy." (*Id.* at 88:5-7).

However, based on the record developed at the evidentiary hearing, the Special Master finds that the CFTC in fact acted willfully and in bad faith on several occasions and, therefore, holds and recommends  that sanctions are warranted under both Rule 11 and the Court's inherent authority. The CFTC had ample time and resources to acquire all the necessary facts in order to present a

---

[2] Defendants raised Attorney 1's    deposition conduct in their Motion for Sanctions, but the majority of Defendants' motion and the evidentiary hearing focused on conduct relating to the CAD $31.55 million transfers. Therefore, this Report and Recommendation addresses only conduct relating to the $31.5 million CAD transfers.

[3] Defendants also raised Rule 30(d)(2) as a basis to impose sanctions for the CFTC's conduct during the course of certain deposition testimony. ECF No. 172 at 15. Again, however, because the testimony and evidence at the evidentiary hearing primarily focused on conduct relating to the CAD $31.55 million transfers, this Report and Recommendation addresses only conduct relating to the $31.5 million CAD transfers.

comprehensive, accurate, and ultimately truthful set of facts to the Court, but failed to do so. At multiple points in time, the CFTC also had the opportunity correct the false statements and impressions that had been made, yet it chose to go a different route in violation of its duty of candor to the Court. The effect of the CFTC's conduct in this case resulted in it gaining a tactical advantage in the litigation by restraining all, or substantially all, of Defendants' assets and placing Defendant companies into receivership, and likely affected the outcome of the SRO/PI Motion and the PI Hearing. The improper conduct at issue has also triggered approximately one year in litigation and associated expenses. The Special Master finds that specific deterrence is necessary to impress upon the CFTC the significance of its improper conduct and to deter future instances of misconduct.

Specifically, the Special Master finds that the CFTC's conduct, as set forth below, was (a) intentional and self-serving and, therefore, meets the standard for "willfulness" under Rule 11, *Agabiti*, 2015 WL 7313862 at *4, and (b) involved both intentional and reckless conduct undertaken for an improper purpose and, therefore, meets the standard for "bad faith" under both Rule 11 and the Court's inherent authority to impose sanctions. Fed. R. Civ. P. 11(b)(1), (3); *Fink*, 239 F.3d at 994. The Special Master also finds that the CFTC's conduct, as set forth below, violated (a) its general duty of candor to the Court, *In re WinNet R CJSC*, 2017 WL 2728436 at *2, (b) the heightened duty of candor that applies in *ex parte* proceedings, *Id.*, and (c) attendant obligations under the applicable rules of professional conduct. N.J. Rules Prof'l Conduct R. 3.3(a), (d).

CFTC argues that the Motion for Sanctions should be denied because Defendants did not comply with the "safe harbor" provision in Rule 11. The "safe harbor" provision requires a moving party to first serve its motion, but not to file it if "the challenged paper, claim, defense, contention

or denial is withdrawn or **appropriately corrected** within 21 days after service." Fed. R. Civ. P. 11(c)(2) (emphasis added). CFTC argues that because Defendants served their motion on February 15, 2024, and CFTC filed a corrected Investigator 1 Declaration on March 7 (the *very last day* of the 21-day safe harbor period), the Motion should be denied. The Special Master disagrees. As Defendants persuasively argue, the CFTC's eleventh-hour filing of a corrected Declaration[4] does not cure the prejudice to Defendants or negate the CFTC's violation of its duty to the Court. It cannot be the case that a federal enforcement agency can knowingly include a misrepresentation in an application for an ex parte SRO that freezes all of a defendant's assets, rely on the misrepresentation for months, fail to correct or even acknowledge the misrepresentation when it is flagged by the defendant, sponsor false testimony as to when the agency learned of the misrepresentation, and then avoid sanctions merely because the agency belatedly files a corrected declaration. Rule 11(c)(2) requires that sanctionable conduct be "appropriately corrected" to forestall the filing of a Rule 11 motion. The Special Master finds that the CFTC's conduct in this case was not "appropriately corrected" by the filing of the corrected Investigator 1 Declaration.

1.    The SRO Application and the Investigator 1 Declaration

The CFTC relied extensively on Investigator 1's sworn declaration, see ECF Nos. 7, 14, 23, which expressly stated that $31.5 million CAD was transferred "to an unidentified Kazmi account." (ECF 23-44 at ¶ 29). This representation was false and lacked any evidentiary basis. The transfers at issue were, in fact, made to the Canada Revenue Agency. (See, e.g., ECF No. 148-1).

The SRO/PI Motion argued for an asset freeze, at least in part, based on the likelihood that Kazmi may transfer or dissipate assets. "In the absence of an asset freeze, Kazmi may—and is

---

[4] CFTC did not correct its September 22, 2023 opposition brief that cites the false portion of the Investigator 1 Declaration.

31

likely to—transfer or dissipate assets held in the US . . . . Kazmi can easily transfer those assets to Canada, beyond the immediate reach of the Court." (ECF No. 14 at 46.) Although the CFTC did not explicitly cite the $31.5 million CAD transfers in the SRO/PI Motion, Attorney 1 agreed during the evidentiary hearing that "the Court in granting the SRO reviewed, considered, and relied on the Investigator 1 declaration . . . [i]ncluding the false information about the tax payments." (Tr. at 175:13-19). That concession refutes any argument by the CFTC that the misrepresentation was immaterial.

During the same time period, CFTC was in communications with the OSC, and was told on more than one occasion about the true nature of the CAD transfers at issue. At a minimum, even before the August 17, 2023 email, which confirmed that these transfers were tax payments, there was information from which an investigation should have been made and steps should have been taken to ensure the accuracy of the information. (*See* June 16, 2023 email from OSC staff at OSC OSC Communication (Ex. D-6 at 1)). A failure to conduct follow-up on this point is inconsistent with a reasonable inquiry under the circumstances, as required by Rule 11. In addition, a basic investigation of the prefixes used on the wire transfers at issue ("TXINS 30301010 BUS/ENT" and "TXBAL 3028610 BUS/ENT") would have revealed that they refer to corporate tax payments to the Canada Revenue Agency.

The August 17, 2023 email – from the same OSC forensic accountant who initially flagged that the $31.5 million CAD transfers OSC Communication — stated, unequivocally, that:

> "[W]e finally have an answer to the destination of the wires in the amounts of CAD 27m and CAD 4.5m from the BMO TGG CAD account ****-995. CAD 27m was paid to [the] Canada Revenue Agency (CRA), which is our equivalent of the IRS, for corporation tax due. CAD 4.5m was paid to [the] CRA for an instalment

> payment for the next year's taxes. This should help both of us account for a significant amount of funds."

(Ex. D-15).

Although Attorney 1 claimed that he did not recall viewing the email at the time it was received, there is no dispute both he and Investigator 1 received it. The fact that neither of them recall viewing the email at that point in time, or had forgotten they had received it, does not obviate the fact that CFTC had this information before it filed its Complaint and the Investigator 1 Declaration – information that directly and expressly refuted the representation contained in the Declaration filed with the Court. This demonstrates that the CFTC acted willfully when it incorrectly and inaccurately represented to the Court that the $31.5 million CAD transfers were to "an unidentified Kazmi account." The CFTC had no basis for that assertion and, in fact, it was false. The facts demonstrate that the CFTC knew, or willfully disregarded, the truth that the transfers at issue were corporate tax payments.

2.    Failure to Correct the Investigator 1 Declaration prior to the November 6th PI Hearing

The Special Master finds that the CFTC also acted willfully and in bad faith when it failed to correct the Investigator 1 Declaration prior to the PI Hearing on November 6, 2023.

First, the OSC expressly placed the CFTC on notice of its misstatements on numerous occasions soon after the SRO/PI Motion and Investigator 1 Declaration were filed. Nevertheless, the CFTC repeatedly failed to correct the record. Specifically, on August 31, 2023, Attorney 1 circulated to CFTC staff a redline comparing the filed Investigator 1 Declaration (filed in U.S. District Court for the District of New Jersey in this case) against a draft declaration for Investigator 1 prepared by the OSC for purposes of anticipated proceedings in Canada. (Ex. D-43 at 1). This redline comparison revealed that the OSC had deleted Investigator 1's banking analysis, including the (false) representation regarding the nature of the $31.5 million CAD transfers. (Ex. D-43-A at

10-13).  However, there is no evidence that the CFTC made any attempt whatsoever to understand why the banking analysis (and with it, the false representation that is the subject of Defendants' sanction motion) was removed by the OSC. This fact is consistent with bad faith and willful conduct.

Moreover, on September 5, 2023, the OSC filed its own sworn affidavit in connection with Canadian proceedings, which stated that the Canadian transfers at issue "appear to be for corporation tax installments." (Ex. D-19 at 3). The evidence shows that the CFTC received a copy of the application on September 7, 2023, but that (a) Investigator 1 failed to download the document until September 20, 2023 and (b) Attorney 1 never downloaded the document. (Tr. at 199:17-200:1). It is inexplicable that the CFTC made no effort to compare and analyze the information contained in the OSC staff affidavit, notwithstanding the fact that her affidavit was filed within one month of the Investigator 1 Declaration and concerned the very same subject.

More problematically, even after Defendants expressly alerted the CFTC to the fact that the $31.5 million CAD transfers were Canadian corporate tax payments, the CFTC did not acknowledge its error or correct the record. Specifically, on September 19, 2023, Defendants filed an Emergency Motion to Modify the SRO. (ECF No. 42). In its September 22, 2023 opposition brief, the CFTC specifically cited the false statement in Paragraph 29 of the Investigator 1 Declaration regarding the $31.5 million CAD "Transfer to an unidentified Kazmi account," stating:

> The evidence also shows substantial transfers from Traders Global's corporate accounts to Defendant Kazmi. (*Id*. ¶ 29.) For example, between December 2022 and April 2023, $31.55 million was transferred from one of Traders Global's corporate accounts in Canada to another account in Defendant Kazmi's name. *Id*. ¶ 29.

(ECF No. 72 at 12). Attorney 1    acknowledged that he included this argument in the CFTC's opposition because he "hoped it would influence the judge's decision on the motion to modify." (Tr. at 204:21-24).

On September 26, 2023, Defendants filed their reply, emphasizing the error:

> Most egregiously, the CFTC asserts, relying on a declaration from its own investigator, Investigator 1    that $31,550,000 CAD was transferred to an "unidentified Kazmi account" sometime between December 2022 and April 2023. As the CFTC should have known, this is demonstrably false. Defendants' bank records clearly show that two pre-authorized payments of $4,500,000 CAD and $27,000,000 CAD during the period were made with reference to "TXINS" and "TXBAL," respectively—common bank codes used to designate tax payments to the Canadian government. A simple Google search would have revealed this. To repeat: the CFTC misrepresented that Traders Global transferred $31.55 million CAD to Mr. Kazmi, when in reality Traders Global transferred that money to the Canadian tax authorities. This is just one example (albeit, a critical one) of a factual misrepresentation that the CFTC submitted to the Court when requesting its all-encompassing SRO on an ex parte basis.

(ECF No. 73 at 9) (internal citations omitted) (emphasis in original).

CFTC has conceded that, at the very latest, it knew at this point in time that the $31.5 million CAD transfers were tax payments and, as a result, the Investigator 1 Declaration was incorrect. (Tr. at 249:14-17). Investigator 1    testified that he flagged the "mistake in [his] declaration" for Attorney 1    (*id.* at 448:20), but Attorney 1    told him "that the Court was . . . informed via the defendants' filing of the nature of those transfers" and "that we didn't need to do anything further at the time." (*Id.* at 449:5-6). At no point before the PI Hearing, however, did the CFTC alert the Court or Defendants to the material error in the Investigator 1 Declaration and the CFTC's Opposition to Defendants' Motion to Modify. The CFTC's failure to alert the Court to these errors constitutes another instance of willful bad faith by the CFTC.

35

The CFTC knew full well, since at least September 26, 2023 that the Investigator 1 Declaration and the CFTC's Opposition to Defendants' Motion to Modify were false.  Moreover, the CFTC was formulating a strategy to address the issue, should Investigator 1 be forced to testify.  Specifically, on October 4, 2023, Attorney 1 circulated a "mock cross outline" for Investigator 1's potential testimony which stated: "There are numerous ambiguous or wrong entries in the summaries," with a sub-point for the "¶ 29, 31.5M 'transfer to unidentified Kazmi account: 1. Where did you get this idea from that it is transfer to unidentified Kazmi account? 2. Do you agree that this is a tax payment? 3. How did you miss that? 4. Don't you think this impugns your credibility?" (Ex. D-24).

The decision not to correct the Investigator 1 Declaration is further confounded by CFTC's decision to correct a separate Declaration. Specifically, on October 31, 2023, Attorney 2 filed a corrective disclosure for Investigator 2 who she was expecting to examine at the PI Hearing. (ECF No. 112 at 1). This correction was appropriate and timely. But the corrected declaration— which only corrected a typographical error and added a missing exhibit—was not of the same order of magnitude as the CFTC's inaccurate representations in the Investigator 1 Declaration regarding the nature of the $31.5 million CAD transfers. The only reasonable inference from these facts is that the CFTC knew how to make a corrective disclosure and chose not to make a corrective disclosure with respect to the Investigator 1 Declaration because it might be harmful to the CFTC's ability to maintain the preliminary injunction and other relief.

3.  Testimony at November 6, 2023 PI Hearing

As set forth in detail above, while CFTC elicited testimony at the PI Hearing to acknowledge the false statement in paragraph 29 of the Investigator 1 Declaration, the testimony was not entirely truthful.  Moreover, the CFTC's lack of diligence and care in preparing for the hearing, notwithstanding its knowledge that inaccurate information had been previously conveyed to the Court,

36

thereby resulting in additional inaccurate testimony to the Court, is galling. Specifically, ██ Investigator 1 provided false testimony regarding when he learned of the true nature of the $31.5 million CAD transfers. Investigator 1 testified at the PI Hearing that he learned that the "transfers" were, in fact, tax payments *after* the SRO/PI Motion and his sworn Declaration were filed when, in truth, he learned, or should have learned, of this fact *before* those filings. (Tr. at 490:14-15; 533:13-18). Investigator 1's false sworn testimony at the PI Hearing was the result of an utter disregard by the CFTC to properly prepare for a hearing at which the CFTC sought extraordinary relief -- that is, the pre-trial restraint of all, or substantially all, of Defendants' assets. The CFTC already knew that the Investigator 1 Declaration and its Opposition to Defendants' Motion to Modify contained misrepresentations -- the failure to investigate *how* those misrepresentations were made, and to ensure truthful testimony at the PI Hearing, is impossible to square with good faith conduct.

    4.    <u>CFTC's Decision to disclose the August 17, 2023 email in a footnote</u>

The Special Master also finds that the CFTC acted willfully and in bad faith in connection with its December 1, 2023, Reply to Defendants' Response to Temporary Receiver's Motion for Fees and Expenses. Rather than deciding to finally and fully bring to the Court's attention the issues relating to the existence of the August 17, 203 email and Investigator 1's false testimony at the PI hearing as to *when* he learned of the error via a stand-alone letter to the Court, the CFTC chose to merely include this information in a footnote to a reply brief on a motion filed by the Temporary Receiver for fees. This conduct and communications implicate involvement of both the CFTC line attorneys and the highest levels of management in the CFTC's Division of Enforcement. Far more is expected from a federal enforcement agency when it makes a mistake of this magnitude. In this instance, the CFTC chose obfuscation over clarity and transparency by electing to disclose this material fact in a footnote on page 5 of a responsive filing.

In addition, the delay in investigating and then ultimately disclosing *when* the CFTC learned of the error in the Investigator 1 Declaration likely impacted the decision of the Court on the PI Motion. Attorney 1 undertook a review of his emails on November 16, 2023, only after the Court chastised the CFTC at the PI Hearing and in its November 14, 2023 Opinion and Order. (ECF Nos. 134, 135; *see* ECF No. 134 at 25 ("the CFTC's failure to disclose or to correct Investigator 1's error, and continued citation to the error even after realizing it was an error, is troubling at best.")). The failure to review emails or files before the Opinion and Order deprived the Court of critical information relating to the circumstances surrounding the $31.5 million CAD transfers, thereby causing the Court to make its ruling on an incomplete record. Given the Court's justifiable consternation with the CFTC, it is certainly possible, and more likely, that there could have been a different outcome if the Court had learned, during the PI Hearing or before finalizing its Opinion and Order, that the CFTC had known of its false representation *before* even the SRO/PI Motion and Investigator 1 Declaration were filed.

5.    CFTC's testimony at the Evidentiary Hearing regarding dissipation

During the evidentiary hearing and at closing, the CFTC argued that the errors did not have a material effect on this case or the Court's decision on the SRO or PI  because the CFTC did not rely on the $31.5 million CAD transfer as evidence of dissipation, since there was other evidence of dissipation. Specifically, Attorney 1 testified that "the $31.5 million tax payments were not evidence of dissipation, were not intended to be evidence of dissipation." (Tr. at 359:22-360:1). The testimony of Attorney 1 at the evidentiary hearing on this point was not credible and was controverted by other reliable evidence.

Attorney 1's own "draft letter to court re testimony," which he wrote and circulated internally within the CFTC on November 17, 2023, directly refutes his testimony at the evidentiary

hearing. This draft, which Attorney 1 intended to submit to the Court, states, "Counsel recognizes that it . . . mistakenly cited to the $31.55 million transfer in CFTC's September 22, 2023 opposition (ECF No. 72 at 9) to Defendants' September 19 emergency motion (ECF No. 42) to modify the asset freeze as being a fact indicative of dissipation." (Ex. P-9 at 2). Attorney 1's efforts during the evidentiary hearing to distance himself from his own draft letter were unconvincing.

Moreover, Attorney 1's testimony that the $31.5 million CAD transfers were not intended to be evidence of dissipation is contradicted by Investigator 1's testimony during the PI Hearing. Investigator 1 agreed that a purpose of including the summary tables in his declaration, including Paragraph 29, was to be "read as evidence of potential dissipation of assets." (PI Tr. at 50:13-17). Attorney 1's attempt to blunt this testimony was, again, unconvincing. Attorney 1 conceded during the evidentiary hearing that "a purpose" of the summary table in Paragraph 29 of the Investigator 1 Declaration was "to demonstrate dissipation, but that is not the purpose of this transfer to unidentified Kazmi account." (Tr. at 185:25-186:3). When asked "you are submitting a declaration in support of an SRO asset freeze and you're arguing as to dissipation of assets. Do you think it's reasonable to assume that a reviewing judge would know which line items they should look at for that and which ones they should ignore for that?" Attorney 1 answered "yes." (*Id.* at 191:7-14). The Special Master disagrees that this is a reasonable assumption. The erroneous entry reflecting $31.5 million CAD transfers to an "unidentified Kazmi account" clearly stands out in the table in Paragraph 29 of the Investigator 1 Declaration. Indeed, this entry it comprises 97% of debits from that account during the relevant period. If "a purpose of this table . . . [was to demonstrate dissipation," as Attorney 1 conceded in his testimony, (*id.* at 185:25-186:1), it is unreasonable to conclude that the line-item accounting for 97% of the debits in that table was not intended to be indicative of dissipation. For these reasons, the Special Master finds that ▮

Attorney 1 did not testify credibly that the false entry regarding the $31.5 million CAD transfers was not intended to be evidence of dissipation.

Conclusion

The CFTC, by virtue of its standing as a law enforcement arm of the United States government, is held to the highest standards, in particular when making an *ex parte* application to the Court.  The CFTC, as one of the primary prudential regulators in the United States, has an obligation to discharge all of its obligations -- statutory, regulatory, and ethical -- faithfully.  It also unquestionably has a duty of candor to the Court.  However, at almost every stage in this case, the CFTC failed in this regard.  In multiple instances, with full knowledge of the error in a sworn Declaration submitted to the Court, rather than be upfront, direct and transparent, the CFTC took deliberate steps down a path of obfuscation and avoidance.  In this case in particular, the need for specific deterrence is paramount and a significant sanction is warranted.

The CFTC's conduct, which was undertaken over the course of a year and involved numerous instances of sanctionable behavior, was willful and undertaken in bad faith.  It likely affected the Court's decision to order the SRO or, at the very least, maintain it, and it likely affected the Court's decision on the PI Motion, because the Court did not have the full, complete and truthful information before it.  The CFTC's conduct was undertaken for the purpose of gaining a tactical advantage, that is, restraining all or substantially all of Defendants' assets, and has caused significant expense and diversion of Court and party resources.  Without the imposition of sanctions, this conduct appears likely to repeat itself.

## VII.    RECOMMENDATION

For the reasons set forth above, the undersigned respectfully recommends that the Court

grant the Defendants' Motion for Sanctions and that the complaint be dismissed with prejudice. Furthermore, the Special Master recommends that Defendants be awarded reasonable attorneys' fees and costs associated with the prosecution of the Motion for Sanctions.

As the Court is also aware, also pending is Defendants' Motion to Dismiss (ECF No. 186). In light of the Special Master's recommendation regarding the Motion for Sanctions, the Motion to Dismiss would be mooted. Accordingly, the Special Master also recommends that the Motion to Dismiss be denied as moot.

Therefore,

IT IS on this 30th day of April 2025;

RECOMMENDED that the Defendants' Motion for Sanctions be granted and the complaint dismissed with prejudice; and it is also

RECOMMENDED that Defendants be awarded reasonable attorneys' fees and costs associated with the prosecution of the Motion for Sanctions; and it is also

RECOMMENDED that Defendants be ordered to submit an affidavit of fees/costs attributable to the prosecution of the Motion for Sanctions for review and determination by the Court; and it is also

RECOMMENDED that Defendants' Motion to Dismiss be denied as moot; and it is also

ORDERED that this Report and Recommendation be temporarily filed under seal and that the parties shall have 14 days to file an appropriate motion under Local Rule 5.3(c) to seal and/or redact any portions of this Report and Recommendation consistent with the requirements set forth under the Local Rules.

    _/s/ Jose L. Linares_____
    Hon. Jose L. Linares, U.S.D.J. (Ret.)